**2015-1580, –1606, –1607**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

———————————

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,

*Plaintiff-Cross-Appellant,*

and

ADVANCED BIONICS, LLC,

*Plaintiff-Cross-Appellant,*

v.

COCHLEAR CORPORATION, n/k/a Cochlear Americas,
and COCHLEAR LTD.,

*Defendants-Appellants.*

———————————

**Appeals from the United States District Court
for the Central District of California
in case no. 2:07-cv-08108,
Judge Fernando M. Olguin.**

———————————

## BRIEF FOR APPELLANTS COCHLEAR CORPORATION
## AND COCHLEAR LTD.

———————————

Bruce G. Chapman
SHEPPARD, MULLIN, RICHTER
 & HAMPTON LLP
333 South Hope Street
Los Angeles, California 90071
(213) 620-1780


July 21, 2015

J. Michael Jakes
Jason W. Melvin
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

*Attorneys for Defendants-Appellants
Cochlear Corporation and Cochlear Ltd.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4(a), counsel for Defendants-Appellants Cochlear Corporation and Cochlear Ltd. certify the following:

1.    The full name of every party or amicus represented by us is:

Cochlear Corporation, n/k/a Cochlear Americas, and Cochlear Ltd.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of any party represented by us are:

Cochlear Corporation, n/k/a Cochlear Americas, is a wholly owned subsidiary of Cochlear Ltd., an Australian company listed on the Australian Securities Exchange as COH

4.    The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

Bruce G. Chapman, Laura M. Burson, Scott R. Miller, Manuel C. Nelson, Dennis J. Smith
SHEPPARD MULLIN RICHTER & HAMPTON LLC

John L. Paik
CONNOLLY BOVE LODGE & HUTZ LLP

Keith Douglas Fraser
LAW OFFICES OF KEITH D. FRASER, PC

J. Michael Jakes, Jason W. Melvin
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

# TABLE OF CONTENTS

Table of Authorities ................................................................... iv

Statement of Related Cases ........................................................ vi

Statement of Jurisdiction ........................................................... 1

I.     Statement of the Issues ..................................................... 2

II.    Statement of the Case ....................................................... 3

     A.    Preliminary Statement .............................................. 3

     B.    Course of Proceedings and Disposition Below ........... 6

III.   Statement of Facts ............................................................ 7

     A.    The Technology at Issue and Parties ....................... 7

     B.    AMF's Patents ....................................................... 11

          1.    The specification ........................................... 12

          2.    Prosecution history of claim 10 of the '616
              patent .......................................................... 15

     C.    Claim Construction ................................................ 19

          1.    The special master's report and
              recommendations ......................................... 19

          2.    The district court's claim-construction order ................. 20

     D.    Cochlear's Accused Systems ................................... 21

     E.    Post-trial Proceedings ........................................... 27

IV.   Summary of the Argument ............................................... 31

V.    Argument ........................................................................ 34

     A.    Standard of Review ............................................... 34

B.    The District Court Erred in Denying JMOL of Noninfringement of Claim 10 .................................................. 35

    1.    The district court erred by not construing claim 10 to require the display of voltage ................................ 36

        a.    The plain meaning of claim 10 requires the display of voltage measurements .......................... 36

        b.    The "whereby" clause of claim 10 was material to patentability and confirms the claim requires the display of voltage .................... 38

    2.    Cochlear's accused systems do not literally infringe under either construction ................................. 43

    3.    As a matter of law, AMF cannot rely on the doctrine of equivalents ..................................... 46

C.    The District Court Incorrectly Construed a "Pair" of Electrodes, Which Refers to Two Intracochlear Electrodes Used for Bipolar Stimulation ................................ 53

VI.    Conclusion ....................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010)...............................................................42

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010)...............................................................44

*Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp.,
    Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)...............................................................55

*Bid for Position, LLC v. AOL, LLC*,
    601 F.3d 1311 (Fed. Cir. 2010)...............................................................42

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    480 F.3d 1335 (Fed. Cir. 2007)........................................................48, 51

*Desenberg v. Google, Inc.*,
    392 F. App'x 868 (Fed. Cir. 2010) ..........................................................40

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009)...............................................................42

*Felix v. Am. Honda Motor Co.*,
    562 F.3d 1167 (Fed. Cir. 2009)...............................................................51

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    344 F.3d 1359 (Fed. Cir. 2003) (en banc).............................34, 47, 51, 53

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002) ................................................................. 46, 47, 48

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010)...............................................................50

*Griffin v. Bertina*,
    285 F.3d 1029 (Fed. Cir. 2002)...............................................................40

*Hoffer v. Microsoft Corp.*,
  405 F.3d 1326 (Fed. Cir. 2005)......................................... 39, 41

*Hoganas AB v. Dresser Indus., Inc.*,
  9 F.3d 948 (Fed. Cir. 1993) ................................................ 14

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
  285 F.3d 1046 (Fed. Cir. 2002) (en banc)............................... 48

*Milcor Steel Co. v. George A. Fuller Co.*,
  316 U.S. 143 (1942) ........................................................... 37

*Pause Tech., LLC v. TiVo, Inc.*,
  419 F.3d 1326 (Fed. Cir. 2005)........................................... 49

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................... 55

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015) ......................................................... 34

*Toro Co. v. White Consol. Indus., Inc.*,
  383 F.3d 1326 (Fed. Cir. 2004)........................................... 34

## Statutes

28 U.S.C. §§ 1292(c)(2) ........................................................... 1

28 U.S.C. § 1338(a).................................................................. 1

35 U.S.C. § 112 ................................................................. 47, 51

## Rules

Fed. R. App. P. 4(a) ................................................................. 1

Fed. R. Civ. P. 54(b) ................................................................ 1

## STATEMENT OF RELATED CASES

This case was the subject of an earlier appeal to this Court, *Alfred E. Mann Found. for Scientific Res. v. Cochlear Corp.*, 604 F.3d 1354 (Fed. Cir. 2010), which was heard by a panel of Chief Judge Michel, Judge Newman, and Judge Dyk, and decided May 14, 2010.

Counsel knows of no other case that may be directly affected by this Court's decision.

## STATEMENT OF JURISDICTION

The U.S. District Court for the Central District of California (Judge Fernando M. Olguin) had jurisdiction over the underlying patent-infringement action pursuant to 28 U.S.C. § 1338(a).

The U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1292(c)(2). On March 31, 2015, the district court entered its Findings of Fact and Conclusions of Law following a bench trial (A25-56), and also entered an Order partially granting and partially denying the relief requested in post-trial motions (A7-24). The court entered a final Judgment on liability under 28 U.S.C. § 1292(c)(2) and Fed. R. Civ. P. 54(b) on April 20, 2015 (A1-3; A4-6), and Defendants-Appellants Cochlear Corporation and Cochlear Ltd. (collectively Cochlear) timely filed their notice of appeal on April 20, 2015, in accordance with Fed. R. App. P. 4(a).

## I.    Statement of the Issues

1.    Whether the district court erred in:

(a) construing claim 10 of U.S. Patent No. 5,609,616 ('616 patent) as not requiring the display of voltage measurements when the claim specifically requires measuring "voltage" and "displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known"; and

(b) denying JMOL of noninfringement of claim 10 because Cochlear's accused systems display calculated impedances, not measured voltages.

2.    Whether the district court erred in denying JMOL of noninfringement of claim 10 of the '616 patent even under Alfred E. Mann Foundation for Scientific Research's (AMF's) construction where AMF failed to present evidence that users of the accused systems would know the stimulation current, a quantity users must know to convert displayed impedances to measured voltages.

3.    Whether the district court erred in allowing the verdict of infringement of claim 10 of the '616 patent to stand based on the doctrine

of equivalents because AMF should have been barred by prosecution-history estoppel from relying on the doctrine.

    4.    Whether the district court incorrectly construed "*at least one pair of the multiplicity of* tissue stimulating electrodes" in claim 10 of the '616 patent as not limited to electrodes within a patient's cochlea given that the specification uses this term of art to refer to such electrodes.

## II.    Statement of the Case

### A.    Preliminary Statement

The district court correctly held three of AMF's four asserted claims invalid because the specification of the two asserted patents do not describe any algorithm that would be used on the microprocessor serving as structure corresponding to the means-plus-function limitations. As to the remaining claim, claim 10 of the '616 patent, the court ignored its plain meaning and failed to recognize the significance of amendments AMF made to secure the claim during prosecution. As a result, the court construed and applied the claim with excess scope, allowing the jury's unreasonable infringement finding to stand.

This case involves cochlear implants, used to restore sound perception to deaf patients or those with severe hearing impairments. Cochlear has long led the market in cochlear implants. AMF has licensed

3

its patents to Advanced Bionics, one of Cochlear's primary competitors and also a party to this case. Although the plain meaning of the claims at issue in these patents relate to certain narrow aspects of a cochlear-implant system, AMF has asserted them more broadly in an attempt to profit from Cochlear's success.

AMF had to narrow claim 10 considerably to overcome rejections during prosecution. In particular, it limited the claim to embodiments supporting bipolar stimulation, which uses a pair of electrodes within the cochlea, in contrast to circumstances where one electrode is within the cochlea and one is outside. AMF also limited claim 10 to measuring voltage between electrodes rather than measuring voltage or current, and it restricted how that measurement is used. Claim 10 recites processing the measurement, but that processed signal must convey information that includes the results of the measurements. And the processed signal must be displayed. Thus, claim 10 requires displaying the voltage measurements.

Because Cochlear's systems do not display the voltage measurements, AMF asserted its claim more broadly. It asserted that, by calculating the electrode impedance from the voltage measurement and displaying the calculation results, Cochlear's accused systems satisfy the

claim requirement to make the measurement known. But, consistent with Ohm's law, AMF's expert agreed that a person looking at impedance values could not know the voltage without knowledge of the stimulation current. This admission confirms that Cochlear's systems do not make known the voltage as required in claim 10 because the users of Cochlear's systems do not know the stimulation current. In fact, AMF's only evidence of the stimulation-current level comes from a confidential Cochlear design document not known to someone using the system.

At trial, AMF tried to use the doctrine of equivalents to escape the claim requirement of displaying voltage measurements. But precisely because AMF added that requirement during prosecution, prosecution-history estoppel bars reliance on the doctrine of equivalents. Although AMF argued for other distinctions over the prior art, those distinctions do not hold up in light of the prior art and cannot permit AMF to fall within the "tangential" exception to prosecution-history estoppel. Applying that exception here, as the district court did, would permit the exception to swallow the entire rule of estoppel.

The amendment requiring the display of voltage measurements does not stand alone in undermining AMF's infringement case. Wholly separate is AMF's amendment that limited claim 10 to a "pair" of electrodes, which

the specification defines as electrodes used for bipolar simulation, also known as intracochlear electrodes. At trial, AMF asserted the claim against unipolar stimulation, which uses one electrode within the cochlea and one outside the cochlea, because Cochlear's systems are usually not programmed for bipolar stimulation. Thus, at a minimum, this case requires a remand under the proper claim construction.

### B.    Course of Proceedings and Disposition Below

AMF brought suit, alleging that Cochlear infringed two related patents owned by AMF, the '616 patent and U.S. Patent No. 5,938,691 ('691 patent). At trial, AMF asserted claims 1 and 10 of the '616 patent and claims 6 and 7 of the '691 patent. The jury found that Cochlear infringed directly and contributorily but did not induce infringement, that the infringement was willful, that the asserted patents were not invalid, and awarded damages of $131,216,325. A59-70.

After the jury trial, the district court conducted a bench trial on equitable and certain legal issues. The court issued its Order on post-trial motions (A7-24) and its Findings of Fact and Conclusions of Law from the bench trial (A25-56). Among other things, the court held as a matter of law that claims 6 and 7 of the '691 patent and claim 1 of the '616 patent are invalid for indefiniteness, due to a lack of adequate corresponding

structure for means-plus-function limitations. A47-56[¶¶67-87]. It also held that prosecution-history estoppel did not preclude AMF's reliance on the doctrine of equivalents to prove that Cochlear infringed claim 10 of the '616 patent. A25-56[¶¶59-66].

The district court granted Cochlear's motions for JMOL and a new trial in part, holding that AMF failed to prove willful infringement and that a new trial on damages was necessary in light of the court's determination that three of the four claims are invalid. A7-24. It denied Cochlear's motion for JMOL of noninfringement of claim 10 of the '616 patent. *Id.* On April 20, 2015, the court issued a Judgment (A1-3) as well as an Order that the case was final except for a determination of damages (A4-6).

## III.    Statement of Facts

### A.    The Technology at Issue and Parties

The patents at issue relate to certain aspects of cochlear implants, which are devices that restore a level of auditory sensation to those who are deaf or suffer a severe hearing impairment. Cochlear implants use a microphone to capture sound, a processor to convert that sound into appropriate stimulation pulses, and then electrodes to apply the stimulation to the nerves of a patient's cochlea (the organ that converts

sound waves into nerve impulses). Thus, the patient can perceive sounds even when the so-called "hair cells" within the cochlea are faulty and unable to convert acoustic energy to nerve stimulation.

Cochlear implants include a portion implanted in the patient's body that has electrodes placed in the cochlea and circuitry to drive the electrodes. The patents at issue here refer to this as the implantable cochlear stimulator (ICS). Outside the skin, worn on a patient's ear, is a processor with the microphone and other circuitry, which the patents refer to as the wearable signal processor (WP). The WP communicates with the ICS using wireless signals.

The development of cochlear implants began in 1961, although the first experiments were unsuccessful, and continued over the next decade. A1265[5-22]. Success came in 1971 with a device that stimulated the cochlea using a single electrode. A1265[23]-1266[6]. To provide increased fidelity in a patient's perception of sounds, "multichannel" implants now use multiple electrodes. A1266[11]-1267[10].

The first modern multichannel cochlear implant was developed in the 1970s under the guidance of Professor Graeme Clark at the University of Melbourne. A1759[17]-1760[13]. That device was successfully implanted in a patient in 1978. A1766[1]-1767[12]. Cochlear—with a license to the

University of Melbourne technology—was formed in the early 1980s to translate Professor Clark's research into a product that could be used in the clinic. A1767[13]-1768[15]. Cochlear and the University of Melbourne then further collaborated, developing a commercial multichannel cochlear implant that was approved by the FDA in 1985. A1768[16]-1770[8].

As part of its collaboration with the University of Melbourne, Cochlear began working with a university researcher named Hugh McDermott, who was developing a cochlear implant that had both more sophisticated stimulation and telemetry. A1770[13]-1772[22]. As part of that work, Cochlear packaged McDermott's chip so that he could test it in human subjects. A1772[1-6]. By 1984, McDermott had published the first of several articles describing this new cochlear implant, including a "simple telemetry system [that] permits electrode voltages to be monitored externally." A15011-12; A1773[2]-1780[1]. McDermott's 1989 article recognized that Cochlear had constructed the device for him. A14482.

The '616 patent was allowed, according to the patent examiner, because "the prior art of record . . . [did] not show or suggest the measuring of the electrode voltage for external display." A15850. The ability to send information from the ICS to the WP, referred to as telemetry or back telemetry, is thus central to the disputes in this appeal.

Telemetry enables one to monitor and display the status of various aspects of the implant, one example of which is monitoring electrode voltage (known as voltage telemetry) as described by McDermott and claimed in the '616 patent. With voltage telemetry, once the electrodes have been implanted by a surgeon, they may be tested to verify that they are correctly placed and will operate as intended. To facilitate this, manufacturers of cochlear implants also provide some form of a device to communicate with the implanted portion of the device and permit a physician or technician to measure and adjust various parameters of the implanted portion. The patents refer to a device with this capability as a "physician's tester." *E.g.*, A801[Abstract]; A833-34[32:32-33:54]. As counsel for AMF explained at the claim-construction hearing, the physician's tester has many purposes and is "used for a multitude of reasons by the physician," including measuring voltage. A3131[8-13]; *see also* A3130[11]-3132[2].

Alfred Mann formed AMF in 1985 to work on cochlear-implant technology. A1177[23]-1178[10]. He then started Advanced Bionics in 1993 to develop a commercial product. A1183[13-21]. AMF licensed its patents to Advanced Bionics, which is one of Cochlear's competitors in the market

for cochlear implants. *See* A1693[2-7]. Described in more detail below, the patents relate to the use of voltage telemetry for diagnostics and control.

The sole claim at issue in Cochlear's appeal is claim 10 of the '616 patent, which relates to certain functionality of the physician's tester—the ability to apply stimulation to a pair of implanted electrodes and measure the voltage between the electrodes during that stimulation, then report the measurement for display.

### B.   AMF's Patents

The two patents in this case come from the same family, where the chain resulting in the '691 patent arose from a continuation-in-part of the parent application to the '616 patent. A801; A836. In substantive aspects, the two patents share a specification. AMF's patents describe several aspects of a cochlear implant and depict an implant system having both an implanted portion (or ICS 12) and a physician's tester for interacting with the implant:



*FIG. 7*

A817. As shown in Fig. 7, the physician's tester can stand in place of the wearable processor (WP), which the patient would wear during normal operation to send audio data into the implant. A833[32:47-59]. The physician's tester permits monitoring feedback from and providing commands to the ICS. A833-34[32:60-33:6].

### 1.    The specification

The specification describes a physician's tester that may be used to configure and test an implant and wearable processor. A833-34[32:32-33:54]. As explained, "[t]he present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS." A833[32:42-46]. Status-indicating signals may represent a number of different

parameters within the implant, including various voltages. A820[5:24-47]; *see also* A821[8:43-46]; A822[10:55-57]. Whereas the specification depicts a "control knob 308" on the physician's tester that allows the physician to choose among configurations for measuring and displaying (1) impedance, (2) voltage, or (3) output current (A834[33:25-54 (Table 7)]), as discussed below, the applicants narrowed the claims to one of the depicted configurations during prosecution.

The implantable cochlear stimulator (or ICS) 12 includes "a plurality of capacitor coupled electrodes in an intra-cochlear electrode 48" implanted within the cochlea. A820[5:22-23]. In addition, an indifferent electrode 49 is located outside the cochlea. A820[6:4-6]. The specification discloses that the ICS can stimulate these electrodes in a unipolar, bipolar, or multipolar configuration. A822[9:57-67]; A832[29:61-30:6]. In bipolar mode, the stimulation source is "connected to pairs of electrodes" in the intracochlear electrode; in unipolar mode, the stimulation source is connected "to individual [intracochlear] electrodes and the indifferent electrode 49"; and in multipolar mode, the stimulation source is connected to "any pair of electrodes in the [intracochlear] electrode array." A822[9:57-67]; A832[29:25-42, 29:61-30:6].

The specification consistently uses the phrase "pair of electrodes" to refer to electrodes in the cochlea (i.e., bipolar electrodes) as opposed to the indifferent electrode (i.e., unipolar electrode). In describing the prior art, for example, the specification refers to "electrode pairs" in an intracochlear electrode (A818[1:21-30, 1:37-39]), distinguishes between "each electrode" and "each *bipolar pair* of electrodes" (A818[2:19-20] (emphasis added)), and refers to "electrode pairs for each channel" in an intracochlear electrode (A818[2:7-8]). Likewise, the prior-art patents described in the specification use the term "pair of electrodes" to refer to electrodes paired across from one another in an intracochlear electrode array, suggesting that "pair of electrodes" is a term of art for such intracochlear electrodes. A19006[1:25-29].[1] Moreover, the specification expressly defines "pairs of electrodes" as "bipolar mode," stating: "The switches allow the current source FET 62 and storage capacitors 60 to be connected to *pairs of electrodes (bipolar mode)* or, alternatively, to individual electrodes and the

---

[1] U.S. Patent No. 4,400,590 to Michelson was not used as an exhibit in the district court, but it is cited and discussed in the '616 patent. *See* A818[21-49]. The Court may take judicial notice of such official papers. *See Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 n.27 (Fed. Cir. 1993) (taking judicial notice of a patent listed as art of record in the patent-in-suit because, "[a]lthough that patent is not part of the record on appeal, it was referred to at the argument, and is publicly accessible. Accordingly, we have taken judicial notice of it.").

indifferent electrode 49 via the indifferent electrode switches 92." A822[9:63-67] (emphasis added). In contrast, not once does the patent refer to a combination of the indifferent electrode and one of the electrodes in the cochlea as being a "pair of electrodes."

### 2. Prosecution history of claim 10 of the '616 patent

Application claim 12 (which ultimately issued as patent claim 10 of the '616 patent) initially recited a method of testing a cochlear implant, including selectively monitoring an electrode to measure voltages/currents associated with stimulation signals; generating status-indicating signals representative of the measurements; transmitting the status indicating signals to an external receiver; and receiving and processing the status indicating signals. A15682; A29[¶14]. The patent examiner rejected the claim as indefinite for using "the alternative phrase 'voltages/current'" and for "the absence of a step utilizing the processed status indicating signal." A15745; A30[¶17]. The examiner also rejected the claim in view of prior art. A15746-47; A30-31[¶18].

In response, AMF narrowed what is now claim 10 to specifically require measurement of voltage instead of the alternatives of "voltages/current." A15834-35; A31-32[¶¶19-20]. It also added limitations

directed to use of the processed status-indicating signals. These limitations appear at the end of the claim and not only limit the "status-indicating signals" to "includ[e] the results of the measurements made within the implanted stimulator" but also require "displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known." A15835; A31-32[¶¶19-20]. In addition, AMF amended what is now claim 10 to require applying the stimulating signals to "at least one pair" of the tissue-stimulating electrodes. A15834; A31-32[¶¶19-20].

AMF also responded to the examiner's prior-art rejection, including the examiner's statement that the prior art taught measuring voltage and current, and circuits for calculating impedance from those measurements, in implanted stimulators. A15746-47; A30-31[¶18]. As the examiner put it, "such monitoring circuitry further including impedance calculation circuits, are well-known in the implantable stimulator art," citing Hafelfinger. A15746-47. The examiner's language paralleled the specification's disclosure that "both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP."

A833[31:54-58]. AMF argued that the claimed method differed from the prior art by *simultaneously* monitoring the pair of electrodes and applying stimulation to the electrodes. A15842-43; A32-33[¶23]. But the reference cited by the examiner, Hafelfinger, specifically teaches measuring "the load impedance presented by the lead/tissue interface *during a stimulation pulse*." A15800[4:10-12] (emphasis added); *see also* A15795-805. Although AMF has argued that the prior art teaches measurement only in a separate operation, not during a stimulation pulse (A15843-44; A36137-38), Hafelfinger teaches a "lead impedance analyzing circuit 40" that "measures impedance from the stimulation pulse and from sensed heart activity" (A15802[8:1-8]).

AMF also distinguished the prior art based on the way the measurements are used: "It is submitted that the infrequent downloading of previously-accumulated data, as taught by van Arragon, et al., and/or Hafelfinger, et al., does not provide the type of real-time feedback available through Applicants' invention." A15844; *see also* A15843-44; A33[¶24]. But van Arragon taught the capture of impedance data from a cardiac pacemaker display. A15806-21. In one embodiment, van Arragon taught the continuous capture of data for creating an evolving histogram. A15811[Fig.4]; A15817[7:39-46, 8:51-54]. When a pacemaker in van

Arragon is connected to a computer for display, two-way communications permit the operator to show "the current status of the histogram." A15819[12:5-8]. Accordingly, van Arragon taught real-time feedback: continuous capture and display.

In response to AMF's amendments and arguments, the examiner found the claim as amended allowable over the prior art "since the prior art does not show or suggest the measuring of the electrode voltage for external display."[2] A15850. Thus, claim 10 of the '616 patent issued as follows:

> ~~12~~ 10. A method of testing an implantable tissue stimulating system comprising:
>
> transmitting data-containing signals to an implanted stimulator from an external transmitter;
>
> selectively controlling the data-containing signals as they are thus transmitted;
>
> receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;
>
> processing the data-containing signals within the implanted stimulator to generate stimulation signals;

---

[2] During prosecution, the examiner did not have before him the articles by McDermott discussed above (*supra* at 6), which disclosed back telemetry that "permits electrode voltages to be monitored" (A15012).

applying the stimulation signals to <u>at least one pair of the multiplicity of</u> [~~a plurality of~~] tissue stimulating electrodes;

selectively monitoring <u>the</u> at least one <u>pair</u> of the <u>multiplicity of</u> electrodes to measure <u>a voltage associated therewith at the same time</u> [~~voltages/currents associated with~~] the stimulation signals <u>are</u> applied thereto;

generating stimulator status<u>-</u>indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status<u>-</u>indicating signals to <u>an external receiver coupled to</u> the external transmitter; [~~and~~]

receiving and processing the status<u>-</u>indicating signals [~~in the external transmitter~~] to produce processed status<u>-</u>indicating signals <u>which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and</u>

<u>displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known</u>.

A15834-35 (with markup as reflected in the file history, showing amendments from original application claim 12); A31-32[¶20]; *see also* A835.

## C.  Claim Construction

### 1.  The special master's report and recommendations

The district court appointed a special master to oversee claim construction. A25684. After considering the claim language and

prosecution history, the special master found that claim 10 of the '616 patent requires displaying the voltage measured between two electrodes. A598-99. He determined that the "whereby" clause had patentable weight and that the term "measurement" in claim 10 is "a voltage" and that the claim requires the display of voltage. A597-99. The special master thus recommended that the district court construe the claim such that the "results of the measurements" refers to the voltage measurement. A599.

The special master also construed the term "one pair of the multiplicity of tissue stimulating electrodes" in claim 10 of the '616 patent and recommended that the electrodes not be limited to those in the cochlea, reasoning that the specification gives an example where an output of the device "may be utilized to power other implanted devices." A516 (quoting A834[33:62-66]).

### 2.    The district court's claim-construction order

Following the special master's report and recommendations regarding claim construction, the district court considered the parties' objections and issued an order construing the claims. A399-424. AMF objected to the special master's construction of the "whereby" clause because AMF viewed that portion of the claim as nonlimiting. A26170-71. The court held that the "whereby" clause did not further limit the claim.

A400-01. It reasoned that the clause "provides no additional restrictions to the claim's *already-existing* requirement that the signals obtained by the testing of the implanted stimulator must be displayed for view by the physician." *Id.* (emphasis added).

Cochlear objected to the special master's construction of "one pair of the multiplicity of tissue stimulating electrodes." The district court declined to construe the term as limiting the claim to electrodes within the cochlea.[3] It reasoned that the construction should not read a disclosed embodiment—i.e., unipolar mode—out of the claims. A416-17.

### D.    Cochlear's Accused Systems

Cochlear's accused implant systems have several components: an implant (including an intracochlear electrode, indifferent electrode, and a package of electronics), a speech processor worn behind a patient's ear, and diagnostic software used to test the implant. A1444[21]-1445[5].

---

[3] The district court's opinion refers to only claims 1 and 12 (A416), but the special master, like the parties, also considered claim 10 as part of the same group (A512-13).



**Figure 2** Clinical system using a USB port.

A4899[Fig. 2].

After a physician implants the electrodes and implant in a patient, he can use the diagnostic software to send stimulation signals through the intracochlear electrode and indifferent electrode in unipolar mode (also referred to as monopolar mode in Cochlear's documents) and determine the impedance (resistance to electrical current). A1450[8]-1451[13]. Notably, the only evidence at trial involved using the accused systems in a unipolar mode. *See, e.g.*, A1459[3]-1460[2]. The implant measures the voltage across the two electrodes, and the speech processor produces signals representative of the voltage. A1585[9-13]. The system, however, does not display the voltage but instead uses it in combination with the stimulation current to calculate impedance for display. A1586[20]-1587[2]; A1890[25]-1891[9]; A1906[18]-1907[10].

Cochlear's system displays the results of the impedance testing by depicting each electrode in red or green, where an electrode displayed in red indicates that the electrode has a short-circuit or open-circuit condition. A5000; A4698. To view the impedance values for each electrode, an operator must request the optional "Measurement Details" window to view the values as tested by a number of different test conditions. A5001; A4699-701. In practice, when the screen of color-coded electrodes indicates that the electrodes are functioning correctly, the operator would not display the impedance values. A1436[7]-1437[13].

According to AMF's expert, Dr. Darrin Young, the voltage between two electrodes in an implant corresponds to the claimed "status-indicating signal." A1462[23]-1463[3]. Further, Dr. Young asserted that "processing the status-indicating signals to produce processed status-indicating signals . . . , including the measurements made within the implanted stimulator" includes "align[ing,] . . . filtering[,] . . . averaging, . . . and . . . reform[ing] the data put into a different format." A1464[23]-1465[5]. And he applied that definition to further assert that the processed status-indicating signal "can be the original voltage signal by itself or it could be impedance." A1465[6-14]. To support this view, he pointed to an illustration in the '616 patent that shows a physician's tester capable of

23

selecting impedance for display. A1465[16-23] (referring to Fig. 6 of the '616 patent, A816).

When Dr. Young testified that claim 10 of the '616 patent read on Cochlear's accused systems, he asserted that the "processing the status-indicating signals" limitation was met because the "microcontroller can process the data or put data into correct format and send to software in the computer for further signal processing." A1466[2-15]. He did not specifically address the claim language "including the measurements made within the implanted stimulator." And when Dr. Young asserted that the final claim limitation was met, he relied on the display of impedance information, not voltage measurements. A1466[18]-1467[18]. He opined that a "process[ed] status indicating signal" may be an impedance rather than a voltage, and relied on Fig. 6 of the patent, which indicates that the described physician's tester may show impedance. A1468[11-25]; A816[Fig. 6].

According to Dr. Young, an impedance value "could be a process[ed] value associated with [a] voltage measurement" because of the relationship between impedance and voltage—according to Ohm's law, the impedance between two points is equal to the voltage between those points divided by the current flowing between them. A1469[1-13]. In light of that

24

relationship, Dr. Young reasoned that "the results of a voltage measurement" are "made known" by displaying the impedance between two electrodes. A1469[14]-1472[1]. He relied on testimony by a Cochlear engineer, Tony Nygard, who stated that an audiologist or clinician could "see the data results from voltage telemetry" as a "calculation of electrode impedance." A1471[2-18]. Dr. Young testified as to the general relationship between impedance and voltage when assuming a constant current: "[I]f the impedance value is high, it tells you the voltage is high. If the impedance value is low, it tells you the voltage is low." A1470[16-22]; *see also* A2372[15]-2373[12] (stating that impedance results give qualitative information about the measured voltage).

But AMF did not rely on this qualitative relationship, recognizing its inadequacy for even the claim language that voltage is "made known" by impedance. Instead, AMF relied on the additional detail later provided by Dr. Young:

> The algorithm used to calculate impedance is a basic Ohm's law. If you know the voltage that measures across the pair of [electrodes] inside the cochlea[], and you also know the current that is used to stimulate a pair of [electrodes]. Once you have th[ose] two parameters, you . . . divide the voltage by the current and you get the impedance value.

A1533[21]-1534[1]. He asserted that an indication of impedance, as displayed by Cochlear's accused systems, conveys voltage if the current of

the system is known. A1586[25]-1587[17]. Significantly, Dr. Young agreed that, if one knows only the impedance but not the current, then "you just have to guess what the [voltage] is." A1587[18-22].

Thus, Dr. Young agreed that current must be known to the person viewing the impedance results for those results to provide information about voltage. He looked to a "Company Confidential" Cochlear document that "outlines the requirements for the implementation of impedance measurements" and "covers the design related to impedance measurements" within the accused systems. A2373[23]-2374[21] (citing A4685-96); A4688. Although Dr. Young characterized the document as a "manual" (A2374[21]), he offered no reasoning or evidence to support that characterization, and AMF offered no evidence that users of Cochlear's accused systems would have had access to the document or known the current level used during impedance testing.

Finally, Dr. Young also asserted that displaying impedance values is equivalent to displaying voltage. A1472[6]-1473[1]. To satisfy the doctrine of equivalents, he simply stated that the function was the same—displaying the process[ed] status indicating signals"—"[a]nd the way and the results are the same. The doctors would know what's going on inside the implant." A1472[17]-1473[1]. He did not elaborate.

### E.    Post-trial Proceedings

The jury found that Cochlear infringed claim 10 directly and contributorily, but did not induce infringement. A61-63. It made the same findings as to the three other asserted claims. A60-67. After the verdict, the district court conducted a bench trial to address a number of equitable defenses and legal questions, including indefiniteness and prosecution-history estoppel. A27.

Following the bench trial, the district court issued its Findings of Fact and Conclusions of Law. A25-56. Relevant here, the court held that prosecution-history estoppel did not apply to bar AMF's reliance on the doctrine of equivalents to assert that displaying impedance is equivalent to displaying voltage. A43-47[¶¶59-66]. Although the court agreed that AMF's amendments narrowed the scope of claim 10, it characterized those amendments as tangential to the asserted equivalent. A44-46[¶¶63-64]. According to the court, AMF added the "displaying" limitation to "overcome the pacemaker prior art that lacked a display." A44-45[¶63]. The court viewed the amendment as relating to displaying information in real time rather than what is displayed. *Id.*. It further held that the "selectively monitoring" limitation only related to measurements within the implant, not to the display of those measurements. A45-46[¶64].

27

The district court also held that the three other claims asserted against Cochlear (claim 1 of the '616 patent, and claims 6 and 7 of the '691 patent) are invalid because the specification fails to disclose algorithms corresponding to means-plus-function limitations. A49-56[¶¶72-88]. The court considered this Court's guidance that the corresponding algorithm need not be described in specific detail or in any particular form (e.g., flowcharts). A49[¶71]. It nevertheless concluded that AMF had failed to disclose algorithms used with the programmed microprocessor implementing the claimed function.

For claim 1 of the '616 patent, the district court held that the specification fails to teach an algorithm for the function of "processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes." A50-51[¶¶74-76]. Although AMF's expert, Dr. Young, asserted that the disclosed system used an algorithm that includes "applying Ohm's law to convert the measured voltage or voltage and current into an impedance value" (A51-52[¶77] (quoting A33661[¶301])), the court rejected that as unsupported by the specification, which does not mention Ohm's law or any of the algorithms that could be used to implement it. The court noted that Dr. Young recognized alternative

algorithms but discounted their relevance. A52[¶78] (citing A33664-65[¶41], in which Dr. Young viewed alternative algorithms as adding negligible contributions to an algorithm based purely on Ohm's law); *see also* A33663-65[¶¶37-41]. In short, the district court concluded that the specification's silence could not be overcome by AMF's assertion that a skilled practitioner would have used Ohm's law to perform the necessary conversion. A52[¶¶78-79].

For claims 6 and 7 of the '691 patent, the district court held that the specification lacked description of an algorithm for programming the microprocessor corresponding to the claimed function of "generating data indicative of the audio signal." A53-56[¶¶80-87] (discussing claim language at A868[34:55-56]). The court found that the specification discloses filter elements outside of the microprocessor but omits any details within it, instead referring to "general processing of microprocessor 30." A53-54[¶83] (considering disclosure at A853[4:46-58]). As with claim 1 of the '616 patent, AMF relied on testimony of its expert, which the district court rejected as unsupported by the specification and undermined by testimony during the bench trial. A54-56[¶¶84-86]. At trial, Dr. Young admitted that the '616 patent does not describe the microprocessor as performing a logarithmic conversion and that, in a microprocessor,

multiple algorithms could perform the logarithmic conversion. A2617[2]-2618[24]. In fact, he admitted that "[t]he patent didn't clearly say whether it has a logarithmic function or not," but that, to him, the statements in the specification indicate "something like a logarithmic function" would be used in the wearable processor. A2619[7-12].

In its motion for JMOL, Cochlear pointed out defects with the jury's verdict, including AMF's failure to prove that Cochlear's accused systems display the electrode voltage as required by the claims. The district court denied the motion, maintaining its claim constructions (A11-13) and holding that substantial evidence supported the verdict (A13-18). The court agreed, however, that Cochlear did not willfully infringe because it had objectively reasonable defenses. A18-19. It noted in particular the argument Cochlear raises in this brief regarding the display of voltage measurements, and an additional noninfringement argument regarding the structure for antennas claimed in the other asserted claims. A18. The court held that AMF further failed to satisfy the subjective prong because (1) AMF did not provide presuit notice of the '691 patent, and (2) Cochlear responded with reasonable noninfringement defenses when notified of the '616 patent, including a defense maintained at trial. A19. The district court concluded that "AMF did not meet its burden of putting forth

substantial evidence—let alone clear and convincing evidence"—for either prong of willful infringement. *Id.*

The district court granted Cochlear's motion for a new trial on damages because the jury awarded damages based on infringement of four claims in two patents. Because AMF did not present a damages theory based on infringement of only claim 10 of the '616 patent, the court held that a new trial was required so a jury could determine the appropriate award.

## IV.    Summary of the Argument

JMOL of noninfringement of the single claim remaining not invalid in this case is warranted because Cochlear's accused systems do not satisfy the "display" limitation of claim 10 of AMF's '616 patent. That claim does not broadly encompass, as AMF asserts, data feedback and display from a cochlear implant. Rather, AMF amended claim 10 in light of the examiner's prior-art and indefiniteness rejections, narrowing it to require measuring voltage across two electrodes in the cochlea and displaying that measured voltage to the operator. The plain meaning of the as-issued claim permits "processing" the measurements, but requires that the processed signals must convey information "including the measurements made." AMF also added a clause to claim 10 that reflects

31

this requirement: "whereby the status of the implanted stimulator, *including the results of the measurements* made within the implanted stimulator, may be made known." A15835 (emphasis added). The language of the amended claim requires that an infringing system must measure and display the voltage between two electrodes. Cochlear's systems do not do this—they measure the voltage but use it in combination with the stimulation current to calculate the electrode impedance for display. Because the accused systems do not display the voltage, they do not infringe and the jury's finding to the contrary was erroneous. The district court should have recognized the proper claim scope and granted JMOL of noninfringement.

AMF's approach to proving infringement cannot be maintained. According to AMF, by showing the calculated electrode impedance, Cochlear's accused systems make the measured voltage known to the operator. But this approach ignores that impedance is calculated from both voltage *and* current. AMF did not present any evidence that stimulation current is known to the operator of the accused systems. The only evidence in the record of the amount of current appears in a confidential Cochlear design document that was not available to the operators. Even AMF's expert agreed that, if one does not know the

32

current, then "you just have to guess what the [voltage] is." A1587[18-22]. Thus, displaying impedance does not make the voltage known when, as here, the person viewing the display does not know the stimulation current used to calculate the impedance.

AMF also tried to rely on the doctrine of equivalents as a backstop for its infringement case, asserting that displaying the calculated electrode impedance was at least equivalent to displaying the measured voltage. But AMF should not be permitted to use the doctrine of equivalents at all because the amendments made to secure claim 10 of the '616 patent added the requirement to measure and display voltage. Thus, prosecution-history estoppel precludes reliance on the doctrine of equivalents. The amendments were not tangential to the display of calculated impedance because they restricted the quantity measured, how that quantity is processed, and how it is displayed. The district court erred by focusing on AMF's statement to the examiner that the claim differed from the prior art because it related to display of real-time data rather than previously captured data. That focus ignores the actual disclosures of the prior art and ignores the plain language of the amendments.

Finally, even if the Court were to permit AMF's broad assertion of the display requirement in claim 10, an additional flaw with the district

court's construction requires a remand under the correct construction. Claim 10 refers to a "pair of . . . tissue stimulating electrodes" and the specification defines that as two electrodes within the cochlea, used for bipolar stimulation. By permitting AMF to assert the claim against unipolar stimulation, which uses one electrode within the cochlea and one outside of the cochlea, the district court erred. At a minimum, this case should be remanded for further proceedings under the correct construction.

## V. Argument

### A. Standard of Review

Claim construction is an issue of law that is reviewed de novo, with any subsidiary factual determinations reviewed for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). Whether prosecution-history estoppel or the disclosure-dedication rule bars reliance on the doctrine of equivalents is a question of law, reviewed de novo. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367-68 (Fed. Cir. 2003) (en banc); *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331-31 (Fed. Cir. 2004). Whether the Court should grant JMOL is a legal conclusion reviewed de novo, evaluating whether substantial evidence supports the jury's verdict.

## B.    The District Court Erred in Denying JMOL of Noninfringement of Claim 10

Contrary to both the plain meaning of claim 10 and its prosecution history, the district court erroneously upheld the jury's verdict of infringement, which found that displaying impedance satisfies the limitation of displaying voltage. A18. It is undisputed that Cochlear's accused systems measure a voltage but use that voltage in combination with stimulation current to calculate electrode impedance for display. A1586[20]-1587[2]; A1890[25]-1891[9]; A1906[18]-1907[10]. There is no substantial evidence to support a finding that they display voltage measurements, and thus, the court should have granted JMOL of no infringement. Even viewing the claim loosely, as AMF does, the evidence cannot support the jury's verdict because operators of Cochlear's systems lacked sufficient information to calculate voltage measurements from the displayed impedance values—namely, stimulation current—and thus could not have known the voltage as required by claim 10.

The district court further erred in determining that the doctrine of equivalents could cure this defect in AMF's proof—indeed, it should not have permitted AMF to rely on the doctrine at all. The amendments AMF made during prosecution of claim 10 give rise to prosecution-history estoppel.

35

### 1. The district court erred by not construing claim 10 to require the display of voltage

In denying JMOL of noninfringement of claim 10, the district court held that the "displaying" limitation of claim 10 does not require construction (A13) and that AMF proved infringement by showing that Cochlear's accused systems display impedance values (A15; A17-18). These holdings fail to recognize the correct construction of claim 10, which requires display of voltage measurements, not merely calculated impedance value.

### a. The plain meaning of claim 10 requires the display of voltage measurements

The express language of claim 10 requires that the processed status-indicating signals must "convey information . . . including the measurements made within the implanted stimulator." This plain language requires that the voltage measurements are included in the processed status-indicating signals and therefore does not permit processing that calculates impedance values from the voltage measurements without maintaining the voltage measurements for display. As explained further below, displaying impedance alone does not convey the voltage measurements.

In contrast, AMF's expert, Dr. Young, viewed claim 10 as ultimately directed to displaying the impedance between a pair of implanted electrodes. A1449[7]-1450[1]. Ignoring the plain language, he took the position that the measured voltage may be converted to impedance for display, reasoning that the "status-indicating signals" represent voltage but the "processed status-indicating signals" may represent impedance. A1462[23]-1463[3]; A1464[23]-1465[14]; *see also* A2418[1-3] (AMF arguing in closing that "the process[ed] signal is the impedance, and that's what the claim requires").

AMF's expert and counsel both relied on Fig. 6 in the specification to define the scope of claim 10 . A1465[16-23]; A2418[1-12]; A816[Fig. 6]. Fig. 6 simply reflects aspects of the specification that are not found in claim 10, namely the multiple options for displaying feedback from the implant. The specification distinguishes between voltage and impedance, and then describes the physician's tester as including the option of displaying voltage or displaying impedance. A834[33:33-45 (Table 7)]. However, "it is the[] claims, not the specifications, that afford the measure of the grant to the patentee. 'Out of all the possible permutations of elements which can be made from the specifications, he reserves for himself only those contained in the claims.'" *Milcor Steel Co. v. George A. Fuller Co.*, 316 U.S.

143, 145-46 (1942) (citations omitted). Thus, when as in claim 10 the claim language specifically refers to measuring voltage and requires that a processed status-indicating signal must "includ[e] the measurements made within the implanted stimulator" (A835[35:56-36:3]), that language should not be read to freely permit other, unclaimed aspects of the description. Instead, claim 10 is properly limited to the display of voltage measurements as required by its language and the amendments during prosecution.

> **b.    The "whereby" clause of claim 10 was material to patentability and confirms the claim requires the display of voltage**

The claim language that describes the processed status-indicating signals requires that the signals "*convey information . . . including the measurements*" or, in other words, that such processing preserves the voltage measurements for display. This construction—that the claim requires displaying voltage measurements—is confirmed by the "whereby" clause in claim 10, which AMF added during prosecution to overcome prior art. AMF amended this claim to specify that the particular measurements include voltage and that the voltage is available for display, i.e., "may be made known."

The special master's construction correctly recognized that the "whereby" clause requires the display of voltage measurements. A598-99. He correctly reasoned that the claim language itself establishes that requirement and the prosecution history simply confirms it. The district court, however, agreed with AMF that the clause did not independently limit the claims, reasoning that the clause "provides no additional restriction" to the preceding limitations (A400).

This is a critical point. If the district court is correct that the clause adds nothing to the claim, then the preceding claim language *already* requires the display of voltage measurements, as Cochlear argues above. *See supra* at 36-38. If, however, the claim does not already require the display of voltage measurements, then the whereby clause provides an additional limitation that must be given its independent significance. Holding that the whereby clause does not limit the claims was erroneous because the clause, as a reflection of the other claim language added simultaneously, was material to patentability.

This Court has held that "whereby" and "wherein" clauses can limit a claim where the patent specification or prosecution history establishes that the claimed results are significant to the invention. *See Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1330 (Fed. Cir. 2005) (noting that a

"whereby clause describ[ing] a network of users at multiple remote user terminals who are 'collectively able to concurrently engage in interactive data messaging'" was "more than the intended result of a process step; it is part of the process itself. This interactive element is described in the specification and prosecution history as an integral part of the invention."); *Griffin v. Bertina*, 285 F.3d 1029, 1033-34 (Fed. Cir. 2002) ("[T]he Board did not err in giving limiting effect to the 'wherein' clauses because they relate back to and clarify what is required by the count. . . . The manipulative steps set forth in the count have little meaning or utility unless they are placed within . . . context . . . ."); *Desenberg v. Google, Inc.*, 392 F. App'x 868, 871 (Fed. Cir. 2010) (nonprecedential) (affirming patentable weight of "wherein" clause where "the patent examiner had required, as a condition of patentability, that claim 1 of the [patent-in-suit] include the limitation 'wherein a service is performed by the user or the provider as a result of the transmission of the lead.'").

The "whereby" clause in claim 10 reflects the other amendments AMF made to secure its claim and therefore cannot be ignored. AMF added the "convey information . . . including the measurements" limitation in response to the examiner's rejecting the claim for indefiniteness because the original claim did not specify how the processed signals were used. *See*

*supra* at 15; A15745; A15834-35; A30-32[¶¶17-20]. By requiring the processed signals to include the voltage measurements and also requiring the display of those processed signals, the amended claim addressed the examiner's concern. The two changes—the nature of the processed signals and the requirement to display those signals—go hand in hand and the "whereby" clause ties them together. As an integral phrase added with other limitations to overcome the examiner's rejection, the "whereby" clause was material to patentability and supports the other claim language requiring the display of voltage. *See Hoffer*, 405 F.3d at 1330.

AMF has argued that, even if limiting, the "whereby" clause does not require the display of voltage because that would "read out or ignore" the phrase "the results of the measurements" contained in the whereby clause. A26171-72. According to AMF, that phrase provides flexibility in how results are displayed in distinction to "the measurements made within the implanted stimulator" language also found the in the whereby clause. A26172-75. But "the results of the measurements" naturally refers to the signals that represent the measurements, not quantities that require additional information (the stimulation current) to indicate the

measurements.[4] AMF's argument thus relies on a distinction without a difference.

In many instances, a claim can use different language to refer to the same thing, and this Court recognizes that such claims should not be interpreted inconsistently with this practice. *Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1317 (Fed. Cir. 2010) ("The claim language uses the terms 'bid' and 'value of the bid' interchangeably, such that the two cannot be read to have separate meanings."). This claim is a perfect example of when it would not make sense to distinguish between "measurements" and "results of the measurements," particularly when doing so would unreasonably expand the claim language to encompass the display of calculated impedance information without sufficient information to determine the measured voltage. *Id.*; *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1328 (Fed. Cir. 2009) (affirming identical constructions of "bifurcated base structure" and "bifurcated base graft structure," where the terms were "used interchangeably in the specification and the claims"); *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (construing "releasably" and "detachable" as

---

[4] The phrase "results of the measurements" appears only in claim 10 and dependent claim 11, not in the specification or prosecution history.

having the same meaning because "the patentee used the two terms interchangeably").

### 2. Cochlear's accused systems do not literally infringe under either construction

AMF does not dispute that Cochlear's accused systems display calculated impedance results and that they do not display measured voltages. Based on the correct construction discussed above, the systems therefore do not infringe. But even under AMF's broad construction, adopted by the district court, which permits "processed status-indicating signals" to merely "make known" the voltage measurements, Cochlear's accused systems display only the calculated impedance results and thus still fail to satisfy claim 10. Accordingly, under either construction, JMOL of noninfringement should be granted.

Cochlear's products measure the voltage between electrodes, but do not display it. Rather, the measured voltage is used to calculate the impedance between the selected electrodes, and at operator's request, the calculated impedance is optionally displayed. A1586[20]-1587[2]; A1890[25]-1891[9]; A1906[18]-1907[10]; A2418[13-18]). Because literal infringement requires that "'every limitation set forth in a claim must be found in an accused product, exactly,' . . . there is no literal infringement

as a matter of law." *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1253 (Fed. Cir. 2010) (alteration in original) (citations omitted).

AMF nonetheless asserts that displaying impedance satisfies the claim because the voltage measurements are "made known" by the impedance. *E.g.*, A40320. For this theory, AMF and its expert relied on the idea that Ohm's law can be used to calculate impedance information from voltage. *Id.*; A1469[1-19]; A2416[22]-2417[14]. Ohm's law governs the relationship between electrical current and voltage; in its most-simplified form, the voltage between two electrodes is equal to the impedance between them multiplied by the current flowing between them. A1383[13-18]. AMF's argument, however, overlooks the fact that Ohm's law cannot "make known" voltage information to an operator, as required by claim 10, unless the operator also knows the stimulation current used to measure and calculate the impedance value.

As its only support for concluding that an operator "knows" the stimulation current, AMF pointed to an internal, confidential Cochlear design document that describes the implementation of those measurements. A2373[23]-2374[21] (citing A4685-96); A4688. The mischaracterization of this internal design document by AMF's expert,

44

who referred to the document as a "manual" (A2374[21]), has no evidentiary basis and thus cannot support the jury's verdict. That an engineer at Cochlear could view a "Company Confidential" document and determine the stimulation current is irrelevant to the "displaying" limitation in claim 10, which is focused on what *users* of the accused systems would know about voltage without knowing the stimulation current. A4685-96. As AMF's expert agreed, when displaying only impedance values, without knowing the current used to generate those values, "you just have to guess what the [voltage] is." A1587[18-22]. Without evidence that the operator who views the displayed impedance value knows the stimulation current, the impedance value alone fails to satisfy the claimed "displaying" limitation.

It is similarly irrelevant that one of Cochlear's engineers, Mr. Nygard, stated that an audiologist or clinician would "see the data results from voltage telemetry" as "calculation of electrode impedance" on the screen. A1471[2-20]. This statement merely explains that voltage measurements are used to calculate electrode impedance for optional display. It does not support AMF's contention that displaying impedance also satisfies a requirement to display voltage measurements or even that voltage measurements are "made known," nor does it address the claim

language regarding a "processed status-indicating signal" and whether impedance is a "processed status-indicating signal" that "include[s] the measurements made within the implanted stimulator."

Without the display (or independent knowledge) of the stimulation current—and there is no dispute that Cochlear's system does not display such information—the claim language requires that "processed status-indicating signals" must at least include the voltage measurements made within the implant.

### 3.    As a matter of law, AMF cannot rely on the doctrine of equivalents

The district court allowed the jury verdict to stand, agreeing with AMF that "the jury reasonably could have found that these differences [between impedance and voltage] were insubstantial under the doctrine of equivalents." A16-17; A2419[8-14]. But settled law compels the opposite conclusion.

As the Supreme Court held in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002), when an applicant amends its claim and narrows patent scope, estoppel arises that may preclude reliance on the doctrine of equivalents. Such amendments include any

"narrowing amendment made to satisfy any requirement of the Patent Act," including those addressing the requirements of § 112. *Id*. at 736-37.

Here, to address the examiner's rejection for indefiniteness under § 112, AMF amended its claim to narrow the phrase of alternatives, "voltages/currents," to just "a voltage." A15834-35; A31-32[¶¶19-20]. It also added a number of limitations regarding how measurements are taken and used—requiring that the "processed status-indicating signals" include "the measurements made within the implanted stimulator" and that the processed signals are displayed, thus making the measurements known. A15835; A31-32[¶¶19-20].

These narrowing amendments fall well within the scope of potential estoppel defined by *Festo*. Whether prosecution-history estoppel applies in this case therefore turns on whether AMF can avoid the doctrine though an exception to the rule. Although a presumption of estoppel arises from narrowing amendments like those made by AMF, certain exceptions define limits to maintain the doctrine's purpose—"to hold the inventor to the representations made during the application process and to the inferences that may reasonably be drawn from the amendment." *Festo*, 535 U.S. at 737-38. Those exceptions turn on the nature of the equivalent the patentee

seeks to capture within the claim and its relationship to the amendment giving rise to estoppel. *Id.* at 740-41. As the Supreme Court explained:

> [1] The equivalent may have been unforeseeable at the time of the application; [2] the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or [3] there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

*Id.*

The district court held that AMF rebutted the presumption of estoppel by establishing that the rationale underlying the amendment bore only a "tangential relation" to the equivalent in question. A44-46[¶¶63-64]. This exception—the only one asserted by AMF[5]—is based on a "very narrow" criterion and "asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1342 (Fed. Cir. 2007) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) (en banc)).

---

[5] The equivalent was hardly unforeseeable when AMF relies on an embodiment in the specification directed to displaying impedance. Given the claim language requiring the display of voltage information, AMF should not be permitted to rewrite the claim to cover displaying impedance alone. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054-55 (Fed. Cir. 2002) (en banc).

Specifically, AMF asserts that its amendments related to the measuring and processing steps, rather than the displaying step, and thus they have no relevance to the asserted equivalent of displaying impedance. A36740-41. The district court agreed and held that AMF rebutted the presumption of estoppel by distinguishing *how* information is displayed (i.e., in real time), from *what* is displayed (i.e., voltage versus current versus impedance). A44-46[¶¶63-64].

But the court's analysis flatly contradicts the claim language and prosecution history. As discussed above, claim 10 recites a sequence of steps that starts with monitoring the electrodes to measure a voltage and ends with displaying a value that makes the measured voltage known. A15834-35; A835. AMF's amendments to earlier steps in the claim specifically restricted that entire sequence since each step builds on the prior step and the later steps refer back to the results of the earlier steps. A15834-35; A835; *see Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (construing "circular storage buffer" narrowly because of other limitations that "detail how the buffer employs addressing to store digital signal values in memory"). Indeed, the later steps refer back to the measured voltage, requiring that the processed status-indicating signals must convey information, "including the measurements made," and then

requiring display of the processed status-indicating signals. A15834-35; A835. Thus, processing to obtain a signal that does not actually convey the measured voltage, and displaying that processed signal—the asserted equivalent here—cannot be tangential to the amendments.

This Court has applied the "merely tangential" exception when the asserted equivalent related to an "aspect [that] was not at issue during prosecution." *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1369 (Fed. Cir. 2010). That is not the case here. AMF's specification discloses embodiments for displaying voltage, current, or impedance, but AMF chose to claim measuring "voltages/current" and then limited the claim to only "voltage." Further, AMF's amendments directly restricted the nature of the "processed status-indicating signals"—restricting them to convey information "including the measurements made within the implanted stimulator." A15834-35. Thus, while both the original and as-issued claims permit processing the status-indicating signals, the narrowed claim allowed by the examiner requires that the processed signals include (and also make known) the measurement information, which AMF explicitly limited to voltage. Permitting claim 10 to read on an asserted equivalent in which the processed signals convey impedance, rather than voltage, would directly overwrite the amendment that secured the claim. Thus,

AMF's asserted equivalent cannot be characterized as "merely tangential" to the prosecution. *See, e.g.*, *Cross Med. Prods.*, 480 F.3d at 1343 (finding prosecution-history estoppel where the limitation "was added to capture the manner in which the [particular] aspect of the invention operated and thereby overcome the 35 U.S.C. § 112 rejections").

Moreover, the "merely tangential" exception "focuses on the patentee's objectively apparent reason for the narrowing amendment." *Festo*, 344 F.3d at 1369. To rebut the presumption, this "objectively apparent reason" must be "discernible from the prosecution history record." *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1184 (Fed. Cir. 2009). Here, the Examiner rejected the claim in part because of "the alternative phrase 'voltages/current'" and because of "the absence of a step utilizing the processed status indicating signal." A15745. In response, AMF limited the claim to voltage measurement and required that the "processed status-indicating signals" be displayed. A15835. It also stated that "the newly-submitted claims have been carefully drafted in an attempt to ensure that they are definite and fully comply with the requirements of 35 U.S.C. § 112, second paragraph." A15841. Thus, the record shows that one "objectively apparent reason" for the amendment was to narrow the claim scope to displaying voltage measurements.

Additionally, the prior art at issue during prosecution does not support the district court's holding that the displaying step was amended to avoid prior art by claiming only real-time display. A44-45[¶63]. One of the embodiments taught in van Arragon was the continuous capture of data for an evolving histogram. A15811[Fig.4]; A15817[7:39-46, 8:51-54]. The operator could view the "current status of the histogram" through a computer. A15819[12:5-8]. Thus, notwithstanding AMF's arguments during prosecution, it distorts the record to say that the amendments related to the real-time nature of the display required by claim 10 since this was taught by van Arragon.

AMF's purported basis for distinguishing Hafelfinger was similarly unfounded. AMF argued that the claims it sought differed from Hafelfinger by requiring measurement simultaneous with stimulation. A15842-43. But Hafelfinger taught an embodiment measuring impedance "during a stimulation pulse," contradicting AMF's arguments. A15800[4:10-12]; *see also* A15802[8:1-8] (teaching a "lead impedance analyzing circuit 40" that "measures impedance from the stimulation pulse and from sensed heart activity"). Moreover, the examiner specifically noted that the claim limitations to "such monitoring circuitry further including impedance calculation circuits, are well-known in the

implantable stimulator art," citing Hafelfinger. A15746-47; *see supra* at 16. Thus, AMF's amendments did not relate only to the distinctions that AMF argued in its remarks and now urges as tangential to the calculation and display of impedance.

In light of these contradictions between AMF's arguments and the disclosures in the prior art, the Court should look at the amendments independently from AMF's present arguments. The amendments, on their face, surrendered the claim scope that AMF now asserts as an equivalent. *See Festo*, 344 F.3d at 1369 ("[A]n amendment made to avoid prior art that contains the equivalent in question is not tangential."). Thus, prosecution-history estoppel should prohibit AMF from using the doctrine of equivalents to recapture that which it specifically surrendered. That is consistent with the examiner's statement of reasons for allowance that "the prior art does not show or suggest the measuring of the electrode voltage for external display." A15850. As a result, the Court should grant JMOL of noninfringement of claim 10.

## C. The District Court Incorrectly Construed a "Pair" of Electrodes, Which Refers to Two Intracochlear Electrodes Used for Bipolar Stimulation

Even if the Court does not agree that claim 10 requires displaying voltage measurements and that the doctrine of equivalents cannot expand

the claim scope to capture displaying only calculated impedance, an additional error requires a remand for further proceedings. Specifically, the district court erred in construing "one pair of the multiplicity of tissue stimulating electrodes" as including an indifferent or extracochlear electrode. The "pair" language was added during AMF's amendment of claim 10 to secure its patentability. The claim language as amended limits the claim to bipolar stimulation, using two electrodes within the cochlea. AMF did not present evidence of infringement under this correct construction, and there is a substantial question regarding whether the accused devices could satisfy that construction at all.

The plain claim language specifically requires a "pair" of "tissue stimulating" electrodes. The specification consistently uses the term "pair of electrodes" to refer to intracochlear electrodes and even defines "pair of electrodes" as "bipolar mode," which involves only intracochlear electrodes. As it states: "The switches allow the current source FET 62 and storage capacitors 60 to be connected to *pairs of electrodes (bipolar mode)* or, alternatively, to individual electrodes and the indifferent electrode 49 via the indifferent electrode switches 92." A822[9:63-67] (emphasis added); *see supra* at 14. This contrast between stimulation modes defines "pair of electrodes" as the configuration used for bipolar, intracochlear stimulation.

When an inventor acts as his own lexicographer, using the specification to give terms a special meaning, the claims must be construed in accordance with that meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). Likewise, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).

The prosecution history also supports Cochlear's construction. AMF amended its claims to require applying stimulation signals to "at least one pair of the multiplicity of [a plurality of] tissue stimulating electrodes" and selectively monitoring the "at least one pair of the multiplicity of electrodes." A15834-35. The public is entitled to rely on AMF's statements in the specification and its amendment to claim 10 to understand that the claim was intentionally limited to electrode pairs in the intracochlear electrode.

Extrinsic evidence also supports Cochlear's proposed construction. The prior art cited by AMF in the Background section of the '616 patent uses the term "pair of conductors" (i.e., electrodes) to refer to the closely spaced electrode pairs in an intracochlear electrode array. A19006[1:25-

29]. This evidence further supports that "pair of electrodes" is a term of art in cochlear implants and refers to intracochlear electrodes.

Because the district court's construction permitted AMF to assert infringement by measurements made using one intracochlear electrode in combination with the indifferent electrode, i.e., made during unipolar stimulation, it encompassed more than the proper claim scope. At a minimum, the Court should remand for further proceedings under the proper construction. Under that construction, Cochlear believes AMF has not shown infringement and would be able to assert at most nominal instances to support damages of this method claim.

## VI.  Conclusion

For the reasons stated above, Cochlear respectfully requests that the Court hold that claim 10 requires the display of voltage measurements and that prosecution-history estoppel bars AMF's reliance on the doctrine of equivalents, and therefore claim 10 is not infringed by Cochlear's accused systems. To the extent any aspect of the jury's infringement finding stands, Cochlear respectfully requests that the Court construe "pair of the multiplicity of tissue stimulating electrodes" as limited to intracochlear electrodes and remand for further proceedings.

Dated: July 21, 2015                    Respectfully submitted,


                                         /s/ J. Michael Jakes
                                        J. Michael Jakes
                                        Jason W. Melvin
                                        FINNEGAN, HENDERSON, FARABOW,
                                          GARRETT & DUNNER, LLP
                                        901 New York Avenue, N.W.
                                        Washington, D.C. 20001
                                        (202) 408-4000

                                        Bruce G. Chapman
                                        SHEPPARD, MULLIN, RICHTER
                                          & HAMPTON LLP
                                        333 South Hope Street
                                        Los Angeles, California 90071
                                        (213) 620-1780

                                        *Attorneys for Defendants-Appellants*
                                        *Cochlear Corporation and*
                                        *Cochlear Ltd.*

## CERTIFICATE OF SERVICE

I certify that on July 21, 2015, this BRIEF FOR APPELLANTS COCHLEAR CORPORATION AND COCHLEAR LTD. was filed electronically using the CM/ECF system and served via the CM/ECF system on all counsel of record.

<div align="right">

/s/ J. Michael Jakes
J. Michael Jakes

</div>

## CERTIFICATE OF COMPLIANCE

I certify that this BRIEF FOR APPELLANTS COCHLEAR CORPORATION AND COCHLEAR LTD. contains 10,827 words as measured by the word-processing software used to prepare this brief.

/s/ J. Michael Jakes
J. Michael Jakes

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Alfred E. Mann Foundation for Scientific Research, and Advanced Bionics, LLC,<br><br>     Plaintiffs,<br><br>   v.<br><br>Cochlear Corporation, and Cochlear Ltd.,<br><br>     Defendants. | Case No. 2:07-cv-08108-FMO-SH<br><br>**JUDGMENT**<br><br>Courtroom: 22, 5th Floor<br>Judge: Hon. Fernando M. Olguin |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

JUDGMENT
2:07-CV-08108-FMO-SH

A00001

The Court conducted a jury trial in this matter from January 14 to January 22, 2014, culminating in a jury verdict.  (Dkt. No. 460, Jury Verdict.)  The Court also conducted a January 22, 2014 bench trial regarding (1) equitable estoppel, (2) laches, (3) inequitable conduct, (4) prosecution history estoppel, and (5) indefiniteness.  On March 31, 2015, the Court entered its Findings of Fact and Conclusions of Law and its Order Re: Post Trial Motions.  (Dkt. No. 539; Dkt. No. 540.)

Based on these rulings, and the others of record, and after having considered the papers and the stipulations submitted by counsel, and good cause appearing, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Judgment is entered in favor of Plaintiffs as to the infringement and validity of claim 10 of U.S. Patent No. 5,609,616.

2. Judgment is entered in favor of Plaintiffs as to:

   a. Defendants' affirmative defense of estoppel as to U.S. Patent No. 5,609,616 and U.S. Patent No. 5,938,691;

   b. Defendants' affirmative defense of laches as to U.S. Patent No. 5,609,616 and U.S. Patent No. 5,938,691; and

   c. Defendants' affirmative defense of inequitable conduct as to U.S. Patent No. 5,609,616.

3. Judgment is entered in favor of Defendants as to the invalidity of claim 1 of U.S. Patent No. 5,609,616.

4. Judgment is entered in favor of Defendants as to the invalidity of claims 6 and 7 of U.S. Patent No. 5,938,691.

5. Judgment is entered in favor of Defendants as to the willful infringement of U.S. Patent No. 5,609,616 and U.S. Patent No. 5,938,691.

6. Judgment is entered in favor of Defendants as to the vacatur of the jury's damages award.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

1

JUDGMENT
2:07-CV-08108-FMO-SH

7.  Except for the issue of damages for infringement of claim 10 of U.S. Patent No. 5,609,616, this Judgment resolves all claims, counterclaims and defenses of all the parties.

8.  This judgment is entered pursuant to 28 U.S.C. § 1292(c)(2), Rule 54 of the Federal Rules of Civil Procedure, and this Court's contemporaneous Order Regarding Federal Rule of Civil Procedure 54(b).

**IT IS SO ORDERED.**

Dated:  April 20, 2015

                                            /s/
                                   _____
                                   HON. FERNANDO M. OLGUIN
                                   UNITED STATES DISTRICT JUDGE

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

2

JUDGMENT
2:07-CV-08108-FMO-SH

A00003

1

2

3

4

5

6

7

8

9                      UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11                          WESTERN DIVISION

12

13  Alfred E. Mann Foundation for          Case No. 2:07-cv-08108-FMO-SH
    Scientific Research, and Advanced
14  Bionics, LLC,                          **ORDER RE: FEDERAL RULE OF
                                           CIVIL PROCEDURE 54(b)**
15                     Plaintiffs,
                                           Courtroom: 22, 5th Floor
16            v.                           Judge:  Hon. Fernando M. Olguin

17  Cochlear Corporation, and Cochlear
    Ltd.,
18
                      Defendants.
19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

On March 31, 2015, this Court entered its Findings of Fact and Conclusions of Law (Dkt. No. 539) and Order Re: Post-Trial Motions (Dkt. No. 540).  Pursuant to Federal Rule of Civil Procedure 54(b) and/or 28 U.S.C. § 1292(c)(2), the Court hereby directs entry of these rulings, and the claims and counterclaims adjudicated thereby, over any and all objections, as a final judgment except for a determination of damages from which an appeal may be taken immediately to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").

In directing entry of a final judgment, the Court expressly determines that there is no just reason for delay.  After considering the circumstances and equities of the parties and the Joint Stipulation that they have submitted, the Court finds that the parties would benefit from an immediate appeal to the Federal Circuit, particularly in light of the extended duration of this litigation, which began in 2007.  The Court finds that the parties have jointly requested such an immediate appeal, as evidenced by their Joint Stipulation.  The Court finds that an immediate appeal to the Federal Circuit would be an efficient use of party and judicial resources and would materially advance the ultimate termination of the case.  The Court further finds that the issues presented in the immediate appeal would not be mooted by future developments in this case nor otherwise have to be decided more than once by the Federal Circuit should a subsequent appeal be necessary.

Accordingly, based on these reasons, and others which may be gleaned from the record, the Court finds "that there is a sound reason to justify departure from the general rule that all issues decided by the district court should be resolved in a single appeal of a final judgment."  *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1072 (Fed. Cir. 2008); *e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014).  In addition, under 28 U.S.C. §1292(c)(2) the Court of Appeals for the Federal Circuit has jurisdiction over "appeals from patent infringement liability determinations when a trial for damages has not yet occurred."  *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1317 (Fed. Cir. 2013) (*en banc*).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

1

ORDER RE: RULE 54(B)
2:07-CV-08108-FMO-SH

1    The Court hereby directs entry of final judgment from which an appeal may

2    be taken immediately to the Federal Circuit.

3    **IT IS SO ORDERED.**

4    Dated:  April 20, 2015

5

6                                                    /s/

                                            HON. FERNANDO M. OLGUIN
                                            UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

ORDER RE: RULE 54(B)
2:07-CV-08108-FMO-SH



1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10
11   ALFRED E. MANN FOUNDATION FOR    )    Case No. CV 07-8108 FMO (SHx)
     SCIENTIFIC RESEARCH,             )
12                                    )
                    Plaintiff,        )
13                                    )
          v.                          )    **ORDER RE: POST-TRIAL MOTIONS**
14                                    )
     COCHLEAR CORPORATION, et al.,    )
15                                    )
                    Defendants.       )
16   _____)

17          Having reviewed and considered all the briefing filed with respect to the parties' post-trial

18   motions, the court concludes that oral argument is not necessary to resolve the motions and

19   orders as follows.  See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d

20   675, 684 n. 2 (9th Cir. 2001).

21                              **BACKGROUND**

22          Plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF" or "plaintiff") brings this

23   action, alleging that defendants Cochlear Corporation and Cochlear Ltd. (collectively, "Cochlear"

24   or "defendants") infringed two patents directed to cochlear implant technology.  (See First

25   Amended Complaint for Patent Infringement ("FAC") at ¶¶ 17 & 21-23; Reply and Counterclaims-

26   in-Reply to Cochlear Americas and Cochlear Limited's Counterclaims ("Pl.'s Supp. Claims") at 13-

27   14) (Document Nos. 164 & 171).  AMF alleges that Cochlear infringed U.S. Patent No. 5,938,691,

28   entitled "Multichannel Implantable Cochlear Stimulator" ("the '691 patent"), and U.S. Patent No.

1  5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear

2  Stimulator" ("the '616 patent") (collectively, "the patents-in-suit"). (See FAC at ¶¶ 21-23; Pl.'s

3  Supp. Claims at 13-14).

4          The '691 patent is generally directed to a cochlea stimulation system comprising of: (1) an

5  audio signal receiving device, i.e., a microphone; (2) a wearable processor ("WP") that receives

6  and processes audio signals; and (3) an implanted cochlear stimulator ("ICS") that receives data

7  representing the audio signals and stimulates electrodes. (See '691 patent at Abstract, col. 3:9-39

8  & 34:51-35:6). By stimulating the electrodes located within the cochlea, the implant can also

9  stimulate locations of the auditory nerve, so that the hearing impaired person's brain can perceive

10  sound. (See id. at col. 1:24-27; Reporter's Transcript ("RT"), Jan. 14, 2014, vol. 2, at 79:13-15 &

11  85:18-25). The '616 patent is generally directed to a system and a method for testing such a

12  system. (See '616 patent at Abstract, col. 34:23-61 & 35:43-36:7).

13          The court, with the consent of the parties, appointed a Special Master for claim

14  construction. (See Order re: Joint Status Report Regarding Appointment of Special Master at 1)

15  (Document No. 179). The Special Master conducted a claim construction hearing, and issued a

16  Report and Recommendation. (See Special Master's Report and Recommendation on Claim

17  Construction ("R&R") at 5) (Document No. 200). After considering the parties' objections to the

18  R&R, the court issued its Claim Construction Order on June 18, 2012.[1] (See Order re: Parties'

19  Objections to the Special Master's Report on Claim Construction ("Claim Construction Order"))

20  (Document No. 212). Advanced Bionics, LLC ("Advanced Bionics"), the exclusive licensee of the

21  asserted patents, (see Pl.'s Supp. Claims at 13), was joined as an involuntary plaintiff on January

22  13, 2014. (See Final Pretrial Conference Order ("PTO") at 1) (Document No. 399).

23          The court conducted a jury trial, in which the jury found that Cochlear infringed claims 1 and

24  10 of the '616 patent, and claims 6 and 7 of the '691 patent. (See Verdict Form at 1-4 & 5-8)

25  (Document No. 460). The jury also found willful infringement of both asserted patents. (See id.

26

27  ─────────────

28          [1] The case was transferred to the undersigned judge on January 18, 2013. (See Order of the
    Chief Judge, dated Jan. 18, 2013) (Document No. 232).

1  at 4 & 8).  In addition, the jury found that the asserted claims are not invalid based on Cochlear's

2  obviousness and anticipation defenses.  (See id. at 4-5 & 8-9).  The jury awarded $131,216,325

3  damages, based on royalty rate of 7.5 percent.  (See id. at 10).  Finally, the jury provided an

4  advisory verdict in favor of AMF on inequitable conduct.  (See id. at 9-10).

5        Pending before the court are the parties' post-trial motions.  Cochlear filed a Motion for

6  Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. [] 50 ("JMOL"), with respect to:  (1) direct

7  and contributory infringement of the asserted claims; and (2) willful infringement of the asserted

8  patents, (see JMOL at 1) (Document No. 507),[2] and a Motion for New Trial pursuant to Fed. R.

9  Civ. P. 59 ("Rule 59 Motion") with respect to (1) infringement, (2) invalidity, and (3) damages

10 issues.  (See Defendants' Notice of Motion and Motion for New Trial at 1) (Document No. 508).[3]

11 Involuntary plaintiff Advanced Bionics moved to revise the proposed judgment, to state that

12 judgment is in favor of both AMF and Advanced Bionics.  (See Motion of Plaintiff Advanced

13 Bionics, LLC to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59 at 2)

14 (Document No. 504).

15            **COCHLEAR'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

16 I.    LEGAL STANDARD.[4]

17        Federal Rule of Civil Procedure 50 permits a district court to grant judgment as a matter of

18 law "when the evidence permits only one reasonable conclusion and the conclusion is contrary

19 to that reached by the jury."  Ostad v. Or. Health Scis. Univ., 327 F.3d 876, 881 (9th Cir. 2003).

20 If there is substantial evidence to support the jury's verdict, the court should deny a motion for

21

22

23        [2]  The parties' Joint Brief Re Defendants' Renewed Motion for Judgment as a Matter of Law
   Pursuant to Fed. R. Civ. P. [] 50 ("JMOL Joint Br.")  was filed in its original form as Document No.
24 507-1, and in re-formatted form as Document No. 511-2.  For convenience, the court refers to the
   pagination in Document No. 511-2, unless otherwise specified.

25
26        [3]  The parties' Joint Brief Re Defendants' Motion For New Trial ("Rule 59 Joint Br.")  was filed
   in its original form as Document No. 508-1, and in re-formatted form as Document No. 511-3.  For
27 convenience, the court refers to the pagination in Document No. 511-3, unless otherwise specified.

28        [4]  A motion for judgment as a matter of law "is not a patent-law specific issue, so regional circuit
   law applies."  Harris Corp.  v. Ericsson, Inc., 417 F.3d 1241, 1248 (Fed.  Cir.  2005).

1  judgment as a matter of law.  See Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007).

2  "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate

3  to support a conclusion even if it is possible to draw two inconsistent conclusions from the

4  evidence." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994); see Wallace, 479

5  F.3d at 624.  "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff

6  has presented sufficient evidence to support the jury's conclusion." Wallace, 479 F.3d at 624.

7  The court must "view the evidence in the light most favorable to the nonmoving party . . . and draw

8  all reasonable inferences in that party's favor." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d

9  951, 961 (9th Cir. 2009) (internal quotations and citations omitted).  Because a post-verdict Rule

10  50(b) motion is "a renewed motion," it is "limited to the grounds asserted in the pre-deliberation

11  Rule 50(a) motion." Id.

12  II.    INFRINGEMENT.

13      Cochlear contends that AMF failed to present substantial evidence that it infringed the

14  asserted claims.  (See JMOL Joint Br. at 3-35).  A finding of patent infringement involves a

15  two-step analysis.  "First, the claims of the patent must be construed to determine their scope.

16  Second, a determination must be made as to whether the properly construed claims read on the

17  accused device." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir.

18  1999) (internal citation omitted); Carroll Touch, Inc. v. Electro Mechanical Sys., Inc., 15 F.3d 1573,

19  1576 (Fed. Cir. 1993).  The first step of claim construction is a question of law; the second step

20  is a question of fact.  See Pitney Bowes, 182 F.3d at 1304.

21      A.    Applicable Law.

22      "Infringement is assessed by comparing the accused device to the claims; the accused

23  device infringes if it incorporates every limitation of a claim, either literally or under the doctrine

24  of equivalents.  If, however, even one claim limitation is missing or not met, there is no literal

25  infringement." MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005)

26  (quotation marks and brackets omitted); Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317

27  (Fed. Cir. 2009) ("To infringe a method claim, a person must have practiced all steps of the

28

1  claimed method."); Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) ("A method

2  claim is directly infringed only by one practicing the patented method.") (emphasis omitted).

3      "A finding of infringement under the doctrine of equivalents requires a showing that the

4  difference between the claimed invention and the accused product was insubstantial.  One way

5  of doing so is by showing on a limitation by limitation basis that the accused product performs

6  substantially the same function in substantially the same way with substantially the same result

7  as each claim limitation of the patented product."  Crown Packaging Tech., Inc. v. Rexam Bev.

8  Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citations omitted); see also Festo Corp. v.

9  Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 732, 122 S.Ct. 1831, 1837-38 (2002)

10  (explaining that prosecution history estoppel limits the range of equivalents).  "Infringement, either

11  literal or under the doctrine of equivalents, is a question of fact."  Brilliant Instruments, Inc. v.

12  GuideTech, LLC, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (citing Crown Packaging Tech., 559 F.3d

13  at 1312).  "[P]laintiff has the burden of proving infringement by a preponderance of the evidence."

14  Kegel Co. v. AMF Bowling, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

15      B.  Claim 10 of the '616 Patent.[5]

16          1.  **Claim Construction.**

17  Claim 10 of the '616 patent states as follows:

18          10.  A method of testing an implantable tissue stimulating system comprising:

19          transmitting data-containing signals to an implanted stimulator from an

20          external transmitter;

21          selectively controlling the data-containing signals as they are thus

22          transmitted;

23          receiving the data-containing signals within the implanted stimulator, the

24          implanted stimulator having a multiplicity of tissue-stimulating electrodes;

25

26

_____

27      [5]  In its bench trial order issued contemporaneously with this Order, the court found that claim
    1 of the '616 patent and claims 6 and 7 of the '691 patent are invalid for indefiniteness.

28  Accordingly, the discussion in this section will be limited to claim 10 of the '616 patent.

1              processing the data-containing signals within the implanted stimulator to

2              generate stimulation signals;

3              <u>applying the stimulation signals</u> to at least <u>one pair of the multiplicity of</u> tissue

4              <u>stimulating electrodes</u>;

5              selectively monitoring the at least one pair of the multiplicity of electrodes to

6              measure a <u>voltage associated therewith</u> <u>at the same time the stimulation</u>

7              <u>signals are applied thereto</u>;

8              generating stimulator status-indicating signals representative of <u>the</u>

9              <u>measurements made within the implanted stimulator</u>;

10             <u>transmitting the stimulator status-indicating signals to an external receiver</u>

11             <u>coupled to the external transmitter</u>;

12             receiving and processing the status-indicating signals to produce processed

13             status-indicating signals which convey information regarding the status of the

14             implanted stimulator, including the measurements made within the implanted

15             stimulator; and

16             displaying the processed status-indicating signals, <u>whereby the status of the</u>

17             <u>implanted stimulator, including the results of the measurements made within</u>

18             <u>the implanted stimulator, may be made known</u>.

19 ('616 patent, col. 35:43-36:7) (emphasis added).

20      For claim construction, the parties agreed that there was no need to construe the term

21 "implanted cochlear stimulator." (<u>See</u> R&R at 2). Accordingly, there is no need to construe the

22 equivalent term, "implanted stimulator." Per the parties' agreement, the court construed the

23 phrase, "selectively controlling the data-containing signals as they are thus transmitted," as

24 "adjusting the data-containing signals which contain data used to set the stimulation signals." (<u>Id.</u>

25 at 8). With respect to the "receiving the data-containing signals" limitation, the court construed the

26 term "tissue-stimulating electrodes" as "electrodes used in stimulating tissue." (<u>Id.</u> at 82). The

27 court found that the term "multiplicity of tissue-stimulating electrodes" should be given its plain and

28 ordinary meaning. (<u>See id.</u>). As for the "applying the stimulation signals" limitation, the court

1   found that the term "applying the stimulation signals" does not require construction.  (See R&R at

2   96; Claim Construction Order at 23-24).  The court also found that "tissue-stimulating electrodes"

3   should be construed as "electrodes used in stimulating tissue."  (R&R at 82; Claim Construction

4   Order at 18-19).  In addition, the court found that "one pair of the multiplicity of tissue-stimulating

5   electrodes" should be given its plain and ordinary meaning.  (See R&R at 82).

6         With respect to the "selectively monitoring" limitation, the court found, per the parties'

7   agreement, that "at the same time the stimulation signals are applied thereto" should be

8   interpreted as "the measurement of the voltage is made at the same time the stimulation signal

9   is applied."  (R&R at 8).  Likewise, per the parties' agreement, the court found that "voltage

10   associated therewith" should be construed as "voltage across a pair of electrodes."  (Id.).

11         As for the "generating stimulator status-indicating signals" limitation, the court found, per

12   the parties' agreement, that "[t]he measurements made within the implanted stimulator" should be

13   interpreted as "voltage across a pair of electrodes."  (R&R at 8).  As for the "transmitting the

14   stimulator status-indicating signals" limitation, the court found that the term, "transmitting the

15   stimulator status-indicating signals to an external receiver coupled to the external transmitter,"

16   should be given its plain and ordinary meaning.  (See R&R at 118-21; Claim Construction Order

17   at 19-20).  The court further explained that this limitation does not require a separate antenna.

18   (See Claim Construction Order at 19-21).  Finally, for the "displaying the processed status-

19   indicating signals" limitation, the court found that no construction was necessary regarding the

20   "whereby" clause.  (See id. at 2).

21         **2.  Overview of AMF's Infringement Theory.**

22         During trial, AMF's expert, Dr. Darrin Young, Ph.D. ("Young"), testified regarding AMF's

23   infringement theory.  AMF also presented documentary evidence and witness testimony, such as

24   the testimony of Dr. Ginger Stickney, Ph.D. ("Stickney"), an audiologist who worked with

25   Cochlear's accused products, and Dr. David Kelsall ("Kelsall"), an ear surgeon who also worked

26   with Cochlear's implants and related products.  (See RT, Jan. 15, 2014, vol. 2, at 30-62).

27         In general, AMF's infringement theory was directed to the inter-operation of the Cochlear

28   implant, the wearable processor, and the testing software.  For the preamble, "[a] method of

1  testing an implantable tissue stimulating system," AMF presented evidence that the Cochlear

2  system has a method of testing the Cochlear implant and wearable processor through the use of

3  the Custom Sound and WinDPS software.  (See, e.g., RT, Jan. 15, 2014, vol. 2, at 73:8-75:7; Exh.

4  182).  As for the "transmitting data-containing signals" limitation, AMF presented testimony and

5  documentary evidence that the wearable speech processor transmits data to the implant.  (See

6  RT, Jan. 15, 2014, vol. 2, at 75:8-21; Exh. 177 at COC-2089413).  With respect to the "selectively

7  controlling" limitation, AMF presented evidence that the practitioner can adjust the signals by, for

8  instance, using the "sliders" on the Custom Sound software to adjust the current levels for the

9  implant.  (See RT, Jan. 15, 2014, vol. 2, at 75:24-78:21; Exh. 155).

10     For the "receiving the data-containing signals" requirement, AMF presented testimony and

11  documentary evidence that the cochlear implant receives the data, and that there are multiple

12  electrodes in the Cochlear implant.  (See, e.g., RT, Jan. 15, 2014, vol. 2, at 79:13-80:13; Exh. 155

13  (disclosing 22 electrodes); Exh. 177 at COC-2089413).  For the "processing the data-containing

14  signals" limitation, AMF presented evidence that the cochlear implant processes the data to

15  generate signals.  For example, there was evidence that the implant receives the data; its input

16  decoder decodes the command and controls the stimulus output controller to generate stimulation

17  currents.  (See RT, Jan. 15, 2014, vol. 2, at 80:14-82:2; Exh. 5 at COC-2086833).  As for the

18  "applying the stimulation signals" requirement, AMF presented evidence that the implant supplies

19  a current to a pair of electrodes, such as an electrode in the implant and an extracochlear

20  electrode.  (See RT, Jan. 15, 2014, vol. 2, at 82:3-83:2; Exh. 155).

21     With respect to the "selectively monitoring" limitation, AMF presented evidence that once

22  the electrodes are selected, the Cochlear system measures the voltage between the electrodes.

23  (See,. e.g, RT, Jan. 15, 2014, vol. 2, at 83:3-85:11; Exh. 5) (e.g., Exh. 5 at COC-2086800) ("This

24  amplifier measures the DC voltage between a pair of electrodes or an internal voltage of the circuit

25  with respect to VSS.").  As for the "generating stimulator status-indicating signals" limitation, AMF

26  presented evidence that the accused products generate status-indicating signals, such as "the

27  voltage difference between the two electrodes."  (See, e.g., RT, Jan. 15, 2014, vol. 2, at

28  85:12-86:16; Exh. 5).  With respect to the "transmitting the stimulator status-indicating signals"

1  limitation, there was evidence that the Cochlear implant transmits the voltage to the wearable

2  processor.  (See RT, Jan. 15, 2014, vol. 2, at 86:17-87:8; Exh. 5).  As for the "receiving and

3  processing the status-indicating signals" limitation, AMF presented evidence that the accused

4  system creates "processed status-indicating signals" such as impedance values.  (See RT, Jan.

5  15, 2014, vol. 2, at 87:10-89:17, Exh. 169).  Finally, as for the "displaying the processed

6  status-indicating signals" limitation, there was evidence that the computer running the Custom

7  Sound software displays information, such as the impedance values.  (See RT, Jan. 15, 2014, vol.

8  2, at 89:18-91:1; Trial Exhibits ("Exhs.") 155 & 101).

9        Thus, AMF's infringement theory generally relies on the inter-operation of the cochlear

10  implant, the wearable processor, and the testing software running on a computer.  While the jury

11  verdict identifies infringement as to each individual product, the court interprets the verdict

12  regarding claim 10 as a finding of infringement as to the implant, processor, and testing software

13  running together.  See Norris v. Sysco Corp., 191 F.3d 1043, 1048 (9th Cir. 1999) (the court must

14  perform and "fair reading" and "the court must search for a reasonable way to read the verdicts

15  as expressing a coherent view of the case.").

16            3. **Direct infringement by Cochlear**.

17        Cochlear asserts that there is no evidence that it directly infringed method claim 10. (See

18  JMOL Joint Br. at 1 & 4).  It asserts that the evidence "falls well short of the requirement that

19  Cochlear itself perform each and every one of the method steps of claim 10."  (Id. at 4).

20  Cochlear's assertions are unpersuasive.

21        First, as discussed above, AMF presented substantial evidence that the steps of claim 10

22  were performed.  In particular, AMF presented evidence that the steps would be performed

23  automatically by clicking the "measure" button on Cochlear's diagnostic software.  (See RT, Jan.

24  17, 2014, vol. 1, at 108:6-11; RT, Jan. 15, 2014, vol. 2, at 43, 53 & 59); see also See Vita-Mix

25  Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir. 2009) ("Direct infringement can be

26  proven by circumstantial evidence.").  Second, as to whether Cochlear performed the steps,

27  Stickney testified that Cochlear representatives performed testing with her.  (See RT, Jan. 15,

28  2014, vol. 2, at 56:14-25) ("So, for instance, just like I was mentioning, when I had this little boy

1   and he was just having a lot of problems . . . . [T]hat's when we contact the manufacturer to come

2   out. And they sat down and they will assist me. Sometimes this is doing what we call an integrity

3   test where it's like a more sophisticated measure of what we just showed you where you're

4   actually checking the integrity of the electrode."); (see id. at 45) ("the rep then proceeded to do

5   some additional testing, and we confirmed at that time it was a device failure"). She also testified

6   that Cochlear representatives conducted conferences and workshops regarding impedance

7   testing. (See id. at 55-57). In addition, AMF presented documentary evidence regarding testing,

8   (see, e.g., Exhs. 4 & 556) (COC 2083658) (Customer Sound, User Manual 59), and evidence that

9   Cochlear personnel trained ear surgeons such as Kelsall to perform impedance checks. (See RT,

10  Jan. 15, 2014, vol. 2, at 34) (Q: "Where did you learn to do an impedance check

11  intra-operatively?"; A: "My staff would have been trained at training courses provided by the

12  manufacturer."). In short, there was more than sufficient evidence for "a reasonable mind [to]

13  accept as adequate to support a conclusion" of direct infringement. Callicrate v. Wadsworth Mfg.,

14  427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.

15  1992)).

16                  4. **Contributory Infringement – Substantial Non-Infringing Use**.

17          Cochlear contends that it does not contribute to the infringement of claim 10, because the

18  accused instrumentalities have "substantial non-infringing uses." (See JMOL Joint Br. at 5). Claim

19  10 recites a method that requires, among other things, "displaying the processed status-indicating

20  signals, whereby the status of the implanted stimulator, including the results of the measurements

21  made within the implanted stimulator, may be made known." ('616 patent at col. 36, ll. 4-7).

22  Cochlear argues that the "accused products are capable of performing impedance testing without

23  displaying impedance value," so performing the "displaying" step is "optional." (JMOL Joint Br.

24  at 7). In response, AMF contends that Cochlear waived the substantial non-infringement use

25  theory, because Cochlear failed to raise the argument in its pre-verdict motion. (See id. at 14-15).

26

27          "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the

28  grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise

1    arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not

2    raise in its pre-verdict Rule 50(a) motion." E.E.O.C., 581 F.3d at 961 (internal quotations omitted);

3    i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 845 (Fed. Cir. 2010) (to preserve an issue for a

4    post-verdict JMOL, the "party must file a pre-verdict JMOL motion on all theories . . . that it wishes

5    to challenge with a post-verdict JMOL.").

6           Cochlear's pre-verdict JMOL did not address the "substantial non-infringing use" theory that

7    it raises in its post-verdict motion.  (See, generally, Pre-Verdict JMOL at 4-5 & 7) (Document No.

8    426).  For example, with respect to contributory infringement, Cochlear's pre-verdict motion only

9    stated that "if there is no infringement of a patent there can be no contributory infringer."[6]  (Id. at

10   7) (citing Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 341, 81 S.Ct. 599, 602

11   (1961).  In short, Cochlear waived the substantial non-infringing use theory.  See E.E.O.C., 581

12   F.3d at 961.

13                  **5.  Contributory Infringement:  Sufficiency of the Evidence**.

14          Cochlear argues that without evidence that someone directly infringes claim 10, there can

15   be no contributory infringement.  (See JMOL at 9-10).  In particular, Cochlear contends that there

16   is no literal infringement, because claim 10 requires the display of "voltage" measurements, (id.

17   at 9), and AMF presented evidence of the display of impedance values. (Id.).  As a result, AMF

18   has to rely on the doctrine of equivalents, which Cochlear asserts is barred by prosecution history

19   estoppel.  (Id.).

20          As an initial matter, the court rejected Cochlear's prosecution history estoppel argument

21   in its bench trial order.   Additionally, the evidence presented at trial was sufficient to support the

22   jury's verdict as to claim 10.  The jury heard evidence that Cochlear's software displays impedance

23   values and that impedance and voltage measurements are closely related, due to, for instance,

24   Ohm's law.  (See Exh. 155; RT, Jan. 15, 2014, vol. 2, at 60, 90 & 95-96).  While there are

25   differences between impedance and voltage measurements, the jury reasonably could have found

26   _____

27     [6]  Cochlear's reference to a "contributory infringer," (see Pre-Verdict JMOL at 7), was in the
     context of its argument that there was no indirect infringement, because AMF had failed to prove
28   direct infringement.  (See id.).

1   that these differences were insubstantial under the doctrine of equivalents.   Moreover, the

2   "displaying" limitation does not expressly require the display of "voltage."   In other words, the jury

3   could have found that the "displaying" step was performed.

4   III.   WILLFUL INFRINGEMENT.

5         In order to establish willful patent infringement, the court performs a two-step analysis

6   entailing an objective and a subjective inquiry.   First, "a patentee must show by clear and

7   convincing evidence that the infringer acted despite an objectively high likelihood that its actions

8   constituted infringement of a valid patent."   In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed.

9   Cir. 2007) (en banc).   For this requirement, "[t]he state of mind of the accused infringer is not

10   relevant[.]"   Id.   Rather, the court's inquiry asks "whether a reasonable person would have

11   considered there to be a high likelihood of infringement of a valid patent."   Bard Peripheral

12   Vascular, Inc. v. W.L. Gore & Assocs., Inc., 682 F.3d 1003, 1008 (Fed. Cir. 2012).   This issue

13   "should always be decided as a matter of law by the judge."   Id.   "If the accused infringer's position

14   is susceptible to a reasonable conclusion of no infringement," the objective prong "cannot be met."

15   Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1310 (Fed. Cir. 2011).   Second, if the

16   "threshold objective standard is satisfied, the patentee must also demonstrate that this

17   objectively-defined risk (determined by the record developed in the infringement proceeding) was

18   either known or so obvious that it should have been known to the accused infringer."   In re

19   Seagate Tech., LLC, 497 F.3d at 1371.

20         Cochlear asserts that the jury's willful infringement verdict should be set aside, because it

21   presented several reasonable non-infringement defenses.   (See JMOL at 42-43).   The court

22   agrees.   While the jury's infringement verdict is supported by substantial evidence, Cochlear

23   presented reasonable non-infringement arguments, including that Cochlear:  (1) did not infringe

24   claim 10 of the '616 patent, because its testing system did not display "voltage" measurements;

25   and (2) it did not infringe claim 1 of the '616 patent or the asserted claims of the '691 patent

26   because it employs a single-antenna structure.   (See, e.g., RT, Jan. 16, 2014, vol. 1, at 50:17-23,

27   72:21-73:22 & 74:14-17; RT, Jan. 21, 2014, vol. 1, at 92-124).   Cochlear's position is "susceptible

28   to a reasonable conclusion of no infringement," so the objective prong of the Seagate inquiry has

1  not been met.  See Uniloc USA, Inc., 632 F.3d at 1310; DePuy Spine, Inc. v. Medtronic Sofamor

2  Danek, Inc., 567 F.3d 1314, 1336 (Fed. Cir. 2009) (objective prong not met, due to "substantial

3  question of noninfringement").

4      With respect to the subjective prong, AMF did not provide pre-suit notice regarding the '691

5  patent.  (See Exh. 277).  Thus, Cochlear did not have the scienter required for the '691 patent.

6  As for the '616 patent, after AMF provided notice of potential infringement, Cochlear promptly

7  responded with reasonable non-infringement defenses, including the single-antenna non-

8  infringement argument.  (See id.).  Thus, the risk was not "so obvious" that it should have been

9  known to Cochlear.  See Uniloc, 632 F.3d at 1310.

10     Under the circumstances, although there was sufficient evidence to support the jury's

11 verdict of infringement with respect to claim 10 of the '616 patent, the court is persuaded that no

12 reasonable jury could conclude that Cochlear's infringement was willful.  AMF did not meet its

13 burden of putting forth substantial evidence – let alone clear and convincing evidence – to

14 establish willful infringement under the objective prong of the willful infringement test.  Nor did it

15 provide substantial evidence to satisfy the subjective prong of the willful infringement test.  The

16 court therefore grants Cochlear's JMOL as to willful infringement.

17                    **COCHLEAR'S POST-VERDICT RULE 59 MOTION**

18 I.    LEGAL STANDARD.[7]

19     A motion for new trial under Federal Rule of Civil Procedure 59(a) may be granted "only if

20 the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious

21 evidence, or to prevent a miscarriage of justice."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729

22 (9th Cir. 2007).  "[T]he district court's denial of the motion for a new trial is reversible only if the

23 record contains no evidence in support of the verdict."  Openshaw v. FedEx Ground Package

24 System, Inc., 576 F.App'x 685, 689 (9th Cir. 2014) (internal quotation marks omitted).  The court

25 has "the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury,

26

27 _____

28     [7] In patent cases, the law of the regional circuit applies in determining whether to grant a new
   trial.  See Wordtech Sys. v. Int. Net. Sol., 609 F.3d 1308, 1313 (Fed. Cir. 2010).

1   even though supported by substantial evidence, where, in the court's conscientious opinion, the

2   verdict is contrary to the clear weight of the evidence . . . [or] to prevent, in the sound discretion

3   of the trial judge, a miscarriage of justice[.]"   Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d

4   1075, 1087 (9th Cir. 2009) (internal quotation marks omitted).

5   II.   INFRINGEMENT.

6       Cochlear seeks a new trial on infringement, "for all of the same reasons judgment as a

7   matter of law is appropriate." (Rule 59 Motion at 50).  For the reasons discussed above, the jury

8   verdict is not contrary to the "clear weight" of the evidence with respect to claim 10 of the '616

9   patent.  See DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218 (9th Cir. 2010).  The court denies

10  Cochlear's motion as to infringement.

11  II.   INVALIDITY.[8]

12      "It is well recognized that the persuasiveness of the presentation of complex

13  technology-based issues to lay persons depends heavily on the relative skill of the experts."

14  Mitsubishi Elec. Corp. v. Ampex Corp., 190 F.3d 1300, 1313 (Fed. Cir. 1999).  For its invalidity

15  case, Cochlear relied almost entirely on the testimony of Dr. Gerald Loeb ("Loeb"), who was a

16  former AMF employee and whose BION program had been terminated. (See RT, Jan. 17, 2014,

17  vol. 2, at 49:13-52:20).  AMF presented the rebuttal testimony of Young. (See RT, Jan. 22, 2014,

18  vol. 1, at 17:22-29:18).

19      During the trial, Loeb testified that the '616 patent was anticipated and/or obvious, in view

20  of the prior art.  He testified regarding references such as U.S. Patent No. 4,947,844 to McDermott

21  ("the '844 patent" or "the McDermott '844 patent") (Exh. 1150); U.S. Patent No. 4,612,934 to

22  Borkan ("the '934 patent" or the "Borkan '934 patent") (Exh. 1152); the LAURA Cochlear

23  Prosthesis Development and Description article by Peeters, which was presented at a 1987

24  cochlear implant symposium (Exh. 1200); and an article by McDermott entitled, "An Advanced

25  Multiple Channel Cochlear Implant," IEEE Transactions on Biomedical Engineering, pp. 789-97,

26  _____

27      [8] In its bench trial order issued contemporaneously with this Order, the court found that claim
    1 of the '616 patent and claims 6 and 7 of the '691 patent are invalid for indefiniteness.

28  Accordingly, the discussion in this section will be limited to claim 10 of the '616 patent.

1   Vol. 36:7 (July 1989) ("the 1989 McDermott article") (Exh. 1039).  (See PTO, App. A, at 46); (see

2   RT, Jan. 17, 2014, vol. 2, at 49:13-52:20).

3        AMF appears to have effectively challenged the credibility of Cochlear's expert during his

4   cross-examination.   For example, while AMF previously funded Loeb's BION project, it

5   discontinued the program in 2008, after a license fee dispute arose between Loeb an AMF.  (See

6   RT, Jan. 17, 2014, vol. 2, at 39-41 & 47-51; Exhs. 3030, 3032, 3037 & 3038).  Also, Loeb admitted

7   that the Examiner, William Kamm, (see RT, Jan. 21, 2014, vol. 1, at 35:18), had been the

8   examiner on "many" cochlear implant patents, (id. at 35:20-22), and multiple references had been

9   cited on the face of the patents-in-suit, including the Borkan '934 patent and the McDermott '844

10  patent.  (See id. at 38:11-15 & 40:7-12).  Finally, a reasonable jury could have discounted Loeb's

11  credibility, based on his background – a medical doctor with no formal training in electrical

12  engineering.  (See RT, Jan. 17, 2014, vol. 2, at 37 & 44-45).  Also, Loeb testified that he did not

13  design any circuitry, and that he was not in a position to direct circuitry design.  (See RT, Jan. 21,

14  2014, vol. 1, at 46-47).

15       In addition to its cross-examination of Loeb, AMF presented the testimony of its own expert,

16  Young, who testified that he did not consider Loeb, a medical doctor with some electronics

17  experience, to be well qualified.  (See RT, Jan. 22, 2014, vol. 1, at 18:21-19:4).  Young also

18  addressed prior art issues, including the '844 McDermott patent, the '934 Borkan patent, the 1989

19  McDermott article, the Peeters article, (see id. at 19:5-21:5, 22:5-23:2 & 24:13-28:20), as well as

20  secondary considerations of non-obviousness.  (See id. at 28:21-29:18).

21       To rebut Cochlear's argument that claim 10 of the '616 patent was anticipated or rendered

22  obvious by the 1989 McDermott article, AMF presented evidence distinguishing the prior art.  For

23  instance, AMF presented evidence that the 1989 McDermott article fails to disclose the "selectively

24  monitoring the at least one pair of the multiplicity of electrodes" and "an external receiver coupled

25  to the external transmitter" limitations.  (See RT, Jan. 22, 2014, vol. 1, at 20:3-22).  For the

26  "selectively monitoring" limitation, Young testified that Figure 6 of the 1989 McDermott article

27  depicts a single "V-Mon" line from the electrode array to the Voltage Monitor Telemetry Circuit,

28  demonstrating that the 1989 McDermott article discloses the monitoring of a single electrode, not

1   a pair of electrodes.  (See id. at 20:22-22:13) (e.g., "in McDermott's article, it's only one line.  He
2   only measures one voltage, not a pair.").  Young also testified that the external transmitter and
3   receiver in the 1989 McDermott article are not "coupled," as required by claim 10.  (See id. at 22-
4   23).

5        In short, the jury's finding with respect to the validity of claim 10 is not against the clear
6   weight of the evidence.  The jury apparently believed AMF's expert over Cochlear's expert.  See
7   Mitsubishi Elec. Corp., 190 F.3d at 1313 ("what you had in this case was two competing scientific
8   technological witnesses, one of whom claimed that the invention was invalid . . . and the other who
9   claimed it was not. . . .  [T]he jury apparently chose to believe the one witness over the other.").
10  This is perhaps not surprising given the credibility issues AMF raised with respect to Loeb.  See,
11  e.g., i4i Ltd. Partnership, 670 F.Supp.2d at 587 ("[u]ltimately, there was conflicting testimony
12  regarding this precise [invalidity] issue and the determination fell upon the credibility of the parties'
13  expert analysis"), aff'd as modified, 589 F.3d 1246, 1260-62 (Fed. Cir. 2009); Allergan, Inc. v. Barr
14  Labs., Inc., 808 F.Supp.2d 715, 733 (D. Del. 2011) (denying post-trial invalidity argument based
15  on credibility issues).

16  III.    DAMAGES.

17       "[U]nless the amount of damages is grossly excessive, unsupported by the evidence, or
18  based solely on speculation, the reviewing court must uphold the jury's determination of the
19  amount."  Morgan v. Woessner, 997 F.2d 1244, 1268 (9th Cir. 1993).  Where the court concludes
20  that a new trial is appropriate due to excessive damages, it may exercise its discretion to grant a
21  new trial either without qualification, or conditioned on the winner's refusal to accept a reduction
22  in damages, known as remittur.  See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433,
23  116 S.Ct. 2211, 2222 (1996).

24       As noted earlier, the jury awarded AMF damages in the $131,216,325.00 for Cochlear's
25  infringement of claims 1 and 10 of the '616 patent, and claims 6 and 7 of the '691 patent.[9]

26  _____

27       [9]  The verdict form stated: "[i]f you find that the Cochlear Defendants have infringed a valid
28  claim of either the '616 patent or the '691 patent, what are the total damages that the Cochlear
    Defendants should pay to the Foundation?"  (Verdict Form at 10).

16

1  However, the court, based on the testimony and evidence presented during both the jury and

2  bench trial, found claim 1 of the '616 patent and claims 6 and 7 of the '691 patent to be invalid on

3  indefiniteness grounds.

4      "[W]here the jury rendered a single verdict on damages, without breaking down the

5  damages attributable to each patent, the normal rule would require a new trial as to damages."

6  Retractable Techs., Inc. v. Becton Dickinson & Co., 757 F.3d 1366, 1370 (Fed. Cir. 2014)

7  (citations omitted); Accentra, Inc. v. Staples, Inc., 500 Fed. Appx. 922, 931 (Fed. Cir. 2013)

8  (vacating and remanding damages award, as expert testimony and jury verdict were based on

9  finding that all asserted patents were valid and infringed). Here, the damages awarded by the jury

10  were not broken down as to each claim or patent. (See Verdict Form at 10). Therefore, in light

11  of the foregoing and the court's contemporaneous finding of indefiniteness with respect to three

12  of the asserted claims, the court believes that it must grant the motion for new trial so as to allow

13  a damages trial with respect to claim 10 of the '616 patent.

14                      **ADVANCED BIONIC'S POST-VERDICT RULE 54 MOTION**

15      Advanced Bionics, an involuntary plaintiff and an exclusive licensee to the asserted patents,

16  filed a motion to alter or amend the judgment to reflect that "Advanced Bionics should be included

17  as a party plaintiff." (Motion of Plaintiff Advanced Bionics, LLC to Alter or Amend Judgment

18  Pursuant to Federal Rule of Civil Procedure [] 59 at 2). Under the circumstances, this motion will

19  be denied as moot.

20                                    **CONCLUSION**

21      Based on the foregoing, IT IS ORDERED THAT:

22      1. Defendant's Motion for Judgment as a Matter of Law **(Document No. 507)** is **granted**

23  **in part** and **denied in part**. The motion is **granted** and the court sets aside the jury's finding of

24  willful infringement. The motion is **denied** as to infringement in all other respects.

25      2. Defendant's Motion for a New Trial **(Document No. 508)** is **granted in part** and **denied**

26  **in part**. The motion is **granted** as to a new damages trial with respect to claim 10 of the '616

27  patent. The motion is **denied** in all other respects.

28

1        3. Involuntary Plaintiff Advanced Bionics' Motion to Amend the Judgment **(Document No.**

2   **504)** is **denied as moot**.

3   Dated this 31st day of March, 2015.

4                                                              /s/

5                                                    Fernando M. Olguin
                                              United States District Judge

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, et al., | Case No. CV 07-8108 FMO (SHx) |
| Plaintiffs, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| COCHLEAR CORPORATION, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF" or "plaintiff") brings this action, alleging that defendants Cochlear Corporation and Cochlear Ltd. (collectively, "Cochlear" or "defendants") infringed two patents directed to cochlear implant technology. (See First Amended Complaint for Patent Infringement ("FAC") at ¶¶ 17 & 21-23; Reply and Counterclaims-in-Reply to Cochlear Americas and Cochlear Limited's Counterclaims ("Pl.'s Supp. Claims") at 13-14) (Document Nos. 164 & 171). AMF alleges that Cochlear infringed U.S. Patent No. 5,938,691, entitled "Multichannel Implantable Cochlear Stimulator" ("the '691 patent"), and U.S. Patent No. 5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator" ("the '616 patent") (collectively, "the patents-in-suit"). (See FAC at ¶¶ 21-23; Pl.'s Supp. Claims at 13-14).

The '691 patent is generally directed to a cochlea stimulation system comprising of: (1) an

audio signal receiving device, i.e., a microphone; (2) a wearable processor ("WP") that receives and processes audio signals; and (3) an implanted cochlea stimulator ("ICS") that receives data representing the audio signals and stimulates electrodes. (See '691 patent at Abstract, col. 3:9-39 & 34:51-35:6). By stimulating the electrodes located within the cochlea, the implant can also stimulate locations of the auditory nerve, so that the hearing impaired person's brain can perceive sound. (See id. at col. 1:24-27; Reporter's Transcript ("RT"), Jan. 14, 2014, vol. 2, at 79:13-15 & 85:18-25). The '616 patent is generally directed to a system and a method for testing such a system. (See '616 patent at Abstract, col. 34:23-61 & 35:43-36:7).

The court, with the consent of the parties, appointed a Special Master for claim construction. (See Order re: Joint Status Report Regarding Appointment of Special Master at 1) (Document No. 179). The Special Master conducted a claim construction hearing, and issued a Report and Recommendation. (See Special Master's Report and Recommendation on Claim Construction ("R&R") at 5) (Document No. 200). After considering the parties' objections to the R&R, the court issued its Claim Construction Order on June 18, 2012.[1] (See Order re: Parties' Objections to the Special Master's Report on Claim Construction ("Claim Construction Order")) (Document No. 212). Advanced Bionics, LLC ("Advanced Bionics"), the exclusive licensee of the asserted patents, (see Pl.'s Supp. Claims at 13), was joined as an involuntary plaintiff on January 13, 2014. (See Final Pretrial Conference Order ("PTO") at 1) (Document No. 399).

The court conducted a jury trial, in which the jury found that Cochlear infringed claims 1 and 10 of the '616 patent, and claims 6 and 7 of the '691 patent. (See Verdict Form at 1-4 & 5-8) (Document No. 460). The jury also found willful infringement of both asserted patents. (See id. at 4 & 8). In addition, the jury found that the asserted claims are not invalid based on Cochlear's obviousness and anticipation defenses. (See id. at 4-5 & 8-9). The jury awarded $131,216,325 damages, based on royalty rate of 7.5 percent. (See id. at 10). Finally, the jury provided an advisory verdict in favor of AMF on inequitable conduct. (See id. at 9-10).

---

[1]   The case was transferred to the undersigned judge on January 18, 2013. (See Order of the Chief Judge, dated Jan. 18, 2013) (Document No. 232).

In addition, the court conducted a bench trial regarding the following: (1) equitable estoppel, (2) laches, (3) inequitable conduct, (4) prosecution history estoppel, and (5) indefiniteness.[2] (See PTO at 28; RT, Jan. 22, 2014, vol. 2).

The court, having heard live testimony and duly considered the evidence presented during both trials, the credibility of the witnesses, the parties' briefing, and the contentions and arguments of counsel, hereby makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

I.    BACKGROUND.

1.    Alfred E. Mann Foundation for Scientific Research is a nonprofit medical research foundation incorporated under California law. AMF's principal place of business is in Los Angeles County. (See PTO, App. A, at No. 1). AMF conducts medical research, and it has developed advanced medical devices for commercialization. (See RT, Jan. 14, 2014, vol. 2, at 51:15-19 & 52:14-53:18; Declaration of Dr. Joseph Schulman, Ph.D., Re Issues Tried to the Court ("Schulman Decl.") (Document No. 406) at ¶¶ 4-6. For instance, from about 2001 to 2004, AMF devoted substantial resources to its Battery Bion project, a wireless, implantable microstimulator intended for use in stroke patients. (See Schulman Decl. at ¶¶ 11-15). From 2004 to 2008, AMF conducted a human clinical trial with the University of Southampton, in order to reanimate paralyzed arms of post-stroke patients. (See Declaration of David Lee Hankin Submitted in Support of Plaintiff Re Issues Tried to the Court ("Hankin Decl.") at ¶ 13) (Document No. 403). In 2006-2009, AMF also worked on a trial involving the reanimation of paralyzed legs of post-spinal cord injury patients. (See id. at ¶ 21).

---

[2] The parties also addressed enhanced damages. (See Plaintiff Alfred E. Mann Foundation's Memorandum of Points and Authorities re Bench Trial ("AMF's Bench Tr. Br.") at 18-25; Defendants Cochlear Ltd. and Cochlear Americas' Memorandum of Points and Authorities re: Bench Trial ("Cochlear's Bench Tr. Br.") at 18-25) (Document Nos. 480 & 482). In the contemporaneously issued Order re: Post-trial Motions, the court granted Cochlear's motion for judgment as a matter of law as to the willfulness finding. Accordingly, it is not necessary to address AMF's request for enhanced damages.

2.   Defendant Cochlear Ltd. is a for-profit Australian company headquartered in Sydney, Australia.  Defendant Cochlear Corporation is a for-profit corporation incorporated under Delaware law with its principal place of business in Colorado.  (See PTO, App. A, at Nos. 2 & 3).

3.   U.S. Patent No. 5,609,616, entitled, "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," was issued on March 11, 1997.  U.S. Patent Application No. 447,157 was filed on May 25, 1995, and issued as the '616 patent.  The U.S. Patent and Trademark Office ("USPTO") issued the '616 patent as a continuation of Ser. No. 23,584, filed on February 26, 1993; which is a continuation of Ser. No. 752,069, filed on August 29, 1991; which is a continuation-in-part of Ser. No. 411,563, filed on September 22, 1989.  The '616 patent lists Joseph H. Schulman, John C. Gord, Primoz Strojnik, and David I. Whitmoyer as inventors, and AMF as the original assignee.  (See PTO, App. A, at No. 9; '616 patent).  The '616 patent expired on March 11, 2014. (See PTO, App. A, at 46).

4.   U.S. Patent No. 5,938,691, entitled, "Multichannel Implantable Cochlear Stimulator," issued on August 17, 1999.  U.S. Patent Application No. 09/103,264 was filed on June 23, 1998, and issued as the '691 patent.  The USPTO issued the '691 patent as a division of Application No. 08/450,041, filed on May 25, 1995; which is a continuation of Application No. 08/322,065, filed on October 12, 1994; which is a continuation-in-part of Application No. 08/23,584, filed on February 26, 1993; which is a continuation of Application Ser. No. 07/752,069, filed on August 29, 1991; which is a continuation-in-part of Application Ser. No. 07/411,563, filed on September 22, 1989. The '691 patent lists Joseph H. Schulman, John C. Gord, Primoz Strojnik, David I. Whitmoyer, and James H. Wolfe as inventors, and AMF as the original assignee.  (See PTO, App. A, at No. 11; '691 patent).  The '691 patent expired on September 22, 2009.  (See PTO, App. A, at 46).

5.   AMF remains the assignee and lawful owner of the '616 patent and the '691 patent. (See PTO, App. A, at 46).

II.    PATENT PROSECUTION – PRIOR ART.

6.   Bryant R. Gold ("Gold") was one of the attorneys who prosecuted the applications that resulted in the issuance of the '616 patent.  (See PTO, App. A, at No. 14).

7.   While prosecuting the application that was eventually issued as the '616 patent, Gold filed an Information Disclosure Statement on August 31, 1995 ("the 1995 IDS").  The 1995 IDS disclosed 63 references, including:  (1) United States Patent No. 4,947,844 to McDermott ("the McDermott patent" or "'844 patent"); and (2) United States Patent No. 4,612,934 to Borkan ("the Borkan patent" or "'934 patent").  (See PTO, App. A, at Nos. 14-16).

8.   On May 6, 1996, patent examiner William E. Kamm initialed the column, "Examiner Initial," on the 1995 IDS, indicating that he had considered the McDermott patent and the Borkan patent.  (See PTO, App. A, at No. 18).

9.   The McDermott and Borkan patents appear on the face of the '616 patent.  (See PTO, App. A, at Nos. 19-21).  U.S. Patent No. 4,232,679 to Schulman ("the Schulman patent" or "'679 patent") also appears on the face of the '616 patent.  (See '616 patent).

10.   During the prosecution of the '616 patent, the named inventors and their attorneys of record did not submit to the PTO an article by McDermott entitled, "An Advanced Multiple Channel Cochlear Implant," IEEE Transactions on Biomedical Engineering, pp. 789-97, Vol. 36:7 (July 1989) ("the 1989 McDermott article").  (See PTO, App. A, at 46).

11.  The 1989 McDermott article was known to Gold when he submitted it to the PTO during the prosecution of Ser. No. 08/322,066.  (See PTO, App. A, at 46).

12.  The '844 patent to McDermott and the 1989 McDermott article were both by the same inventor, Hugh McDermott.  (Trial Exhibits ("Exhs.") 1039 & 1150).

13.  The '844 patent issued from an application filed in the United States prior to the priority date claimed in the '616 patent.  (See PTO, App. A, at 45).

III.    PATENT PROSECUTION – AMENDMENTS TO CLAIM 10 OF THE '616 PATENT.

14.   The method claim that issued as claim 10 of the '616 patent first appeared in U.S. Patent Application No. 447,157 (the "'157 Application").  The '157 Application was filed on May 25, 1995.  Joseph H. Schulman, John C. Gord, Primoz Strojnik, and David I. Whitmoyer were listed as the applicants (collectively, "Applicants").  The method claim that later issued as claim 10 of the '616 patent was originally filed as claim 12.  (See Exh. 1303 at COC-1985 & 2053).

15.   In its original form, claim 12 recited as follows:

12.  A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to a plurality of tissue stimulating electrodes;

selectively monitoring at least one of the electrodes to measure voltages/currents associated with the stimulation signals applied thereto;

generating stimulator status indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status indicating signals to the external transmitter; and

receiving and processing the status indicating signals in the external transmitter to produce processed status indicating signals.

(Exh. 1303 at COC-2053).

16.  The claim limitation, "displaying the processed status-indicating signals . . .," in the issued claim 10 did not appear in then-claim 12 as originally proposed.  (See, generally, Exh. 1303 at COC-2053).

17.  In the November 17, 1995 Office Action ("November 1995 Office Action"), Examiner Kamm rejected claim 12 as "indefinite in the use of the alternative phrase 'voltages/current.'" (Exh. 1303 at COC-2113 & 2116).  Examiner Kamm also stated that "[t]he claim is further indefinite and incomplete in the absence of a step utilizing the processing status indicating signal."  (Id. at COC-2116).

18.  In the November 1995 Office Action, Examiner Kamm also rejected claim 12 "under 35 U.S.C. § 103 as being unpatentable over Van Arragon et al in view of Hafelfinger et al."  (Exh.

1303 at COC-2117-18). Examiner Kamm explained that "Van Arragon et al discloses the claimed combination of an implantable stimulator with an external programmer-tester communicating in both directions via transmitters and receivers.  While Van Arragon et al does not show the specific parameters of measuring at least one of voltage or current on at least one electrode, such monitoring circuitry further including impedance calculation circuits, are well-known in the implantable stimulator art as shown, for example, by Hafelfinger et al.  It would have been obvious to one of ordinary skill in the art at the time of the invention to choose the parameters to be measured as an indication of the status of the stimulator and it would be a mere matter of choice to employ electrode current/voltage as such a parameter especially in view of the teaching of Hafelfinger et al." (Exh. 1303 at COC-2117-18).  "Van Arragon et al." refers to U.S. Patent No. 4,513,743; and "Hafelfinger et al." refers to U.S. Patent No. 5,003,975.  (See id. at COC-2120 & 2166-92).

    19.  On March 18, 1996, the Applicants filed Amendment A, amending claim 12.  (Exh. 1303 at COC-2202 & 2205-06).

    20.  The amended claim 12 states as follows:

    ~~12~~ 10. A method of testing an implantable tissue stimulating system comprising:

    transmitting data-containing signals to an implanted stimulator from an external transmitter;

    selectively controlling the data-containing signals as they are thus transmitted;

    receiving the data-containing signals within the implanted stimulator, <u>the implanted stimulator having a multiplicity of tissue-stimulating electrodes</u>;

    processing the data-containing signals within the implanted stimulator to generate stimulation signals;

    applying the stimulation signals to <u>at least one pair of the multiplicity of</u> [a ~~plurality of~~] tissue stimulating electrodes;

    selectively monitoring <u>the</u> at least one <u>pair</u> of the <u>multiplicity of</u> electrodes to

measure a voltage associated therewith at the same time [voltages/currents
associated with] the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the
measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver
coupled to the external transmitter; [and]

receiving and processing the status-indicating signals [in the external
transmitter] to produce processed status-indicating signals which convey
information regarding the status of the implanted stimulator, including the
measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the
implanted stimulator, including the results of the measurements made within
the implanted stimulator, may be made known.

(Exh. 1303 at COC-2205-06) (underlining and strikeouts in original).

21. In the Remarks to Amendment A, the Applicants stated that, "[b]y way of the present amendment, Applicants have made a diligent effort to address each and every one of the definiteness concerns raised by the Examiner. Further, the newly-submitted claims have been carefully drafted in an attempt to ensure that they are definite and fully comply with the requirements of 35 U.S.C. § 112, second paragraph. Hence, it is believed that this rejection should be overcome." (Exh. 1303 at COC-2212).

22. The Applicants also stated that "[b]y way of the present amendment, Claims 1 and 12 (the independent claims) have been amended to distinguish the claimed invention over van Arragon et al. and Hafelfinger et al. More particularly, both van Arragon et al. and Hafelfigner et al (and, indeed, all of the other prior art cited by the Examiner) relate to implantable pacemakers, not cochlear stimulators. While there are some similarities between an implantable pacemaker and an implantable cochlear stimulator . . . there are many more dissimilarities." (Exh. 1303 at COC-2212).

23. The Applicants further distinguished claim 12 from the prior art by arguing that "the

claimed method is restricted to a method of testing an implantable tissue stimulating system that requires, <u>inter alia</u>, <u>monitoring</u> at least one pair of the multiplicity of electrodes <u>at the same time</u> the <u>stimulation signals are applied</u> thereto. Such simultaneous application of the stimulating signal to the electrode at the same time the electrode is monitored is not done in the pacemaker art." (Exh. 1303 at COC-2213-14) (emphasis in original).

24.  The Applicants referred to the invention's "display[]" of parameters "in real time," in order to distinguish the cited pacemaker prior art, which "deals with downloading histogram data that has been accumulated in the implant device (the pacemaker) over a period of time."  (Exh. 1303 at COC-2214-15) (emphasis in original).  By contrast, the Applicants stated that their invention provides real time feedback, and "[t]he sensed parameter is sent back to the physician's tester as part of a feedback signal were [sic] it is displayed or otherwise processed."  (<u>Id.</u> at COC-2214).

IV.    CLAIM CONSTRUCTION.

25.  The court construed the "means for generating data indicative of the audio signal" element of claim 6 of the '691 patent to be a means-plus-function element within the scope of 35 U.S.C. § 112, sixth paragraph.[3]  The recited function is "generating data indicative of the audio signal," and the corresponding structure is "a microprocessor."  (<u>See</u> R&R at 25-26 & 28; Claim Construction Order at 25; RT, Jan. 22, 2014, vol. 2, at 29:11-14).

26.  The court construed the "external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes" element of claim 1 of the '616 patent to be a means-plus-function element.  The recited function is "receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue-stimulating electrodes," and the corresponding structure is an "antenna, receiver, and microprocessor."  (<u>See</u> R&R at 3-4; Claim Construction Order at 25; RT, Jan. 22, 2014, vol. 2, at

---

[3]  Currently 35 U.S.C. § 112(f).

28:3-13).

27.  Each of the above limitations requires the disclosure of an algorithm.  (See Order Re: Cross-Motions for Summary Judgment, filed on January 3, 2014 ("Court's Order of January 3, 2014"), at 28-32 & 34-35) (Document No. 352).

V.    AMF'S KNOWLEDGE AND COMMUNICATIONS RE: COCHLEAR'S POTENTIAL INFRINGEMENT.

28.  Dr. Joseph Schulman, Ph.D. ("Schulman") was the head of AMF's day-to-day operations from AMF's inception in 1985 to 2007.  (See Schulman Decl. at ¶¶ 2-5).  In 1994, Schulman attended a conference regarding cochlear implants in Melbourne, Australia, where Hugh McDermott presented an article regarding the Cochlear Nucleus system.  (See id. at ¶¶ 23-24).  At the conference, Schulman learned that Cochlear's Nucleus implant reported impedance measurements.  (See RT, Jan. 17, 2014, vol. 1, at 123:4-124:9; Exh. 1075).  Schulman did not learn that Cochlear's system necessarily used back telemetry, or the technical details regarding Cochlear's system.  (See Schulman Decl. at ¶ 25; RT, Jan. 17, 2014, vol. 1, at 124:18-22).

29.  In 1998, Schulman learned that the Cochlear Nucleus 24, one of the accused products in this case, had a cochlear implant and a speech processor that included some telemetry features.  (Schulman Decl. at ¶ 26).  However, Schulman did not learn the details of Cochlear's implementation of back telemetry at the time.  (See id.).

30.  Cochlear's implants and processors were not available to the general public for testing. The publicly available material that Schulman reviewed, including marketing materials and conference presentations, did not reveal the detailed technical workings of Cochlear's devices sufficient to allow Schulman to reach a conclusion regarding potential infringement of the patents-in-suit.  (See Schulman Decl. at ¶ 27).

31.  In 2003, Schulman attended a meeting at the House Ear Institute, where he obtained literature on the fitting system for the Nucleus 24.  This literature showed details of the Nucleus 24 product and how its telemetry features were used and programmed.  (See Schulman Decl. at ¶ 28).

32.  Schulman, as President of AMF, sent a letter, dated July 21, 2003, to Jack O'Mahony

("O'Mahony"), who was then the CEO and President of Cochlear Pty Ltd. In the letter, Schulman states "that we have received information that your Nucleus cochlear implants utilize features that may infringe our U.S. Patent 5,609,616." (Schulman Decl. at ¶ 29; Exh. 1071). The letter further states that, "[a]lthough the patent is licensed to the Advanced Bionics Corporation, our licensee has decided, in accordance with the terms of our agreement, to defer enforcement of that patent to the AEMF. In doing so, Advanced Bionics has asked that we first explore a license agreement with Cochlear Pty Ltd. rather than undertake legal action to prevent you from using such important and patented technology in fitting patients. We are receptive to any reasonable resolution of the matter." (Exh. 1071). The July 21, 2003, letter does not mention the '691 patent. (See, generally, id.; Schulman Decl. at ¶ 29).

33. On October 7, 2003, Schulman received a response letter, dated October 1, 2003, from O'Mahony. (See Exh. 1072; Schulman Decl. at ¶ 30). The letter states, "With reference to your letter of July 21, 2003 and your U.S. Patent No. 5,609,616, the Nucleus cochlear implants do not infringe the patent." (Exh. 1072). The letter further states that "[t]he claims require separate transmitter and receiver coils. The Nucleus cochlear implant uses common circuitry with a single coil to exchange signals with an external speech processor in a manner very similar to the prior art references cited in the patent, and therefore it does not infringe." (Id.). The letter also states that "[a]nother feature of the claimed system is that the physician's tester can be connected directly to the external headpiece/transmitter. The Nucleus cochlear implant does not have a physician's tester that can be connected directly to an external coil of a headpiece/transmitter." (Id.). O'Mahony's response letter does not mention the '691 patent. (See id.). Schulman was not contacted further regarding this letter by O'Mahony or other Cochlear representatives. (See Schulman Decl. at ¶ 30).

34. In 2006, AMF conducted additional due diligence on Cochlear's implant systems. While AMF had difficulty finding materials regarding the circuitry of Cochlear's systems, it reviewed the materials it was able to locate. AMF's due diligence included reviewing Cochlear product manuals and speaking with medical doctors familiar with Cochlear's systems. (See Hankin Decl. at ¶ 24). AMF then retained the law firm of Irell & Manella LLP regarding this dispute. (See id.

1  at ¶ 25).

2      35.  On August 28, 2006, AMF's outside counsel, Morgan Chu of Irell & Manella LLP

3  ("Chu"), sent a letter to Dr. Chris Roberts, Cochlear Pty Ltd.'s CEO and President.  (See Hankin

4  Decl. at ¶ 25[4]; Exh. 634).  Following up on the 2003 correspondence, the letter states that "the

5  claims of the '616 patent do not require 'separate transmitter and receiver coils' or a 'physician's

6  tester . . . connected directly to an external coil of a headpiece/transmitter.'"  (Exh. 634).  Thus,

7  AMF asserted that Cochlear's arguments "do not bear on Cochlear's infringement of the '616

8  patent."  (Id.).  The letter further states that AMF "would like to discuss Cochlear's licensing of the

9  '616 patent in connection with Cochlear's cochlear implant products, such that the matter may be

10  amicably resolved."  (Id.; see Hankin Decl. at ¶ 25).  The August 28, 2006, letter does not mention

11  the '691 patent.  (See, generally, Exh. 634).

12      36.  Michael G. Verga ("Verga"), outside counsel for Cochlear Ltd., responded to Chu's

13  letter on October 24, 2006.  (See Hankin Decl. at ¶ 27[5]; Exh. 633).  The October 24, 2006, letter

14  states that "Cochlear was surprised to receive [AMF's] letter of August 28, 2006, since Cochlear

15  and AEMF last communicated about this matter over three years ago.  At that time Cochlear

16  presented to AEMF several reasons that Cochlear's products did not infringe the claims of the '616

17  patent.  Having not received a reply, Cochlear believed that this matter was resolved to [AMF's]

18  satisfaction over three years ago."  (Exh. 633).  The October 24, 2006, letter, also does not refer

19  to the '691 patent.  (See, generally, id.).

20      37.  On December 13, 2007, AMF filed this lawsuit against Cochlear.  (See Complaint for

21  Patent Infringement) (Document No. 1).  In the original complaint, AMF asserted infringement only

22  as to the '616 patent.  (See id. at ¶¶ 20-22).

23      38.  Any finding of fact that more correctly constitutes a conclusion of law should be treated

24  as such.

25  _____

26  [4]  The Hankin Declaration refers to an August 18, 2006, letter.  (Hankin Decl. at ¶ 25).  However, the referenced letter has an August 28, 2006, date.  (See Exh. 634).

27  [5]  The Hankin Declaration again refers to the incorrect date of the referenced letter.  (See Hankin

28  Decl. at ¶ 27).

**CONCLUSIONS OF LAW**

I.    EQUITABLE ESTOPPEL.

39.  A patentee may forfeit its right to any relief from an infringer where: "(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." Radio Sys. Corp. v. Lalor, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (citing A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)).  The alleged infringer must prove each of these elements by a preponderance of the evidence.  Aukerman, 960 F.2d at 1045-46.  The "applicability of equitable estoppel is 'committed to the sound discretion of the trial judge.'" Radio Sys. Corp., 709 F.3d at 1130 (citing Aukerman, 960 F.2d at 1028).

40.  There is no evidence that AMF communicated with, or made any representation to Cochlear with respect to the '691 patent before filing suit.  AMF's discussions with Cochlear in 2003 and 2006 refer only to the alleged infringement of the '616 patent.  (See, e.g., Exhs. 1071, 1072, 633 & 634).  "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, . . . or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." Aukerman, 960 F.2d at 1043-44.  Cochlear has not proven by the preponderance of the evidence that AMF had a "clear duty to speak" concerning the '691 patent, or that it could reasonably infer that AMF would not file suit as to the '691 patent.  In other words, there is no "misleading conduct (or silence)" to indicate that AMF did not intend to enforce the '691 patent.  See Radio Sys. Corp., 709 F.3d at 1130.  Thus, Cochlear's equitable estoppel argument fails as to the '691 patent.

41.  With respect to the '616 patent, AMF's conduct, namely, its 2003 correspondence and silence from late 2003 through mid-2006, was not sufficiently misleading to lead Cochlear to "reasonably infer that the  patentee does not intend to enforce its patent[.]" Radio Sys. Corp., 709 F.3d at 1130.  "Misleading 'conduct' may include specific statements, action, inaction, or silence when there was an obligation to speak." Aspex Eyewear Inc. v. Clariti Eyewear, Inc., 605 F.3d

1    1305, 1310 (Fed. Cir. 2010) (citing Aukerman, 960 F.2d at 1028).  Intentionally misleading silence

2    may arise where a patentee "threatened immediate or vigorous enforcement of its patent rights

3    but then did nothing for an unreasonably long time."  Id. (internal citations omitted); see, e.g., id.

4    at 1311 (demand letter stating patentholder's "strong intention to fully and vigorously enforce [its]

5    rights"); Radio Sys. Corp., 709 F.3d at 1126 (demand letter alleging infringement and stating that

6    accused infringer "must take a license or cease all manufacturing and destroy all sales

7    inventory.").  Here, while the almost three-year gap between the parties' October 2003 and August

8    2006 letters raise questions as to AMF's diligence, "equitable relief is not a matter of precise

9    formula."  Aspex Eyewear Inc., 605 F.3d at 1311.  AMF's correspondence does not indicate that

10   it would immediately or vigorously enforce its rights.  Rather, the July 21, 2003, letter expressed

11   AMF's interest in "first explor[ing] a license agreement . . . rather than undertak[ing] legal action."

12   (Exh. 1071).  AMF's 2003 letter also stated that AMF was "receptive to any reasonable resolution

13   of the matter."   (Id.).  In the context of AMF's interactions with Cochlear, the court does not

14   interpret AMF's discussions with Cochlear in 2003 as "threats of suit for infringement[.]"  Aspex

15   Eyewear Inc., 605 F.3d at 1311.  In short, Cochlear has not proven the elements of equitable

16   estoppel by a preponderance of the evidence.

17   II.    LACHES.

18          42.  A patentee's claim for pre-suit damages may be barred under the doctrine of laches

19   where (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from

20   the time the plaintiff knew or reasonably should have known of its claim against the defendant,"

21   and (2) "the delay operated to the prejudice or injury of the defendant."  Aukerman, 960 F.2d at

22   1028 & 1032.  The alleged infringer must prove laches by a preponderance of the evidence.  Id.

23   at 1045.  Historically, "[a] rebuttable presumption of laches [has arisen] when a patentee has

24   delayed more than six years after actual or constructive knowledge of the defendant's alleged

25   infringing activity."  Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1333 (Fed. Cir. 2009)

26

27

28

1    (citing Aukerman, 960 F.2d at 1032).[6]  Laches is an equitable defense, applied at the trial court's

2    discretion in view of the circumstances.  See Aukerman, 960 F.2d at 1036.

3        43.  The record demonstrates that AMF had actual or constructive knowledge of Cochlear's

4    purported infringement of the '616 patent and the '691 patent in 2003 when Schulman attended

5    a meeting at the House Ear Institute, where he obtained literature regarding the fitting system for

6    Cochlear's Nucleus 24 product.  This literature included details of the Nucleus 24 product and how

7    its telemetry features were used and programmed, (see Schulman Decl. at ¶ 28), and put AMF

8    on inquiry notice regarding Cochlear's purported infringement.  See Wanless v. Gen. Elec. Co.,

9    148 F.3d 1334, 1338 (Fed. Cir. 1998) ("sales, marketing, publication, or public use of a product

10   similar to or embodying technology similar to the patented invention, or published descriptions of

11   the defendant's potentially infringing activities, give rise to a duty to investigate whether there is

12   infringement.").

13       44.  The court is not persuaded that AMF knew or should have known of Cochlear's

14   infringing activities due to Schulman's attendance at the Melbourne conference in 1994.  (See,

15   e.g., Schulman Decl. at ¶¶ 23-25).  At the Melbourne conference, Schulman learned that

16   Cochlear's Nucleus implant reported impedance measurements; however, he did not receive

17   detailed technical information about the Nucleus implant.  (See id.; Exh. 1075 at AMF8912).  This

18   is insufficient to establish that AMF had inquiry notice regarding Cochlear's purported infringement.

19       45.  Likewise, the court is not persuaded by Cochlear's argument that AMF should have

20   known of its claims by 1996, when AMF purportedly identified the Cochlear 24-N as having "back

21   telemetry."  (See RT, Jan. 22, 2014, vol. 2, at 93:5-13); Cf. Wanless, 148 F.3d at 1339

22   (constructive knowledge based on defendant's "open and notorious sale of easily testable

23   products," which gave the patentholder "the opportunity to discover the alleged infringement

24   earlier").  The general disclosure of "back telemetry" was not enough to put AMF on inquiry notice

25

26   ─────────────────────
[6]   The Federal Circuit has granted a petition for rehearing en banc to consider Aukerman in light
27   of Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S.Ct. 1962 (2014).  See SCA Hygiene Prods.
     Aktiebolag v. First Quality Baby Prods., LLC, 2014 WL 7460970, *1 (Fed. Cir. 2014).  The court
28   has analyzed both Aukerman and Petrella, and considers its ruling consistent with both decisions.

of its claims.  For the same reasons, AMF did not have actual or constructive knowledge of Cochlear's infringement in 1998, when Schulman learned that Cochlear's Nucleus 24 implant had telemetry features.  (See Schulman Decl. at ¶ 26).  Under the circumstances, Cochlear has not presented sufficient evidence to establish that AMF had constructive knowledge of its claims in the 1994-1998 time frame.

46.  AMF presented credible evidence that Cochlear's implants and processors were not available to AMF for testing, and the readily available materials were not detailed enough for AMF to reach a conclusion as to whether Cochlear's telemetry features were similar to those claimed in the patents-in-suit.  (See Schulman Decl. at ¶ 27).  The record does not indicate that AMF received detailed technical information, such that AMF should have known of its claims against Cochlear.  Nor has Cochlear demonstrated that other public information was detailed enough to put AMF on inquiry notice of its claims.  See Wanlass, 148 F.3d at 1338-39 (constructive knowledge may be warranted due to disclosures in "readily available information").

47.  Based on the foregoing, the court finds that AMF knew or should have known of its claims in 2003, when it obtained detailed technical information regarding Cochlear's accused devices.  (See Schulman Decl. at ¶ 28).

48.  AMF filed suit in December 2007.  Thus, AMF delayed approximately four years before filing suit, so the traditional presumption of laches does not apply.  See Aukerman, 960 F.2d at 1028 & 1035.

49.  AMF's four-year delay in bringing suit was not unreasonable under the circumstances. See Aukerman, 960 F.2d at 1032 ("The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances.").  In the 2003-2007 time frame, AMF had limited resources, and it devoted substantial portions of its resources to its research and development activities, such as the Battery Bion project.  (See Schulman Decl. at ¶ 15).  During this time period, AMF also conducted a human clinical trial at the University of Southampton, in order to reanimate paralyzed arms of post-stroke patients.  (See Hankin Decl. at ¶ 13).  AMF also initiated a trial involving the reanimation of paralyzed legs of post-spinal cord injury patients.  (See id. at ¶ 21).  Given AMF's limited personnel, AMF's delay in filing suit was not unreasonable.

1    50. In addition, the court is not persuaded that Cochlear suffered economic prejudice due

2   to AMF's delay.  See Aukerman, 960 F.2d at 1033.  First, while Cochlear argues that it would not

3   have invested in the "new Nucleus Freedom implant with the exact same telemetry system" as the

4   older accused products, (see Cochlear's Bench Tr. Br. at 4), Cochlear conceded that it did not

5   change the development plans for its implants or processors based on the 2003 letter from AMF.

6   (See PTO, App. A, at No. 188).  For the same reason, the court is not persuaded by Cochlear's

7   argument, (see Cochlear's Bench Tr. Br. at 4), that it "could have" designed around the '616 patent

8   with an earlier lawsuit, as there was nothing preventing Cochlear from designing around the '616

9   patent on the basis of AMF's 2003 letter.  In short, Cochlear has not shown economic prejudice

10   due to the delay in filing suit.

11    51. Likewise, the court is not persuaded by Cochlear's assertions regarding evidentiary

12   prejudice.  (See Cochlear's Bench Tr. Br. at 4-5).  While some trial witnesses had difficulty

13   remembering some details, the court is not persuaded that such issues rendered Cochlear unable

14   to "present a full and fair defense on the merits[.]"  Aukerman, 960 F.2d at 1033.  For instance,

15   Cochlear did not present evidence that the "loss of records" or "death of a witness" undermined

16   the trial.  (See, generally, Cochlear's Bench Tr. Br. at 4-5).  As for fading memories, AMF

17   presented credible evidence that the witness testimony would not have been materially different

18   if it had filed suit earlier.  (See, e.g., Schulman Decl. at ¶¶ 33-36).

19    52. In short, Cochlear has not proven the laches defense by the preponderance of the

20   evidence.

21   III.    INEQUITABLE CONDUCT.

22    53. In order to prevail on an inequitable conduct defense, "the accused infringer must prove

23   that the applicant misrepresented or omitted material information with the specific intent to deceive

24   the PTO.  The accused infringer must prove both elements – intent and materiality – by clear and

25   convincing evidence."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1287 (Fed.

26   Cir. 2011) (en banc) (internal citations omitted).  "[G]ross negligence or negligence under a 'should

27   have known' standard does not satisfy this intent requirement."  Id. at 1290.  In a case that

28   involves the nondisclosure of a prior art reference, "clear and convincing evidence must show that

the applicant made a deliberate decision to withhold a known material reference."  Id. (internal

quotation marks and emphasis omitted)."  Accordingly, "the accused infringer must prove by clear

and convincing evidence that the applicant knew of the reference, knew that it was material, and

made a deliberate decision to withhold it."  Id.  While the trial court "may infer intent from indirect

and circumstantial evidence[,]" the intent to deceive must be "the single most reasonable inference

able to be drawn from the evidence."  Id. (internal quotation marks omitted).  The evidence "must

be sufficient to require a finding of deceitful intent" under the circumstances.  Id. (internal quotation

marks omitted).    Intent to  deceive  may  not  be  found  where  "there  are  multiple  reasonable

inferences that may be drawn[.]"  Id. at 1290-91.

54. Cochlear asserts that AMF engaged in inequitable conduct as to the '616 patent, due

to the failure of Bryant Gold, one of AMF's patent prosecutors, to disclose the 1989 McDermott

article. (See Cochlear's Bench Tr. Br. at 14-16).

55. The jury provided an advisory verdict that Cochlear did not prove inequitable conduct

by clear and convincing evidence.  (See Verdict Form at 9-10).

56. Based on the record, the court is not persuaded that it should disturb the jury's advisory

verdict.  As for materiality, AMF presented evidence that the 1989 McDermott article was

cumulative of the cited prior art.  See Therasense, 649 F.3d at 1291 (but-for materiality standard

for materiality).  It is undisputed that the Applicants disclosed the McDermott '844 patent during

prosecution. (See PTO, App. A, at Nos. 14-15, 18-19).  Gold testified that cited prior art, such as

the McDermott '844 patent, the Borkan '934 patent, and the Schulman '679 patent, "disclose[d]

everything and more than is disclosed in the McDermott article."  (RT, Jan. 21, 2014, vol. 1, at

80:15-86:18 & 88:9-12).  Based on the jury's advisory verdict, the jury apparently found Gold's

testimony credible.  The court agrees with the jury's credibility finding.  Based on the current

record, it is reasonable to conclude that the 1989 McDermott article was cumulative.  See

Therasense, Inc., 649 F.3d at 1290-91.  Thus, Cochlear has not proven materiality by clear and

convincing evidence.

57. As for intent to deceive, AMF presented evidence that Gold did not have the requisite

intent, for instance, because he did not consider the McDermott material. (See, e.g., RT, Jan. 21,

1  2014, vol. 1, at 80:12-83:16 & 86:11-18); see Therasense, Inc., 649 F.3d at 1290 ("the accused

2  infringer must prove by clear and convincing evidence that the applicant . . . knew that [the

3  reference] was material").  Based on the evidence regarding the cited prior art, it is reasonable to

4  conclude that Gold considered the 1989 McDermott article cumulative during prosecution.  Under

5  the circumstances, intent to deceive is not the most reasonable inference drawn from the

6  evidentiary record.  See id.

7      58.  Cochlear has not proven inequitable conduct by clear and convincing evidence, so the

8  '616 patent is not unenforceable due to inequitable conduct.

9  IV.    PROSECUTION HISTORY ESTOPPEL.[7]

10     59.  "Prosecution history estoppel prevents a patentee from recapturing under the doctrine

11 of equivalents subject matter surrendered during prosecution to obtain a patent."  Cross Med.

12 Prods. v. Medtronic Sofamor Danek, Inc., 480 F.3d 1335, 1341 (Fed. Cir. 2007); see Festo Corp.

13 v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 738, 122 S.Ct. 1831, 1841 (2002).

14 "There are two distinct theories that fall under the penumbra of prosecution history estoppel –

15 amendment-based estoppel and argument-based estoppel. . . .  In general, prosecution history

16 estoppel, under either theory, requires that patent claims be interpreted in light of the proceedings

17 before the PTO."  Deering Precision Instr., L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314,

18 1324-25 (Fed. Cir. 2003), cert. denied, 540 U.S. 1184 (2004).

19     60.  For amendment-based estoppel, where the applicant "narrowed the claim in response

20 to a rejection, courts may presume the amended text was composed with awareness of this rule

21 and that the territory surrendered is not an equivalent of the territory claimed."  Deering Precision

22

23 ───────────────────

24 [7]  AMF notes that Cochlear abandoned its prior prosecution history estoppel argument as to the
   "means for transmitting" limitation in the '691 patent, which purportedly barred the use of the
25 doctrine of equivalents to cover a single-antenna implant.  (See AMF's Bench Tr. Br. at 17-18).
   Cochlear did not present this argument during the bench trial.  (See, generally, Cochlear's Bench
26 Tr. Br. at 16-18; RT, Jan. 22, 2014, vol. 2; Defendants' Cochlear Ltd. and Cochlear Americas'
   Proposed Findings of Fact and Conclusions of Law; Defendants Cochlear Ltd. and Cochlear
27 Americas' Opening Statement) (no reference to "means for transmitting" limitation or antenna-
   based theory for prosecution history estoppel).  Accordingly, it is unnecessary to address this
28 limitation.

1  Instr., L.L.C., 347 F.3d at 1325 (internal quotation marks omitted).  In order to rebut the

2  presumption, "the patentee must show that at the time of the amendment one skilled in the art

3  could not reasonably be expected to have drafted a claim that would have literally encompassed

4  the alleged equivalent."  Id. (internal quotation marks omitted).  The patentee may do so by

5  showing that (1) "the equivalent may have been unforeseeable at the time of the amendment;" (2)

6  "the rationale underlying the amendment may bear no more than a tangential relation to the

7  equivalent in question;" or (3) "there may be some other reason suggesting that the patentee could

8  not reasonably be expected to have described the insubstantial substitute in question."  Id.  As for

9  argument-based estoppel, the "prosecution history must evince a clear and unmistakable

10 surrender of subject matter."  Id. at 1326 (internal quotation marks omitted).

11     61.  Cochlear argues that AMF narrowed claim 10 of the '616 patent by:  (1) adding the

12 "displaying" limitation to overcome the prior art; and (2) modifying the "selectively monitoring"

13 limitation.  (See Cochlear's Bench Tr. Br. at 16-18).  Cochlear also notes that in the response to

14 the Amendment, the Examiner withdrew the rejection, stating that claim 10 is "allowable over the

15 prior art of record since the prior art does not show or suggest the measuring of the electrode

16 voltage for external display."  (Id. at 17) (emphasis from brief omitted).

17     62.  AMF argues that it has rebutted the Festo presumption, because the focus of the

18 amendment was on "the displaying capability of the invention, not on any particular type of

19 information that must be displayed."  (AMF's Bench Tr. Br. at 16).  In addition, AMF contends that

20 "the Patent Examiner focused on the fact that this invention, as opposed to the [prior art]

21 pacemaker, allowed for a display of the data measurements that are taken in real time."  (Id. at

22 17 (quoting the Claim Construction Order)) (emphasis omitted).  As for the "selectively monitoring"

23 limitation, AMF asserts that the modification is tangential to the equivalent at issue in the

24 "displaying" limitation.  (See AMF's Bench Tr. Br. at 17).  Finally, AMF argues that the statements

25 of the Examiner alone cannot give rise to prosecution history estoppel.  (Id.).

26     63.  Based on a review of the prosecution history and the parties' briefing, the court is

27 persuaded by AMF's arguments.  As for the "displaying" limitation, the Applicants' addition of the

28 "displaying" limitation to claim 10 was directed towards overcoming the pacemaker prior art that

1   lacked a display.  "'[T]he inquiry into whether a patentee can rebut the Festo presumption under

2   the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing

3   amendment.'"  Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1378

4   (Fed. Cir. 2008) (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d

5   1359, 1367 (Fed. Cir. 2003)).  An amendment may be "tangential," where the focus of the

6   amendment was not the equivalent at issue.  See, e.g., Regents of the Univ. of Cal., 517 F.3d at

7   1378 ("The prosecution history therefore reveals that in narrowing the claim to overcome the prior

8   art rejections, the focus of the patentees' arguments centered on the method of blocking – not on

9   the particular type of nucleic acid that could be used for blocking."); Funai Elec. Co., Ltd. v.

10  Daewoo Elecs. Corp., 616 F.3d 1357, 1369-70 (Fed. Cir. 2010) ("It is apparent that the nature of

11  the insulating material was not a factor in the allowance . . . . This limitation is in the category that

12  the Court called 'merely tangential' to the prosecution, as discussed in Festo.  Thus the district

13  court correctly held that the cancellation of claims 1 and 2 did not surrender access to equivalency

14  with respect to the insulating material. The district court appropriately tried the question of

15  equivalency to the jury.").  Here, the prior art rejection and the amendment to add the "displaying"

16  limitation was focused on the displaying capability of its invention, not on the particular type of

17  information that must be displayed.  Thus,  the "objectively apparent reason" for the amendment

18  was to overcome the pacemaker prior art, which did not include the real-time display of data.  See

19  Regents of the Univ. of Cal., 517 F.3d at 1378 ("prosecution history estoppel will not bar the

20  doctrine of equivalents when 'the reason for the narrowing amendment was peripheral, or not

21  directly relevant, to the alleged equivalent'").

22      64.  As for the "selectively monitoring" amendment, the Examiner rejected claim 10 (then

23  claim 12), on the basis of § 112, explaining, for instance, that it is "indefinite in the use of the

24  alternative phrase voltages/current." (See Exh. 1303 at COC-2116). The Examiner reiterated that

25  voltage measurements require a reference. (See id.).  In the Amendment, the Applicants replaced

26  "voltages/currents" with "a voltage . . . ."  (See Exh. 1303 at COC-2205).  While it is possible that

27  the amendment to the "selectively monitoring" limitation may foreclose a doctrine of equivalents

28  argument regarding the "voltage" in that step, the court is not persuaded by Cochlear's argument

that AMF should be broadly "estopped from asserting infringement of claim 10 under the doctrine of equivalents." (See Cochlear's Bench Tr. Br. at 17). Here, the equivalent at issue is in the "displaying" step of claim 10. (See id. at 18). However, claim 10 recites several intermediate steps between the "selectively monitoring" and "displaying" steps, which even involve processing the data. (See '616 patent at col. 35:56-36:8). In particular, after the electrodes have been "selectively monitored" to "measure a voltage," the (1) "status-indicating signals representative of the measurements" are generated, (2) these signals are transmitted, and (3) the "status-indicating signals" are processed "to produce processed status-indicating signals," which are then (4) displayed in the "displaying" step. Under the circumstances, the amendment of the "selectively monitoring" limitation is "tangential" to the equivalent in the "displaying" step. See Regents of the Univ. of Cal., 517 F.3d at 1376. The court's review of the prosecution history does not indicate the surrender of the doctrine of equivalents in the "displaying" step. See Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1291 (Fed. Cir. 2010) ("There is no reason why a narrowing amendment should be deemed to relinquish equivalents . . . beyond a fair interpretation of what was surrendered.") (internal quotation marks omitted).

65. Finally, Cochlear asserts that AMF is estopped from asserting infringement of claim 10 under the doctrine of equivalents based on the Examiner's statement that "the prior art does not show or suggest the measuring of the electrode voltage for external display." (Cochlear's Bench Tr. Br. at 17) (citing Exh. 1303 at COC-2221). Cochlear's assertions are unpersuasive. The Examiner's Notice of Allowance cannot, by itself, give rise to disavowal of claim scope. See Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("The parties . . . contest whether the applicant's silence to the examiner's remarks in the Examiner's Statements of Reasons for Allowance amounts to a clear disavowal of claim scope . . . . [S]uch statements do not amount to a clear disavowal of claim scope[.]"). Moreover, the court interprets Examiner Kamm's emphasis to be on the "external display," and does not interpret the Examiner's comment as requiring the display of a voltage value. Indeed, during claim construction, the court rejected a similar argument by Cochlear that claim 10 "must be construed to require that the display be in voltage form." (Claim Construction Order at 2). The court explained that "the Patent Examiner

1   did not emphasize the measuring and displaying of the electrode voltage in voltage form.  Rather,

2   the Patent Examiner focused on the fact that this invention, as opposed to a pacemaker, allowed

3   for a display of the data measurements that are taken in real time."  (See id. at 3) (emphasis in

4   original).

5       66.  In short, the court finds that AMF rebutted the Festo presumption, and that AMF is not

6   foreclosed from arguing that the "displaying" step in claim 10 is met under the doctrine of

7   equivalents.

8   V.    INDEFINITENESS.[8]

9       67.  A patent is presumed to be valid.  35 U.S.C. § 282.  A party challenging the validity of

10  a patent must prove invalidity by clear and convincing evidence.  Intel Corp. v. VIA Techs., 319

11  F.3d 1357, 1366 (Fed. Cir. 2003) ("Any fact critical to a holding on indefiniteness, moreover, must

12  be proven by the challenger by clear and convincing evidence.").

13      68.  Whether a claim is indefinite or definite is a question of law.  See DDR Holdings, LLC

14  v. Hotels.com, L.P., 773 F.3d 1245, 1260 (Fed. Cir. 2014).  The indefiniteness or definiteness

15  analysis requires a determination of whether one skilled in the art would understand the bounds

16  of the claim when read in light of the specification.  See Personalized Media Commc'ns, LLC v.

17  Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Determining whether a claim is definite

18  requires an analysis of whether one skilled in the art would understand the bounds of the claim

19  when read in light of the specification. . . . If the claims read in light of the specification reasonably

20  _____

21  [8]  In the bench trial, Cochlear also argued indefiniteness as to the "means in the WP for receiving
    and processing the ICS-status-indicating signals" limitation in claims 6 and 7 of the '691 patent.

22  (See, e.g., Direct Testimony of Robert J. Stevenson, Ph.D. Re Indefiniteness ("Stevenson Decl.")
    at ¶¶ 15-18) (Document No. 410).  However, Cochlear did not identify the indefiniteness issue for

23  this limitation in its Memorandum of Contentions of Fact and Law.  (See, generally, Def.'s
    Memorandum of Contentions of Fact and Law at 50-54) (Document No. 310).  Nor did Cochlear

24  identify this limitation in its claim construction briefing or its motion for summary judgment.  (See
    Integrated, Joint Brief on Claim Construction at 7) (Document No. 59) (Joint Brief re: Summary

25  Judgment Motions at 27-30 (Document No. 246).  Finally, the parties did not identify the claim
    limitations at issue for indefiniteness in the pretrial order.  (See, generally, PTO).  Under the

26  circumstances, the court finds that Cochlear waived the indefiniteness argument as for the "means
    in the WP for receiving and processing the ICS-status-indicating signals" limitation in claims 6 and

27  7.  AMF's objection to Cochlear's inclusion of this limitation in its indefiniteness case, (see AMF's
    Bench Tr. Br. at 13-14), is sustained.

28

1  apprise those skilled in the art of the scope of the invention, § 112 demands no more.") (internal

2  quotation marks omitted); see also Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2129

3  (2014) ("[W]e read §112, ¶ 2 to require that a patent's claims, viewed in light of the specification

4  and prosecution history, inform those skilled in the art about the scope of the invention with

5  reasonable certainty."); Source Search Tech. LLC v. LendingTree, LLC, 588 F.3d 1063, 1077

6  (Fed. Cir. 2009) ("[T]his court measures indefiniteness according to an objective measure that

7  recognizes artisans of ordinary skill are not mindless 'automatons.'").

8        69.  "While it is undisputed that the question of whether a claim is indefinite is based on how

9  the claim limitation would be understood by one of skill in the art, the testimony of one of ordinary

10  skill in the art cannot supplant the total absence of structure from the specification." Noah Sys.,

11  Inc. v. Intuit Inc., 675 F.3d 1302, 1312 (Fed. Cir. 2012) (internal quotation marks omitted); see also

12  Intel, 319 F.3d at 1366 (holding that the internal circuitry of an electronic device need not be

13  disclosed in the specification if one of ordinary skill in the art would understand how to build and

14  modify the device); Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1341 (Fed. Cir.), cert.

15  denied, 555 U.S. 1070 (2008) ("This court does not impose a lofty standard in its indefiniteness

16  cases."); Telcordia Techs., Inc. v. Cisco Sys., 612 F.3d 1365, 1377 (Fed. Cir. 2010) (where

17  defendant bears the burden of proving that an ordinary artisan would not understand the

18  disclosure, finding that the trial record did not show that an ordinary artisan would not understand

19  the link between the controller and the monitoring function).

20       70.  "In a means-plus-function claim in which the disclosed structure is a computer, or

21  microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

22  purpose computer, but rather the special purpose computer programmed to perform the disclosed

23  algorithm." WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999).

24  Accordingly, a means-plus-function limitation can be indefinite, due to the failure to adequately

25  disclose an algorithm corresponding to the microprocessor's function. See Noah Sys., 675 F.3d

26  at 1312 ("In cases such as this one, involving a special purpose computer-implemented

27  means-plus-function limitation, this court has consistently required that the structure disclosed in

28  the specification be more than simply a general purpose computer or microprocessor.  We require

1    that the specification disclose an algorithm for performing the claimed function.") (internal

2    quotation marks, footnote, and citation omitted); see also Net MoneyIN, Inc. v. VeriSign, Inc., 545

3    F.3d 1359, 1367 (Fed. Cir. 2008) ("To avoid purely functional claiming in cases involving

4    computer-implemented inventions, we have consistently required that the structure disclosed in

5    the specification be more than simply a general purpose computer or microprocessor.") (internal

6    quotation marks omitted).

7        71.  "For a claim to be definite, a recited algorithm, or other type of structure for a section

8    112(f) claim limitation, need not be so particularized as to eliminate the need for any

9    implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds

10   of the claim – declared by section 112(f) to cover the particular structure and its equivalents –

11   understandable by the implementer."  Ibormeith IP, LLC v. Mercedes-Benz USA, LLC, 732 F.3d

12   1376, 1379 (Fed. Cir. 2013).  "The usage 'algorithm' in computer systems has broad meaning, for

13   it encompasses in essence a series of instructions for the computer to follow, whether in

14   mathematical formula, or a word description of the procedure to be implemented by a suitably

15   programmed computer."  Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1384 (Fed. Cir.

16   2011) (internal quotation marks and citation omitted); see Finisar, 523 F.3d at 1340 ("This court

17   permits a patentee to express that algorithm in any understandable terms including as a

18   mathematical formula, in prose, . . . or as a flow chart, or in any other manner that provides

19   sufficient structure.") (internal citation omitted).

20       A.    Claim 1 of the '616 Patent.

21       72.  Claim 1 of the '616 patent discloses a "physician's tester," comprising, among other

22   things, an "external processor means coupled to the transmitting means of the external

23   headpiece/transmitter for receiving and processing the status-indicating signals to derive

24   information therefrom regarding the operation of the implanted stimulator and its plurality of tissue

25   stimulating electrodes."  The parties agree that the "external processor means" limitation is a

26   means-plus-function limitation.  (See Joint Brief re: Summary Judgment Motions at 9 & 29).  For

27   purposes of this inquiry, the relevant part of the function is "processing the status-indicating signals

28   to derive information therefrom regarding the operation of the implanted stimulator and its plurality

1  of tissue stimulating electrodes." The parties agree that the corresponding structure is an

2  antenna, receiver, and microprocessor. (See R&R at 3-4).

3      73. The court previously found that the disclosed microprocessor is programmed, and

4  therefore, an adequate disclosure of an algorithm is required. (See Court's Order January 3,

5  2014, at 35).

6      74. Cochlear argues that claim 1 of the '616 patent is indefinite, because it fails to disclose

7  an algorithm for "processing the status-indicating signals to derive information therefrom regarding

8  the operation of the implanted stimulator and its plurality of tissue stimulating electrodes." (See

9  Stevenson Decl. at ¶ 19).

10     75. The "external processor means . . . for . . . processing the status-indicating signals"

11 claim limitation relates to the "physician's tester," which is described in columns 32-33 of the '616

12 patent. Cochlear's expert posits that "[t]here is very little disclosure to inform [his] inquiry

13 regarding processing status-indicating signals" in that section. (See Stevenson Decl. at ¶ 21).

14 Having reviewed the specification, the court agrees. The physician's "tester monitors the

15 performance parameters of the ICS 12 by detecting the back telemetry signal of the ICS in an

16 interrogation protocol[9] for the microprocessor." ('616 patent at col. 32:60-62). After the tester

17 stores the back telemetry signal in its memory, the tester's control panel, "which contains

18 electronic circuitry," "conver[ts] the back telemetry signal into directly readable information[,] which

19 is read out on the LCD display 304." (Id. at col. 32:63-33:2). In addition, the control panel's knobs

20 can be adjusted to change the values that are measured and displayed. The knobs "control

21 potentiometers, the position of which are read by the microprocessor 30 to control the commands

22 . . . and hence the parameters measured and displayed by the ICS and Physician's Tester

23 combination." (Id. at col. 33:14-18). In short, while the "physician's tester" section generally

24 explains that the tester converts the back telemetry signal into readable information and that the

25 microprocessor helps control the commands, it does not disclose how the microprocessor

26

27  [9] "Interrogation protocol" is not defined or discussed in the '616 patent. (See, generally, '616

28 patent).

1    "processes" the signal from the implant "to derive information therefrom regarding the operation"

2    of the implant and the electrodes.  (See id. at col. 34:46-52).

3        76.    The tester described in Figure 7 is based on the components in the wearable

4    processor.  (See '616 patent at col. 32:55-59; Figs. 1 & 7).  Thus, the court reviews the

5    corresponding discussion of the microprocessor.  (See id. at col. 5).  The ICS's "processor 46

6    selectively monitors the voltage applied . . . and generates a status indicating signal relative to

7    such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry

8    receiver 36 [in the wearable processor].  As previously stated, such information is utilized in the

9    microprocessor 30 and gate array 32 of the WP 16 to control the power level[.]"  (Id. at col. 5:38-

10   47).  Similarly, "power level indicating signals" are received by the transmitter (Block 36) in the WP

11   "and processed in the microprocessor 30 and gate array 32 to generate signals controlling the

12   power level."  (Id. at col. 5:8-13).  Like columns 32-34, this discussion does not provide significant

13   guidance regarding how the microprocessor "processes" the signal from the implant "to derive

14   information therefrom regarding the operation" of the implant and the electrodes.  (See id. at col.

15   34:46-52).  The court has reviewed the rest of the specification, and it has not located an express

16   disclosure of an algorithm for the "processing the status-indicating signals" function.

17       77.    AMF argues that the '616 patent discloses an algorithm for the "processing the status-

18   indicating signals . . ." limitation.[10]  Specifically, AMF's expert, Dr. Darrin Young, Ph.D. ("Young"),

19   asserts that the '616 patent discloses an algorithm for the microprocessor that "includes the steps

20   of (1) accepting from the receiver signals representative of measured voltage," and "(2) applying

21   Ohm's law to convert the measured voltage or voltage and current into an impedance value."

22   (Declaration of Dr. Darrin J. Young in Opposition to Cochlear Defendants' Indefiniteness Claim

23   ("Young Decl.") at ¶ 30) (Document No. 406).  He further explains that Figure 6 and the tables

24   identify "impedance" as a value that has been derived.  (See id. at ¶ 29; '616 patent at Fig. 6, col.

25   33:23-54).  He then states that a person of ordinary skill in the art would understand from the

26

27   _____

28   [10]   AMF has not identified another algorithm in its briefing or supporting declaration.  (See,
     generally, AMF's Bench Tr. Br. at 10-12; Young Decl.).

1  specification that the tester instructs the microprocessor to calculate impedance, and that one of
2  ordinary skill would know that "[t]he algorithm for calculating impedance is Ohm's law[.]"  (See
3  Young Decl. at ¶¶ 31 & 34).

4      78.  AMF's argument is based on the premise that the patentee necessarily disclosed
5  Ohm's law by identifying impedance and voltage.  The court is not persuaded by AMF's argument.
6  First, the '616 patent does not identify Ohm's law in the disclosure.  (See, generally, '616 patent).
7  Second, AMF's theory that a person of ordinary skill in the art would know how to calculate
8  impedance by using Ohm's law does not mean that the patentee adequately disclosed an
9  algorithm.  See Blackboard, Inc. v. Desire2Learn, Inc., 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("The
10  question before us is whether the specification contains a sufficiently precise description of the
11  'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the
12  art could devise some means to carry out the recited function.").  Third, AMF practically concedes
13  that there are multiple ways to calculate impedance.  (See Young Decl. at ¶ 41) (discounting
14  relevance of alternate equation to calculate impedance); See also Noah Sys. Inc., 675 F.3d at
15  1317 ("We explained that the disclosure must identify the method for performing the function,
16  whether or not a skilled artisan might otherwise be able to glean such a method from other
17  sources or from his own understanding. . . . That various methods might exist to perform a function
18  is 'precisely why' the disclosure of specific programming is required.") (citations and emphasis
19  omitted).

20      79.  Based on the court's review of the specification and the evidence presented during the
21  trials, the court finds that the '616 patent does not disclose an algorithm for "processing the
22  status-indicating signals to derive information therefrom regarding the operation of the implanted
23  stimulator and its plurality of tissue stimulating electrodes."  Defendants have proven by clear and
24  convincing evidence that the '616 patent fails to disclose the algorithm necessary to achieve the
25  claimed function.  See WMS Gaming, Inc., 184 F.3d at 1349; Aristocrat Techs. Austl. Pty Ltd. v.
26  Int'l Game Tech., 521 F.3d 1328, 1333-38 (Fed. Cir.), cert. denied, 555 U.S. 1070 (2008).  Thus,
27  claim 1 of the '616 patent is invalid as indefinite.

28

B.     Claims 6 and 7 of the '691 Patent.

80.   Claims 6 and 7 of the '691 patent require a "means for generating data indicative of the audio signal."[11]  This claim limitation has been determined to be a means-plus-function element.  (See R&R at 28).  The recited function is "generating data indicative of the audio signal," and the corresponding structure is "a microprocessor."  (See R&R at 26 & 28; Claim Construction Order at 25).

81.   The court previously found that the microprocessor structure corresponding to the "means for generating data indicative of the audio signal" requires the disclosure of a corresponding algorithm.  (See Court's Order of January 3, 2014, at 32).

82.   Cochlear argues that the '691 patent fails to disclose any algorithm for the microprocessor to perform the "generating data indicative of the audio signal" limitation in claims 6 and 7.  (Cochlear's Bench Tr. Br. at 10-11).  Cochlear's expert, Dr. Robert J. Stevenson, Ph.D., ("Stevenson") asserts that the specification's description only "provides that a digitized signal is applied to microprocessor 30[,]" and that the "output from the microprocessor is converted into a serial bit stream for transmission to the ICS[.]"  (Stevenson Decl. at ¶ 12).  Indeed, the specification explains that the audio signals are "processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30."  ('691 patent at col. 4:49-52).  The specification further states that "[t]he output of the microprocessor 30 is coupled through the custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34."  (Id. at col. 4:59-62).  Thus, the specification describes the signal flow into the microprocessor (Block 30), as well as the signal flow out of the microprocessor.   However, this section of the specification does not disclose how the microprocessor generates the "data indicative of the audio signal."

83.   The specification also describes an embodiment where the "filter bank may . . . be implemented as a group of digital filters, for example in a digital signal processor integrated

_____

[11]   Claim 7 of the '691 patent depends on claim 6 and therefore incorporates the "means for generating data indicative of the audio signal" by reference.

circuit." ('691 patent at col. 4:52-55); (see id. at Fig. 1) (identifying multichannel filter bank as Block 24).  In this embodiment, "the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital filter, then into a digital filter bank 24 and the general processing of microprocessor 30."  (Id. at col. 4:52-58).  While this portion of the specification discloses a variation in the signal flow, it is still silent regarding what happens within the microprocessor.  Rather, the '691 patent discloses "general processing of microprocessor 30." (Id.).  The court has reviewed the rest of the specification, and it has not located an express disclosure of an algorithm for the "means for generating data indicative of the audio signal" requirement.

84.  In response, AMF asserts that claims 6 and 7 of the '691 patent are not indefinite, because the microprocessor "implement[s] a logarithmic conversion algorithm to generate data indicative of [an] audio signal."[12]  (AMF's Bench Tr. Br. at 12).  AMF's expert, Young, posits that "the steps (or algorithm) performed by the microprocessor in the '691 patent to be: (1) receiving digital data from the analog to digital converter and (2) using a logarithmic conversion function to format the received data to be encoded on an amplitude modulated signal."  (Young Decl. at ¶ 15).  AMF argues that "because the implant includes an 'exponential D to A converter'" to decompress data, the "microprocessor in the WP must employ a logarithmic conversion algorithm[.]"  (AMF's Bench Tr. Br. at 12).  The specification discloses the implanted cochlea system (i.e., implant), that uses "an exponential D to A converter 64."  (see '691 patent at Fig. 2, col. 5:62 & col. 6:58).  Young asserts that the "algorithm is implemented with a simple logarithmic lookup table[,]" and that he "know[s] of no other way to implement such a logarithmic algorithm in a DSP."  (Young Decl. at ¶ 17).

85.  Based on the intrinsic record and the evidence presented in trial, the court is not persuaded by AMF's theory.  First, while it may be necessary for the wearable processor (WP) (Block 16 in Figure 1) in the '691 patent to perform a logarithmic conversion, because the

_____

[12]  AMF has not identified another algorithm in its briefing or supporting declaration.  (See, generally, AMF's Bench Tr. Br. at 12-13; Young Decl.).

1   implantable cochlear system includes an exponential D/A converter, it has not been established

2   that the logarithmic conversion must take place in the microprocessor (Block 30).  AMF's expert

3   admitted that the '691 patent does not state that the logarithmic conversion must take place in the

4   microprocessor.  (See RT, Jan. 22, 2014, vol. 2, at 99:2-4) (Q: "Does the patent say that that

5   function, the logarithmic conversion, is done in the microprocessor?"; A: "The patent doesn't say

6   that.").  Moreover, Young admitted that the logarithmic function could be performed by the A to D

7   converter.  (See id. at 98:13-15) (Q: "So it can't be in the A to D converter?"; A: "You could

8   implement a logarithmic function into the A to D converter").  Young later admitted that based on

9   the disclosure of an exponential delay, the logarithmic function must generally take place in the

10  wearable processor, not specifically in the microprocessor.  (See id. at 100:20-24) (Q: "The patent

11  doesn't say how to implement a logarithmic function in the microprocessor; does it?"; A: "The

12  patent disclose an exponential delay.  And when I read that, it suggests to me they got to be a

13  logarithmic function in the external wearable processor.").  Stevenson, Cochlear's expert,

14  confirmed that the logarithmic conversion can take place using a logarithmic A to D converter.

15  (See, e.g., id. at 78:5-15).  Under the circumstances, the court is not persuaded by AMF's theory,

16  which is based on the flawed assumption that the logarithmic conversion must be performed by

17  the microprocessor.

18      86.  AMF's algorithm theory is also unavailing, because the record demonstrates that there

19  are multiple logarithmic algorithms.  See Noah Sys. Inc., 675 F.3d at 1317 ("We explained that the

20  disclosure must identify the method for performing the function, whether or not a skilled artisan

21  might otherwise be able to glean such a method from other sources or from his own

22  understanding. . . . That various methods might exist to perform a function is 'precisely why' the

23  disclosure of specific programming is required.") (citations and emphasis omitted).  AMF has not

24  presented credible evidence that there is only a single algorithm available, i.e., "a simple

25  logarithmic lookup table[.]"  (See Young Decl. at ¶ 17).  Young's declaration is equivocal on the

26  topic.  (See id.) ("I know of no other way to implement such a logarithmic algorithm in a DSP.")

27  (emphasis added).  Moreover, during the bench trial, Young admitted that there are additional

28  possible algorithms, such as a power series algorithm and a binary logarithmic algorithm.  (See

1   RT, Jan. 22, 2014, vol. 2, at 99:2-100:21). Thus, the disclosure in the '691 patent of the purported

2   algorithm for the microprocessor is deficient.

3       87.  Based on the foregoing, claims 6 and 7 of the '691 patent are invalid as indefinite

4   because it has been proven by clear and convincing evidence that the specification of the '691

5   patent fails to disclose the requisite algorithm for the microprocessor to perform the "means for

6   generating data indicative of the audio signal" function.  See 35 U.S.C. § 112(f); WMS Gaming,

7   Inc., 184 F.3d at 1349; Aristocrat Techs. Austl. Pty Ltd. , 521 F.3d at 1333-38.

8       88.  Any conclusion of law that more correctly constitutes a finding of fact should be treated

9   as such.

10                                  **CONCLUSION**

11      Based on the foregoing, IT IS ORDERED that:

12      1.  Defendants have not met their burden to show that plaintiff should be equitably estopped

13  from enforcing its claims.

14      2.  Defendants have not met their burden to show that plaintiff should be barred from pre-

15  suit damages under the doctrine of laches.

16      3.  Defendants have not met their burden to show that plaintiff committed inequitable

17  conduct before the PTO.

18      4.  Plaintiff is not prevented from asserting an infringement theory under the doctrine of

19  equivalents for the "displaying" limitation of claim 10 of the '616 patent.

20      5.  Claim 1 of the '616 patent, and claims 6 and 7 of the '691 patent are invalid on

21  indefiniteness grounds.

22  Dated this 31st day of March, 2015.

23                          _____
                                             /s/
24                                  Fernando M. Olguin
                                    United States District Judge

25

26

27

28

US005609616A

# United States Patent [19]

## Schulman et al.

[11] **Patent Number:** **5,609,616**

[45] **Date of Patent:** **Mar. 11, 1997**

[54] **PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR**

[75] Inventors: **Joseph H. Schulman**, Santa Clarita; **John C. Gord**, Venice; **Primoz Strojnik**, Granada Hills; **David I. Whitmoyer**, Los Angeles, all of Calif.

[73] Assignee: **Alfred E. Mann Foundation for Scientific Research**, Sylman, Calif.

[21] Appl. No.: **447,157**

[22] Filed: **May 25, 1995**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 23,584, Feb. 26, 1993, which is a continuation of Ser. No. 752,069, Aug. 29, 1991, abandoned, which is a continuation-in-part of Ser. No. 411,563, Sep. 22, 1989, abandoned.

[51] Int. Cl.⁶ ........................................ A61N 1/36
[52] U.S. Cl. ................................................ **607/56**
[58] Field of Search ...................... 607/27–32, 59–60, 607/56, 57

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 31,031 | 9/1982 | Kissiah, Jr. | 179/107 R |
| Re. 32,947 | 6/1989 | Dorner et al. | 128/420.6 |
| 3,449,768 | 6/1969 | Doyle | 3/1 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4106178 | 10/1978 | Australia . |
| 2823798 | 9/1979 | Germany . |

OTHER PUBLICATIONS

Gheewala, et al., "A CMOS Implantable Multielectrode Auditory Stimuatlr for the Deaf", *IEEE Journal of Solid State Circuits*, 10:6, pp. 472–479 (Dec. 1975).

Clark, et al., "A Multiple–Electrode Hearing Prosthesis for Cochlear Implantation in Deaf Patients", *Med. Progr. Technol.*, 5:127–140 (1977).

Forster, "Theoretical Design and Implementation of a Transcutaneous, Multichannel Stimulator for Neural Prosthesis Applications", *J. Biomed. Engng.*, 3:107–120 (Apr. 1981).

Hochmair & Hochmair–Desoyer, "An implanted auditory eight channel stimulator for the deaf," *Med. & Biol. Eng. & Comput.* 19:141–148 (1981).

Loeb, G., "The Functional Replacement of the Ear," *Scientific American*, 252(2):104–111 (1985).

(List continued on next page.)

*Primary Examiner*—William E. Kamm
*Attorney, Agent, or Firm*—Fitch, Even, Tabin & Flannery

[57] **ABSTRACT**

A physician's tester provides for physician monitoring and control of an implantable human tissue stimulator system, such as an implantable cochlear stimulator (ICS) system. During normal operation, the tissue stimulator system includes an implantable stimulator and a wearable processor (WP). The physician's tester is designed around a microprocessor, and is basically a modification of the WP. The tester provides control over the selection of voltages and currents to be measured and the presetting of parameters in the implantable stimulator during testing of the implanted stimulator and/or a patient's response to data transmitted by the WP/tester to the implanted stimulator. The physician's testor is portable and utilizes telemetry coupling with the implanted stimulator to provide communication between the tester and stimulator for the monitoring, control and measurement of the stimulator parameters. The tester resides in a portable housing having a control panel and a visual display. The control panel allows the physician to manually set various parameter levels. The visual display provides alpha numeric data for viewing. Various devices, such as additional displays and/or a printer, may be coupled to the tester through a display port or an infrared serial output port in order to permit a print out of the displayed data or other information.

**14 Claims, 15 Drawing Sheets**



**5,609,616**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,662,758 | 5/1972 | Glover | 128/419 |
| 3,667,477 | 6/1972 | Susset et al. | 128/419 E |
| 3,727,616 | 4/1973 | Lenzkes | 128/422 |
| 3,751,605 | 8/1973 | Michelson | 179/107 R |
| 3,751,651 | 8/1973 | Pomella et al. | . |
| 3,752,939 | 8/1973 | Bartz | 179/107 R |
| 3,818,149 | 6/1974 | Stearns et al. | 179/107 FD |
| 3,989,904 | 11/1976 | Rohrer et al. | 179/107 FD |
| 4,019,518 | 4/1977 | Maurer et al. | 128/419 R |
| 4,025,721 | 5/1977 | Graupe et al. | 179/1 P |
| 4,025,723 | 5/1977 | Blackledge | 179/1 VL |
| 4,026,300 | 5/1977 | De Luca et al. | 128/418 |
| 4,063,048 | 12/1977 | Kissiah, Jr. | 179/107 R |
| 4,207,441 | 6/1980 | Ricard et al. | 179/107 R |
| 4,232,679 | 11/1980 | Schulman | 128/419 |
| 4,267,410 | 5/1981 | Forster et al. | 179/107 BC |
| 4,284,856 | 8/1981 | Hochmair et al. | 179/107 E |
| 4,357,497 | 11/1982 | Hochmair et al. | 179/107 E |
| 4,400,590 | 8/1983 | Michelsen | 179/107 FD |
| 4,405,831 | 9/1983 | Michelsen | 179/1 P |
| 4,408,608 | 10/1983 | Daly et al. | 128/421 |
| 4,419,995 | 12/1983 | Hochmair et al. | 128/419 R |
| 4,424,812 | 1/1984 | Lesnick | 128/419 PG |
| 4,428,377 | 1/1984 | Zollner et al. | 128/419 R |
| 4,441,202 | 4/1984 | Tong et al. | 381/68 |
| 4,441,210 | 4/1984 | Hochmair et al. | 455/41 |
| 4,462,406 | 7/1984 | De Cote, Jr. | 128/419 PG |
| 4,513,743 | 4/1985 | van Arragon et al. | 607/27 |
| 4,515,158 | 5/1985 | Patrick et al. | 128/419 R |
| 4,532,930 | 8/1985 | Crosby et al. | 128/419 |
| 4,550,732 | 11/1985 | Batty, Jr. et al. | 128/419 PG |
| 4,573,481 | 3/1986 | Bullara | 128/784 |
| 4,590,946 | 5/1986 | Loeb | 128/642 |
| 4,592,359 | 6/1986 | Galbraith | 128/419 R |
| 4,592,360 | 6/1986 | Lesnick | 128/419 PG |
| 4,593,696 | 6/1986 | Hochmair et al. | 128/419 R |
| 4,611,598 | 9/1986 | Hortmann et al. | 128/419 R |
| 4,612,934 | 9/1986 | Borkan | 128/421 |
| 4,616,655 | 10/1986 | Weinberg et al. | 128/419 P |
| 4,648,403 | 3/1987 | Van Compernolle | 128/419 R |
| 4,679,560 | 7/1987 | Galbraith | 128/419 R |

| | | | |
|---|---|---|---|
| 4,686,765 | 8/1987 | Byers et al. | 29/858 |
| 4,696,287 | 9/1987 | Hortmann et. al. | 128/1 R |
| 4,726,378 | 2/1988 | Kaplan | 128/419 R |
| 4,729,366 | 3/1988 | Schaefer | 128/1.6 |
| 4,809,697 | 3/1989 | Causey, III et al. | 607/30 |
| 4,819,647 | 4/1989 | Byers et al. | 128/642 |
| 4,837,049 | 6/1989 | Byers et al. | 427/96 |
| 4,847,617 | 7/1989 | Silvian | 340/870.1 |
| 4,850,962 | 7/1989 | Schaefer | 600/25 |
| 4,918,745 | 4/1990 | Hutchison | 455/41 |
| 4,920,979 | 5/1990 | Bullara | 128/784 |
| 4,931,795 | 6/1990 | Gord | 341/135 |
| 4,932,405 | 6/1990 | Peeters | 128/419 R |
| 4,947,844 | 8/1990 | McDermott | 128/421 |
| 4,961,434 | 10/1990 | Stypulkowski | 128/784 |
| 4,969,468 | 11/1990 | Byers et al. | 128/642 |
| 4,988,333 | 1/1991 | Engebretson et al. | 600/25 |
| 4,990,845 | 2/1991 | Gord | 323/312 |
| 4,991,582 | 2/1991 | Byers et al. | 128/419 P |
| 5,003,975 | 4/1991 | Hafelfinger et al. | 607/27 |
| 5,058,584 | 10/1991 | Bourgeois | 128/421 |
| 5,070,535 | 12/1991 | Hochmair et al. | 455/41 |
| 5,095,904 | 3/1992 | Seligman et al. | 128/420.6 |
| 5,123,419 | 6/1992 | Platt et al. | 607/27 |

## OTHER PUBLICATIONS

Loeb, et al., "Design and fabrication of an experimental cochlear prosthesis," *Med. & Biol. Eng. & Comput.* 21:241–254 (1983).

Mecklenburg & Brimacombe, "An overview of the Nucleus cochlear implant program," *Seminars in Hearing* 6(1):41–51 (1985).

Millar, et al., "Speech processing for cochlear implant prosthesis," *J. Speech & Hearing Research* 27:280–296 (1984).

Herndon, Matthew, "Psychoacoustics and speech processing for a modiolar auditory prosthesis," *Dissertation Stanford Univ. Dept. EE* (Table of Contents only)(Jun. 1981).

Soma, Mani, "Design and fabrication of an implantable multichannel neural stimulator," *Dissertation–Stanford Unviv. Dept. EE* (May 1980).



FIG. 1

A00803



ELECTRODES 48
1
2
3
16
ELECTRODE SWITCHING MATRIX 66
OUTPUT CONTROL LOGIC (1 OF 8) 88
OUTPUT MODE REGISTER 86
PULSE WIDTH CONTROL 90
INDIFFERENT ELECTRODE SWITCHES 92
49
INDIFFERENT ELECTRODE
STORAGE CAPACITOR 1 OF 8
CURRENT SOURCE FET (1 OF 8) 62
ANALOG MUX 80
WORD STROBE GENERATOR 79
AMPLITUDE DATA LATCH 74
COMMAND DECODER 84
COMMAND LATCH 76
MUX 94
TELEMETRY GAIN STAGES 96
60
10.5V
7.0V
3.5V
VOLTAGE DOWN-CONVERTER 58
EXPONENTIAL D/A CONVERTER 64
SERIAL TO PARALLEL CONVERTER 68
BIT & WORD COUNTERS, ERROR CHECKING 78
INITIALIZATION 82
A/D CONVERTER 98
14.0V
PROCESSOR 46
VOLTAGE REGULATOR ERROR AMPLIFIER 56
DATA DECODER 52
LOOP FILTER 72
VCO 70
TELEMETRY CONTROL LOGIC 102
ICS BACK TELEMETRY SYSTEM
TELEMETRY MODULATOR SWITCH 104
REGULATOR 44
VOLTAGE REFERENCE 54
D/A CURRENT REFERENCE 65
DC
TELEMETRY A/D CURRENT REFERENCE 100
TELEMETRY COIL 106
TELEMETRY TRANSMITTER 42
MAIN COIL 50
RECEIVER 40

FIG. 2

A00804



FIG. 3

A00805

## FIG. 4

| FIGURE 4-D | FIGURE 4-H |
|---|---|
| FIGURE 4-C | FIGURE 4-G |
| FIGURE 4-B | FIGURE 4-F |
| FIGURE 4-A | FIGURE 4-E |



FIG. 4-A



C203-1 TO 5
C203-6 TO 13
DOWNCLOCK
VOLTAGE DOWNCONVERTER 203B
-14V
-10.5V
-7V
-3.5V
DCLKPH1
DCLKPH2
SYSRESET
VREF
POWERBAD DETECTOR 204A
TO -3.5V LOGIC
RV0(1-8)
RV1(1-8)
OUTENABLE
POWERBAD
INTIALIZATION 204B
CARDET
3
ALLZERO DISCONNECT
CARON
RESETERR
PALARM
SYSRESET
PARITY ERROR DETECTOR PARITY 204C
REFRESH VOLTAGE LOGIC 210
RFMAIN
WSTRB1,3
FRMCLK
AMPDATA(1-8)
SERDATA
FUNC7
WORD(1-9)
LOGARITHMIC D/A CONVERTER 207B
IPOSCON
INEGCON
IREF
WORDTRCLK
PLLLOCK
PFRMCLK
CLKPH1
CLKPH2
MANDATA
SERIAL TO PARALLEL CONVERTER 201C
XFERB
XFERC
DATA(1-9)
AMPSYNC
DCENABLE
WORD (1-9)
DATA(1-9)

FIG. 4-B



FIG. 4-C

CF1
REFRESH VOLTAGE CONTROL 212A
PRV1
CRV1
NRV1
-14V
-10.5V
-7V
-3.5V
DCLKPH1
DCLKPH2
SYSRESET
TO 212-2 THRU 212-8
RV0(1-8)
RV1(1-8)
RV0(2-8)
RV2(2-8)
NRV(1-8)
NRV(2-8)
IPOS(1-8)
INEG(1-8)
ANALOG MULTIPLEXER 207C
ICP(1-8)
POLARITY
WSTRB(1-8)
WSTRB1,3
FRMCLK
AMPDATA(1-8)
IPOSCON
INEGCON
XFERB
XFERC
WORDTRCLK
AMPSYNC
WORD STROBE GENERATOR 201D
CLKPH1
CLKPH2
WORDTRCLK
WORD9CLK
WSRTB1
AMPDATA (1-8)

PRV1
+IN1
ELECTRODE
SWITCHING
MATRIX
212C
OUTA1
OUTB1
CA1
CB1
TO ELECTRODES
INDCOM
VOUTA (1)
VOUTB (1)
CURRENT
SOURCE
212B
NRV1
-IN1
OUTPUT STAGE
212-1
RV0(2-8)
RV2(2-8)
NRV(2-8)
IPOS(1-8)
INEG(1-8)
ZERO
SHORT
INDCOM
VOUTA (2-8)
VOUTB (2-8)
OUTPUT STAGES
212-2 THROUGH
212-8
TO ELECTRODES
CA(2-8)
OUTA(2-8)
CB(2-8)
OUTB(2-8)
ICP(1-8)
ICP(2-8)
POLARITY
ZERO
SHORT
AMPDATA(1-8)
POLARITY
ZERO
CURRENT
CONTROL
205B
PWC(2-8)
AMONO(2-8)
BMONO(2-8)
DRC(2-8)
AMPSYNC
CLKPH2
CLKPH1
FRMCLK
AMPSYNC
PWC(1-8)
AMONO(1-8)
BMONO(1-8)
DRC(1-8)
VOUTA(1-8)
VOUTB(1-8)
INDCOM

FIG. 4-D



FIG. 4-E

CARON
CARON
WSTRB(1-8)
WSTRB9
ADPWR
SH2X1
SH2X3
SH2X10
SH1X10
FUNC4
FUNC5
VRTPWR
DCENABLE
FUNC7
WORD9(1-9)
RFMAIN
ALLZERO
DISCONNECT
WSTRB(1-8)
OUTENABLE
COMMAND LATCH 206A
WORD9CLK
DATA(1-9)
WORD9CLK
TELEMETRY FUNCTION DECODER 211A
WORD9(1-9)
WORD9CLK
COMMAND DECODER 206B
ALLZERO DIS CONNECT
FUNC8
WSRTB1
FUNC2
DCENABLE
FUNC7
FUNC4
FUNC5
RFMAIN
RFMAIN
RFMAIN
PFMAIN
OUTENABLE
IECLOSE
RLOCTRL
RHICTRL
MUXCTRL(1-23)
PFMAIN
IECLOSE
RLCTRL
RHICTRL
IECLOSE
RLCTRL
RHICTRL
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTB(1-8)
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTB(1-8)
INDELEC
ILO
IH1
INDELEC
ILO
IH1

FIG. 4-F

WSTRB(1-8)
WSTRB(1-8)
WSTRB(1-8)
NRV(1-8)
WORDTRCLK
WSTRB1
ICP(1-8)
AMPDATA (1-8)
POLARITY
POLARITY AND AMPLITUDE DATA LATCH
205A
WORD9CLK
WORD9CLK
DATA(1-9)
WORD9(1-9)
WORD9(1-9)
FUNC8
FUNC8
WSRTB1
WSRTB1
FUNC2
FUNC2
PFMAIN
PFMAIN
OUTENABLE
OUTENABLE
IECLOSE
IECLOSE
RLOCTRL
RLOCTRL
RHICTRL
RHICTRL
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTA(1-8)
VOUTB(1-8)
VOUTB(1-8)
INDELEC
INDELEC
IL0
IL0
IH1
IH1

FIG. 4-G



FIG. 4-H

## FIG. 5A



LONG DATA FRAME FOR MULTIPLE CHIP OPERATION

## FIG. 5B





FIG. 6

PHYSICIAN'S TESTER



*FIG. 7*

A00817

5,609,616

**1**

## PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR

### RELATED APPLICATIONS

This application is a continuation of application Ser. No. 08/023,584, filed Feb. 26, 1993, entitled IMPROVED HUMAN TISSUE STIMULATOR; which is a continuation of application Ser. No. 07/752,069, filed Aug. 29, 1991, now abandoned; which is a continuation-in-part of patent application Ser. No. 07/411,563, filed Sep. 22, 1989, also abandoned.

### BACKGROUND

The present invention relates to improvements in human tissue stimulators and more particularly to a human tissue stimulating system which in a preferred form comprises an audio responsive system for artificially stimulating the cochlea to improve the hearing of the hearing impaired.

U.S. Pat. No. 4,400,590 issued Aug. 23, 1983 for "Apparatus for Multi-Channel Cochlear Implant Hearing Aid System" describes and illustrates a multi-channel intra-cochlear electrode and system for electrically stimulating predetermined locations of the auditory nerve within the cochlea of the ear. The electrode comprises a plurality of exposed electrode pairs spaced along and embedded in a resilient curved base for implantation in accordance with the method of surgical implantation described in U.S. Pat. No. 3,751,615 issued Aug. 7, 1973 for "Method of Inducing Hearing." The hearing aid system described in the '590 patent receives audio signals at a signal processor located outside the body of a hearing impaired patient. The processor converts the audio signals into analog data signals which are transmitted by a cable connection through the patient's skin to the implanted multi-channel intra-cochlear electrode. The analog signals are applied to selected ones of the plurality of exposed electrode pairs included in the intra-cochlear electrode to electrically stimulate predetermined locations of the auditory nerve within the cochlea of the ear where the intra-cochlear electrode is positioned.

The cochlea stimulating system described in the '590 patent is limited in the number of channels of information, the speed of transfer of stimulating signals to the cochlea and the fidelity of the signals. Also, the cable connection through the skin of the patient to the intra-cochlear electrode is undesired in that it interferes with the freedom of movement of the patient and represents a possible source of infection.

U.S. Pat. No. 4,532,930, issued Aug. 6, 1985 for "Cochlear Implant System For an Auditory Prosthesis" describes and illustrates a multiple electrode system. While multiple electrodes are employed to stimulate hearing the system only operates with a single pulsatile output stimulating a single electrode channel at any given time. Such a sequential system is limited in speed of operation and does not provide for analog operation where continuous stimulating signals controllable in amplitude are simultaneously applied to a number of electrode channels. Further, the system is subject to charge imbalance with misprogramming or circuit fault and inefficient use of electrical power. Moreover, once the stimulator unit is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,592,359, issued Jun. 3, 1986 for "Multi-Channel Implantable Neural Stimulator" describes a cochlear implant system having 4 current sources and 4

**2**

current sinks per channel controlled by series switches to provide 16 different circuits for supplying 16 levels of 2 polarities to each output channel. In a pulsatile mode, the system provides for simultaneous analog update (amplitude control) and output to all channels. However, the system does not permit simultaneous analog update and output on all channels and the electrode pairs for each channel are not electrically isolated from all other electrode pairs whereby undesired current leakage may occur. Further, once the stimulator is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,947,844, issued Aug. 14, 1990 for "Receiver/Stimulator For Hearing Prosthesis" describes and illustrates a multiple channel electrode system. The system includes an implanted receiver/stimulator connected to an implanted electrode array. The receiver/stimulator includes an electrode stimulating current control characterized in that current is delivered to each electrode or to each bipolar pair of electrodes in a series of short electrical pulses, each elemental pulse being separated from the next by an interval of zero current which has a longer duration than an elemental pulse. The waveform of the stimulus current comprises a series of pulses of one polarity followed by an equal number of pulses of an opposite polarity whereby the sum of all the electrical charge transferred through each electrode is approximately zero at the end of a stimulating current waveform. In this way, elemental current pulses applied to each electrode on each pair of electrodes which are stimulating are preferably delivered cyclically such that elemental pulses delivered to one electrode are interleaved in time with those delivered to any other electrodes. This enables the use of a single current source in the receiver/stimulator. The use of a single current source limits the operation of the receiver/stimulator in that the single current source must be switched to serve all output channels in a sequential manner. Simultaneous operation is not possible. Further, the number of channels cannot be greater than 3 or 4 without greatly reducing the duty cycle of the stimulating current waveform in each channel. Not only does the stimulus effectiveness in each channel suffer in such a situation, but the time required to complete the switching cycle for the single current source lengthens in direct proportion to the number of channels. Further, this system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the simultaneous transmission of the telemetry signal and reception of the input carrier signal as described will result in undesired modulation and possible loss of input data.

Accordingly, there is a continuing need for an improved multi-channel tissue stimulator system particularly useful as a cochlear stimulator system and which is characterized (i) by a high operating speed in analog and pulsatile operation, (ii) freedom from charge imbalance, (iii) complete isolation of its electrode pairs for each channel, and (iv) the externally

**A00818**

5,609,616

3

controllable monitoring and selective control a plurality of operating parameters and power supply to and currents and voltages developed within the implanted stimulator unit of the system to optimize system operation and power efficiency. The present invention satisfies such needs.

## SUMMARY OF INVENTION

A preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS). The receiver, which may comprise a headpiece adjacent the ear of a patient, receives audio signals and transmits the audio signals to the WP. The WP receives and processes the audio signal and includes means for generating data indicative of the audio signals for transmission to the ICS.

The ICS includes means for receiving transmissions from the WP as well as a processor for processing such transmissions to sequentially update and simultaneously or sequentially generate and apply stimulation signals to a plurality of cochlea stimulating channels each having capacitor coupled electrodes implanted within the cochlea of the patient. The processor includes means responsive control signals from the WP for selectively monitoring one or more of the electrodes and voltages within the processor and for generating ICS status indicating signals. The ICS status indicating signals are telemetered back to the WP which includes means for receiving and processing the ICS status indicating signals. For example, such means may include means for controlling the power level of transmissions to the ICS.

The processor in the ICS also includes means for selectively controlling the pulse widths of the stimulation signals, the frequency at which stimulating signals are applied to selected electrodes, and means for generating a plurality of voltages for powering different components in the ICS and for selectively receiving and responding to analog and pulsatile input data signals from the WP.

Preferably, each channel in the ICS includes (i) a current source and floating current transfer device with switching capacitors for supplying stimulating signals to the capacitor coupled electrodes which are independent and isolated from the stimulating signals supplied to the output of all other channels, (ii) means for selectively driving the electrodes as unipolar or bipolar electrodes and (iii) means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a block diagram of a basic form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 2 is a more detailed block diagram of the ICS of FIG. 1 and associated circuitry for receiving and transmitting signals from and to the WP.

FIG. 3 is block diagram of second form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 4 illustrates the arrangement of FIGS. 4-A through 4-H.

FIGS. 4-A through 4-H show respective portions of a detailed block/schematic diagram of the ICS.

4

FIG. 5A depicts a long data frame useful in multiple chip configurations for the stimulating system, the long frame comprising a series of n+1 data frames, the first frame being designated as a master frame and the subsequent frames being designated as slave frames 1 through n. The number of data frames comprising the long data frame corresponds to the number of chips included in the system.

FIG. 5B is a block diagram of multiple chip system for the ICS of FIG. 2 or FIGS. 4A–4H.

FIG. 6 is a diagrammatic representation of a physician's tester useful with the cochlear system of FIG. 1.

FIG. 7 is a block diagram of the cochlear system of FIG. 1 with the WP replaced by the physician's tester.

## DETAILED DESCRIPTION OF INVENTION

The preferred forms of the present invention are implemented using CMOS technology. In development of the invention, however, a prototype was developed using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system, including CMOS integrated circuits and chips. Thus, in duplicating the systems hereinafter described, one may either utilize conventional off-the-shelf electrical components or develop the systems utilizing techniques well known in CMOS technology, whichever is desired.

As illustrated in FIG. 1, the basic system according to a preferred embodiment of the present invention basically comprises an externally wearable system 10 and an implantable cochlear stimulator (ICS) 12. The external system 10 comprises a headpiece 14 and an externally wearable processor (WP) 16. The headpiece may be worn behind the ear of a hearing impaired person and comprises a conventional microphone 18 and an antenna 20 for transmitting and receiving electromagnetic energy preferably in the form of radio frequency signals. Such coupling can be restricted to magnetic field only by an electrostatic shield around the coils comprising the antenna 20. In addition, signals from the ICS to the WP on one carrier frequency and from the WP to the ICS on another frequency can be transferred via a single coaxial cable between the headpiece 14 and the WP 16. This can be accomplished by having tuned inductor-capacitor filters for each frequency at each end of the coaxial cable.

The WP 16, powered by a battery 38, is adapted to receive audio signals received by the microphone 18 and to transmit such signals to a conventional audio front end 22 which features automatic gain control (AGC). The audio signals processed by the audio front end 22 are transmitted to a bank of filters 24 for filtering and for generation of a plurality of parallel audio signals. The audio signals are processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30. The filter bank may also be implemented as a group of digital filters, for example in a digital signal processor integrated circuit. In this case the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank 24 and the general processing of microprocessor 30.

The output of the microprocessor 30 is coupled through a custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34. The gate array 32 also converts data from a telemetry

5,609,616

| 5 | 6 |

receiver **36** and the microprocessor **30** to control the power level of and data generated by the data transmitter **34**.

As illustrated in FIG. 1, the ICS **12** includes a receiver **40** for receiving data transmissions from the wearable system **10** and a telemetry transmitter **42** for transmitting ICS status indicating and measured signals from the ICS **12** to the wearable system **10** for processing thereby. For example, power level indicating signals transmitted by the telemetry transmitter **42** are received by the telemetry transmitter **36** and processed in the microprocessor **30** and gate array **32** to generate signals controlling the power level of the transmissions from the transmitter **34** to the ICS **12**, thereby providing a closed-loop system for optimizing the power levels of the transmission from the wearable system **10** to the ICS **12** and hence conserving the battery **38** and optimizing the voltages generated within the system **10**.

In addition to the receiver **40** and transmitter **42**, the ICS **12** includes a regulator **44** for receiving a power signal from the receiver **40** to energize a processor **46**. Data signals from the receiver **40** are also transmitted to the processor **46** for processing to generate stimulation signals applied to one or more of a plurality of capacitor coupled electrodes in an intra-cochlear electrode **48**.

Generally speaking, in response to control or data signals from the WP16 the processor **46** selectively monitors voltages of the electrodes and associated circuitry in the processor and generates ICS status indicating and measured signals. For example, the processor **46** monitors the voltage applied to the regulator **44**, the impedance of the electrodes and other voltages within the processor to generate the status indicating signals which are sent as data to the telemetry transmitter **42** for transmission to the wearable system **10**.

More particularly, in the cochlea stimulating system shown in FIG. 1, the signals transmitted to the ICS **12** from the wearable system **10** include electrical power components. Such power components are processed within the receiver **40** through the series regulator **44** to generate a voltage signal which powers the processor **46**. The processor **46** selectively monitors the voltage applied to the series regulator and generates a status indicating signal relative to such voltage which is transmitted by the telemetry transmitter **42** and received by the telemetry receiver **36**. As previously stated, such information is utilized in the microprocessor **30** and gate array **32** of the WP **16** to control the power level of the transmissions from the data transmitter **34** to the ICS **12**.

More specifically as to the ICS **12** and the embodiment thereof illustrated in FIG. 2, power and data are sent through a main coil **50** to the receiver **40** comprising a power rectifier which filters out DC power for the regulator **44** and a detector which demodulates the data for transmission to a data decoder **52**. The regulator **44** in conjunction with a voltage reference **54** and voltage regulator error amplifier **56** produces a precise 14 volts for powering the balance of the processor **46**. More particularly, the 14 volts powers a voltage downconverter **58** which generates three additional voltages, 10.5, 7.0 and 3.5 volts. The three voltages are used to power various other circuits, including the output circuits of the processor **46**.

The voltage used to provide charge to the outputs applied to the electrodes **48** is transferred to eight different storage capacitors **60**, one of which is illustrated in FIG. 2. There is one storage capacitor for each of eight isolated bipolar channels. The output of each storage capacitor is controlled by a current source FET **62** for that channel. Each FET current is determined by an exponential D to A converter **64**

and current reference **65**, such as the D to A converter described in U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as the present invention.

The output of the current sources **62** are connected to the electrodes **48** and an indifferent electrode **49** through a switch matrix **66**. The output of the electrode switch matrix **66** is capacitor coupled to each of 16 electrodes. The following table lists the output currents available to the electrodes:

| Constant Current Amplitude Steps (µA) | | | | |
|---|---|---|---|---|
| 2500 | 425.7 | 72.49 | 12.34 | 2.102 |
| 2417 | 411.7 | 70.11 | 11.94 | 2.033 |
| 2338 | 398.2 | 67.81 | 11.54 | 1.966 |
| 2261 | 385.1 | 65.58 | 11.16 | 1.901 |
| 2187 | 372.4 | 63.43 | 10.80 | 1.839 |
| 2115 | 360.2 | 61.34 | 10.44 | 1.779 |
| 2046 | 348.4 | 59.33 | 10.10 | 1.720 |
| 1978 | 336.9 | 57.38 | 9.772 | 1.664 |
| 1913 | 325.9 | 55.49 | 9.451 | 1.609 |
| 1850 | 315.2 | 53.67 | 9.140 | 1.556 |
| 1790 | 304.8 | 51.91 | 8.840 | 1.505 |
| 1731 | 294.8 | 50.20 | 8.549 | 1.455 |
| 1674 | 285.1 | 48.55 | 8.269 | 1.408 |
| 1619 | 275.7 | 46.96 | 7.997 | 1.361 |
| 1566 | 266.7 | 45.42 | 7.734 | 1.317 |
| 1514 | 257.9 | 43.92 | 7.480 | 1.273 |
| 1465 | 249.4 | 42.48 | 7.234 | 1.232 |
| 1416 | 241.2 | 41.08 | 6.997 | 1.191 |
| 1370 | 233.3 | 39.73 | 6.767 | 1.152 |
| 1325 | 225.6 | 38.43 | 6.545 | 1.114 |
| 1281 | 218.2 | 37.17 | 6.330 | 1.077 |
| 1239 | 211.1 | 35.95 | 6.122 | 1.042 |
| 1198 | 204.1 | 34.76 | 5.921 | 1.008 |
| 1159 | 197.4 | 33.62 | 5.726 | 0.975 |
| 1121 | 190.9 | 32.52 | 5.538 | 0.000 |
| 1084 | 184.7 | 31.45 | 5.356 | |
| 1049 | 178.6 | 30.42 | 5.180 | |
| 1014 | 172.7 | 29.42 | 5.010 | |
| 981.2 | 167.1 | 28.45 | 4.845 | |
| 949.0 | 161.6 | 27.52 | 4.686 | |
| 917.8 | 156.3 | 26.61 | 4.532 | |
| 887.6 | 151.1 | 25.74 | 4.383 | |
| 858.5 | 146.2 | 24.89 | 4.239 | |
| 830.3 | 141.3 | 24.07 | 4.100 | |
| 803.0 | 136.7 | 23.28 | 3.965 | |
| 776.6 | 132.2 | 22.52 | 3.835 | |
| 751.1 | 127.9 | 21.78 | 3.709 | |
| 726.4 | 123.7 | 21.06 | 3.587 | |
| 702.6 | 119.6 | 20.37 | 3.469 | |
| 679.5 | 115.7 | 19.70 | 3.355 | |
| 657.2 | 111.9 | 19.05 | 3.245 | |
| 635.6 | 108.2 | 18.43 | 3.138 | |
| 614.7 | 104.6 | 17.82 | 3.035 | |
| 594.5 | 101.2 | 17.24 | 2.936 | |
| 575.0 | 97.92 | 16.67 | 2.839 | |
| 556.1 | 94.70 | 16.12 | 2.746 | |
| 537.8 | 91.59 | 15.59 | 2.656 | |
| 520.2 | 88.58 | 15.08 | 2.568 | |
| 503.1 | 85.67 | 14.58 | 2.484 | |
| 486.5 | 82.86 | 14.11 | 2.402 | |
| 470.6 | 80.13 | 13.64 | 2.324 | |
| 455.1 | 77.50 | 13.19 | 2.247 | |
| 440.1 | 74.96 | 12.76 | 2.173 | |

Under control of a voltage controlled oscillator **70** and its loop filter **72**, the serial output from the data decoder **52** drives a serial to parallel converter **68**. The parallel output of the serial-to-parallel converter **68** provides channel amplitude data to an amplitude data latch **74** and program command data to a command latch **76**. More particularly, the serial data from the data decoder **52** is analyzed by bit and word error checking counters **78**. The amplitude data from the amplitude data latch **74** determines the output of the exponential D to A converter **64**. In that regard, the analog value of the output from the D to A converter **64** is generated

5,609,616

7

in a current mirror which is then transferred via an analog multiplexer 80 to the capacitively-coupled output electrodes 48. The sequence of operation of the multiplexer 80 is controlled by the output of a word strobe generator 79 which is driven by command latch 76. It should be noted that the command latch 76 cannot function unless an initialization circuit 82 and the bit error checking circuit 78 permit data to be transferred to a command decoder 84.

The command decoder 84 controls all the other specific functions such as the electrode switching matrix 66 via an output mode register 86 and output control logic 88, and a pulse width control 90 which also controls the output via the output control logic 88. As with the command latch, the pulse width control 90 and the output control logic 88 cannot function unless the initialization circuit 82 is properly initialized. To be enabled, the initialization circuit 82 must detect the correct initial digital code. When the initialization circuit 82 is not enabled, the electrode switching matrix 66 cannot turn on.

In addition to the other functions of the command decoder 84, it also controls the setting of indifferent electrode switches 92 which are used for monitoring the current flowing through the indifferent electrode and therefore through any or all 16 electrodes in a unipolar configuration. With the appropriate output channel configuration in the unipolar state, the indifferent electrode switches permit multi-polar operation.

As illustrated more clearly in FIG. 2, the ICS back telemetry system described briefly relative to FIG. 1, consists of a signal multiplexer (MUX) 94 programmed by the command decoder 84 to monitor various voltages throughout the processor 46 and ICS 12. The output of the multiplexer 94 is amplified through a series of telemetry gain stages 96 which are connected to an A to D converter 98. Power to the gain stages 96 can be turned on and off by the command decoder 84 to conserve energy when not in use.

The A to D converter 98 may be a single-slope type which functions by comparing the output of the gain stages 96 with a voltage ramp. The slope of the ramp is set by a current reference 100. The output of the A to D converter 98 and a telemetry control logic 102 is a train of bits that controls a telemetry modulator switch 104. The telemetry modulator switch 104 modulates the telemetry transmitter 42 which energizes a telemetry coil 106.

As previously indicated, the back telemetry system included in the cochlear stimulating system of the present invention provides means for minimizing power consumption of the system. As previously noted, the WP 16 is powered by the battery 38. To increase the battery life or to allow a smaller battery to be used, the radio frequency transmitted from the WP 16 via the antenna 20 to the ICS 12 is rectified in the receiver 40 and applied to the regulator 44. It is important that the output voltage of the regulator 44 be held constant, in this case, 14 volts. It is also important that the voltage regulator which has the 14 volt output must have somewhat more than 14 volts available as an input. Any additional voltage is lost as heat and will reduce the life of battery 38. In the present invention, the regulator input voltage (DC) is optimized by controlling the RF power transmitted by the wearable system 10 and received by the ICS 12. As previously indicated, the data transmitter 34 is powered by the battery 38, preferably a 6 volt 0.5 amp-hour battery. The power control is affected through a conventional switching regulator included in the gate array 32 whose output voltage may be varied based upon the duty cycle of a switching transistor or multiple switching transistors in the

8

switching regulator. The output of the power control circuit powers the transmitter 34 and by varying its output voltage can vary the transmitter power. The transmitter may run at 49 MHz and be 100% amplitude modulated by a digital signal. The digital signal comes from the gate array 32. The signals transmitted by the transmitter 34 are received at the ICS 12 and rectified as previously described. The rectified power noted as "DC" in FIG. 2 is applied to the regulator 44 which may be of conventional design including a junction type depletion-mode FET to hold the output voltage of the regulator 44 constant as the input voltage changes. In practice, the input voltage can vary from 14 volts up to 20 volts or more. To maintain best efficiency, it is desired that the DC voltage be only slightly greater than the output voltage of the series regulator 44, perhaps on the order of 14.2 to 15 volts. However, as the antenna 20 is moved or as the circuit loads change, the DC voltage may start to change. One purpose of the back telemetry system is to allow the DC voltage to be automatically maintained at the lowest voltage consistent with normal operation. To accomplish this, under control of the command decoder 84, the multiplexer 94 monitors the DC voltage. The desired output of the multiplexer 94 is applied to the conventional A to D converter 98. As previously described, the output of the A to D converter, telemetry control logic 102 and telemetry modulator switch 104, FM modulates the telemetry transmitter 42 which may comprise a 10.7 MHz oscillator. The output of the oscillator is coupled back through the skin to the headpiece 14 and antenna 20 to the telemetry receiver 36. The output of the receiver 36 is applied to the gate array 32 including a conventional serial to parallel converter. The parallel data output from the serial to parallel converter is processed in the microprocessor 30 to adjust the power level in the power control circuit of the data transmitter 34 to maintain the value of the DC voltage slightly greater than the desired output voltage of the series regulator 44.

As just described, the command decoder 84 controls the monitoring of the value of the DC voltage to provide the desired voltage control. Similarly, the command decoder 84 may select particular channels to be monitored and the impedance of the various electrodes to be determined in the same manner as the DC voltage was monitored and as above described. In such cases, the ICS status indicating signals generated in the processor 46 and telemetered to the WP 16 may be utilized within the microprocessor 30 to provide indications of the operating status of the ICS 12.

In still other instances, to save power the command decoder 84 may function to cause a powering down of various subsystems within the processor 46. With the circuitry of FIG. 2, power may be restored in approximately 20 msec. on appropriate output from the command decoder. Similarly, the microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The hibernation state terminates whenever additional commands are received from the command decoder 84.

In the ICS 12 illustrated in FIG. 2, the current sources 62 are floating. Such "floating" of the current sources may be as described in United States patent application Ser. No. 428,179, filed Dec. 18, 1989, and assigned to the same assignee as the present invention, and may be implemented with an FET that is not directly tied to a power supply. This may be implemented using two identically sized transistors, one being a reference transistor upon which an input current is impressed to generate a voltage difference thereacross which is a predetermined gate voltage for the second or output transistor which is floating with respect to all power supplies. The predetermined gate voltage is that voltage

5,609,616

**9**

which when applied to the output transistor will produce the same current value as the input current. The importance of such floating current sources in the ICS **12** is to enable the ICS **12** to stimulate pairs of electrodes independent of the current flow in other pairs of electrodes and independent from the main power supply. This allows for the exact control of current in each output stage with no direct current path back to the main power supply or to any other output stage. This eliminates any concern of undesired currents flowing between any of the output stages.

The processor **46** included in the ICS **12** includes means (**88** and **90**) for selectively controlling the pulse width of the stimulation signals applied to the electrode **48**. Such means preferably comprises a timing circuit capable of turning the stimulus current of a particular channel on and off with a time resolution of approximately one microsecond. Such means is preferably controlled by a command signal separate from the signals which set the current to each stimulus channel; the command signal controls the duration of stimulus while the previously described signals control the stimulus current in each channel.

Further, the processor **46** included in the ICS **12** includes means for selectively controlling the frequency at which stimulating signals are applied to select ones of the electrodes. This is preferably accomplished by providing a signal frame (or set of signals to the multiplicity of electrodes) of varying length. The use of short frames allows a subset of channels to be refreshed or updated more often than would be possible if all channels were always updated by a fixed, long frame. Such reduced frame length may be implemented either as a frame length encoded in the frame data or (in the preferred implementation) as a unique end of frame marker.

In the processor **46**, the voltage downconverter **58** generates three voltages of different value for powering different components in the ICS **12**. The voltage downconverter may comprise a set of capacitors and switches so arranged to connect the capacitors alternately in series across the high voltage from the regulator **44** input and then in parallel to provide a lower voltage supply (3.5 volts in the preferred implementation). The storage or supply capacitors **60** may be charged to various multiples of the 3.5 volt supply by connecting their associated transfer capacitors to the appropriate points in the downconverter when the downconverter capacitors are connected in series.

The ICS **12** includes means for selectively receiving and responding to analog and/or pulsatile input data from the WP **16**. Preferably, this is accomplished by using the stimulus current control signals to provide continuous analog control of stimulus and using a separate command signal to selectively control the "on" or "off" status of a given channel. The stimulus parameters of each channel are controlled independently of all other channels by means of separate signals within the data frame and separate configuration commands for each channel encoded in the command signal.

Further, the ICS **12** is capable of selectively stimulating the electrodes in a unipolar and/or bipolar configuration. This is accomplished by providing a set of command signals which affect separate bits for each channel in the output mode register **86**. Via the output control logic **88**, these bits independently configure the switches for each channel in the electrode switching matrix **66**. The switches allow the current source FET **62** and storage capacitors **60** to be connected to pairs of electrodes (bipolar mode) or, alternatively, to individual electrodes and the indifferent electrode **49** via the indifferent electrode switches **92**.

**10**

While FIG. **2** illustrates a basic ICS, FIGS. **3** and 4A–4H illustrate a preferred form of the ICS. FIG. **3** is a more general block diagram illustration of the system which is represented in greater detail in FIGS. 4A–4H. The majority of the active circuitry of the ICS may be imbedded in a custom chip which with other active and passive circuitry comprising the ICS may be supported on a substrate. The ICS illustrated in FIGS. **3** and 4A–4H comprises a receiver **200** for receiving an input signal generated in the WP **16** and transmitted by the headpiece **14**. Preferably, such input is a Manchester-encoded data stream comprising an amplitude-modulated RF signal consisting of a serial sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-of-frame marker. A frame is defined as one such bit sequence and such frames are sent sequentially from the WP to the ICS. The first 8 words of each frame contain the digital amplitude and polarity information for output channels **1** through **8** in that order. The 9th word contains command information for the control of ICS configuration and functionality. The receiver **200** separates the incoming RF signal into a power signal transmitted to a power supply section **202** and data which is transmitted into a data recovery section **201**. In the power supply section, power signals are generated for the ICS and, via a downconverter **203**, are transformed into the voltage levels which provide power for the eight output stages indicated by numbers **212-1** through **212-8**, one of which will be described in greater detail hereinafter.

The data signal extracted by the receiver **200** and transmitted to the data recovery section **201** is further processed within the data recovery section to provide input signals to an initialization and status control section **204**, a polarity and amplitude control section **205**, a command decoder section **206**, and to a multiple chip control **214**. The initialization and status control section **204** receives power from the power supply section **202** and establishes the control conditions of the other sections of the ICS upon system startup and upon detection of a system operating error by the status control section. The polarity and amplitude control section **205** determines the polarity of the output currents generated in the various output stages **212-1** through **212-8** and generates signals which are further processed in a log D-A converter section **207** to control the magnitude of current signals supplied by the outputs of the various output stages. In the command decoder section **206**, the data signals are processed and decoded to form signals which (1) via an output mode register **208** control the status of the output stages as either unipolar or bipolar, (2) via a pulse width control **209** control the width of the output pulses supplied by the output stages when such stages are in a pulsatile mode and (3) via a refresh voltage logic **210** control the power applied to the output stages. In addition, the ICS includes a back telemetry section **211** which in response to signals from the command decoder **206** generates and transmits back to the WP status indicating and power control signals. The status signals indicate the status of the various elements within the ICS and voltages generated therein. The power control signals control the power of the transmitted signals and effect a power conservation by control of the level of the signals from the WP and by control of the refresh voltages from the downconverter **203** to the various output channels.

Still further, the illustrated ICS includes a multiple chip control section **214**. Section **214** enables the chip included in the ICS to act as a "master" having the capacity to drive a plurality of identical "slave" chips mounted on the substrate thereby effecting a multiplication of the number of output stages.

A00822

5,609,616

| 11 | 12 |

FIGS. 4A–4H, organized as set forth in FIG. 4, show details of the various system sections illustrated in FIG. 3, with subsections of the sections bearing the same numbers as set forth in FIG. 3 and with letters to denote the specific subsections, e.g., 201A, 201B, 201C and 201D are subsections of the data recovery section 201. The following detailed description of the sections and subsections comprising the system will begin with the receiver 200 and will continue through a description of the output stages 212-1 through 212-8 and multiple chip control 214 and will be followed by a description of the operation of the system comprising the described sections. Details of the frame structure, data word structure, and/or the transmission rate for the input signal from the WP and data signal extracted therefrom will be included in the description of the operation of the system.

## STRUCTURE

Receiver 200

The receiver 200 illustrated in FIG. 4A is a conventional AM detector containing capacitors which implement a parallel resonant tuned circuit in conjunction with a main coil 50 followed by series connected power rectification and data detection diodes and energy storage capacitors to generate signals PDATA, NDATA, RAWDC, ZEROV and TANKV. PDATA and NDATA are differential signals generated across the data detection diodes and convey demodulated data to the data recovery section 201. RAWDC is DC voltage generated across the energy storage capacitors and is delivered to the input of a series regulator 202A in the power supply section 202. ZEROV is the reference voltage against which all other voltages are measured in the ICS. TANKV is derived from RAWDC via a resistive divider network in the receiver 200 and, as will be described in greater detail hereinafter, via a telemetry multiplexor 211B in back telemetry section 211 provides one of the power control signals 35 which is an input to the back telemetry section.

Data Recovery 201

The data recovery section comprises four subsections: a data conditioner 201A, a clock decoder 201B, a serial to parallel converter 201C and a word strobe generator 201D. All analog and digital circuitry in the data recovery section 201 is of conventional design.

Within data conditioner 201A, the signals PDATA and NDATA from the receiver 200 provide the two inputs to an analog comparator. The output from the comparator is the signal MANDATA, which is the recovered version of the Manchester-encoded serial data stream transmitted by the WP. MANDATA is distributed to clock decoder 201B, serial to parallel converter 201C, as well as downconverter clock 203A to be discussed hereinafter.

In addition, within data conditioner 201A, the signal MANDATA is applied to the gate of a MOSFET switch which allows an on-chip capacitor to be charged in a pulsatile manner. A constant-current discharge path in parallel with the on-chip capacitor reduces the voltage to zero in the absence of the signal MANDATA. The voltage across the on-chip capacitor is buffered by three inverters to become the carrier detect signal, CARDET. CARDET is distributed to clock decoder 201B and to an initialization subsection 204B of the initialization and status control section 204.

In the clock decoder subsection 201B, the signal MANDATA is applied to an edge-detector circuit comprised of an XOR gate with an RC delay circuit preceding one of the inputs. Output pulses from the edge detector are the primary input to a phase-lock loop (PLL) circuit of conventional design which, by locking to the MANDATA pulse edges,

generates the data clock signals CLKPH1 and CLKPH2. The clock signals comprise a two-phase non-overlapping clock system at a frequency of 1.1 MHz with a CLKPH1 pulse asserted during the first half of each bit time and a CLKPH2 pulse during the second half. Signals CLKPH1 and CLKPH2 are sent to the serial to parallel converter 201C, word strobe generator 201D, pulse width control 209 and an A/D converter 211C in back telemetry section 211.

Further, within clock decoder 201B, the timing of pulse edges in the signal MANDATA is compared to those of the local clock VCO in the PLL. In particular, a unique pulse with non-standard edge timing sent by the WP to mark an end-of-frame is sensed by a circuit of conventional design comprised of a D-type flip-flop and an XOR gate. This unique pulse results in the generation of the frame clock signal, PFRMCLK which is sent to serial to parallel converter 201C.

Additional circuitry of conventional design in the clock decoder 201B, comprising logic gates and binary counters, is used to generate a signal PLLLOCK. PLLLOCK is asserted so long as the PLL is locked to the signal MANDATA, CARDET is asserted, and, as will be described relative to a powerbad detector 204A in initialization and status control section 204, POWERBAD is negated. The signal PLLLOCK is sent to serial to parallel converter 201C and to parity error detector and initialization subsections 204C and 204B of section 204.

Serial to parallel converter 201C comprises logic gates, latches, D type flip-flops, counters and a shift register all of conventional design. Under control of the signal CLKPH1 and a signal DCENABLE from multiple chip control section 214, the serial data bits represented in the signal MANDATA are shifted into a 9-bit serial-in, parallel-out shift register. The first stage output of the shift register generates a serial bit stream signal SERDATA. The 9 outputs of the register are the source of the signal bus DATA (1–9) which is sent solely to a polarity and amplitude data latch 205A in section 205 and to a command latch 206A in command decoder 206.

In addition, within serial to parallel converter 201C, the signal PFRMCLK is gated with the clock signal CLKPH2 to generate a signal FRMCLK sent to pulse width control section 209 and a refresh voltage logic section 210.

Further, within serial to parallel converter 201C, the signal CLKPH1 is connected to the clock input of a 4-bit binary up-counter which is reset by FRMCLK. The counter and succeeding decoders and latches provide the signals XFERB and XFERC solely to an analog multiplexer 207C included in the log D-A converter section 207. Also, the bit 4 output of the counter is gated with CLKPH1 and CLKPH2 to produce the signal WORDTRCLK (word transfer clock) which provides a reset pulse to the counter as well as being sent to word strobe generator 201D, down converter clock 203A and a polarity and amplitude data latch 205A. The counter is also decoded to generate the signal AMPSYNC which is sent solely to pulse width control 209.

Word strobe generator 201D comprises logic gates, D type flip-flops and a 9-stage Johnson counter of conventional design. The signal WORDTRCLK provides the clock input to the Johnson counter. Signals CLKPH1, CLKPH2, FRMCLK and the output from stage 9 of the Johnson counter are combined to provide the reset signal for the counter. Outputs from the first 8 stages of the counter provide the 8-bit signal bus WSTRB (1–8) with each line asserted during the appropriate word time during the data frame. WSTRB (1–8) is sent to analog multiplexer 207C, pulse width control 209 and back telemetry section 211. In addition, the output from stage 9 of the Johnson counter provides the signal

## A00823

5,609,616

**13**

WORD9CLK which is sent to command latch **206**A and command decoder **206**B.

Power Supply **202**

As depicted in FIG. 4A, the power supply section **202** includes the series regulator **202**A which includes a series regulating element such as a depletion-mode FET. In conjunction with a conventional voltage reference **202**C and a conventional voltage regulator error amplifier **202**B, the series regulator produces a precise negative 14 volts (NEG14) with respect to ZEROV for powering the balance of the ICS. The gate of the series regulating element in the regulator **202**A is controlled by a signal REGCONT output from an operational amplifier located in a regulator error amplifier **202**B, having as its inputs the output VREF of the voltage reference **202**C and an attenuated version of NEG14, i.e., TAP14. The voltage reference **202**C includes an off chip zener diode which is powered by the NEG14 line. The precision reference voltage VREF is generated across this zener diode.

Downconverter Section **203**

As represented in FIGS. 4A and 4B, the downconverter section **203** comprises a downconverter clock **203**A and a voltage downconverter **203**B.

The downconverter clock **203**A has as its inputs NEG14 and ZEROV from regulator **202**A, MANDATA from data conditioner **201**C, POWERBAD from powerbad detector **204**A and WORDTRCLK from serial to parallel converter **201**C and comprises two toggle flip-flops and a two-pole FET selector switch of conventional design. The two toggle flip-flops receive and divide by a factor of four, the signal MANDATA. During startup, since MANDATA is pulsing at 550 KHz, the resulting signal from the toggle flip-flop is a 137.5 KHz signal which is applied to one input of the two-pole FET switch. The other input to the two-pole switch is WORDTRCLK and the state of the switch is controlled by POWERBAD. Since, as will be described, POWERBAD is asserted during ICS startup, the 137.5 KHz signal is delivered as DOWNCLOCK during startup to the voltage down converter **203**B whereas a level-shifted version of WORDTRCLK is sent out as DOWNCLOCK during normal ICS operation.

The voltage downconverter **203**B comprises conventional logic gates and off-chip capacitors. It receives DC power (NEG14 and ZEROV) from series regulator **202**A and a squarewave output signal DOWNCLOCK from the downconverter clock **203**A. The squarewave is converted into a two-phase non-overlapping pair of clock signals in a conventional cross-connected logic gate and inverter circuit in the downconverter **203**B. The two-phase clock signals drive a set of FET switches which establish the pattern of connections between and among a group of four off-chip capacitors **203**-1 through -4.

During phase 1 of the clock signals, the four capacitors are connected in series across the −14 volt supply and each charges to a final value of −3.5 volts. At that time, output voltages of −3.5, −7.0, −10.5 and −14 volts are made available on outputs from the voltage downconverter **203**B to each of the eight output stages **212**-1 through **212**-8 in the ICS, and, in particular, to each of the refresh voltage control subsections **212**A included in such output stages.

During phase 2 of the clock signals, the four capacitors are connected in parallel and deliver charge to an off-chip storage capacitor **203**-5 which is the source of the −3.5 volt logic supply. Also during phase 2, as a natural result of the parallel connection, the voltages on the four capacitors are equalized in preparation for the return to the series arrangement of the next phase 1.

**14**

Initialization and Status Control Section **204**

The initialization and status control section **204** consists of digital circuitry and an analog comparator of conventional design to detect errors and to set the internal conditions of system circuitry on system startup and upon error detection by this section. Section **204** is made up of three subsections: a powerbad detector **204**A, an initialization subsection **204**B, and a parity error detector **204**C.

The powerbad detector **204**A comprises an analog comparator having the −3.5 volt output from the voltage downconverter **203**B presented to one of its inputs. The other input to the comparator is the reference voltage, VREF, coming from power supply section **202**. The comparator operates on the −3.5 volts and VREF to generate an output POWERBAD which is asserted when the −3.5 volt supply is below normal operating potential, such as during startup. Thus, during the initial phase of startup, the POWERBAD signal is asserted. The signal POWERBAD is used to force a known logic condition on circuitry within initialization subsection **204**B and is also sent to the downconverter clock **203**A and to the data recovery section **201** for the same purpose. For example, while POWERBAD is asserted, the output stages **212**-1 through **212**-8 are disabled. This is accomplished by POWERBAD resetting a flip-flop within **204**B to negate a signal OUTENABLE, the assertion of which is required to enable any of the output stages. Then, upon negation of POWERBAD, assertion of CARDET from data conditioner **201**A, PLLLOCK from clock decoder **201**B and CONNECT from command decoder **206**B, the flip-flop is set and OUTENABLE is asserted to enable the output stages **212**.

Similarly, and as will be described again hereinafter, the assertion of a signal PALARM from parity error detector **204**C will result in a disabling of the output stages **212** via a negation of Outenable. In this regard, parity error check is made at the end of each frame to assure that the total number of "ones" in the data stream to the ICS is even. The parity error detector **204**C comprises a combination of logic gates and flip-flops of conventional design and is based on a D type flip-flop which is clocked by the serial bit data stream SERDATA from signal to parallel converter **201**C. The state of the flip-flop at the end of the frame indicates whether the received number of one bits was odd or even. The resulting state of the D type flip-flop is then transferred to a holding flip-flop whose output generates the parity error signal PALARM which is connected to the initialization subsection **204**B.

Initialization subsection **204**B comprises a combination of logic gates of conventional design and receives input signals CARDET from clock decoder **201**B; PALARM from parity error detector **204**C; DISCON, CONNECT, and ALLZERO from command decoder **206**B, PLLLOCK from clock decoder **201**B and POWERBAD from POWERBAD detector **204**A. CARDET, PALARM, PLLLOCK and POWERBAD have been described. The manner in which such input signals DISCON, CONNECT and ALLZERO are generated will be described hereinafter relative to section **206**. Output signals generated by the initialization subsection **204**B are CARON, OUTENABLE, RESETERR, and SYSRESET. In subsection **204**B, the signal CONNECT sets a latch flip-flop to assert the output signal OUTENABLE at pulse width control **209**. Input signals DISCON and ALLZ-

5,609,616

15

ERO are combined in logic gates within subsection 204B to generate the output RESETERR which goes from 204B to parity error detector 204C to reset the parity error detector flip-flop. Signals PALARM, DISCON, ALLZERO, PLLLOCK and POWERBAD are combined in logic gates within 204B such that when any of these signals indicate a problem, a disconnect command output signal SYSRESET is generated and functions as a general reset signal for all the circuitry in the ICS. In this regard, SYSRESET, when asserted will reset the ICS circuitry to its initial state ready for restart in response to system startup data from the WP. Signals CARDET and PLLLOCK asserted and signals POWERBAD and PALARM not asserted combine in gates in 204B to generate the output signal CARON. CARON goes off-chip to turn on the back telemetry carrier signal, at a telemetry transmitter 211E of the back telemetry section 211. As will be described hereinafter, the absence of the back telemetry carrier signal is detected in the WP as an indication of a system defect in the ICS. The WP will initiate a restart of the ICS and will continue in that mode until the back telemetry carrier signal is again detected.

Polarity and Amplitude Data Latch Section 205

The polarity and amplitude data latch section 205 comprises amplitude data latch 205A and a zero current control 205B. The latch 205A consists of a conventional 9-bit latch which receives data bit inputs from a 9-bit bus DATA (1–9) from the serial to parallel converter 201C in addition to WORDTRCLK also generated in 201C. WORDTRCLK causes the input data bits DATA (1–9) to be latched and then held until replaced by a new set of incoming data. Output from the 9-bit latch consists of an 8-bit wide data bus signal AMPDATA (1–8) and a 9th bit defining a single line POLARITY which goes directly to output stages 212-1 through 212-8. AMPDATA (1–8) goes from latch 205A to the zero current control 205B and to the logarithmic D-A converter in section 207, and as described more specifically hereinafter, to the internal subsection 207B.

The zero current control 205B comprises logic gates of conventional design. The signal bus AMPDATA (1–8) from amplitude data latch 205A is decoded in an 8 input gate such that the output of the gate is asserted only when all 8 bits are at logic 0. This corresponds to a requested output current amplitude of zero. The signal POLARITY from the latch 205A is combined with AMPDATA (1–8) to generate two (2) complimentary output signals ZERO and SHORT. SHORT is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 1 and, conversely, ZERO is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 0 (zero).

Command Decoder 206

The command decoder section 206 comprises digital logic circuitry of conventional design and consists of two subsections: command latch 206A and command decoder 206B. The command latch 206A is similar to latch 205A discussed above in that it is a 9-bit latch with input data coming from the 9-bit bus DATA (1–9) from serial to parallel converter 201C. In command latch 206A, DATA (1–9) is caused to be latched by signal WRD9CLK from the word strobe generator 201D to develop a 9-bit bus WORD9 (1–9) output which is maintained until replaced by a new ninth word command. WORD9 (1–9) connects directly to the command decoder 206B which consists of logic gates to decode the various functions from the 9-bit combinations on the output bus. The

16

following table depicts the content of WORD9 and the outputs generated by the various function codes contained in bits 6–8 of WORD9.

TABLE 1

| | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|---|
| | Function code | | | Value C B A | | | Channel number | | |

| Function Code | Outputs | Description |
|---|---|---|
| 000 | ALLZERO, DISCON, CONNECT | global control |
| 001 | FUNC2 | output control |
| 011 | FUNC4 | normal back telemetry read |
| 100 | FUNC5 | inverted back telemetry read |
| 110 | FUNC7 | refresh voltage control |
| 111 | FUNC8 | output pulse width control |

In addition, command decoder 206B receives input signals RFMAIN from refresh voltage logic 210, PFMAIN from pulse width control 209 and WORD9CLK and WSTRB1 from the word strobe generator 201D. Output signals from 206B which exit the command decoder 206 consist of logic gate output signals CONNECT, DISCON, ALLZERO, FUNC2, FUNC4, FUNC5, FUNC7 and FUNC8.

As previously described, the signals CONNECT, DISCON and ALLZERO exiting the command decoder 206 provide inputs into the initialization section 204. FUNC2 through FUNC8 are function decodes which provide inputs to the various sections which they control on a command basis. The signal FUNC2 is the primary enabling signal going from the command decoder to the output mode register 208. Signals FUNC4 and FUNC5 are connected directly to the back telemetry section 211 (telemetry function decoder 211A and A/D converter 211C) to control its function. FUNC7 is directly and solely connected to the refresh voltage logic 210 to provide enabling for the refresh voltage control portion. FUNC8 is connected directly and solely to pulse width control 209 to enable that function to take place.

Logarithmic D/A Converter 207

The logarithmic D/A converter section 207 consists of conventional analog and digital circuitry, with the exception of a logarithmic D/A converter subsection 207B which is the subject of U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as this invention. The logarithmic D/A converter 207 consists of three subsections: a current reference generator 207A, the logarithmic D/A converter subsection 207B, and an analog multiplexer 207C. The current reference generator 207A receives a voltage input VREF from the voltage reference 202C and utilizes that reference voltage to generate reference output current signals ADIREF and IREF. ADIREF is a fixed current supply to A/D converter 211C while IREF provides the input current to the logarithmic D/A converter 207B which includes multiplicative stages of current mirrors controlled by the 8-bit data bus AMPDATA (1–8) from the data latch 205A. Output signals from the logarithmic D/A converter subsection 207B are control voltages IPOSCON and INEG-CON connected to the analog multiplexer subsection 207C. The multiplexer is controlled by signals XFERB and XFERC from the serial to parallel converter 201C and an 8-bit bus signal WSTRB (1–8) from the word strobe generator 201D. Outputs from the analog multiplexer are distributed to, and control, each of the current sources 212B in

A00825

5,609,616

17

the eight output circuits 212-1 through 212-8 as signals IPOS (1–8) and INEG (1–8). Thus, the output current for each of the eight output stages 212-1 through 212-8 are controlled individually, separately and sequentially.

Output Mode Register 208

The output mode register 208 contains 24 transparent latches of conventional design arranged in 3 banks of 8 latches each. The 8 latches in the first bank give rise to an 8-bit bus AMONO (1–8) and likewise the remaining 2 banks generate bus signals BMONO (1–8) and DRC (1–8). AMONO(1), BMONO(1) and DRC(1) connect to output stage 212-1 and the rest of the bus signals are distributed to the other 7 output stages in a like manner.

Only upon assertion of function code signal FUNC2 from the command decoder 206D can the bit pattern in the latches of the register 208 be modified. More particularly, under control of pulse signal WSTRB1 from word strobe generator 201D, the low-order 3 bits of the 9-bit bus signal WORD9 (1–9) from the command latch 206A are decoded in a conventional 3-to-8 decoder. The decoder has each of its 8 output lines connected to and selectively enabling one latch in the same position in each of the three banks comprising the register 208 to effect a selective modification of the bit pattern in the register according to the pattern of the low order 3 bits. The middle 3 bits of WORD9 (1–9) are each connected to a single one of the 3 banks and enable the data inputs to all 8 latches in each of the three banks comprising 208. The high-order 3 bits in WORD9 (1–9) are not used in section 208.

Pulse Width Control Section 209

The pulse width control section 209 comprises logic gates, latches, D type flip-flops, counters and decoders of conventional design. The signals FUNC8 from command decoder 206B in conjunction with FRMCLK, CLKPH1 and CLKPH2 enables the operation of this section and causes the contents of two sequential 9th words to be latched from the bus signal WORD9 (1–9) into one of two buffers under control of a bit 5 in the first WORD9. The contents of the two WORD9 commands are diagrammed below:

TABLE 2

| WORD9 | | | | | |
|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 9 3 | | 2 1 0 |
| | 1 1 1 | E | F F | | C C C |
| Second WORD9 | 8 | 7 | | 6 5 4 3 2 1 0 | |
| | X | D | | N N N N N N N | |

E           EDGE CONTROL BUFFER NUMBER [0,1]
FF          EDGE EXECUTION FRAME NUMBER [00,01,10,11]
CCC         CHANNEL NUMBER [000–111 = CH1–CH8]
X           DON'T CARE
D           DIRECTION OF EDGE [0=ON TO OFF, 1=OFF TO ON]
NNNNNNN     COUNT TO OCCURRENCE OF EDGE [0–84]

As depicted in Table 2, requested stimulus output pulse edges will occur at the bit time specified in second WORD9 bits 0–6 above, during the frame time according to the command specified in the first WORD9 bits 3 and 4. This is accomplished by using such data bits to preset two down-counters which are decremented by the signal CLKPH1 from the clock decoder 201B and FRMCLK from the serial to parallel converter 201C respectively. Channel select bits

18

0–2 in the first WORD9 are latched and decoded to allow the passing of edge information only to the requested output channel as represented in the 8-bit signal bus PWC (1–8). The signal OUTENABLE from initialization 204B is gated with all bits of PWC (1–8) and must be asserted to enable any PWC (1–8) line to be asserted. Assertion of at least one PWC line is required for any stimulation signal to occur (see Table 6 herein).

Refresh Voltage Logic Section 210

Refresh voltage logic 210 comprises logic gates and latches of conventional design. The signal bus WORD9 (1–9) is gated into 8 pairs of such latches. The outputs from each one of each pair of latches is represented as one line in each of the two output bus signals RV0 (1–8) and RV1 (1–8) which are sent to a refresh voltage control 212A included in each of the output stages in section 212.

Since at least 16 bits are required to establish 4 possible refresh voltage levels across 8 channels, the refresh system is controlled by 2 consecutive 9th word commands of 9 bits each. The format of these 2 command words is shown below:

TABLE 3

| Word9 | | | | | |
|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 4 3 | 2 1 | 0 |
| | 1 1 0 | stage 1/2 select | stage 1/2 RV | stage 3 RV | stage 4 RV |
| Second WORD9 | 8 | 7 6 | 5 4 | 3 2 | 1 0 |
| | stage 4 RV | stage 5 RV | stage 6 RV | stage 7 RV | stage 8 RV |

As depicted in Table 3 above, the first WORD9 consists of the function code for refresh voltage control (110 in bits 8–6), a stage 1 or 2 select code (bit 5: 1=stage 1, 0=stage 2) which determines whether stage 1 or stage 2 will be updated at this time, the stage 1 or 2 refresh voltage level code RV (bits 3 and 2), the stage 3 refresh level code (bits 1 and 2) and the high-order bit of the refresh level code for stage 4. The second WORD9 also consists of 9 bits with bit 8 representing the low-order bit of the refresh level code for stage 4 and the remaining 8 bits representing the 2-bit refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two separate double WORD9 refresh voltage commands. The 2-bit RV codes and the refresh voltage levels associated with them are shown below:

| Code | | refresh |
|---|---|---|
| RV1 | RV0 | voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

Backtelemetry Section 211

The backtelemetry section 211 comprises telemetry function decoder 211A, a telemetry multiplexer 211B, an A/D converter 211C, a telemetry modulator 211D and a telemetry transmitter 211E.

A00826

5,609,616

**19**

Decoder **211A** comprises logic gates, latches and decoders of conventional design receiving as inputs WSTRB (**1–8**), WORD9 (**1–9**), FUNC4 and FUNC5. Within decoder **211A** signals WSTRB8 and WSTRB1 are combined to create signal WSTRB9 which is asserted from the end of WSTRB8 until the beginning of WSTRB1 and sent to the A/D converter **211C** and telemetry modulator **211D**. Signals FUNC4 and FUNC5 are the primary activation signals for decoder **211A** and cause the 6 low-order bits in the input bus signal WORD9 (**1–9**) to be latched, decoded and gated to control output signals applied to: indifferent electrode switch **212D** (IECLOSE); bus MUXCTRL (**1–23**); and lines identified as VRTPWR, RLOCTRL and RHICTRL (to telemetry multiplexer **211B**), ADPWR, and SH2X1, SH2X3, SH2X10 and SH1X10 (to A/D converter **211C**) to control functions in subsections **211B** and **211C** as shown in the tables below:

TABLE 4A

| Six low order bits WORD9 | | Output Signal from 211A | Description of Function Activated in MUX 211B |
|---|---|---|---|
| 543 | 210 | | |
| 001 | 000 | MUXCTRL1 | VOUTA1 vs VOUTB1 |
| 001 | 001 | MUXCTRL2 | VOUTA2 vs VOUTB2 |
| 001 | 010 | MUXCTRL3 | VOUTA3 vs VOUTB3 |
| 001 | 011 | MUXCTRL4 | VOUTA4 vs VOUTB4 |
| 001 | 100 | MUXCTRL5 | VOUTA5 vs VOUTB5 |
| 001 | 101 | MUXCTRL6 | VOUTA6 vs VOUTB6 |
| 001 | 110 | MUXCTRL7 | VOUTA7 vs VOUTB7 |
| 001 | 111 | MUXCTRL8 | VOUTA8 vs VOUTB8 |
| 010 | 000 | MUXCTRL9 | ICP1 vs NRV1 |
| 010 | 001 | MUXCTRL10 | ICP2 vs NRV2 |
| 010 | 010 | MUXCTRL11 | ICP3 vs NRV3 |
| 010 | 011 | MUXCTRL12 | ICP4 vs NRV4 |
| 010 | 100 | MUXCTRL13 | ICP5 vs NRV5 |
| 010 | 101 | MUXCTRL14 | ICP6 vs NRV6 |
| 010 | 110 | MUXCTRL15 | ICP7 vs NRV7 |
| 010 | 111 | MUXCTRL16 | ICP8 vs NRV8 |
| 011 | XXX | RLOCTRL | Output current monitor, high range |
| 100 | XXX | RHICTRL | Output current monitor, low range |
| 101 | 000 | MUXCTRL17 | ZEROV vs ZEROV |
| 101 | 001 | MUXCTRL18 | ZEROV vs 3.5 |
| 101 | 010 | MUXCTRL19 | ZEROV vs VREF |
| 101 | 011 | MUXCTRL20 | EXTP vs EXTN |
| 101 | 100 | MUXCTRL21 | ZEROV vs TAP14 |
| 101 | 101 | MUXCTRL22 | NEGI4 vs TANKV |
| 101 | 110 | MUXCTRL23 | ZEROV vs VRTV (int. voltage) |
| 101 | 111 | | no operation |

TABLE 4B

| Six low order bits WORD9 | | Output Signal from 211A | Description of Function Activated in A/D Converter 211C |
|---|---|---|---|
| 543 | 210 | | |
| 111 | 000 | SH2X1 | set gain to x1 (default) |
| 111 | 001 | SH2X1, 3 | set gain to x3 |
| 111 | 010 | SH2X1, 10 | set gain to x10 |
| 111 | 011 | | no operation |
| 111 | 100 | SH1X10, SH2X1 | set gain to x10 (redundant) |
| 111 | 101 | SH1X10, SH2X3 | set gain to x30 |
| 111 | 110 | SH1X10, SH2X10 | set gain to x100 |
| 111 | 111 | | no operation |

**20**

TABLE 4C

| Six Low Order Bits | | | Description of Function Activated in 211B, C, D | | |
|---|---|---|---|---|---|
| 543 | 210 | | IECLOSE | VRTPWR | ADPWR |
| 110 | 000 | | open | off | off |
| 110 | 001 | | open | off | on |
| 110 | 010 | invalid state | | | |
| 110 | 011 | | open | on | on |
| 110 | 100 | | closed | off | off |
| 110 | 101 | | closed | off | on |
| 110 | 110 | invalid state | | | |
| 110 | 111 | | closed | on | on |

The telemetry multiplexer subsection (telemetry MUX **211B**) comprises 25 level shifters connected to 25 pairs of transmission-gates of conventional design which allow one and only one pair of MUX input signals to be connected to the pair of output lines, MUXOUT+ and MUXOUT–. This pair of output lines convey the differential signal to be measured and are connected to the A/D converter **211C**.

A/D converter **211C** comprises logic gates, level shifters, transmission-gates, switched capacitor amplifiers and comparators of conventional design arranged in 2 stages. The first stage has a default gain of 1 and can be changed to a gain of 10 by signal SH1X10. The second stage has selectable gains of 1, 3 or 10 as set by signals SH2X1, SH2X3 and SH2X10, respectively. Signal ADPWR from decoder **211A** is used to turn on operating power to the amplifiers and the comparator in subsection **211C** only when back telemetry has been requested by the WP WORD9 commands. This manner of operation is power-conservative.

In addition, in the converter **211C** signals FUNC4 and FUNC5 are connected to the set and reset inputs of a flip-flop which has as its Q output a signal NORMPOL. Assertion of FUNC4 results in NORMPOL true and assertion of FUNC5 causes negation of NORMPOL. Within the converter **211C**, NORMPOL is used to direct the converter to take a normal or inverted sample of the signal presented to it via the telemetry MUX **211B** In addition, NORMPOL is sent to the telemetry modulator **211D**.

Further, in converter **211C**, the signals WSTRB (**1–8**) from the word strobe generator **201D** and WSTRB9 from telemetry function decoder **211A** are combined in logic gates and level shifters to generate a multiphase clock for controlling switch timing in a switched capacitor amplifier circuit which samples, holds and conditions the voltage to be measured. A reference level for the samples is established by signal VREF.

More particularly, the voltage sample is delivered to a single-slope A/D converter of conventional design which comprises a comparator along with a ramp generator. The ramp generator uses the fixed current ADIREF to charge an on-chip capacitor. The comparator senses equality of the ramp voltage and the sample voltage, terminating the conversion cycle and causing the contents of a 6-bit counter driven by the signal CLKPH1 to be latched. The 6-bit latch output is the bus signal ADCOUNT (**1–6**) which is sent to telemetry modulator **211D**.

Subsection **211D** comprises 7 tri-state buffers of conventional design. The 7 buffers are connected to the output line DATAOUT and represent the 6 bits resulting from the A/D conversion plus a 7th bit which indicates polarity. The 7 bits are placed on the common output line DATAOUT in a sequence controlled by WSTRB (**2–8**) following a logic 1 sent during the WSTRB1 on-time and preceding a logic 0

**A00827**

5,609,616

| 21 | 22 |

sent during the WSTRB9 on-time. Thus, 9 bits are conveyed to a conventional off-chip telemetry transmitter 211E and thence to the WP in synchrony with one full data frame sent to the ICS by the WP. As previously described, the transmitter 211E is enabled for such transmission by the signal CARON from initialization 204B.

Output Stages 212 - 1 through 8

Output stages 1–8, section 212 (1–8), comprise 8 identical circuits. The table below summarizes the electrical connections to the output stages 1–8 comprising single lines connected to all 8 stages in parallel as well as 8-line buses with an individual line connected to each of output stages 1–8.

TABLE 5

SUMMARY OF CONNECTIONS
TO OUTPUT STAGES 1 THROUGH 8

| Single lines connected to all eight stages in parallel: | 8 Line buses with 1 line connected to each output stage 1 through 8: |
| --- | --- |
| ZeroV | RV0 (1–8) |
| –14 V | RV1 (1–8) |
| –10.5 V | IPOS (1–8) |
| –7 V | INEG (1–8) |
| DCLKPH1 | PWC (1–8) |
| DCLKPH2 | AMONO (1–8) |
| ZERO | BMONO (1–8) |
| SHORT | DRC (1–8) |
| POLARITY | OUTA (1–8) |
| INDCOM | OUTB (1–8) |
| | VOUTA (1–8) |
| | VOUTB (1–8) |
| | ICP (1–8) |
| | NRV (1–8) |

Output stage 1 will be discussed below as representative of all 8 stages. Output stage 1, section 212-1, comprises a refresh voltage control 212A, a current source 212B, an electrode switching matrix 212C and an indifferent electrode switch 212D. The refresh voltage control 212A comprises a conventional switching matrix, like the matrix 212C, in addition to level shifters connected to input circuitry to distribute two different logic levels defined by –3.5 and –14 volts within the refresh voltage control 212A and to the circuits that communicate with the refresh voltage control. As indicated, inputs to the refresh voltage control 212A include the 4 power supply voltage levels (–14 V, –10.5 V, –7.0 V, –3.5 V) along with signals DCLKPH1 and DCLKPH2 from the downconverter 203B. Signals RV1 and RV0 from the refresh control logic 210 provide a 2-bit code to logic gates connected to an intermediate charge storage device for the output stage 1, comprising "flying" capacitor CF1. Signals RV0 and RV1 operate on the logic gates to select one of the four power supply voltages to charge CF1 during assertion of signal DCLKPH1. During assertion of signal DCLKPH2, capacitor CF1 is disconnected from the selected power supply voltage and is connected in parallel with and transfers charge to a capacitor CRV1 via lines PRV1 and NRV1. Such switched capacitor circuitry impresses the voltage of CF1 on storage capacitor CRV1. CRV1 then functions as a floating power source for output stage 1. In this regard, it is the use of the intermediate charge storage device, CF1, alternately connected to the power supply voltages and to CRV1 of output stage 1, that provides electrical isolation for the output stage 1.

As previously described with respect to Refresh Voltage Logic Section 210, more than 9 bits are required to specify which one of the four refresh voltages is to be selected for each of the 8 isolated output stages. Therefore, two ninth-word commands are issued by the WP in two frames in sequence, processed in the ICS, and produce two WORD9

commands from command latch 206A. To control the refresh voltage for Stage 1, the first WORD9 command consists of the refresh voltage function control 110 in bits 8–6, a stage 1 select code 1 in bit 5, a stage 1 refresh voltage level code in bits 3 and 4, a stage 3 refresh level code in bits 1 and 2 and a high-order bit of the refresh level code for stage 4. The second WORD9 command includes the refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two 2-word refresh voltage commands. The 2-bit refresh voltage level codes for stage 1 in bits 3 and 4 of the first WORD9 (RV1 and RV0) and the refresh levels associated therewith are shown below:

| Code | | refresh |
| --- | --- | --- |
| RV1 | RV0 | voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

The refresh voltage control 212A has a pair of input latches to hold the 2-bit codes. The latches are always reset to the 00 (–14 volt) state at startup by the startup reset signal SYSRESET from the initialization section 204B and remain in that condition unless overwritten by a refresh voltage command. Thus, the highest available source voltage is automatically selected for all channels. However, the source voltage can be reduced on a channel-by-channel basis as indicated by back-telemetry data related to the power required for each channel. Such reduction of the source voltage will minimize power dissipation in the current source 212B in the affected output stage and thereby reduce power dissipation in the ICS 12.

Within current source 212B, power signal NRV1 from refresh voltage control 212A is connected to the source of a conventional MOSFET device comprising the current source. Connected to the drain of the MOSFET device is the output line –IN1 which connects to the electrode switching matrix 212C and is one line of the signal bus ICP (1–8) connected to the telemetry MUX 211B Similarly, signal NRV1 is one line of the signal bus NRV (1–8) also connected to subsection 211B.

The gate-to-source voltage of the MOSFET device is controlled by signals IPOS1 and INEG1 respectively from analog multiplexer 207C, with such signals being applied to the device through transmission gates in the analog multiplexer controlled by signals XFERB and XFERC from converter 201C. The gate-to-source voltage so applied in a periodic manner is stored in a capacitor associated with the gate of the MOSFET device and remains operative between the refresh episodes. The refresh episodes are sequentially distributed across all 8 output stages in a non-overlapping manner so that only one current source 212B is connected via multiplexer 207C to the ICS circuitry at any time. The seven non-selected current sources are isolated from each other and the rest of the ICS circuitry by the off-resistance of the transmission gates in multiplexer 207C.

Electrode switching matrix 212C is the final subsection leading to the output coupling capacitors CA1 and CB1 which are connected to the stimulating electrodes. The circuitry in this subsection comprises logic gates, transmission gates, latches and level shifters of conventional design. Electrical isolation of the output stage is maintained in the switching matrix 212C since the various control signals for

5,609,616

23

the matrix are applied only to the gates of MOSFET devices which comprise the transmission gates and which directly control the functions described hereinafter.

In particular, two transmission gates are connected between the signal lines +IN1 and –IN1 upon their entry into the matrix 212C. One of the transmission gates is of low on-resistance and is latched by the signal SHORT from the zero current control 205B. The other transmission gate is a high on-resistance device which is turned on by the signal DRC1 from the output mode register 208.

Signals +IN1 and –IN1 are connected to outputs OUTA1, OUTB1, VOUTA1, VOUTB1 and INDCOM via 10 transmission gates in the matrix 212C. The transmission gates are controlled by logic gates driven by input signals AMONO1 and BMONO1 from the output mode register 208, PWC1 from pulse width control 209 and POLARITY from amplitude data latch 205A. The connection patterns are shown in the table below.

24

Multiple Chip Control 214

In the preferred embodiments thus far described, the ICS comprises a single chip. However, multiple chips of the same or similar circuitry may be usefully employed in a human tissue stimulator. In such an embodiment, a circuit 214 at the input of each chip permits the interconnection of several chips into one functional unit by making one of the chips a master device which receives data and clock signals and then distributes such signals to all the slave chips. In this manner a large number of chips may be connected together forming a system with a large number of output channels, e.g., 16 monopolar channels times the number of chips. Such an embodiment, for example, with two chips, one master and one slave, provides twice the number of channels and requires twice the number of words per frame. In such an embodiment, a total of 18 words per frame instead of the basic 9 words per frame is required since the two chips are in series.

TABLE 6

| | | | | CONNECTION | | | PATTERN | | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| | INPUT SIGNALS | | | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | OF CONNECTION |
| AMONO1 | BMONO1 | PWC1 | POLARITY | OUTA1 | OUTB1 | INDCOM | VOUTA1 | VOUTB1 | PATTERN |
| 0 | 0 | 1 | 1 | +IN1 | –IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR NORMAL |
| 0 | 0 | 1 | 0 | –IN1 | +IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR INVERT |
| 1 | 0 | 1 | 1 | +IN | NONE | –IN | OUTA1 | INDCOM | MONOA NORMAL |
| 1 | 0 | 1 | 0 | –IN | NONE | +IN | OUTA1 | INDCOM | MONOA INVERT |
| 0 | 1 | 1 | 1 | NONE | +IN1 | –IN | OUTB1 | INDCOM | MONOB NORMAL |
| 0 | 1 | 1 | 0 | NONE | –IN1 | +IN | OUTB1 | INDCOM | MONOB INVERT |
| 1 | 1 | X | X | NONE | NONE | NONE | OUTA1 | OUTB1 | DISCONNECT |
| X | X | 0 | X | NONE | NONE | NONE | X | X | DISCONNECT |

Please note that selection of any monopolar mode will eliminate the electrical isolation of that particular output stage via the common connection to INDCOM.

Bus signals VOUTA (1–8) and VOUTB (1–8) from the matrix 212C, ICP (1–8) from current source 212B and NRV (1–8) from refresh voltage control 212A are all connected to the telemetry multiplexer 211B as previously described. Output line INDCOM from the matrix 212C is connected to the indifferent electrode switch 212D.

Within the switch 212D, the signals OUTENABLE from initialization 204B and IECLOSE, RLOCTRL and RHICTRL from telemetry function decoder 211A control the connection between INDCOM and the indifferent electrode via line INDELEC. Assertion of OUTENABLE and IECLOSE activates a transmission gate within the switch 212D which then connects INDCOM directly to INDELEC. Further, assertion of RLOCTRL or RHICTRL from telemetry function decoder 211A places off-chip resistor RLO or RHI, respectively, in a series connection between INDCOM and INDELEC. Stimulus current flowing through the selected resistor generates the voltage output signal ILO or IHI with respect to INDELEC. Such signal is proportional to stimulus current in the monopolar mode and is sent to telemetry MUX 211B

FIG. 5A depicts a long data frame for multiple chip operation including n+1 standard frames per long frame, where n is the number of slave chips and 1 represents the frame associated with the master chip. Note that each standard frame included in the long frame comprises an end of frame pulse (depicted in black) and that the long frame is terminated in a unique marker that signals the end of the long frame. Thus in multiple chip operation, the format of the data transmission is extended by one level. A set of data consists of bits, words, and standard frames embedded in a long frame. As in the regular operation of an ICS previously described, one word consists of 9 bits and one frame consists of 9 words. However, one long frame consists of as many frames as there are chips participating in the multiple chip operation. The beginning (or end) of a long frame is defined by a long frame pulse that has a duration of two regular frame pulses.

An example of multiple chip system is set forth in FIG. 5B having a master chip and n slave chips. Each chip includes a multiple chip control circuit (214, 214-S1 to 214-Sn). As shown in FIG. 4E, chip control 214 has inputs PFRMCLK from the clock decoder 201B, RFMAIN from refresh voltage logic 210, PFMAIN from the pulse width control 209, a preset master/slave input M/S ("1" for the master chip and "0" for all slave chips) and open input leads DIN and ECLK. The control 214 outputs going out of chip include PFRMCLK (for connection to each of the inputs ECLK of the slave chips) and DCENABLE (for a control signal applied to the serial to parallel converter 201C). The chip control 214 in

5,609,616

**25**

each slave chip includes the same input and output lines. However, each line ECLK is connected to receive the signal PFRMCLK from the master chip, each line PFRMCLK is open and each line DIN is connected to DCENABLE of the preceding chip.

Basically each chip control includes a conventional gate flip-flop. In the chip control **214**, the gated flip-flop is preset by M/S=1 and changes state to develop the control signal DCENABLE upon receipt of PFRMCLK (indicative of the long frame marker when in multiple mode operation and indicative of standard end of frame pulse during regular single chip operation). As previously discussed, DCEN-ABLE enables operation of **201C** to develop DATA (1–9) from MANDATA and hence the processing of input data from the WP by the ICS. In multiple chip operation, as depicted in FIG. **5**B, DCENABLE from chip control **214** is applied to input DIN of chip control **214**-S1. This effects a preset of the flip-flop in **214**-S1, which will change state to develop a control signal DCENABLE for output to the chip control **214**-S2 at its DIN input upon receipt of the next PFRMCLK at the ECLK input of **214**-S1. DCENABLE developed within **214**-S1 is applied to the serie to parallel converter **201C** in the ICS of the Slave **1** chip to enable processing of data from the WP by that ICS. This process is repeated in sequence for each slave chip. From slave n chip, DCENABLE is fed back to the DIN input of the master chip to complete the ring.

Thus, in the multiple chip operation, the flip-flops in each chip control are ganged together such that the output DCEN-ABLE of the master chip feeds into the DIN input of the next slave flip-flop and the DCENABLE output of the next slave chip feeds into the DIN input of the following slave flip-flop and so on until the DCENABLE of the last chip feeds into DIN input of the master chip flip-flop. In this way, the flip-flops form a ring-type shift register.

The multiple chip operation also allows for short frames and short-long frames. With an early application of a long frame pulse or marker, the long frame can be shortened. Further, when WORD9 commands requiring more than one frame for loading and execution are in process, the frame pulse may be inhibited as a clock pulse for the flip-flops until the WORD9 command is fully executed.

Having described each section and subsection of the ICS of FIGS. 4A–4-I, the following is a description of the general operation of the ICS.

SYSTEM OPERATION

(a) Power Supply

The ICS has no internal power source and, therefore, is completely dependent for power from an outside source, that is, power radiated by the antenna connected to the wearable processor WP. The magnetic portion of that radiated field is received by the ICS and converted into two types of signals. One is the power supply for the balance of the implantable system and the second is the data stream which contains the commands which control the behavior of the ICS. The data stream coming from WP is a 50% duty cycle amplitude-modulated signal. The modulated carrier is converted to RAWDC power in receiver **200**. The DC power, RAWDC, is passed to series regulator **202**A and its associated circuitry to generate a regulated negative 14 volts, NEG14, which is the primary power supply for the ICS. The primary power is further operated on to create various voltage levels for the balance of the circuitry. The principal derived power supply is the output from the downconverter **203**B, which is the −3.5 volt line, used to power much of the logic circuitry

**26**

within the ICS. Also derived are −7 volts, −10.5 volts, and the original −14 volts, which are supplied to the output circuits, of which there are 8. Each output circuit utilizes one of 4 different levels of refresh voltages, which can be selected according to requirements for stimulation output of a given channel in the ICS. In addition, the −14 volt supply is used to power much of the ICS analog circuitry to provide rail to rail operation, where the rails are defined by the −14 V line and the ZEROV line. ZEROV is common to all the circuitry, except for the isolated output stages, and is the logic true or logic one level for all the logic circuitry. The zero or false logic level is −3.5 V or −14 V, depending on the power supply for a particular logic section.

The signals TANKV from receiver **200** and TAP14 from regulator **202**A are resistively-divided representations of RAWDC and NEG14, respectively. As indicated at telemetry MUX **211**B, TANKV and TAP14 are applied to the back telemetry system so that closed loop control of the incoming DC power to the ICS can be maintained. In particular, during startup, the microprocessor in the WP sets the transmit power to a level sufficient to insure proper operation of the ICS (see FIG. 1 and related text). Then, during operation of the ICS, TANKV and TAP14 are telemetered back to the WP for processing. Depending upon the magnitude of the difference between TANKV and TAP14, that is the voltage drop across the series regulator **202**A, the transmit power of WP can be reduced by operation of the microprocessor. Preferably, the power transmitted to the ICS is just sufficient for normal operation, thereby conserving power drawn from the WP and its batteries.

(b) Initialization

As previously described, the WP startup procedure comprises transmission of a data stream of alternating ones and zeros. Simultaneously, the series regulator **202**A output NEG14 ramps from 0 to −14 volts with respect to NEG14 and the receiver develops outputs PDATA and NDATA at half the standard bit transmission rate (550 KHz) to data conditioner **201**A. Within **201**A, PDATA and NDATA result in the signal MANDATA which is transmitted to downconverter clock **203**A, clock decoder **201**B and serial to parallel converter **201**C. Within downconverter clock **203**A, MAN-DATA is divided by four in passing through two toggle flip-flops. The resulting 137.5 KHz signal is applied to one input to a two-pole FET selector switch, the other input comprising WORDTRCLK from serial to parallel converter **201**C. The state of the switch is controlled by POWERBAD, which is asserted during system startup to cause the switch to transmit the 137.5 KHz signal. Thus the 137.5 KHz signal is selected as the clock signal for the voltage downconverter **203**B during startup operation of the ICS whereas a level-shifted version (−3.5 to −14 V) of WORDTRCLK (122 KHz) from converter **201**C is selected during normal operation of the ICS (DOWNCLOCK).

Also during initial startup, the powerbad detector **204**A asserts POWERBAD from just after the start of transmission until the −3.5 volt power supply reaches about −3.3 volts. As previously described, POWERBAD drives the reset of logic circuitry in many parts of the ICS and also forces the output stages **212** to be off so that no stimulus can be presented until proper functioning of the ICS is determined. This is accomplished by POWERBAD resetting a flip-flop within **204**B to OUTENABLE, the assertion of which is required to enable the output stages **212**. Then, upon a negation of POWER-BAD, assertion of CARDET from clock decoder **201**B and assertion of CONNECT and PLLLOCK from command decoder **206**B, the flip-flop is set and OUTENABLE is asserted to enable the output stages **212**. Similarly, the

5,609,616

27

assertion of PALARM from parity error detector **204C** results in a disabling of the output stages **212** via a negation of OUTENABLE.

In addition, during power-up of the ICS, the carrier of the back telemetry transmitter section **211** is turned on and the turning on of that carrier is sensed by the WP and indicates normal operation of the ICS. Such turning on of the carrier is accomplished by assertion of CARON from **204B**. As previously described, CARON is generated only when signals CARDET and PLLLOCK asserted and signal POWERBAD and PALARM not asserted are combined in gates in **204B** to indicate proper operation of the ICS. From **204B**, CARON goes off chip to turn on the back telemetry carrier signal at a telemetry transmitter **211E** of the back telemetry section **211**, the back telemetry section being off-chip. If at any time any of the signals CARDET, PLLLOCK, POWERBAD or PALARM changes to a different state indicative of a problem condition, CARON will be negated and the back telemetry carrier will be turned off. Thus, if at any time the WP no longer detects the back telemetry carrier from the ICS, we assume that improper operation is in progress. The microprocessor in the WP halts data transmission and begins the above described startup procedure which should then result in reappearance of the back telemetry carrier from the ICS.

Following this initial handshake between the WP and the ICS, a series of patient-specific parameters which have been embedded in the WP via a clinician's programmer will be sent into the ICS. Once all such parameters are set up, the electrode outputs will be connected and stimulation will commence. This is accomplished via a WORD9 command to assert the command line CONNECT from the command decoder **206B** followed by assertion of the OUTENABLE line from the initialization section, **204B**. Assertion of OUTENABLE will enable an output from Pulse Width Control **209** [PWC (**1–8**)] which in matrix **212C** will connect the electrode outputs (see table 6 herein). Conversely, the WP can force a global disconnect of all of the outputs at any time by sending in the WORD9 command which asserts the command line DISCON from the command decoder **206B**. Of course, in the event of catastrophic failure of the stimulation circuitry, the user can disable the ICS simply by moving the headpiece away from the ICS.

If a parity error is detected by the parity error detector **204C** the detector asserts line PALARM to the initialization section **204**. Section **204** then issues the system reset signal SYSRESET to force the ICS system into its restart condition and turn off the back telemetry carrier, signaling the WP that a serious error has occurred. A new startup sequence will then ensue under control of the startup procedure of the WP.

(c) Data Recovery

The pair of data signals, PDATA and NDATA, coming from receiver **200** are squared up in the data conditioner **201A** to generate the signal MANDATA. The signal MANDATA represents the recovered data signal from the Manchester-encoded stream transmitted by the WP to the ICS and, therefore, represents the primary data signal input into the ICS to control its function. In addition, the presence of modulated carrier is used to create the carrier detect signal CARDET. CARDET is connected to the clock decoder **201B** to indicate the presence of carrier and therefore is one of the requisites for normal operation of the ICS. Since MANDATA is a Manchester-encoded signal, it comprises a clock and data. The clock information is extracted from MANDATA in the clock decoder **201B** The clock information is then expressed as 2 signals: CLKPH1 and CLKPH2, used to control the clocking of the serial data into a register in serial to parallel converter **201C**. In the converter **201C** the nature of the signal is converted from serial to parallel.

28

As previously discussed, data sent to the ICS by the WP is in the form of a serial bit stream organized within a frame, which consists of 9, 9 bit words, that is 81 bits, plus a parity bit and a frame-ending marker. The 9 bit data words, which make up the data portion of the frame, comprise 8 amplitude and polarity data words for the eight output channels in sequence **1** through **8**, and a 9th word containing special commands which control housekeeping and certain other functions of the ICS.

In clock decoder **201B**, the signal PFRMCLK is derived from the frame ending pulse. PFRMCLK signals the end of one data frame and, therefore, the beginning of the next.

In the converter **201C**, WORDTRCLK is generated at the end of each 9 bit word transmitted and causes those specific 9 bits, DATA (**1–9**), to be latched into the amplitude data latch **205A** for amplitude and polarity control. The signal WORD9CLK is used to cause latching of the 9th word coming in so that those 9 bits are directed to the command latch **206A** and will remain in that latch until the next 9th word time. Thus, the amplitude data latch **205A** is updated 8 times during the normal frame, with data for any particular channel being available only for the transmit time of the next word, when it is then replaced by the new data.

On the other hand, command latch **206A** retains the 9th word command information for at least one complete frame time, that is, until the next 9th word occurs. Of course, the succeeding 9th word command could be the same command sent again, in which case the functionality requested by that command would simply be maintained for another frame or, potentially for additional frames for an unlimited period of time.

Note that at times when use of the 9th word command is not required, the frame can be shortened by sending the frame-ending marker after any word of the amplitude data information. The sequence of the data is amplitude and polarity data word for channel **1**, followed by **2** through **8**, and this sequence can be terminated at the end of any word by a frame ending marker. This manner of operation is known as short cycling, and allows the frame to be shortened for more rapid update of low number channels but, of course, without 9th word commands. Such short cycle operation will allow higher frequency waveforms to be represented on such low-order channels at the expense of less-frequent updates on the higher order channels and the absence of 9th word command information. Under short cycling conditions, the amplitude and polarity information for channels not addressed, as well as 9th word commands not overwritten, will simply maintain their previous setting until written again at some future time.

(d) Amplitude and Polarity Control

In the normal full frame sequence, amplitude and polarity data, that is 9 binary bits each for 8 different channels, is received in sequence for channels **1** through **8**. The first amplitude and polarity data word received is latched as noted above, and then presented to the logarithmic D to A converter **207B** during the second word transmit time. Thus, the update of amplitude and polarity information for a given channel lags that channel's transmit time by one word time. In addition, since the data queue is only one word deep, the amplitude and polarity information sent, for example for channel **1**, has to be operated on and completed during the channel **2** transmit time. During that time, the logarithmic D to A converter **207B** uses the 8 bits of amplitude information to operate on the reference current IREF from the current reference generator **207A** to generate the two current control voltages IPOSCON and INEGCON, which are passed to the analog multiplexer **207C** as signals IPOS and INEG. IPOS

5,609,616

29

and INEG are the gate-to-source voltage which will be impressed on the current source 212B in the appropriate output signal channel under the control of the signal WSTRB appropriate for that particular channel. The signals WSTRB (1–8) arise from the word strobe generator 201D, and are a sequence of pulses which are active in the appropriate word time for each channel in sequence 1 through 8. The current source 212B in each of the 8 individual isolated output channels, stores its appropriate gate-to-source voltage on capacitance associated with the MOSFET, maintaining control at the commanded level until updated in the next frame. Each of the 8 current sources is a unidirectional current-controlling device which controls output current drawn from the refresh voltage capacitor, e.g., labeled CRV1 in FIG. 4-C.

Each current source 212B is only connected to the logic circuitry during its signal transfer time. The refresh voltage capacitor CRV1 is only connected during its transfer time. Thus, for the balance of the time of operation, each output channel is electrically isolated from all other channels and also from the logic circuitry.

Since the MOSFET comprising current source 212B is unidirectional, the switching network 212C is placed after the current source in order to control the direction of stimulus current. This aspect is controlled by the signal POLARITY from latch 205A, which for bipolar operation directs the electrode switching matrix 212C to connect output A1 and output B1 for the first channel, for example, directly to the lines +IN1 and −IN1 for normal polarity, or to −IN1 and +IN1 for reverse polarity. In this way the direction of current flow between the electrodes can be controlled to be in either direction, even though the actual current source is a unidirectional device. For monopolar operation, as opposed to bipolar operation as described above, the electrode switching matrix 212C, along with the indifferent electrode switch 212D, is configured to allow the output to be generated between output A1 and the indifferent electrode or output B1 and the indifferent electrode with either direction of current flow being possible. The selection of bipolar or monopolar style of output in the matrix 212C is under control of the buses AMONO (1–8) and BMONO (1–8) from output mode register 208. In this regard, AMONO (1–8) and BMONO (1–8) each have one representative line going to each of the eight output channels (see Table 6).

In addition, there is a capability for placing a discharge resistor across each pair of outputs. Such function is under control of the discharge resistor control bus lines DRC1–8. Assertion of a DRC line to a particular output by the output mode register 208 will place a 150K resistance across the output terminals to discharge the output coupling capacitors. Alternatively, or in addition, a low resistance connection in 212C can be placed across the output terminals to more rapidly discharge the output coupling capacitors in response to the signal SHORT from the zero current control 205B. Further, the output current can be forced to zero by assertion of the signal ZERO from zero current control 205B. In this regard, the signal ZERO causes all output switches in the switching matrix 212C to be in an off or high impedance state.

An additional output mode (MULTIPOLAR MODE) involves using a pair of output channels to generate a bipolar output using any pair of electrodes in the electrode array. To accomplish this, two channels are programmed by the output mode register 208 to assume a monopolar mode. This causes one side of each of the selected channels to be connected together and to the indifferent electrode. Then, unlike the

30

normal monopolar mode, a WORD9 command from WP is sent to the ICS to disconnect the indifferent electrode via IECLOSE. Thus, by programming one of the channels as a source and the other as a sink, current can be driven through any selected pair of electrodes with complete control over amplitude and polarity.

(e) Pulse Width Control

The amplitude and polarity control described above is typical of the analog operation of the ICS. An additional mode of operation is provided by the ICS in which the described amplitude and polarity control is still in operation, but the outputs to one or more channels, controlled individually, can be turned on and off in order to create pulses of controlled amplitude and controlled duration. This is the pulsatile mode of operation. Pulsatile operation is under the control of pulse width control 209. Pulse width control is via a sequence of 9th word commands (WORD9), the first of which results in the assertion of the line FUNC9, which enables the pulse width control 209. The first such command also contains information about the placement of pulse edges within the next succeeding frame, and the rest of the command is issued in a series of 9th words which must not be interrupted by any other 9th word command. Therefore, a feedback signal to prevent other 9th word commands from interfering is sent back from the pulse width control 209 to the command decoder 206, that signal being PFMAIN.

In the control 209, bits of the first of the pulse width commands and succeeding ones are loaded into the pulse width control registers. The bits are used to preset down-counters, driven by the internal system clock, to control the appearance of the on and off times for the channel which is being controlled. Therefore, on a channel by channel basis, the amplitude of the pulse can be controlled in the usual way by the amplitude and polarity information sent in for that channel, and the turning on and off of the output is controlled by the pulse width control 209 in conjunction with the electrode switching matrix.

In addition to the channel by channel control of outputs being either on or off via the pulse width control 209, there is also a global control which can enable or disable all outputs from all channels simultaneously, that is via the signal OUTENABLE from the initialization section 204B. The global signal OUTENABLE can be controlled by the outputs, CONNECT and DISCON, from the command decoder 206B. That is, the line can be driven by a 9th word command to connect or disconnect all the outputs. In addition, the global output control, OUTENABLE, can be negated by the initialization section 204B when circuitry in that section detects conditions of improper operation. Furthermore, during startup of the ICS, all outputs are disconnected until normal operation is in progress, at which time OUTENABLE is asserted and stimulation will begin.

(f) Refresh Voltage Control

The isolated power supply voltages for the stimulus currents from each of the 8 output channels is provided by charge stored on the refresh capacitors, CRV1 through 8. Selection of the appropriate voltage level for each of the 8 output stages is a decision made by the WP based on information telemetered back to it from the ICS about the voltage requirements for proper output drive of that individual channel. This is an important power conservation feature of the ICS which seeks to minimize the potential difference and, therefore, the power dissipation in the current source 212B.

Any one of four different power supply voltage levels are selectable for each of the output channels, independently, and those voltages are −3.5, −7.0, −10.5, 10.5, and −14. Refresh voltage control on a channel by channel basis is effected by two sequential 9th word commands which are decoded in the command decoder 206B and result in asser-

5,609,616

**31**

tion of the signal FUNC7 line going to refresh voltage logic **210**. This requires 2 full frames to implement, that is two 9th words must be transmitted in sequence to achieve such control. The command decoder **206B** must be prevented from operating on a different 9th word during the sequence, hence the line RFMAIN from refresh voltage logic **210** is applied to the command decoder to lock it into the refresh voltage sequence for two frames. Refresh voltage logic **210** provides 2 bits RV0 and RV1 which define the four possible power supply voltage levels for each of the 8 output channels via the lines RV0 (**1** to **8**) and RV1 (**1** to **8**) connected to refresh voltage control **212A**. The control bits, two for each channel, are latched into their respective refresh voltage control so that (1) one of the four possible power supply voltage levels is selected for each associated channel, e.g., −3.5 for channel **1**, −10.5 for channel **2**, −14 for channel **3**, −7 for channel **4**, and so on, and (2) the selected power supply levels are maintained until changed by a new refresh voltage command. During startup, all 8 output channels are automatically commanded to use the −14 volt refresh, which provides for the maximum output power. As the system continues to run and, as described hereinafter at (g) "Back Telemetry", as information is fed back via telemetry to the WP, logic within the microprocessor of the WP can then cause a reduction in the power supply voltage for each channel to a level most appropriate for the stimulation requirements for that channel, thereby enhancing the power conservation within the ICS.

(g) Back Telemetry

Function codes FUNC4 and FUNC5 from the command decoder **206B** enable the function of the back telemetry section **211** which is to report back to the WP the state of various voltages within the ICS. As previously indicated, some of the functions of the telemetry section are of a housekeeping nature. For example, the measurement and transmission back of the voltage TANKV provides an index or status indication of the RAWDC voltage generated in the ICS in response to data from the WP. In addition, the power supply voltages ZEROV, −3.5 volts and TAP14 are available for transmission back to the WP as indicators of proper power supply function and for feedback control of the WP and the power transmitted therefrom to the ICS.

Also, the back telemetry can be commanded to measure and send back the value of the voltage reference, VREF, to indicate proper operation and, since this voltage is highly stabilized, to provide a system calibration point. In addition, stimulus output voltages can be measured via the lines OUTA (**1** through **8**), and OUTB (**1** through **8**), when the ICS is in the bipolar mode.

In the monopolar mode, the output voltage can be measured between either output A and the indifferent electrode, or output B and the indifferent electrode, whichever is appropriate. Additionally, in the monopolar mode, the current sampling resistors RLO or RHI can be placed in series with the stimulus circuit, and the resulting voltage drop across the resistors measured and transmitted back to the WP as an index of stimulus current. Thus, in the monopolar mode, both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP. The WP is able to use this information in its microprocessor to choose the appropriate refresh voltage for each channel in the manner heretofore described at (f) Refresh Voltage Control.

As indicated in FIG. 4-E, following the telemetry multiplexer **211B** which selects the signal to be measured and transmitted back to the WP, inputs are generated for the analog to digital converter section **211C**. The analog to digital converter is of a unipolar type. But, at least some of the signals which are to be measured have unknown polarity

**32**

at the time of measurement. Therefore, the capability is provided to make measurements in a normal mode or an inverted mode, depending on the state of the function lines, FUNC4 and FUNC5. If FUNC4 is asserted at the converter **211C** and the resulting ADCOUNT is zero, this indicates either that the measured signal is zero or of a polarity opposite to the setting of the converter. To determine which is the case, FUNC5 is asserted to switch the converter to the inverted mode. If ADCOUNT now registers other than zero, this indicates that the measured signal was of an opposite polarity to the normal setting of the converter. If ADCOUNT remains zero, this indicates that the measured signal was in fact zero.

In addition, the amplitude of some of the voltages to be measured is unknown at the time of measurement. Therefore provision is made for a stepwise gain selection prior to analog to digital conversion under control of SH2X1, SH2X3, SH2X10 and SH1X10. For example, if SH2X1 is asserted and ADCOUNT is a series of 1's, the input is out of range of the converter and the gain should be reduced until ADCOUNT reads less than 111111.

Thus, if the measurement is taken and is judged by the WP to be of the wrong polarity or wrong gain setting, correction can be sent back from the WP to make another measurement using the correct parameters as deduced from the first reading. The 6 bit parallel output bus from the A to D converter is connected to the telemetry modulator multiplexer which converts this parallel set of bits into a serial bit stream which is then applied to the back telemetry transmitter.

PHYSICIAN'S TESTER

As described herein most clearly under the heading "SYSTEM OPERATION", the system of the present invention provides for feedback and microprocessor control of various power levels and measurement of different voltages and currents within the ICS in response to commands and data changes transmitted by the WP in response to data telemetered back to the WP in the form of status indicating and measurement signals. The present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS.

Basically such physician control is embodied in a portable tester utilizing telemetry coupling to the implanted ICS, thereby providing communication between the tester and ICS for the monitoring, control and measurement of the ICS parameters. In this regard, the tester as shown in FIG. **6** comprises a modification of the previously described WP embodied in a portable housing **300** having a control panel **302** and a visual display **304** providing alpha numeric data for viewing and appropriate action by the physician. A block diagram of the circuitry embodied in the tester is depicted in FIG. **7** in combination with the ICS **12** of FIG. 1—all previously described components bearing the same numerals as in FIG. 1.

The tester monitors the performance parameters of the ICS **12** by detecting the back telemetry signal of the ICS in an interrogation protocol for the microprocessor. The tester places the received signal into a self contained memory storage section.

Physician interaction with the ICS is exercised by the use of the control panel **302** which contains electronic circuitry for conversion of the back telemetry signal into directly

5,609,616

33

readable information which is read out on the LCD display **304**. Commands are provided to the implanted stimulator through a control of the microprocessor **30** and the commands generated thereby. The physician's tester additionally can provide a print out of both the displayed data and information and the executed commands.

As illustrated, the physician's tester is basically a modification of the WP **16**. The Physician's Tester microprocessor **30** has both a display port and an infrared serial output port. The display port drives display **304** while the infrared port can drive a separate infrared display, a printer for recording the displayed information or a separate IR transducer for generating infrared light signals for transmission to an IR receiver for separate processing of the information from the ICS. Panel knob **306, 308**, and **310** control potentiometers, the position of which are read by the microprocessor **30** to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination. In particular, such manual control results in changes in the commands transmitted by the WP to the ICS to control the measurement of the ICS parameters in the same manner as previously described for the system of FIGS. 4-A through 4-I.

Table 7 describes typical parameter settings for the control knobs **306, 308**, and **310**.

TABLE 7

| Control Knob 306 | |
| --- | --- |
| Position 1 = | Ground (0 Volts) |
| Position 2 = | 14.0 Volts |
| Position 3 = | 3.5 Volts |
| Position 4 = | Reference Voltage |
| Position 5 = | Coil Voltage |

| Control Knob 308 | |
| --- | --- |
| Position 1 = | Impedance of Monopolar A configured channel |
| Position 2 = | Impedance of Monopolar B configured channel |
| Position 3 = | Impedance of Bipolar configured channel |
| Position 4 = | Voltage of Monopolar A configured channel |
| Position 5 = | Voltage of Monopolar B configured channel |
| Position 6 = | Voltage of Bipolar configured channel |
| Position 7 = | Voltage of Pass FET |
| Position 8 = | 1 KHz output current Monopolar A configured channel |
| Position 9 = | 1 KHz output current Monopolar B configured channel |
| Position 10 = | 1 KHz output current Bipolar configured channel |

| Control Knob 310 Volume Control (Peak Output Current) | |
| --- | --- |
| Position 1 = | 0 μA |
| Position 2 = | 0.5 μA |
| Position 3 = | 1.0 μA |
| Position 4 = | 10 μA |
| Position 5 = | 100 μA |
| Position 6 = | 1000 μA |
| Position 7 = | 2500 μA |

Extended System Operation and Applications

While preferred forms of the human tissue stimulator of the present invention embodied in cochlear stimulating systems have been described in detail hereinabove, it should be appreciated that various changes and modifications may be made in the described systems without departing from the spirit of the present invention.

For example, while the outputs of the preferred embodiments have been described as stimulating tissue, the DC and squarewave outputs of the ICS under control of the pulse width control **209** may be utilized to power other implanted devices. For some such AC applications, a larger capacitor CAl and/or CB1 may be required for each or some of the

34

ICS output channels. Conversely, for strictly DC applications, no output capacitors are necessary.

Further, while the ICS status signal-generating features for the preferred embodiment include the measurement and telemetry functions described in subsection (g) hereinabove, similar measurements and telemetry back to the WP may be provided by the ICS for other implanted devices connected to an electrode pair of the ICS. This permits a wide range of applications since the back telemetry feature can sample and measure any external voltage within its amplitude and frequency range and provide 6 bit resolution. Any external device which can generate an appropriate voltage related to its function can utilize this feature.

Moreover, with the ICS as previously described with respect to FIGS. 4-A through 4-I, the output electrode pairs for the separate channels of the ICS are simultaneously available to power another implanted device or stimulate tissue and to sense variable voltage conditions therebetween.

In view of the foregoing and other additions and changes which may be made in the illustrated embodiments, the present invention is to be limited in scope only by the terms of the following claims.

We claim:

1. A physician's testing system for testing a multichannel cochlear stimulating system, comprising a physician's tester, an external headpiece/transmitter, and an implanted cochlear stimulator (ICS),

the external headpiece/transmitter having transmitting means for transmitting data-containing signals to the ICS;

the ICS comprising: (a) receiving means for receiving the data-containing signals, (b) processor means for processing the data-containing signals to generate stimulation signals, (c) a plurality of tissue-stimulating electrodes for receiving the stimulation signals, (d) monitor means in the processor means and responsive to the data-containing signals for (1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and (2) generating stimulator status-indicating signals, and (e) telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/transmitter means; and

the physician's tester comprising:

external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes;

user-controllable means connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means, said user-controllable means including manual means for specifying a peak output current for the stimulation signals to be applied to the at least one pair of tissue-stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

2. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a parallel output port coupled thereto through which information derived from the status-indicating signals may be coupled to a remote site.

5,609,616

35

**3**. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a printer port coupled thereto through which information derived from the status-indicating signals may be sent.

**4**. The physician's testing system of claim **1** wherein the manual means of the user-controllable means of the physician's tester further includes means for specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

**5**. The physician's testing system of claim **4** wherein the external-processor means includes means for computing an impedance measurement based on the voltage measured by the monitor means of the ICS and the peak output current specified by the manual means of the user-controllable means.

**6**. The physician's testing system of claim **4** wherein the ICS includes a current-sensing resistor within the ICS through which a current associated with a stimulating signal applied to a select pair of the tissue-stimulating electrodes must pass, and wherein said monitor means within said ICS includes means for measuring a voltage across said current-sensing resistor, which voltage provides a measure of a stimulating current flowing through the select pair of electrodes, and wherein the external-processor means of the physician's tester includes means for computing an impedance measurement based on the voltage and current measured by the monitor means of the ICS.

**7**. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having an RS232 output port coupled thereto through which information derived from the status-indicating signals may be sent to a remote site.

**8**. The physician's testing system of claim **1** wherein the manual means for specifying the peak output current, included as part of the user-controllable means of the physician's tester, comprises a manual switch having means for selecting one of at least seven separate peak output current settings.

**9**. The physician's testing system of claim **8** wherein the at least seven separate peak output current settings of the manual switch include 0, 0.5, 1.0, 10, 100, 1000 and 2500 μa.

**10**. A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;

selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;

receiving and processing the status-indicating signals to produce processed status-indicating signals which con-

36

vey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

**11**. The method of claim **10** further including printing the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be preserved on a printed record.

**12**. A system for testing an implantable cochlear stimulator (ICS) comprising a portable physician's tester and the ICS,

the ICS comprising (a) receiver means for receiving data-containing signals, (b) processor means for processing the received data-containing signals to generate stimulation signals, the stimulation signals having a peak output current associated therewith prescribed by the data-containing signals, (c) a multiplicity of tissue-stimulating electrodes; (d) means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes, (e) monitor means in the processor and responsive to the data-containing signals received by the receiver means for (1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto, and (f) telemetry means for transmitting the stimulator-status indicating signals to an external receiver;

the portable physician's tester comprising:

user-controllable means for selectively generating the data-containing signals, said user-controllable means including manual means for manually specifying a peak output current to be included in the data-containing signals;

external transmitter means for transmitting the data-containing signals to the receiver means of the ICS;

external receiver means for receiving the status-indicating signals transmitted by the telemetry means of the ICS;

external processor means for processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

**13**. The system for testing of claim **12** wherein the portable physician's tester further includes a signal port coupled to the external processor means through which the information derived from the status-indicating signals may be sent for further processing at a location removed from the external processor means.

**14**. The system for testing of claim **12** wherein the manual means of the user-controllable means of the portable physician's tester further includes means for manually specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

\* \* \* \* \*