**2015-1580, -1606, -1607**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

_____

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,

and

ADVANCED BIONICS, LLC,

*Plaintiffs-Cross-Appellants,*

v.

COCHLEAR CORPORATION, n/k/a Cochlear Americas,
and COCHLEAR LTD.,

*Defendants-Appellants.*

_____

**Appeals from the United States District Court
For the Central District of California
In case no. 2:07-cv-08108, Judge Fernando M. Olguin.**

_____

**STEP TWO BRIEF OF APPELLEE AND CROSS-APPELLANT
ADVANCED BIONICS, LLC**

_____

Todd Malynn
FELDMAN GALE, P.A.
880 West First Street, Suite 315
Los Angeles, CA 90012
(213) 625-5992

Paul W. Hughes
MAYER BROWN LLP
1999 K St. NW
Washington, DC 20001
(202) 263-3147

Donald M. Falk
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112
(650) 331-2000

*Attorneys for Plaintiff-Appellee-Cross-Appellant Advanced Bionics, LLC*

## CERTIFICATE OF INTEREST

Counsel for the Plaintiff-Appellee-Cross-Appellant Advanced Bionics, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

**Advanced Bionics, LLC**

2.     The name of the real party in interest represented by me is: **N/A**

3.     All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

**Advanced Bionics Corp., Advanced Bionics AG, Sonova AG, and Sonova Holding AG**

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Mayer Brown LLP — Donald Falk and Paul Hughes**

**Feldman Gale, PA — Todd Malynn and Christina DeAngelis**

Dated: October 5, 2015                    /s/ Donald M. Falk
                                          Donald M. Falk

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE..............................................................1

STATEMENT OF THE FACTS ............................................................2

SUMMARY OF THE ARGUMENT .....................................................2

ARGUMENT .......................................................................................3

    A.    The Jury's Award Of Damages Should Be Reinstated Because
          The District Court Abused Its Discretion In Granting A New
          Trial On Damages. ..............................................................4

        1.    The district court necessarily abused its discretion by
            relying on an erroneous legal principle requiring an
            automatic damages retrial upon invalidation of some
            patent claims underlying an undifferentiated royalty
            award. .......................................................................5

        2.    By proposing and accepting a verdict form calling for the
            calculating of a single royalty rate if any "valid claim of
            either the '616 patent or the '691 patent" were infringed,
            Cochlear waived any entitlement to a new trial on
            damages based on the invalidity of some but not all of the
            patent claims at issue. ..............................................10

        3.    Substantial evidence supports the full damage award
            based on infringement of claim 10 of the '616 patent. .............12

4.      At the very least, the Court should reinstate the jury's determination of the royalty rate.............................................19

B.      The District Court's Indefiniteness Ruling Erroneously Treated A Routine Digital Signal Processor As If It Were A General Purpose Computer Performing A Function Central To The Point Of Inventiveness. ......................................................................19

1.      The district court erroneously discerned indefiniteness based on the mere possibility that an artisan could implement an algorithm in more than one way to accomplish routine claimed functions using a digital signal processor.......................................................................21

2.      In light of the ubiquitous use of microprocessors to perform simple, well-known tasks, the Court's evaluation of the sufficiency of the disclosed algorithm should reflect the decreasing level of detail required in patent disclosures as once-novel technologies become commonplace. ......................................................................27

CONCLUSION ...................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Accentra, Inc. v. Staples, Inc.*,
  500 F. App'x 922 (Fed. Cir. 2013) ............................................9, 14

*Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*,
  No. 2009-1447, 604 F.3d 1354 (May 14, 2010)............................................ iii

*AllVoice Computing PLC v. Nuance Communications, Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007) ....................................................24

*Applera Corp. v. MJ Research Inc.*,
  389 F. Supp. 2d 356 (D. Conn. 2005) ............................................9

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014) ....................................................16

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015) ....................................................16

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ............................................26, 27

*Budde v. Harley-Davidson Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) ........................................21, 23, 24

*C.B. v. City of Sonora*,
  769 F.3d 1005 (9th Cir. 2014) ....................................................11

*Davis v. Rennie*,
  264 F.3d 86 (1st Cir. 2001)............................................................11

*Decca Ltd. v. United States*,
  640 F.2d 1156 (Ct. Cl. 1980)........................................................16

*Digital Technology Licensing, LLC v. Cingular Wireless, LLC*,
  2007 WL 2300792 (E.D. Tex. Aug. 7, 2007)................................................31

# TABLE OF AUTHORITIES - Continued

**Cases**                                                                    **Page(s)**

*Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*,
    235 U.S. 641 (1915)........................................................................16

*EON Corp. IP Holdings, LLC v. Landis+Gyr Inc.*,
    2014 WL 6466663 (E.D. Tex. 2014).......................................9, 14

*Goldberg v. Pac. Indem. Co.*,
    405 F. App'x 177 (9th Cir. 2010)...................................................6

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ...............................................7, 15

*Helferich Patent Licensing, LLC v. the New York Times Company*,
    778 F.3d 1293 (Fed. Cir. 2015) .....................................................15

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    134 S. Ct. 1744 (2014).....................................................................5

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
    732 F.3d 1376 (Fed. Cir. 2013) ....................................................22

*In re Dossel*,
    115 F.3d 942 (Fed. Cir. 1997) ......................................................24

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ....................................................32

*Intel Corp. v. VIA Techs. Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003) ...................................20, 23, 24. 26

*Kern v. Levolor Lorentzen, Inc.*,
    899 F.2d 772 (9th Cir. 1990) .........................................................6

*Levine v. Samsung Telecommunications Am., LLC*,
    2012 WL 383647 (E.D. Tex. 2012)..............................................32

## TABLE OF AUTHORITIES - Continued

**Cases**                                                    **Page(s)**

*LifeScan Scot., Ltd. v. Shasta Techs., LLC,*
    734 F.3d 1361 (Fed. Cir. 2013) ...................................................15

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003) .............................................26, 27

*Memphis Community School District v. Stachura,*
    477 U.S. 299 (1986).................................................................8

*Men-tor H/S, Inc. v. Med. Device Alliance, Inc.,*
    244 F.3d 1365 (Fed. Cir. 2001) .................................................5

*Net MoneyIN, Inc. v. VeriSign, Inc.,*
    545 F.3d 1359 (Fed. Cir. 2008) ................................................27

*NTP, Inc. v. Research In Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ...........................................6, 7, 8

*Nutri-Metics Int'l, Inc. v. Carrington Labs., Inc.,*
    981 F.2d 1259 (9th Cir. 1992) ...................................................6

*Quanta Computer, Inc. v. LG Elecs., Inc.,*
    553 U.S. 617 (2008)................................................................15

*Retractable Technologies, Inc. v. Becton Dickinson & Co.,*
    757 F.3d 1366 (Fed. Cir. 2014) .............................................7, 14

*S3, Inc. v. NVIDIA Corp.,*
    259 F.3d 1364 (Fed. Cir. 2001) ................................................24

*Stickle v. Heublein, Inc.,*
    716 F.2d 1550 (Fed. Cir. 1983) ................................................18

*Syufy Enterprises v. Am. Multicinema, Inc.,*
    793 F.2d 990 (9th Cir. 1986) .....................................................6

# TABLE OF AUTHORITIES - Continued

**Cases**                                                                    **Page(s)**

*Traver v. Meshriy*,
 627 F.2d 934 (9th Cir. 1980) ...........................................................6

*Technology Licensing Corp. v. Videotek, Inc.*,
 545 F.3d 1316 (Fed. Cir. 2008) ...................................................25

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
 659 F.3d 1376 (Fed. Cir. 2011) ...................................................23

*United States v. Univis Lens Co.*,
 316 U.S. 241 (1942)........................................................................15

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
 503 F.3d 1295 (Fed. Cir. 2007) .....................................................8

**Statutes and Rules**                                                       **Page(s)**

35 U.S.C. § 112(f)...........................................................................3, 27

35 U.S.C. § 284................................................................................11

**Other Authorities**                                                        **Page(s)**

6 Moy's Walker on Patents § 1940 (4th ed.) .........................................15

## STATEMENT OF RELATED CASES

This Court heard a prior appeal in this action:  *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, No., 2009-1447, 604 F.3d 1354 (May 14, 2010) (Michel, C.J., Newman & Rader, JJ.)

Counsel is not aware of any other related case.

## STATEMENT OF JURISDICTION

To Cochlear Corporation's statement of jurisdiction, Advanced Bionics adds that it separately noticed its appeal from the judgment on April 28, 2015.

## STATEMENT OF THE ISSUES

Advanced Bionics adopts the Alfred Mann Foundation's overall statement of the issues, but separately addresses only the following two issues, each of which pertains to the cross-appeal:

A.     Whether the jury's damages award should be reinstated because the district court's new trial order applied the wrong legal standard to a general verdict on damages, where the general damages award resulted from Cochlear's proposed verdict language and damages evidence that uniformly recognized that the hypothetical negotiation would produce a single royalty irrespective of the number of patents or claims that were infringed.

B.     Whether clear and convincing evidence supported the district court's conclusion that three claims were invalid as indefinite because a skilled artisan arguably would have some leeway in implementing an algorithm to perform certain claimed functions of a digital signal processor.

## STATEMENT OF THE CASE

Advanced Bionics adopts and incorporates by reference the statement of the case in the Step Two brief of the Alfred Mann Foundation.

## STATEMENT OF THE FACTS

Advanced Bionics adopts and incorporates by reference the statement of facts in the Step Two brief of the Alfred Mann Foundation.

## SUMMARY OF THE ARGUMENT

The jury verdict should be reinstated in full.

1.    There was no basis to disturb the jury's damages award even if the district court was correct that three patent claims were invalid as indefinite.  The jury awarded a single royalty that explicitly compensated the plaintiffs for infringement of any claim of either patent-in-suit. The jury verdict was delivered in that form because Cochlear persuaded the district court to use a verdict form that provided a single royalty sum whether one patent claim or all four claims were infringed. Cochlear not only waived any objection to that general damages verdict, but invited any error related to it.

Moreover, under Ninth Circuit law—which here determines when a new trial of a general damages verdict is appropriate—the verdict should remain in place so long as substantial evidence supports the damages award. That unquestionably is the case here, where all the damages evidence before the jury treated the royalty as the same whether one or all of the claims in suit were infringed.  Indeed, the evidence showed that any of the four claims was sufficient

to block Cochlear's product. Cochlear needed back-telemetry, and had to infringe in order to use it.

2.     In any event, the district court was wrong to hold that three patent claims were indefinite because certain claimed digital signal processors might theoretically have some leeway in implementing the algorithms necessary to perform functions claimed under Section 112(f). There was no serious dispute that the needed algorithms were disclosed inherently if not explicitly. The fact that Cochlear's expert speculated that an artisan might be able to perform the function using a different and more obscure implementation of the algorithm for logarithmic conversion or Ohm's Law, respectively, falls far short of the clear and convincing evidence needed to invalidate a patent as indefinite.  The single-purpose, prior art processing functions at issue here have nothing to do with the inventive aspect of the patents.  In examining whether disclosures of limited-function processors are sufficiently definite, this Court should follow the course of other once-innovative technologies like light bulbs that became routine elements of later inventions, and recognize that less detailed disclosures of now-familiar elements suffice.

## ARGUMENT

Advanced Bionics, which designs and manufactures cochlear implants using back-telemetry as the exclusive licensee of the patents-in-suit, incorporates by reference the brief of the Alfred Mann Foundation and limits its separate briefing

to two issues in the plaintiffs' cross-appeal: whether the damages award should be reinstated and whether the judgment that claim 1 of the '616 patent and claims 6 and 7 of the '691 patent are invalid as indefinite should be reversed. Advanced Bionics adopts the Foundation's statement of the standards of review.

## A.    The Jury's Award Of Damages Should Be Reinstated Because The District Court Abused Its Discretion In Granting A New Trial On Damages.

The district court erroneously granted a new trial with respect to damages. When, as here, multiple theories support a damages verdict, and one theory is later found legally invalid, Ninth Circuit law (which governs this issue) holds that a verdict should generally be sustained so long as substantial evidence supports a proper theory of liability. That law controls the outcome here; because a legally proper theory of liability independently supports the award of damages, the district court erred in setting aside the jury's damage verdict.

The district court's contrary order relied on a manifestly erroneous rule of law. The court held that it "must grant" a "new trial" on damages (A23) because it had invalidated some of the patent claims presented to the jury. Not only is that statement wrong as a matter of legal principle, but Cochlear waived any right to a new trial on this basis by proposing the language in the verdict form that called for a single royalty calculation so long as any claim of either patent was infringed. Moreover, the only evidence either party presented as to the royalty value

addressed the back-telemetry system as a whole, not the value of particular patents or particular claims. Under that circumstance, the controlling Ninth Circuit rule and this Court's decisions alike require reinstatement of the jury verdict.

**1.    The district court necessarily abused its discretion by relying on an erroneous legal principle requiring an automatic damages retrial upon invalidation of some patent claims underlying an undifferentiated royalty award.**

The district court held as a matter of law that a new trial was required because "the damages awarded by the jury were not broken down as to each claim or patent." A23. The district court's premise misstates the law; as a result, the district court necessarily abused its discretion in granting the motion for the new trial. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

The district court reached the wrong result because it believed that a new trial on damages is automatic whenever one or more patents before the jury is invalidated. But a new trial is not automatic, and a new trial is wholly inappropriate in the circumstances here.

The legal question at issue—whether and when a new trial should be granted when a jury verdict rests on multiple legal theories, one of which was later declared erroneous—is "a procedural issue not unique to patent law"; accordingly, Ninth Circuit law governs as the law of the relevant regional circuit. *Men-tor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1374 (Fed. Cir. 2001). And the

Ninth Circuit law is clear: "when one but not all of the theories submitted to the jury lacks evidentiary support, 'the reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error.'" *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986) (quoting *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980)).[1] Although the jury used a special verdict form, the damages award here—by design and at Cochlear's request—was in the form of a single, general verdict to compensate for the infringement of any or all of the patent claims submitted to the jury. Accordingly, the Ninth Circuit's general verdict rule applies here.

Although Ninth Circuit law controls, that law is consistent with this Court's holdings in similar contexts. For example, this Court considered a verdict that did not apportion damages to particular devices or claims in *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005). After reversing both a verdict of infringement on several patent claims and a claim construction that was arguably necessary to find infringement of other claims—but upholding the infringement

---

[1] *See also*, *e.g.*, *Goldberg v. Pac. Indem. Co.*, 405 F. App'x 177, 180 (9th Cir. 2010) (finding that "the jury's verdict may be upheld because there was substantial evidence to support the jury's general verdict" on one proper legal theory); *Nutri-Metics Int'l, Inc. v. Carrington Labs., Inc.*, 981 F.2d 1259 (9th Cir. 1992); *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 777 (9th Cir. 1990) ("we may construe a general verdict as attributable to one of several theories if it was supported by substantial evidence and was submitted to the jury free from error").

verdict as to still other claims—this Court did not order a new trial on damages. On the contrary, this Court remanded and specifically noted that "the district court will have to determine the effect of any alteration of the jury verdict on the district court's damage award." *Id.* at 1326. That is, a new trial was *not* automatic even though the Court held as a matter of law that the defendant did not infringe at least one patent for which the jury had held it accountable. Rather, depending on the state of the evidence and the nature of the jury's findings, the damages award might be reinstated.

Likewise, in *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1371 (Fed. Cir. 2014), the Court recognized that the presence of a "lump-sum reasonable royalty theory" could negate the need for a new trial on damages. And the Court expressed a similar view in *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), where it observed: "Assuming that the royalty rate did not depend on whether all four, or fewer than four, of the asserted claims were infringed—and nothing in the record leads us to believe that it did so depend—then 0.5% is the applicable royalty rate, should infringement be found on remand." *Id.* at 1258.

To be sure, this Court has identified a "normal rule" that, "where the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent," and one patent is ruled invalid, "a new trial as to

7

damages" may be needed. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007). But that statement quoted and rested on the Supreme Court's decision in *Memphis Community School District v. Stachura,* 477 U.S. 299 (1986), which addressed a situation where "damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages." *Id.* at 312. Here, in contrast, there was nothing "faulty" about the damages instructions. As explained below, the special verdict form—in accord with Cochlear's own proposals—asked the jury to determine the appropriate reasonable royalty if Cochlear infringed any "valid claim of either the '616 patent or the '691 patent." A69; *see*, *e.g.*, A31641-42; A33210-11; A33846-47. Moreover, in *Verizon* the Court was careful to note that the parties had not offered "any reason to depart from this general rule in this case."[2] 503 F.3d at 1310. And the Court identified its earlier decision in *NTP* to guide the district court in determining whether the jury's damages award should be left undisturbed. *Id.* at 1310 n.11.

---

[2]   Dissenting from the Court's holding on patent validity, Chief Judge Michel also underscored that there is no inflexible rule always requiring invalidation of a jury's award of damages. "When, as here, the evidence shows that each of the accused products infringes *all* of the patents-in-suit, and the infringer fails to make any showing on appeal that the damages award would not be supported by only those patents for which we affirm liability, we must affirm the damages despite our reversal of part of the infringer's liability." *Verizon*, 503 F.3d at 1315 (Michel, C.J., dissenting).

8

The district court in the present case claimed support from *Accentra, Inc. v. Staples, Inc.*, 500 F. App'x 922 (Fed. Cir. 2013). But that case was far different from this one. The jury award in *Accentra* was "higher than any figure proffered by either party's expert," and (in contrast with Cochlear's damages evidence here) the infringer's expert had testified that separate and different royalty rates were appropriate for each of the three patents-in-suit. *Id.* at 931. Even that circumstance warranted only that the district court "revisit the damages issue based on its reevaluation of the liability issues in light of this [Court's] decision." *Id.* A new trial was not automatic. *Id.*

It is little surprise, therefore, that courts routinely uphold jury verdicts awarding undifferentiated royalty damages even if, after trial, certain claims or patents were found invalid or noninfringed. For example, in *Applera Corp. v. MJ Research Inc.*, 389 F. Supp. 2d 356, 361 (D. Conn. 2005), a court granted a motion for judgment of noninfringement as a matter of law as to one among many patent claims at issue. But the court nonetheless left the general damages verdict undisturbed. "[A]s there was no testimony at trial that a reasonable royalty rate for the '675 patent would be based on the number of infringing claims of the '675 patent," holding one claim was not infringed did not provide a "basis for adjusting or vacating the jury's damages award." *Id.* That is exactly the case here. See pp. 12-18, below. *See also EON Corp. IP Holdings, LLC v. Landis+Gyr Inc.*, 2014

WL 6466663, at *12 (E.D. Tex. 2014) (denying new trial on damages, despite judgment of noninfringement as to one of several patents-in-suit, where defendant offered "single lump sum damages amount" and did not object to verdict form).

As these courts understand, the pertinent precedents of this Court, like those of the Ninth Circuit, do not require a new trial on damages whenever liability is reversed as to some of the patents or claims underlying an undifferentiated damages award. On the contrary, a damages award may be sustained if the circumstances—including the conduct of the parties and the nature of the damages evidence—indicate that the award was *not* contingent on patents or claims that cannot support the judgment. As explained below, this is such a case, and the district court's reliance on a rigid new-trial rule was not only legally erroneous, but prejudicial.

> **2.    By proposing and accepting a verdict form calling for the calculation of a single royalty rate if any "valid claim of either the '616 patent or the '691 patent" were infringed, Cochlear waived any entitlement to a new trial on damages based on the invalidity of some but not all of the patent claims at issue.**

Upon application of the correct legal rule, the district court's grant of a new trial on damages should be reversed for a simple and fundamental reason: Cochlear waived any right to have the jury separately consider the damages attributable to

each patent.[3] As the Ninth Circuit put it in a similar context, "[b]y failing to object to an undifferentiated verdict form, Defendants have not met their burden to show what portion of the jury's award was for [disallowed] damages." *C.B. v. City of Sonora*, 769 F.3d 1005, 1032 (9th Cir. 2014). *See also*, *e.g.*, *Davis v. Rennie*, 264 F.3d 86, 106-07 (1st Cir. 2001) ("[I]f the complaining party does not object to a general verdict form or request interrogatories, a verdict that encompasses multiple claims of liability may be affirmed as long as there is substantial evidence to support one of the theories presented, irrespective of any reversible errors in other claims submitted to the jury.").

In this case, Cochlear did not object to the jury form or request interrogatories that would parse damages depending on which patents or claims were infringed. On the contrary, Cochlear repeatedly *proposed* a jury verdict form that asked the jury to determine a single royalty rate, royalty base, and damages if the jury found that Cochlear infringed any "valid claim of *either* the '616 patent *or* the '691 patent." *See* A31641-42; A33210-11; A33846-47 (emphasis added). And the final verdict form used exactly that disjunctive language. *See* A69. Cochlear never suggested that the royalty amount should be segregated by patent or specific

---

[3]   The verdict here generally tracked 35 U.S.C. § 284—which entitles a patentee to "no … less than a reasonable royalty for the use of the invention by the infringer"—in that the verdict did not differentiate between the number of patents or claims, but treated the back-telemetry technology infringed by Cochlear as a single invention. Plaintiffs did not seek additional recovery for the infringement of multiple inventions.

claims, *see*, *e.g.*, A36338, or that the royalty rate or royalty base should vary according to which or how many claims were infringed.[4] So long as the jury found that "a valid claim" of either patent was infringed, it was instructed to undertake a single calculation of the reasonable royalty. A69.

Cochlear's waiver was knowing and intelligent; Cochlear made its choice as to the verdict form in full awareness of its own separate arguments against the validity and infringement of all four claims at issue. Indeed, Cochlear's choice not to ask the jury to break out its royalty awards patent by patent or claim by claim appears to have been a strategic decision designed to afford Cochlear a chance seek a new trial on damages if displeased with the jury's first calculation.[5]

Accordingly, Cochlear waived any potential right to a new trial on damages.

### 3.   Substantial evidence supports the full damage award based on infringement of claim 10 of the '616 patent.

Because the district court relied on an erroneous view that an automatic new trial was required—and because Cochlear waived any right to patent-by-patent or claim-by-claim damages, an independently adequate basis for resinstatement of the damages award—the remaining question is whether sufficient evidence supports

---

[4] The form did recognize that the royalty periods for the two patents might differ, but the period for the '616 patent ended long after that for the '691 patent.

[5] As explained below (at pp. 13-14), Cochlear also waived any right to a new trial because it presented no evidence that infringement of the '616 patent alone would reduce the amount of damages recoverable here.

the damages under a legally proper theory. Here, the jury's finding that Cochlear infringed claim 10 of the '616 patent fully supports the damages verdict.

To begin with, as explained above, the jury was instructed that it should calculate damages if it finds infringement as to "either the '616 patent *or* the '691 patent." A69 (emphasis added). There is a clear reason that the jury form uses the disjunctive: because each of the asserted claims provided a basis to exclude Cochlear's product, it did not matter if the jury found the products infringed one or multiple claims. This is a circumstance where each claim would have the equal and identical effect of precluding Cochlear's products, especially in light of the jury's conclusion that all of the Cochlear products at issue infringed all of the patent claims at issue. *See* A60-67.

*First*, the expert evidence made plain that the damages would be the same even if only claim 10 of the '616 patent were valid and infringed. Nothing in the trial testimony of Cochlear's expert, Parr, suggests that his analysis turned on individual claims or patents. On the contrary, he (properly) treated each claim as part of a singular "system" and addressed damages consistently as a single royalty, regardless of what claims were found to infringe. For example, in discussing the *Georgia-Pacific* factor relating to duration of the patent, Parr plainly looked *only* to the '616 patent and not to the '691 patent, which expired much earlier.

> Q: So the next factor is the duration of the patent in terms of the license agreement. How did that impact your analysis?

13

A: Well, a patent that's not going to expire for a long period of time means you can't wait for it to expire, and they knew that. So that would have an upward pressure.

A2287. Nowhere does Parr suggest that this upward pressure should apply to only certain aspects of damages. Likewise, in coming to his total proposed royalty rate of 1.2%, Parr nowhere indicated that the rate depended on any number of infringed claims or patents; instead, he claimed that the rate reflects the value of the technology generally. A2291.[6] This contrasts sharply with the testimony of the infringer's expert in *Accentra*, who "testified that the appropriate royalty rates were 0.6% each for [two patents-in-suit] and 0.3% for the [third]." 500 F. App'x at 931. When the defendant's own model treats damages as a single royalty for all patents, the damages verdict should be sustained even if certain claims or patents are later invalidated. *See Retractable*, 757 F.3d at 1371; *EON*, 2014 WL 6466663, at *12. Where "nothing in the record" can lead a court to believe that the jury's choice of a "royalty rate … depend[ed] on whether all four, or fewer than all four, of the asserted claims were infringed," that royalty rate—and the jury's damages award—remain valid. *Harris*, 417 F.3d at 1258. Cochlear's failure to present

---

[6] Similarly, plaintiffs' expert, Cate Elsten, did not peg the royalty to specific claims or patents. In applying the *Georgia Pacific* factors, for example, she drew no distinction between patents or claims. *See*, *e.g.*, A1691-94. The value comes from the fact that the claimed back telemetry technology provides a "must-have feature." A1752. While Elsten noted that she "start[ed] with … an assumption that the jury finds the patents are valid and infringed" (A1637), nothing in her substantive analysis pointed to any distinction among the patents or claims. This approach was wholly consistent with Parr's testimony.

evidence supporting a different royalty rate if only the '616 patent (or only claim 10 of that patent) were infringed also reinforces the waiver evidenced in its proposal and acceptance of the special verdict form's damages questions. *See* pp. 10-12, *supra*.

*Second*, there is a plain practical reason why the experts did not tether their models to specific patents or claims individually. The relevant consideration here is whether Cochlear had the right to incorporate back-telemetry technology into its devices. Whether Cochlear was barred from doing so by one or multiple claims could have no bearing on the royalty that Cochlear would have paid to obtain AMF's permission to use the back-telemetry technology.[7]

---

[7] This conclusion comports with the one-sale doctrine of exhaustion, which generally precludes a patentee from licensing an invention on a claim-by-claim basis. *See Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1308 (Fed. Cir. 2015) (dicta explaining this licensing restriction applies where "authorized sale of an article triggered exhaustion of method claims by asking if the article 'substantially embodied' the claimed method" (quoting *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 637-38 (2008), and citing *United States v. Univis Lens Co.*, 316 U.S. 241, 250-51 (1942), and *LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1368 (Fed. Cir. 2013)). In working through the hypothetical negotiation, a jury should not, and generally would not be asked to, parse claims.

A jury certainly should not ignore the subject invention. For example, under implied licensing principles, a license to AMF's later '616 patent necessarily would have licensed the earlier '691 patent to the extent that it was necessary to practice the '691 in order to practice the '616. *See generally* 6 Moy's Walker on Patents § 1940 (4th ed. 2015) (explaining that sale of an article used to practice a patented method impliedly licenses the method patent and all other patents necessary to use the article effectively). For this additional reason, a jury assessing

That is to say, "the royalty due for patent infringement should be the 'value of what was taken'—the value of the use of the patented technology." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1344 (Fed. Cir. 2015) (quoting *Aqua Shield v. Inter Pool Cover Team,* 774 F.3d 766, 770 (Fed. Cir. 2014) (in turn quoting *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.,* 235 U.S. 641, 648 (1915)). The reasonable royalty analysis compensates the patentee "for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Id.* at 1334. The analysis, by undertaking a hypothetical negotiation, is thus inherently functional. "(T)he number of patents involved in a licensing agreement is not the material factor in determining the license's worth; it is the value of the rights embodied in those patents." *Decca Ltd. v. United States*, 640 F.2d 1156, 1180 n.73 (Ct. Cl. 1980). One blocking patent covering the same technology will command the same royalty as two or four.

Indeed, the claim held valid below—claim 10 of the '616 patent—is the method claim relating to the whole use of back-telemetry for testing the device. If valid and infringed, it necessarily bars Cochlear from using the innovations at issue here. Cochlear has offered no basis to think that there is some sort of unique design-around for this claim that is inapplicable to the other claims at issue, let alone any evidence to support such a contention. The value Cochlear would have

the hypothetical negotiation of a royalty for related patents and claims would focus on the underlying technology or invention, not on any arbitrary parsing of claims.

acquired in the relevant licensing agreement, accordingly, would have been the right to use the back-telemetry systems in its devices.

*Third*, the parties proceeded in this case as if there was one invention or "system" at issue. Indeed, both experts testified that the standard practice in the industry as testified is to pay a single royalty rate for the use of a group of related patents. Thus, the evidence shows that the royalty rate would not have differed based on the number of patents.

To determine "industry licensing practice," Plaintiffs' expert, Elsten, relied on the AMF/AB licensing agreement, and also "Cochlear's main license with the University of Melbourne and the Commonwealth of Australia." A1705; *see also* A1640 ("I think the most informative license was the one that the Foundation made to Advanced Bionics."). Cochlear's expert Parr similarly relied on both the AMF/AB and the Cochlear/Melbourne licenses. A2268. Both licensing agreements provided for a single royalty rate applied to entire systems for the right to use a group of patents regardless of the number of patents or claims infringed. A2268-70 (Parr); A1705 (Elsten) (both licenses "had a royalty that was assessed based on systems … not on components").

In sum, because all "parties treated the mechanical and process patents as a unitary licensing property," a court "need not consider damages for infringement of each patent individually." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561 n.8

(Fed. Cir. 1983). The trial court abused its discretion in concluding otherwise, vacating the damages award, and granting a new trial on that issue.

*Fourth*, the jury verdict makes clear that the jury's royalty rate was unaffected by the presence of the '691 patent. That award maintained a consistent royalty rate even after the '691 patent expired. *See* A69. The plaintiffs requested, and the jury awarded, a royalty rate of 7.5%. *See*, *e.g.*, A2433. Cochlear even focused on this in its closing argument:

> It was agreed by the parties, by the parties, the '691 patent expired on September 22nd, 2009. That's a little more than four years ago, if I calculate it right. And Ms. Elsten doesn't change her royalty. She wants Cochlear after the end of this time to keep paying. That's as if you move out of an apartment and the landlord expects you to keep paying rent. It just doesn't make sense.

A2473. Notwithstanding this argument, the jury maintained a consistent royalty, because it simply did not matter if the products infringed one or multiple patents. This is dispositive evidence that the jury's calculation of damages did not depend on whether one, or multiple, patents or claims were infringed.

For each of these reasons, a new trial on damages was not warranted. The district court's order granting a new trial should be reversed with instructions to reinstate the jury's damages award.

**4.      At the very least, the Court should reinstate the jury's determination of the royalty rate.**

As described, the jury awarded a prospective royalty rate of 7.5%. *See* A69. Because the '691 patent expired in 2009, that royalty rate could turn on infringement *only* of the '616 patent. The finding of infringement with respect to claim 10 of the '616 patent necessarily constitutes sufficient support for this royalty determination.

**B.      The District Court's Indefiniteness Ruling Erroneously Treated A Routine Digital Signal Processor As If It Were A General Purpose Computer Performing A Function Central To The Point Of Inventiveness.**

Advanced Bionics is acutely concerned with how the Court's definiteness jurisprudence addresses the use of microprocessors to perform routine tasks. The Foundation's brief explains that the district court concluded that the specifications corresponding to means-plus-function claim elements in three patent claims did not disclose sufficient structure relating to the internal functioning of microprocessors performing routine tasks. The pertinent claim elements disclose a microprocessor to perform particular functions: (1) generating "data indicative of the audio signal" (A33, A53 (addressing claims 6 & 7 of the '691 patent)), or (2) deriving "information … regarding the operation of the implanted stimulator and its plurality of tissue-stimulating electrodes" (A33 (addressing claim 1 of the '616 patent)).

The district court held that the claims were indefinite because the specifications were "silent regarding what happens within the microprocessor." A54 (addressing '691 patent, claims 6 & 7). In the district court's view, the patent specification did not adequately disclose "how the microprocessor processes" the signal from the implant "to derive information therefrom regarding the operation" of the implant and the electrodes. A50-51 (addressing '616 patent).

From Advanced Bionics' vantage point as an implant designer and manufacturer, the district court's conclusions make no practical sense. What happens inside the microprocessor is neither a mystery nor a point of innovation within the claimed invention. Rather, the microprocessors are simple digital signal processors (or DSPs), and the simple display functions claimed here are both routine and remote from the elements that provide the "novelty of the invention." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003). The structure of the components that the district court held indefinitely claimed in fact was more than adequately disclosed to a person skilled in the art. A skilled artisan would not need to engage in creative computer programming, but merely would need to pick a familiar and well-recognized structure described in the specification using well-known (and adequately identified) algorithms to perform routine tasks. *See* A819 ['616, 4:57-59]; A853 ['691, 4:52-54].

Under the familiar standard for establishing the indefiniteness of disclosed structure supporting a means-plus-function element of a patent claim, the accused infringer must prove, by "clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde v. Harley-Davidson Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001). The evidence here does not meet the standard necessary to overcome the presumption of validity.

>    **1.    The district court erroneously discerned indefiniteness based on the mere possibility that an artisan could implement an algorithm in more than one way to accomplish routine claimed functions using a digital signal processor.**

The evidence established that the DSPs at issue in the two patents "perform certain well-known steps, including encoding amplitude, frequency or phase information on digital data." AA33657[2-3]. The DSP in the wearable processor in the '691 patent would "convert the received amplitude data for stimulation from digital to analog form … using a logarithmic algorithm" that could only be "implemented with a simple logarithmic lookup table." A33658[16-21]. The district court seemed to recognize that it "may be necessary for the wearable processor … in the '691 patent to perform a logarithmic conversion" (A54[24-25]), yet the court accepted Cochlear's speculation that the necessary logarithmic conversion could be implemented without using a lookup table. And the court also accepted Cochlear's insistence that the claimed A/D (analog-to-digital) converter

might be designed so that it could be programmed to implement that algorithm (A54-55), although the evidence showed that programming of that kind would render the converter "no longer a simple logarithmic A to D converter," while it would make no sense to "design a programmable A to D converter" when there is a "microprocessor right next to it." A2616. As the Foundation explains, the evidence that the function claimed might with difficulty be implemented in an unusual A/D converter did not even create a genuine dispute, let alone provide clear and convincing proof of indefiniteness.

The district court was bothered by the notion that there might be more than one theoretically possible algorithm to perform the claimed functions, or (more precisely) more than one way to implement a known algorithm, even though the evidence showed that one solution would be obvious to a skilled artisan, and ultimately all that was involved was a logarithmic conversion algorithm. A2618-19; A33658-60. But this hair-splitting was misdirected; the existence of more than one potential solution does not make the disclosure of structure inadequate. As this Court has recognized, "a recited algorithm … need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan." *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013). Rather, the algorithm need only "be sufficiently defined to render the bounds of the claim … understandable by the implementer." *Id.* That is, the touchstone is

22

whether the implementer can understand the metes and bounds of the claim, not whether (by analogy to the mechanical setting) the implementer may be left with an implied choice between a screw with a slotted, Phillips, Torx, or hexagonal head to accomplish a claimed function.

That is especially so because the functions at issue are peripheral to the bounds of the back-telemetry claim, so that this aspect of the DSP's "role in the invention as a whole" (*Typhoon Touch Techs., Inc. v. Dell, Inc*., 659 F.3d 1376, 1385 (Fed. Cir. 2011)) is minimal. The routine signal conversion functions at issue have nothing to do with the back-telemetry "problem solved by the invention" *Budde*, 250 F.3d at 1379. There is nothing novel about an ohmmeter (as the function performed by the DSP at issue in the '616 patent), and the claimed function of the DSP at issue in the '691 patent is a well-known aspect of prior art cochlear implants. *See* A33659; A2619.

This Court has repeatedly upheld disclosures of structure that presented explicit or well-recognized alternatives. The Court in *Intel* rejected the argument that a patent was indefinite "because there may be unlimited numbers of implementations that can modify the core logic to perform the recited functions and the patent does not disclose circuitry or other structure on any of the implementations so the universe of such implementations is undefined." 319 F.3d at 1366. The Court has also "held that a 'selector' was an adequate corresponding

structure for performing the 'selectively receiving' function even though neither the electronic structure of the selector nor details of its electronic operation were described in the specification." *Id*. (describing *S3, Inc. v. NVIDIA Corp.,* 259 F.3d 1364, 1370–71 (Fed. Cir. 2001)). And the Court approved a disclosure of structure for a "reconstructing" function even though "there could be multiple ways for the computing device to reconstruct the data because no specific mathematical algorithm was disclosed in the written description, although the description stated that 'known algorithms' could be used to solve standard equations known in the art." *Id.* (citing *In re Dossel,* 115 F.3d 942, 946 (Fed. Cir. 1997)).[8]

As this Court has observed, "if a chair is disclosed in the specification that corresponds to the 'means for seating' limitation in a claim, asserting that there are infinite numbers of structures that could make a chair or there are unlimited types of chairs in the world would not necessarily make the claim indefinite." *Intel*, 319 F.3d at 1367. Thus, the Court elsewhere approved a disclosure where there were "several straightforward ways that the algorithm represented in [the specification] could be implemented by one skilled in the art." *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007). *Cf. Budde*, 250 F.3d at 1380 (holding that each of four disclosed types of sensors constituted sufficient structure even though artisan would have to choose).

---

[8] *Cf. Budde*, 250 F.3d at 1381 (addressing disclosure of "vacuum sensors," a "commercially available" component that was "well known in the art").

As a consequence, even if Cochlear were correct that a skilled artisan might have been able to discover and choose an algorithmic path other than a logarithmic lookup table to perform the function claimed in the '691 patent, that does not render the disclosure indefinite, let alone by clear and convincing evidence.[9]

As for the DSP in the '616 patent, as disclosed it "calculates impedance as the ratio of voltage to current" in a way that is "no different from a commercially available ohmmeter, which literally measures voltage, and displays voltage to current ratio as indicative of impedance." A33662[15-17]. The fact that a microprocessor performs the function of an ohmmeter does not somehow raise the bar for disclosing structure. On the contrary, if no DSP were involved, an ohmmeter surely would amount to sufficient disclosed structure without a further recitation of how an instrument as familiar as an ohmmeter works.

Thus the modestly conflicting evidence provided by Cochlear's expert falls short of the one-sided factual record necessary to support a finding of indefiniteness by clear and convincing evidence. *See, e.g.*, *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1339 (Fed. Cir. 2008). Just as in *Intel*, "how to modify the core logic to perform [a specified operation] on the circuitry

---

[9] Not only was the inherent disclosure of a logarithmic lookup table sufficient to set the boundaries of the claims, but the specification further describes the decompression of data that has been subjected to a logarithmic conversion algorithm (*see* A36658[15-22]); the nature of that speech processing algorithm was well known (*see* A36659-60).

level may also be properly left to the knowledge of those skilled in the art, and need not be specified in the patent," 319 F.3d at 1366-67, here the choice among ways to implement routine algorithms to perform a routine function properly can be left to the skilled artisan—especially because the "novelty of the invention" (*id.* at 1367) lies elsewhere. *See Medical Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1212 (Fed. Cir. 2003) (disclosure of structure for digital-to-digital conversion sufficient "if one of skill in the art would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program").

Moreover, and contrary to the district court's apparent belief (A52; A55-56), there is no question here of requiring a person of "ordinary skill … to devise a means to perform the claimed function." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009). Rather, the patents here require only the use of a familiar means to perform the claimed function. When there are such well-established means, fears of permitting a patent to embrace "all possible means of achieving a function" are no more valid than similar fears about permitting "all possible means of achieving" lighting where the internal functioning of a claimed lightbulb was not disclosed.

The critical difference is between a claim that would require a skilled artisan to program a computer to perform the claimed function, and a function that a

skilled artisan would perform by using a well-known component or solution that would require no more creative effort than selecting and screwing in a lightbulb. The disclosure here does not call upon the artisan to write a program, in contrast with the disclosure in *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008). *See Blackboard*, 574 F.3d at 1385. All the artisan has to do is use a DSP that either uses a simple logarithmic lookup table (for the '691 patent) or acts as an ohmmeter (for the '616 patent).

The disclosures here thus provide what is needed:  "some link between a generic structural reference and a claimed function." *Medical Instrumentation*, 344 F.3d at 1214. In context, the specifications' link between a generic DSP and the claimed functions in the '616 and '691 patents is more than enough.

> **2.    In light of the ubiquitous use of microprocessors to perform simple, well-known tasks, the Court's evaluation of the sufficiency of the disclosed algorithm should reflect the decreasing level of detail required in patent disclosures as once-novel technologies become commonplace.**

As the Court evaluates the nature and extent of the algorithm disclosure necessary to render a § 112(f) claim involving a microprocessor sufficiently definite, the Court should recognize the trajectory of the disclosure requirements imposed on technologies that began as revolutionary yet became commonplace. As technologies evolve from the cutting edge into the familiar, and from the focus of invention to peripheral and well-known components—when what once was a

mystery becomes routine—patents include far less structural detail. A few examples illustrate this progression.

In Edison's 1882 patent for the "Incandescent Electric Lamp," U.S. Pat. No. 264652, each wire of the light bulb was specified, as well as the nodes used to hold the wire together, and the glass that surrounds it, as can be seen in this figure: (A=Glass) (B, C, 1, 2=Wires) (a=node that brings wires together)



As early as 1899, a patent was granted for a dental device that shines light to allow a dentist to see a patient's throat more clearly. *See* "Electric Lamp For Dental Purposes," U.S. Pat. No. 657199. The image for the device includes an "Incandescent Electric Lamp," which is depicted as a single object without detail and described in the specification without discussion of each individual wire or the



composition of the bulb.            The light bulb is still an integral part

of the product; no one could practice the patent without obtaining or making a

bulb. But already it was no longer necessary to explain the inner workings of a

light bulb in order to describe the new invention in terms sufficiently definite to be

patentable. Now, of course, a patent that includes a light bulb or a means for

lighting would simply say so without any elaboration or schematic drawing of the

bulb.

Batteries provide another example. While early battery patents specified the

components of a battery and how they worked, *e.g.*, "Improvement in Galvanic

Batteries," U.S. Pat. No. 57687, later inventions could incorporate a battery

without further description because the technology had become routine and

familiar. *E.g.*, "Improved System of Telegraphing," U.S. Pat. No. 102252.

Similarly, an early (1885) patent on an electric furnace includes two pages of

images and a four-page specification explaining exactly how the furnace works.

*See* "Electric Smelting-Furnace," U.S. Pat. No. 319945. The object of that

invention was "to provide an apparatus by means of which metallurgical operations

and chemical operations which require an intense heat can be carried on with

electricity as the heat-producing agent." *Id.*, p.1, ll. 16 -20. Yet only ten years later, in a patent claiming the "Art Of Producing Carbide Of Calcium," U.S. Pat. No. 551461, by use of an electric furnace, the specification says nothing about the structure or operation of the furnace itself. The patent simply says that "any convenient or well-known form or size of electric furnace may be used." *Id.*, p.2, ll. 31-32. In this patent, the electric furnace is just a means of creating heat, not a point of invention.

The technology at issue here is a digital signal processor, or DSP. *See* A819, A853. The district court's concern about the adequacy of disclosure of structure arose from the use of a digital signal processor to perform simple functions that in an earlier era might have been performed without digital processing. Patents that specifically claim a digital signal processor of course provide great detail about its structure and operation. *E.g.*, "Digital Signal Processor," U.S. Pat No. 3,996,519. Yet later patents that incorporate a DSP, but for which the point of invention lies elsewhere, need not and do not describe the structure of that by-then familiar piece of technology. *See*, *e.g.*, "System For Estimating Acceleration Of Maneuvering Targets," U.S. Pat. No. 4,148,029. The '029 patent says what the processor does: for example, "[t]he digital processor provides information to the computer through a tracking error detector portion. … The digital signal processor also provides information through a suitable conventional range and range rate measurement

detector portion." *Id.*, col. 4, ll. 51-59. But the '029 patent does not explain how the digital signal processor claim element accomplishes these tasks; in other words, it does not provide the algorithm the digital signal processor uses. We are aware of no cases that have invalidated a patent for indefiniteness because it used the phrase "digital signal processor" without further elaboration. Indeed, one decision observed that the term "digital signal processor" was "generic," and in the context of a means-plus-function claim found that it was sufficient to note that the digital signal processor was an integrated circuit. *See Digital Tech. Licensing, LLC v. Cingular Wireless, LLC*, 2007 WL 2300792, at *9-10 (E.D. Tex. Aug. 7. 2007).

Here, the claimed functions performed by the wearable DSP are straightforward and the DSP is equally generic structure. Today, as in the 1990s when the patents-in-suit issued, the shrinking size and cost of computing power have led to the use of microprocessors to perform an increasing range of measurement, calculation and other functions that formerly relied on electro-mechanical or other means.

In the '616 patent, the function is basically that of an ohmmeter, but it performed with using digital processing rather than the electromechanical structure of the ohmmeters. Had the claim identified an ohmmeter, there would be no discussion of the need for an algorithm so long as the basic location of the ohmmeter within the system's structure was identified. The result should not

change merely because the ohmmeter is a DSP. In articulating the application of the algorithm requirement for means-plus-function claims in this context, this Court's approach should recognize that the use of limited-purpose microprocessors like the DSPs at issue here requires no more effort or creativity on the part of a skilled artisan than the use of their electromechanical predecessors.

That indicates yet another reason that the claims at issue here recite sufficient structure. When a claim recites generic "functions" that "can be achieved by any general purpose computer without special programming," it is "not necessary to disclose more structure than the general purpose processor that performs those functions." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). The necessary corollary is that when a claim discloses a *special purpose* microprocessor with only limited programmability, no algorithm is needed. That is, when "special-purpose hardware is disclosed," "no algorithm is required." *Levine v. Samsung Telecommunications Am., LLC*, 2012 WL 383647, at *19 (E.D. Tex. 2012). Here, the microprocessors at issue are not general purpose computers that require special programming; they are by contrast application-specific integrated circuits that, as the district court recognized, have only "limited user programmability." A377 n.28.  In the district court's view, any programming in a disclosed microprocessor, no matter how routine the claimed function, requires disclosure of an algorithm as well. A378. But in this

circumstance, disclosing the routine element itself is sufficient, and no specific algorithm is required. And if any disclosure is necessary, the disclosures described above are more than sufficient.

## CONCLUSION

The jury verdict should be reinstated in full and the district court instructed on remand to consider damages enhancement and attorneys' fees.


Dated: October 5, 2015                    Respectfully submitted,

                                          /s/ Donald M. Falk

Todd Malynn                               Donald M. Falk
FELDMAN GALE, P.A.                        MAYER BROWN LLP
880 West First Street, Suite 315          Two Palo Alto Square, Suite 300
Los Angeles, CA 90012                     3000 El Camino Real
(213) 625-5992                            Palo Alto, California 94306-2112
                                          (650) 331-2000 (phone)
                                          (650) 331-4530 (fax)
                                          dfalk@mayerbrown.com

                                          Paul W. Hughes
                                          MAYER BROWN LLP
                                          1999 K St. NW
                                          Washington, DC 20001
                                          (202) 263-3147 (phone)
                                          (202) 263-5347 (fax)
                                          phughes@mayerbrown.com

                                          *Attorneys for Plaintiff-Appellee-*
                                          *Cross-Appellant Advanced Bionics,*
                                          *LLC*

## CERTIFICATE OF SERVICE

I certify that on October 5, 2015, this BRIEF OF APPELLEE AND CROSS-APPELLANT ADVANCED BIONICS, LLC was filed electronically using the CM/ECF system and served via the CM/ECF system on all counsel of record.


   /s/ Donald M. Falk
Donald M. Falk

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

The brief contains 7,973 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(b)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman font.

/s/ Donald M. Falk
Donald M. Falk