Nos. 2015-1580, -1606, -1607

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH,
*Plaintiff-Cross-Appellant,*

and

ADVANCED BIONICS, LLC,
*Plaintiff-Cross-Appellant,*

v.

COCHLEAR CORPORATION, N/K/A COCHLEAR AMERICAS,
*Defendant-Appellant,*

and

COCHLEAR LTD.,
*Defendant-Appellant.*

———————————————

Appeals from the United States District Court for Central District of
California in Case No. 2:07-cv-08108, Judge Fernando M. Olguin

## PLAINTIFF-CROSS-APPELLANT ALFRED E. MANN FOUNDATION
## FOR SCIENTIFIC RESEARCH'S PRINCIPAL AND RESPONSE BRIEF

———————————————

Daniel Grunfeld
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Telephone: (213) 612-2500
Facsimile: (213) 612-2501

Michael J. Lyons
MORGAN, LEWIS & BOCKIUS LLP
3000 El Camino Real, Suite 700
Palo Alto, CA 94306-2122
Telephone: (650) 843-4000
Facsimile: (650) 843-4001

Thomas M. Peterson
MORGAN, LEWIS & BOCKIUS LLP
One Market Street, Spear Tower
San Francisco, CA 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

*Attorneys for Plaintiff-Cross-Appellant*
ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH

# CERTIFICATE OF INTEREST

Counsel for the Plaintiff-Appellee-Cross-Appellant Advanced Bionics, LLC certifies the following:

1.   The full name of every party or amicus represented by me is:

   The Alfred E. Mann Foundation for Scientific Research

2.   The name of the real party in interest represented by me is:

   The Alfred E. Mann Foundation for Scientific Research

3.   All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me is:

   None

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   MORGAN, LEWIS & BOCKIUS, LLP:  Daniel Grunfeld, Daniel Johnson, Jr.[*], Michael J. Lyons, Thomas M. Peterson, Jason E. Gettleman, Rachel M. Walsh[*], Esther K. Ro, Corey R. Houmand, Lindsey M. Shinn, Jacob J.O. Minne.

   KAYE SCHOLER, LLP:  Jonathan M. Rotter, Oscar Ramallo, Robert D. Estrin, Robert Laurenzi, Scott G. Lindvall

   MERCHANT & GOULD, PC:  Brett A. Hertzberg, Brian G. Bodine, Peter A. Gergely

   MORRISON AND FOERSTER, LLP:  Charles S. Barquist

   PERKINS COIE LLP:  Kaustuv M. Das

---

[*] Appeared at trial, but no longer associated with Morgan, Lewis & Bockius LLP.

i

Dated:  October 5, 2015          Respectfully submitted,


                                 By:  /s/ Thomas M. Peterson
                                      Thomas M. Peterson

                                      *Attorneys for Plaintiff-Cross-Appellant*
                                      ALFRED E. MANN FOUNDATION
                                      FOR SCIENTIFIC RESEARCH

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTEREST ..................................................................i

INDEX OF AUTHORITIES...................................................................vi

STATEMENT OF RELATED CASES ................................. xii

I.     STATEMENT OF JURISDICTION ...........................................1

II.     STATEMENT OF ISSUES ..........................................................1

    A.     Preliminary Statement ......................................................1

    B.     Issues Presented................................................................4

III.     STATEMENT OF THE CASE .....................................................6

    A.     Plaintiff-Cross-Appellant-Mann Foundation And Its Life-
        Enhancing Research .........................................................6

    B.     The Foundation's Back-Telemetry Invention Quickly Becomes
        An Essential Feature Of Cochlear Implants.........................7

    C.     Defendant-Appellant–Cochlear Copies The Patented
        Technology After Failing To Develop Its Own Back-Telemetry......11

    D.     Litigation History .........................................................12

    E.     The Foundation Prevails But The District Court Sets Part Of
        The Verdict Aside .........................................................15

IV.     SUMMARY OF ARGUMENT...................................................16

V.     ARGUMENT...........................................................................20

    A.     Standards Of Review.......................................................20

    B.     Response To Cochlear's Appeal:  The Infringement Verdict For
        Claim 10 Of The '616 Patent Should Stand......................22

        1.     Claim 10 Is Not Limited To Display Of Voltage ...................23

            a.     The '616 Patent's Preferred Embodiment And
                Claim 10's Plain Language Address Display Of
                Impedance.........................................................24

            b.     The District Court Correctly Held The "Whereby"
                Clause Neither Limits Claim 10 Nor Requires
                Display Of Voltage .........................................31

        2.     Substantial Evidence Established That Cochlear
            Infringed Claim 10 ...................................................34

            a.     Cochlear Literally Infringes Claim 10..........................34

# TABLE OF CONTENTS
(continued)

|   |   | b. | Prosecution History Estoppel Does Not Save Cochlear From Infringement By Equivalents | 41 |
| C. | 3. |   | Claim 10 Is Not Limited To "Intra-cochlear" Electrodes | 44 |
| C. |   |   | Cross-Appeal:  The Asserted Claims Are Not Indefinite | 49 |
|   | 1. |   | The '691 Claims Are Not Indefinite | 50 |
|   |   | a. | The '691 Patent Discloses A Logarithmic Conversion Algorithm For "Generating Data Indicative Of The Audio Signal" | 50 |
|   |   | b. | The District Court Erred In Finding The Disclosed Algorithm Insufficient Due To Purported Uncertainty About Where The Algorithm Is Performed | 53 |
|   |   | c. | The District Court Erred In Declaring The Disclosed Algorithm Insufficient Merely Because It Can Be Implemented More Than One Way | 58 |
|   | 2. |   | Claim 1 Of The '616 Patent Is Not Indefinite | 60 |
|   |   | a. | The '616 Patent Discloses Use Of Ohm's Law To Calculate Impedance | 61 |
|   |   | b. | The District Court Failed To Consider The Voltage Display Embodiment Of "Means For… Processing The Status-Indicating Signals" | 64 |
| D. |   |   | Cross-Appeal:  The Jury's Damages Award Must Be Reinstated | 65 |
|   | 1. |   | The Verdict Awards Damages For Infringement Of Claim 10 Of The '616 Patent Alone | 66 |
|   | 2. |   | Applying The Proper Standard, An Exercise Of This Court's Discretion Compels Reinstating The Jury's Damage Award And Royalty Rate In Full | 69 |
|   | 3. |   | Cochlear Forfeited Any Claim To A New Trial Because It Proposed The Verdict Form Used | 71 |
|   | 4. |   | Case Law Cited By The District Court Supports Full Reinstatement Of The Damage And Royalty Verdicts | 72 |
| E. |   |   | Cross-Appeal:  The Jury's Willfulness Finding As To The '616 Patent Should Be Reinstated | 74 |
|   | 1. |   | Cochlear's Infringement Was Objectively Willful | 74 |

iv

# TABLE OF CONTENTS
(continued)

2.    Cochlear's Infringement Was Subjectively Willful ...............77

    a.    Cochlear Spurned Offers To License The Foundation Technology And Then Copied The Back-Telemetry System ..................................................77

    b.    The District Court's Ruling That Cochlear Responded Reasonably To Notice Of Infringement Of Claim 10 Bespeaks Clear Legal Error.....................80

VI.    CONCLUSION .........................................................................82

# INDEX OF AUTHORITIES

CASES

*Accentra, Inc. v. Staples, Inc.*,
   500 Fed. Appx. 922 (Fed.Cir. 2013)...................................................73

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
   616 F.3d 1283 (Fed.Cir. 2010) .........................................................26

*AllVoice Computing PLC v. Nuance Communications, Inc.*,
   504 F.3d 1236 (Fed.Cir. 2007) ...........................................50, 59, 63

*Apple Inc., v. Samsung Electronics Co., Ltd.*,
   Case No. 14-1802, Dkt. 105-2, at *1 (Fed.Cir. Sept. 17, 2015) ........79

*Atmel Corp. v. Info. Storage Devices, Inc.*,
   198 F.3d 1374 (Fed.Cir. 1999) ...................................................50, 63

*Bank of Am. N.T.& S.A. v. Hayden*,
   231 F.2d 595 (9th Cir. 1956) .............................................................71

*Bard Peripheral Vascular, Inc. v. W.L. Gore Associates*,
   682 F.3d 1003 (Fed.Cir. 2012) ...................................................22, 75

*Biosig, Inc. v. Nautilus, Inc.*,
   783 F.3d 1374 (Fed.Cir. 2015) .........................................................21

*Cadence Pharms., Inc. v. Exela PharmSci Inc.*,
   780 F.3d 1364 (Fed.Cir. 2015) .........................................................21

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
   748 F.3d 1134 (Fed. Cir. 2014) ...........................................50, 59, 63

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
   668 F.3d 1340 (Fed.Cir. 2012) .........................................................21

*Clonetech Labs v. Invitrogen Corp.*,
   406 F.3d 1347 (Fed.Cir. 2005) .........................................................81

*Creo Prods., Inc. v. Presstek, Inc.*,
   305 F.3d 1337 (Fed.Cir. 2002) .........................................................64

*Cybor Corp. v. FAS Techs. Inc.*,
138 F.3d 1448 (Fed.Cir. 1998) ........................................................21

*Desenberg v. Google*,
392 Fed. Appx. 868 (Fed.Cir. 2010).................................................32

*DuPoy Spine, Inc. v. Medtronic Sofanor Danek, Inc.*,
567 F.3d 1314 (Fed.Cir. 2009) ........................................................76

*Enzo Biochem Inc. v. Applera Corp.*,
780 F.3d 1149 (Fed.Cir. 2015) ........................................................21

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
344 F.3d 1359 (Fed.Cir. 2003) ("*Festo III*") ....................................42

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
535 U.S. 722 (2002) ("*Festo II*").....................................................41

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed.Cir. 2008) ..................................................49, 58

*Fractus, S.A. v. Samsung Electronics Co.*,
876 F. Supp. 2d 802 (E.D. Tex. 2012).............................................76

*Funai Elec. Co. Ltd. v. Daewoo Elecs. Corp.*,
616 F.3d 1357 (Fed.Cir. 2010) ..................................................26, 43

*Function Media, LLC v. Google, Inc.*,
708 F.3d 1310 (Fed.Cir. 2013) ........................................................58

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................14

*Griffin v. Bertina*,
285 F.3d 1029 (Fed.Cir. 2002) ........................................................32

*Halo Electronics, Inc. v. Pulse Electronics, Inc*.
769 F.3d 1371 (Fed.Cir. 2014) ........................................................22

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*
134 S.Ct. 1744 (2014).....................................................................22

*Hoffer v. Microsoft Corp.*,
  405 F.3d 1326 (Fed.Cir. 2005) ........................................................31

*i4i Limited Partnership v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) .....................................................80, 82

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
  732 F.3d 1376 ...............................................................................59

*In re Dossel*,
  115 F.3d 942 (Fed.Cir. 1997) .....................................................58, 59

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011) .........................................................65

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed.Cir. 2007) (en banc) ..............................74, 77, 81

*Inc. v. Rambus Inc.*,
  No. C-00-20905 RMW, 2013 WL 1915865 (N.D. Cal. May 8, 2013) ..............68

*Intel Corp. v. VIA Techs., Inc.*,
  319 F.3d 1357 (Fed.Cir. 2003) ...............................................49, 59, 60

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
  336 F.3d 1308 (Fed.Cir. 2003) .....................................................61, 63

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed.Cir. 2014) .........................................................21

*Intervet Inc. v. Merial Ltd.*,
  617 F.3d 1282 (Fed.Cir. 2010) .....................................................42, 44

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  *383 F.3d 1295 (Fed.Cir. 2004)*........................................................48

*Ishida Co. v. Taylor*,
  221 F.3d 1310 (Fed.Cir. 2000) .........................................................64

*Koon v. United States*,
  518 U.S. 81 (1996)..........................................................................22

*Landes Constr. Co. v. Royal Bank of Canada*,
    833 F.2d 1365 (9th Cir. 1987) ...........................................................71

*Lucent Techs., Inc. v. Gateway, Inc*.,
    580 F.3d 1301 (Fed.Cir. 2009) ..........................................................20

*McCord v. Maguire*,
    873 F.2d 1271 (9th Cir. 1989) ...........................................................72

*Memphis Community School District v. Stachura*,
    477 U.S. 299 (1986)...................................................................73, 74

*Mitsubishi Elec. Corp. v. Ampex Corp*.,
    190 F.3d 1300 (Fed.Cir. 1999) ..........................................................72

*Nautilus, Inc. v. Biosig Instruments, Inc*.,
    134 S. Ct. 2120 (2014).....................................................................63

*Noah Systems, Inc. v. Intuit Inc*.,
    675 F.3d 1302 (Fed.Cir. 2012) ..........................................................63

*Octane Fitness, LLC v. ICON Health & Fitness, Inc*.,134
    S.Ct. 1749 (2014)............................................................................22

*Oracle Am. Inc. v. Google, Inc.*,
    2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ...................................69

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed.Cir. 2005) (en banc) .........................................26

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed.Cir. 2013) ..........................................................69

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    451 F.3d 841 (Fed.Cir. 2006) ............................................................41

*Rawcar Group, LLC, v. Grace Medical, Inc.*,
    Case No. 13-cv-1105 (S.D. Cal. Dec. 16, 2014) ..............................76

*Regents of Cal. v. Dakocytomation Cal., Inc.*,
    517 F.3d 1364 (Fed.Cir. 2008) ..........................................................43

*Retractable Techs., Inc. v. Becton Dickinson & Co.,*
    757 F.3d 1366 (Fed.Cir. 2014) ...................................................72, 73

*S3 Inc. v. NVIDIA Corp.,*
    259 F.3d 1364 (Fed.Cir. 2001) .........................................................52

*Saman v. Robbins,*
    173 F.3d 1150 (9th Cir. 1999) ..........................................................21

*Spectralytics, Inc. v. Cordis Corp.,*
    649 F.3d 1336 (Fed.Cir. 2011) .........................................................81

*SRI Int'l, Inc. v. Advanced Tech. Labs.,*
    127 F.3d 1462 (Fed.Cir. 1997) .........................................................77

*SSL Servs., LLC v. Citrix Sys., Inc.,*
    769 F.3d 1073 (Fed.Cir. 2014) .........................................................77

*Stryker Corp v. Zimmer, Inc.,*
    782 F.3d 649 (Fed.Cir. 2015) ...........................................................22

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,*
    789 F.3d 1335 (Fed.Cir. 2015) .........................................................53

*Teva Pharmaceuticals USA v. Sandoz, Inc.,*
    135 S.Ct. 834 (2015)................................................................21, 22

*Thomas & Betts Corp. v. Litton Systems,*
    720 F.2d 1572 (Fed.Cir. 1983) .........................................................44

*TiVo, Inc. v. EchoStar Commc'ns Corp.,*
    516 F.3d 1290 (Fed.Cir. 2008) .........................................................68

*Traver v. Meshriy,*
    627 F.2d 934 (9th Cir. 1980) ......................................................70, 71

*Typhoon Touch Tech. Inc. v. Dell, Inc.,*
    659 F.3d 1376 (Fed. Cir. 2011) ...............................................57, 59, 62

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed.Cir. 2007) .........................................................73

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed.Cir. 2013) ..........................................................45

*Yeti by Molly, Ltd. v. Deckers Outdoor*,
   259 F.3d 1101 (9th Cir. 2001) ...........................................................22

*Zhang v. Am. Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) ...........................................................69

*Ziggity Sys., Inc. v. Val Watering Sys.*,
   769 F.Supp. 752 (E.D. Pa. 1990) ......................................................69

STATUTES

35 U.S.C. §112 ...............................................................................passim

35 U.S.C. §284 ......................................................................................69

## **STATEMENT OF RELATED CASES**

This case was the subject of an earlier appeal to this Court. Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp., 604 F.3d 1354 (Fed. Cir. 2010), which was heard by a panel of Chief Judge Michel, Judge Newman and Judge Dyk, and decided May 14, 2010.

Counsel knows of no other case that may be directly affected by this Court's decision.

# GLOSSARY

The Joint Appendix is cited as A____.  Appellant's brief is cited as AOB–____.

Emphasis had been added in quotations, and both citations and quotations omitted,

unless stated otherwise.


Citations to specific sections of a patent are "AAA.BB:cc-dd," where AAA is the

abbreviated patent number, BB is the column within the patent, and cc-dd are line

numbers within those columns, *i.e.*, 691.06:5-48 means the '691 patent, column 6,

lines 5 through 48.

# I.    STATEMENT OF JURISDICTION

Plaintiff-Cross-Appellant-Alfred E. Mann Foundation for Scientific Research Foundation (the "Foundation") filed a timely notice of cross-appeal on April 23, 2015.

# II.    STATEMENT OF ISSUES

## A.    Preliminary Statement

The Foundation's "back-telemetry" patents fundamentally improved the safety and effectiveness of cochlear implants by providing doctors with real-time diagnostic information from an implant inside a patient's ear.  The patents established today's ubiquitous design benchmark.  The Foundation formed Plaintiff-Cross-Appellant-Advanced Bionics to ensure that this patient-protective technology became available, after Defendants-Appellants Cochlear Corporation and Cochlear, Ltd. ("Cochlear") initially refused to incorporate back-telemetry into their implants.  Once Advanced Bionics introduced its back-telemetry-equipped Clarion implants, Cochlear's share of the implant market dropped a staggering 30%.  Facing catastrophic losses, Cochlear copied the Foundation's patented technology to stay competitive.

Cochlear spurned the Foundation's 2003 offer of a license, leaving the Foundation little choice but to sue in 2007.  The Foundation asserted the '616 and '691 patents.  Both involve back-telemetry.  Over the next seven years, Cochlear aggressively litigated, never attempted to design around, and profited handsomely

1

from infringement that continued unabated until the last of the patents (the '616)

expired in March 2014.

Following a six-day trial, the jury found willful infringement of all four

asserted claims.  The district court correctly entered judgment for infringement of

claim 10 of the '616 patent.  But the court erroneously set aside the rest of the

verdict favoring the Foundation, invalidating three of the claims as indefinite and

ordering a new damages and royalty trial despite a verdict that measured damages

and set a royalty rate for infringement of claim 10 alone.  The district court also

granted JMOL on Cochlear's liability for willful infringement.

Cochlear asks this Court to reverse the finding of infringement by narrowing

the district court's claim constructions.  Without those narrow constructions,

Cochlear has no basis to attack the claim 10 infringement finding.

Thus, Cochlear would constrict the "displaying" limitation of claim 10 to

require display of voltage, excluding display of impedance.  But the specification

and claim language confirm that display of impedance literally meets claim 10.

The '616 patent's preferred embodiment depicts display of impedance, just as

claim 10 contemplates.  And no narrowing amendment during prosecution estops

the Foundation from asserting that display of impedance infringes by equivalents.

Cochlear also asserts that claim 10's requirement of a pair of tissue-

stimulating electrodes must be read to require implanting both in the cochlea,

despite claim language and a preferred embodiment depicting one electrode inside the cochlea and another, extra-cochlear, indifferent electrode.

Turning to the Foundation's cross-appeal, the district court repeatedly failed to respect the verdict and the standards requiring judicial focus on the perspective of one skilled in the art. Unlike most indefiniteness cases, the district court found the two means-plus-function claims of the '691 patent indefinite despite acknowledging the inherent disclosure of a logarithmic conversion algorithm for "generating data indicative of the audio signal." In finding claim 1 of the '616 patent indefinite, the court demanded unnecessary details about Ohm's Law—the well-known algorithm for determining impedance. The court also adopted an inordinately relaxed standard for declaring an algorithm indefinite: if the algorithm can be implemented in more than one way. Based on proper attention to the perspective of one skilled in the art, this Court should reverse each of these indefiniteness rulings.

After declaring three of the four claims-in-suit indefinite, the district court vacated the damage and royalty verdicts because the figures "were not broken down as to each claim or patent." Even if this Court does not disturb the indefiniteness rulings, the damage and royalty verdicts must be reinstated. These monetary components of the verdicts remediate infringement of claim 10 alone: that is what the evidence, the instructions, and verdict form provide—a form

Cochlear proposed and, for that reason, cannot invoke as a basis for a new damages trial. And that result is dictated by regional Ninth Circuit precedent that allows reviewing courts to uphold general verdicts for the plaintiff when they rest on at least one claim that is supported by substantial evidence and was submitted to the jury free of reversible error.

Finally, the district court failed to defer to the jury's willfulness finding as to claim 10 of the '616 patent. Cochlear's "voltage display" defense to infringement was not objectively reasonable: it excludes aspects of a preferred embodiment and was contradicted by Cochlear's own witnesses. The jury's fact-dependent assessment of subjective willfulness should not have been supplanted by the court.

The Foundation asks that the verdict be reinstated in full and the district court be directed to determine enhanced damages and attorneys' fees.

**B.   Issues Presented**

1.   Should the jury verdict of infringement of claim 10 of the '616 patent be affirmed because it is supported by substantial evidence and Cochlear seeks unduly constricting claim constructions that are contradicted by claim language and preferred embodiments, *i.e.*:

> a.   The displaying element of claim 10 (by which performance of the cochlear implant is tested) requires display of only voltage rather than also encompassing,

as the district court determined, display of impedance; and

b.   The claimed pair of tissue-stimulating electrodes must both be implanted in the cochlea rather than, as the district court determined, encompassing one electrode implanted in the cochlea and one outside?

2.   Did the district court erroneously declare claims 6 and 7 of the '691 patent indefinite despite acknowledging that the patent teaches a logarithmic conversion algorithm for "generating data indicative of the audio signal"?

3.   Did the district court erroneously declare claim 1 of the '616 patent indefinite even though it undisputedly teaches a microprocessor that processes status-indicating voltage signals to compute impedance using Ohm's well-known Law?

4.   Did the district court erroneously order a new damages trial where the verdict asked the jury, as Cochlear proposed, to award a single sum of damages and a single *Georgia Pacific* royalty rate if *any* claim of *any* patent was infringed, and damage experts for both sides calculated damages and set royalty rates that did not vary based on the number of claims found infringed?

5.   Did the district court erroneously set aside the jury's verdict finding willful infringement of claim 10 of the '616 patent?

## III.   STATEMENT OF THE CASE

### A.   Plaintiff-Cross-Appellant-Mann Foundation And Its Life-Enhancing Research

The Foundation is a nonprofit medical research foundation that eliminates suffering by developing advanced medical technologies.  Foundation scientists have developed implantable glucose sensors for diabetic patients, technology to restore function to partially paralyzed stroke patients, a visual prosthesis to enable the blind to see, and (relevant here) implantable cochlear stimulators to restore hearing to the deaf.  A01173-01175; A00027.

In a properly functioning cochlea, tiny hair-like structures move in response to sound vibrations inside the cochlea, causing electrical impulses to be transmitted to the brain via the auditory nerve.  Damage to these hair-like structures deprives the profoundly deaf of the experience of sound.  A cochlear implant bypasses the damaged cochlea by generating electrical currents between electrodes threaded into or near the cochlea that stimulate the auditory nerve and transmit electrical impulses to the brain, mimicking a healthy inner ear.  A01203[5]-01206[15]. Thus:



A microphone on an external wearable processor detects sound from the air.  The

processor transforms the sound into electrical signals that are transmitted through

the skin to an implanted receiver.  The receiver signals an array of electrodes

that—like playing keys on a piano—stimulate different parts of the cochlea to

create sound perception in the brain.  A01266-01267; A01347[14]-01353[24];

A01206[2]-01208[11].

**B.** **The Foundation's Back-Telemetry Invention Quickly
Becomes An Essential Feature Of Cochlear Implants**

The patents-in-suit cover fundamental improvements in cochlear implants:

introducing back-telemetry to monitor implant performance and communicate

results in real time to a receiver located outside the patient.  U.S. Patent No.

5,609,616 ("Physician's Testing System and Method for Testing Implantable

Cochlear Stimulator"), and U.S. Patent No. 5,938,691 ("Multichannel Implantable Cochlear Stimulator"). A01348[3-17]; A01389-01390[22]; A01446[20]-01448[25]. Because an implant's stimulation electrodes are tiny, delicate, electrically conductive wires, prone to malfunction, it is important to test them, assess functionality, and fine tune to enhance performance. A01335[22]-01337[20]; A01354[14]-01355[12]; A01280[16]-01283[4]; A01202[14-22]; A01210[7]-01217[18]; A01450[2]-01452[7]; A01535[8]-01536[1].

Back-telemetry is indispensable for diagnostics and performance adjustments. A01208[15]-01209[9]; A01211[17]-01213[6]; A01281[8]-01283[4] ("critically important tool"). Implant surgeons use back-telemetry to verify that electrodes are working and electricity is flowing correctly before closing up patients. A01200[24]-01202[22]; A01206[9-15]; A01209[16-22]; A01341[22]-01343[17]. Audiologists use back-telemetry to verify that electrodes are connected and functioning, and to fine tune performance. A01343-01344; A01419[19]-01425[5]; A01428[22]-01432[12]; A01213[17]-01214[17]. Doctors uniformly testified that they would never recommend or implant a device without back-telemetry. A01282[6-7]; A01425[3-5].

Per the co-inventor, electrode functionality is tested by determining "impedance":

> [I]mpedance is a measure of how well something conducts electricity. High impedance means it doesn't conduct very well; low impedance

8

means it conducts well. And it's one of the things you want to know about an electrode in one of these systems. You want to know is that electrode making contact with the body. Is it in fluid? If it is, then the impedance will be moderate. Is it in air? Then the impedance will be very high, and it means the current can't flow. And if it's really low, it might be shorted to another electrode. So those are things you'd want to know about the electrode.

A01383[2-12].

When a doctor wants to know impedance across a pair of electrodes, the

'616 patent's Physician's Tester (or analogous computer software) signals to the

implant to apply a stimulation current. A37387; A01357[18]-01358[21];

A01449[16-24].



*Trial Witness, Dr. Schindler, in surgery using the physician's tester. See* A01283[21]-01284[24]; A40783-40784 (video).

While the stimulation current flows between a pair of electrodes, the implant

measures the voltage between that pair and sends the measurement back via back-

telemetry.  A01354[23]-01346[20]; A01348[6-17];  A01355[22]-01356[22];

A01357[17]-01358[11].  Next, using Ohm's Law, impedance is calculated by

dividing the measured voltage by the current, and then displayed to the user.

A01353[22]-01383[22] (Ohm's Law is "one of the first things you learn as an

electrical engineer"); 616.35.10-15 ("computing an impedance measurement based

on the voltage measured by the monitor means of the ICS and the peak output

current"); A14419; A01449[2]-01450[1]; *see generally* A01346-01359, A01382-

01388.

　　　　The '691 patent is also directed to back-telemetry.  It describes a system that

can target particular features of the implant—like the stimulating electrodes—and

report performance data using back-telemetry.  A01389[15]-1400[22]; *see*

*generally* A01388[24]-1401[24].

　　　　Foundation research is funded by commercializing Foundation patents.

A01598[18]-1599[6]; A01601[7-21].  The Foundation formed Advanced Bionics

to manufacture implants with back-telemetry.  A01180[24]-01183[21]; A01199[6-

18].  It was the exclusive licensee of the patents-in-suit.  A01076-01077; A01085-

01086.  It designed and sold the world's first cochlear implant with back-

telemetry—the Clarion—and began clinical trials in 1991.  A01217[19]-1218[17].

The first six patients implanted in 1991 did "incredibly well" (A01180[25]-

01181[9]) and the Clarion experienced tremendous sales growth following initial commercial release in 1994.  A01224[9]-01227[16].

C.    **Defendant-Appellant–Cochlear Copies The Patented Technology After Failing To Develop Its Own Back-Telemetry**

Cochlear made the Nucleus 22 implant, which the FDA approved in 1985. A01769[25]-01770[8].  It had no back-telemetry.  A01070[19-20]; A01814[13-18]

When Cochlear learned in 1991 of the impending introduction of the Clarion, it faced, by its own admission, "being challenged competitively for the first time"; Cochlear feared losing market leadership and seeing its Nucleus 22 rendered "obsolete."  A14281-14282, A04461-04462; A01824[14]-01827[1]; A01830[6-19]; A01831[23]-01833[5]; A01846[16]-01848[9].  So motivated, Cochlear disseminated falsehoods via a "'marketing position' that the flexibility of the impending Clarion product really implies they don't know what to do"; with this misinformation campaign, Cochlear sought to "steal [Clarion's] thunder completely."[1]  A14281; A04505; A13896-13897; A04515; A01819[6-19].

But Cochlear faced the fundamental problem that its own back-telemetry device was only in "planning stages"; "final design [was] not [yet] agreed." A01824[12]-01826[20]; A01832[23]-01834[8].  Cochlear's internal design

---

[1] A company called MiniMed preceded Advanced Bionics as licensee; Cochlear's initial efforts at thwarting the Clarion were aimed at MiniMed.  A01199[10]-01200[12]; A01182[2]-01185[1].

11

documents show that it aimed to launch a system in January 1993, which would "allow [Cochlear] to release a new system in the same year that MiniMed are expected to gain premarket approval." But such a product never launched. A01832[23-24].

Internally, Cochlear wishfully described back-telemetry as a "future feature" of products planned in 1994. A01841[11]-01844[9]; A04513-04515. In truth, Cochlear launched no back-telemetry product until 1998—four years after the Clarion implant came to market, by which time Cochlear's sales had plummeted. A01070[24-25]; A01844[1-9]; A01848[7-11] ("Q. Did you have any idea as [to] whether or not your sales started to dropped [sic] after the Clarion came on the market? A. Of course they dropped."); A01227[11-16].

When Cochlear finally launched an implant with back-telemetry, its patent infringement started and continued unabated, until the last patent (the '616) expired in 2014. A02318[7-12]; A02310[18]-02311[10]; A01082[18]-01083[6]; A01085[15-18].

### D.    Litigation History

In December 2007, the Foundation sued. A20001-20007. Cochlear counterclaimed. A20060. Two years later the district court dismissed for lack of standing. A00627; A25089. This Court reversed. A25506. Following remand, Advanced Bionics was added as an involuntary plaintiff. A00610-00611.

The Foundation and Advanced Bionics amended the complaint, asserting the '616 patent; the '691 patent was asserted via counterclaims-in-reply to Cochlear's counterclaims.  A25573-25574; A25618-25621.

Special Master Gale Peterson issued a Report and Recommendation ("R&R") on claim construction.  A25684; *see generally* A00426-00606.  The district court sustained the Foundation's single objection to the R&R and rejected Cochlear's objections.  A00599-00601; A26435-26437; A26459.

Cross-motions for summary judgment addressed (1) Cochlear's inequitable conduct defense, (2) the definiteness of the patents' means-plus-function claims, and (3) infringement of claim 10 of the '616 patent.  A26591-26593.[2]

The court denied the cross-motions as to infringement of claim 10 and inequitable conduct, but ordered supplemental briefing to address definiteness and algorithm disclosures related to means-plus-function limitations found in claim 1 of the '616 patent and claims 6 and 7 of the '691 patent.  A26747.  Supplemental briefing ensued.  A26749-26750; A26765-26766; A26790-26791; A26799-26800. The court denied summary judgment as to definiteness, noting that the means-plus-function claims have "microprocessor" structures.  A00373-00374; A00380; A00388.

---

[2] Earlier motions preceded the district court's erroneous standing ruling.  A22417-22419.

13

A six-day jury trial followed, featuring more than a dozen witnesses and hundreds of exhibits. The Foundation adduced overwhelming evidence that Cochlear's accused products infringe claims 1 and 10 of the '616 patent and claims 6 and 7 of the '691 patent, both literally and under the doctrine of equivalents.

The parties presented differing damage calculations. The Foundation's expert, Cate Elsten, applied the *Georgia-Pacific*[3] factors and concluded that, following a hypothetical negotiation, the parties would have agreed to a royalty rate of 7.5% on a sales-royalty base of $1,809,247,456, for total damages of $135,693,559. A01690[4]-01707[16]; A01749[21]-01755[19]. Cochlear's expert, Russell Parr, performed the same analysis using the same sales-royalty base. A02267[19]–02268[4]; A02295[4]-02296[14]. Parr opined that the royalty rate would have been 1.2% for total damages of $21,710,969.[4] A02290[15]-02291[20]; A02297[6]-02298[23].

Each expert's royalty rate remained the same, irrespective of the number of claims or patents found infringed or the fact that the '691 patent expired before the '616. Elsten explained, without differentiating between the patents, that back-telemetry is "must-have" technology (A01752[16-20]) that directly influences

---

[3] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[4] Parr agreed that the apparent discrepancy between his and Elsten's sales-royalty base figures resulted from Elsten updating her numbers with recent data. A02295-02296.

industry market shares.  A01741[1-4]; A01753[18-22].  Parr described the two

patents as back-telemetry inventions.  A02288[4]-02289[14]; A02291[8-12].  He

did not advocate changing the royalty rate if fewer than all claims were found

infringed.

### E.    The Foundation Prevails But The District Court Sets Part Of The Verdict Aside

The jury found that Cochlear willfully infringed all four claims.  A00059-

00068.  The jury also found that the asserted claims were not invalid based on

Cochlear's obviousness and anticipation defenses.  *Id.*  It awarded $131,216,325 in

damages and fixed a 7.5% royalty rate.  A00069.  The verdict form was proposed

by Cochlear and states:  "If you find that the Cochlear Defendants have infringed *a*

valid claim of *either* the '616 patent *or* the '691 patent, what are the total damages

that the Cochlear Defendants should pay to the Foundation?"  *Id.* (emphasis

altered).  Cochlear repeatedly proposed a verdict form soliciting a single royalty

rate.  A30765; A31641-31642; A33846; A33210; *see generally* A30761-30766;

A31635-31643; A33832-33849; A33196-33212.  The Foundation proposed a

verdict that would have required the jury to specify damages by individual claims-

in-suit.  A33793-33794.

A bench trial followed the jury trial and addressed (1) equitable estoppel, (2)

laches, (3) inequitable conduct, (4) prosecution history estoppel, and (5)

indefiniteness.  A00027[1-3].  On March 31, 2015, the court found for the

Foundation on each issue except indefiniteness. A00037-00047. The court declared claims 6 and 7 of the '691 patent and claim 1 of the '616 patent indefinite for lack of sufficient algorithmic disclosures. A00051-00052; A00054-00056. Consequently, the court set aside the infringement verdict except as to claim 10 of the '616 patent.

Also on March 31, 2015, the court addressed Cochlear's post-verdict motions. The court denied JMOL except as to willful infringement, where it determined, contrary to jury findings, that substantial evidence did not satisfy the objective or subjective prongs of the willfulness test. A00023; *see generally* A00007-00024.

The court denied new trial relief except as to damages, ruling that, given "the court's contemporaneous finding of indefiniteness with respect to three of the asserted claims, the court believes that it must grant the motion for new trial." A00023.

## IV.    <u>SUMMARY OF ARGUMENT</u>

1.    The judgment of infringement of claim 10 of the '616 patent should be affirmed. The claim's "displaying" element applies to systems that display impedance as shown in the patent's preferred embodiment (Fig. 6). A claim construction that excludes the preferred embodiment is rarely correct. That principle defeats Cochlear's argument that display of voltage only is required as

does claim 10's language, which requires "displaying" a "processed status indicating signal." 616.36:4-7. The only restriction on the "processed status-indicating signal" is that it "convey[s] information regarding status of the implanted stimulator, including the measurements made within the implanted stimulator." 616:35-67-36:3. Impedance is a disclosed example of a "processed status-indicating signal" and, as the venerable Ohm's Law recognizes, there is a direct relationship between impedance and voltage: displaying a high or low impedance conveys the information that the voltage measurement is correspondingly high or low. Cochlear's own witnesses confirmed this analysis. Claim 10's whereby clause does not narrow the claim so as to require voltage display. The whereby clause was added to describe an intended result and not to distinguish prior art.

2.    Substantial evidence shows Cochlear's products infringed claim 10 both literally and under the doctrine of equivalents. Expert testimony and other evidence confirm infringement. Prosecution history estoppel does not absolve Cochlear because the amendment adding the display limitation of claim 10 was not designed to distinguish display of voltage from display of impedance. Rather, the amendment distinguished the prior art from the invention's display of "real time" status information and addressed the Examiner's objection that claim 10 should "utiliz[e] the processed status indicating signal."

17

3.    Claim 10 was also infringed by Cochlear because that claim does not require that its pair of "tissue-stimulating electrodes" must both be implanted in the cochlea. Cochlear forfeited this argument by failing to present it in district court. Moreover, claim 10's language does not require that both electrodes be implanted in the cochlea. Such a claim construction would exclude a disclosed embodiment showing an extra-cochlear electrode in Fig. 2 as one of a tissue-stimulating pair. The term "pair" does not carry the locational significance Cochlear contends and, even if it did, Cochlear still infringed, because its accused products can operate using intra-cochlear pairs.

4.    The decision setting aside the verdict of infringement as to three means-plus-function claims—on the basis of indefiniteness—must be reversed and the verdict reinstated.

A.    Claims 6 and 7 of the '691 patent are not indefinite because they disclose a logarithmic conversion algorithm that skilled artisans would understand, as the record establishes. Indeed, the district court did not find the algorithm missing, but instead declared indefiniteness based on doubt about where the algorithm would be performed. This was error because skilled artisans would understand that the algorithm is performed in the microprocessor. Compounding these errors, the court misapprehended the law by concluding that the algorithm is indefinite because it leaves some implementation choices to the skilled artisan.

18

B.    Claim 1 of the '616 patent is not indefinite when it contemplates display of impedance.  Cochlear concedes the patent discloses Ohm's Law for computation of impedance.  That disclosure is more than sufficient, even if a skilled artisan had implementation choices.  Moreover, the district court failed to consider all of the patent's corresponding structure, including the Physician's Tester's display of voltage.  That setting requires no special programming or computation.

5.    The district court ordered a new damages and royalty rate trial because it mistakenly thought it was required to do so once it set aside the verdict of infringement as to three claims declared indefinite.  But the damages and royalty rate verdict must be reinstated even if indefiniteness rulings are not reversed.  The verdict instructed the jury to award damages and set a royalty rate for infringement of *any* claim.  The jury's undisturbed verdict of infringement of claim 10 of the '616 patent warrants compensation in the amounts of the damages and the royalty rate set by the verdict.  The competing expert witnesses agreed:  damages and the royalty rate would not change based on the number of claims found infringed.  Moreover, under controlling Ninth Circuit precedent, reviewing courts may uphold general verdicts linked to alternative grounds for liability if one ground was submitted to the jury free of reversible error.  Here, the damage and royalty rate

verdict rests on claim 10 infringement.  Furthermore, Cochlear cannot object to reinstating that verdict because it proposed the general verdict form used.

6.    JMOL was erroneously granted as to willful infringement of claim 10 of the '616 patent.  Cochlear's voltage versus impedance display defense contradicts claim 10's language and Figure 6's preferred embodiment.  It was not an objectively reasonable defense, as confirmed by Cochlear witnesses who undermined the defense's premise that display of impedance conveys no voltage information.  The jury also had substantial evidence of Cochlear's subjectively willful misconduct.  Cochlear copied patented technology and disseminated misinformation about competing implants.  Once made aware of the '616 patent, Cochlear interposed pre-litigation defenses that were wholly lacking in any arguable relevance to claim 10.  Cochlear inadequately investigated the Foundation's patent rights.  These and other factors warrant reinstatement of the willfulness verdict.

## V.    <u>ARGUMENT</u>

### A.    <u>Standards Of Review</u>

"Infringement is a question of fact, reviewed for substantial evidence when tried to a jury." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1310 (Fed.Cir. 2009).  "In reviewing questions of claim construction," this Court "review[s] underlying factual determinations for clear error and ultimate determinations de

novo." *Cadence Pharms., Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1368 (Fed.Cir. 2015). Prosecution history estoppel is a legal question subject to *de novo* review. *Cybor Corp. v. FAS Techs. Inc.*, 138 F.3d 1448, 1460 (Fed.Cir. 1998).

JMOL decisions are reviewed under regional circuit law. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed.Cir. 2012). The Ninth Circuit reviews JMOL rulings de novo. *Saman v. Robbins*, 173 F.3d 1150, 1154 (9th Cir. 1999).

Indefiniteness determinations are reviewed de novo. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed.Cir. 2014). "[I]f the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed.Cir. 2015). "[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharmaceuticals USA v. Sandoz, Inc.*, 135 S.Ct. 834, 841 (2015). "[W]hen the district court looks beyond the intrinsic evidence and consults extrinsic evidence, for example to understand the relevant science, these subsidiary fact findings are reviewed for clear error." *Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1153 (Fed.Cir. 2015).

"[W]illfulness has long been treated as a question of fact." *Bard Peripheral Vascular, Inc. v. W.L. Gore Associates*, 682 F.3d 1003, 1006 (Fed.Cir. 2012). The subjective part of willfulness is fact-dependent and reviewed for clear error. The standard for the objective part is in doubt. *Stryker Corp v. Zimmer, Inc.*, 782 F.3d 649, 661 & n.6 (Fed.Cir. 2015). While this Court has articulated a de novo standard, *Bard*, 682 F.3d at 1007, subsequent Supreme Court decisions emphasize appellate deference to fact-finding. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749 (2014); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.* 134 S.Ct. 1744, 1746 (2014); *Teva*, 135 S.Ct. at 841. Following these decisions, fact finding relevant to the objective prong of willfulness should be reviewed for clear error. *See Halo Electronics, Inc. v. Pulse Electronics, Inc.* 769 F.3d 1371, 1385-86 (Fed.Cir. 2014) (O'Malley, J., with Hughes, J., concurring) (noting need to reexamine de novo review).

The party who proposed a verdict form may not object on the basis that some other form would have been preferable. *Yeti by Molly, Ltd. v. Deckers Outdoor*, 259 F.3d 1101, 1109-10 (9th Cir. 2001). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

### B.    Response To Cochlear's Appeal:  The Infringement Verdict For Claim 10 Of The '616 Patent Should Stand

Overwhelming evidence establishes that Cochlear infringed the

Foundation's patents, including inculpatory Cochlear documents and telling

concessions by Cochlear's 30(b)(6) and expert witnesses.

To counter its infringement, Cochlear seeks aggressively narrow

constructions of claim 10 of the '616 patent—constructions that would exclude

significant features of the preferred embodiment. The district court properly

rejected Cochlear's gambit, found substantial evidence of infringement, and

rejected Cochlear's argument that prosecution history estoppel undermines the

finding of infringement under the doctrine of equivalents. The infringement

judgment merits affirmance.

## 1.    Claim 10 Is Not Limited To Display Of Voltage

Cochlear admits that its "accused systems measure a voltage" and "use that

voltage in combination with stimulation current to calculate electrode impedance

for display." AOB–35. By these admissions, Cochlear concedes infringement of

the "displaying" limitation under the district court's construction of claim 10. To

escape its infringement, Cochlear asks this Court to restrict claim 10's "displaying"

limitation to display of voltage only, excluding display of impedance. *Id.* But the

'616 patent depicts and describes the invention as displaying impedance, and claim

10's language confirms that display of impedance conveys all of the information

required.

### a.    The '616 Patent's Preferred Embodiment And Claim 10's Plain Language Address Display Of Impedance

The '616 patent specification describes display of impedance as a central aspect of the invention. Figure 6 is the only disclosed embodiment of the Physician's Tester. It depicts display of impedance as the processed status-indicating signal envisioned by claim 10:



A00816[Fig.6]. As the figure shows and the patent explains in Table 7, "Control Knob 308" has three "Z" settings dedicated to the display of impedance.

24

616.33:25-55.  The '616 patent specification expressly teaches how to process the

voltage measured in the implant to determine and display impedance:

> …the resulting voltage drop across the resistors [is] measured and
> transmitted back to the WP as an index of stimulus current. Thus, in
> the monopolar mode, both the stimulus voltage and current can be
> measured, and thereby, the impedance of the electrode and the tissue
> electrode interface can be measured…

616.31:52-58.

The '616 patent explicitly claims "computing an impedance measurement

based on the voltage and current measured by the monitor means of the ICS."

616.35:10-15 (claim 5); *see also* 616.35:16-27 (claim 6).  Dependent claims 5 and

6 narrow broader claim 1 to the display of impedance.  Much like claim 10, claim

1 broadly recites "measur[ing] a voltage associated with a pair of electrodes,"

"generating stimulator status-indicating signals," "processing the status-indicating

signals," and "displaying the information derived from the status-indicating

signals."  616.34:24-61.  Cochlear has never contested that "displaying information

derived from the status indicating signals" in claim 1 covers displaying impedance.

In light of these teachings, Cochlear concedes that the only disclosed

embodiment—Figure 6's Physician's Tester—includes "displaying impedance."

AOB–37.  Yet, Cochlear mystifyingly contends that the display of impedance in

"Fig. 6 simply reflects aspects of the specification that are not found in claim 10."

AOB–37.

In seeking to narrow the claim, Cochlear disregards this Court's oft-quoted directive that the specification "is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed.Cir. 2005) (en banc). This Court has expressed deep skepticism about aggressively narrowing constructions that would exclude aspects of the patent's only embodiment. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed.Cir. 2010) ("A claim construction that excludes the preferred embodiment is 'rarely, if ever, correct and would require highly persuasive evidentiary support.'"). Guided by the specification, claim 10 can only be understood as encompassing display of impedance. *Funai Elec. Co. Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1371 (Fed.Cir. 2010) (declining to require junction point to lie between erasing heads when patent figure shows point located elsewhere).

Claim 10's language clearly reads on the preferred embodiment's display of impedance. While the claim requires "selectively monitoring" a pair of electrodes "to measure a voltage associated therewith," claim 10 only requires "displaying" a "processed status-indicating signal," a disclosed example of which is impedance. 616.36:4-7. Specifically, claim 10 starts with a measured voltage, but then "generat[es] stimulator status-indicating signals representative of the measurements." 616.35:60-63. This "representative" status-indicating signal is then transmitted to an external receiver for further "processing … to produce

processed status-indicating signals." 616.35:66-67.  The only restriction placed on the nature of the "processed status-indicating signal" is that it must "convey information regarding status of the implanted stimulator, including the measurements made within the implanted stimulator." 616.35:67–36:3. Impedance is an example of a processed status-indicating signal provided by the '616 patent.

Cochlear argues that the "processed status-indicating signal" of impedance does not convey information regarding the status of the implanted stimulator that includes the measurements made within the implanted stimulator.  Wrong. Impedance and voltage are directly proportional values related by Ohm's Law. A01383[13-18] ("And you take the voltage, divide it by the current, and you get impedance.  **And that's called Ohm's law**.").

Displaying a high impedance value conveys the information that the voltage measured in the implant is higher than expected, indicating a potential open circuit. A01382[22]-01383[22] ("[h]igh impedance means it doesn't conduct very well"); A01469[1-19] ("if the impedance is very high, you know that you got a high voltage").  Displaying a low impedance value conveys the information that the voltage measured in the implant is lower than expected, indicating a potential short circuit.  A01382[22]-01383[22] ("low impedance means it conducts well"); A01469[1-19] ("[i]f the impedance is very low, you know the voltage is low");

27

A01354[21]-013455[12]; A01295[15]-01296[17]; A01420[11-19]; A04695-04696.

Nothing in claim 10 suggests that any additional information needs to be

conveyed—like an exact voltage measurement. And nothing justifies reading the

preferred embodiment of displaying impedance out of the claim.

Cochlear's 30(b)(6) witness, Nygard, agreed that impedance conveys

information about voltage measurements:

> Q … **how would you, as an audiologist or a clinician, see the data results from voltage telemetry**? ***
>
> A **One example that we just discussed was calculation of electrode impedance.**

A01471[2-10], A24015. Cochlear has admitted that measured voltage data results

are revealed by displayed "electrode impedance." A24016; *see also* A24016

("**Impedance measurement is a result of using voltage telemetry**.") This same

Cochlear witness explained that "data that is obtained from measuring the voltage

on electrodes" is "displayed on a screen" in the form of impedance:

> Q And how is that data displayed? Is it displayed on a PC screen?
>
> * * *
>
> **Q The data that is obtained from measuring the voltage on electrodes?**
>
> **A Yeah, that is displayed on a screen**, on a --
>
> * * *
>
> A Just to clarify what I said before. **What we measure is not impedance, it is voltage. So the impedance was calculated from that**.

Q Okay. And the impedance is a proxy for the voltage; correct?

* * *

Q The impedance is a representative of the voltage by means of an equation; correct?

A The impedance is calculated by Ohm's Law (phonetic), yeah.

A24018[10]-24019[8].

Even Cochlear's technical expert, Dr. Loeb, confirmed that displaying impedance calculated from voltage measurements conveys information about implant status. In explaining that claim 1 covers displaying impedance, Loeb said that "as we know from multiple previous witnesses, impedance is information that provides something about the status of the implanted system, Ohm's Law and all that sort of thing we were talking about. This would be information about the status that's being displayed for the user." A02050[14-18]. Loeb testified that the display of impedance in a prior art tester <u>met</u> the claim 1 "display" limitation.



A41048; A02050[11-13] ("Borkan's showed an actual sketch of what the physician's testing system would look like, and one of the items that is shown displayed here is impedance.").

These admissions are dispositive. Arguments by Cochlear's attorneys cannot supplant on-point testimony by Cochlear's technical witnesses. AOB–45-46 (attempting to explain away Cochlear witness Nygard's testimony).

If claim 10 were intended to cover only display of voltage, the claim language makes little sense. Why require converting the measured voltage first into a "representative" "status-indicating signal" and then further processing that signal into a "processed status indicating signal" if the intent was to require display of the originally measured voltage? If the exact voltage measurement must be displayed, why merely require that the displayed value "convey information" about

the implant status and measured value?  Cochlear's construction requires a

suspension of common sense, rendering superfluous much of claim 10.

> **b.    The District Court Correctly Held The "Whereby" Clause Neither Limits Claim 10 Nor Requires Display Of Voltage**

A "whereby" or "wherein" clause that states results inherent from other

positively recited elements adds no patentable significance to the infringement or

validity analysis.  *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed.Cir. 2005).

Per the district court, "while it is clear that the 'displaying' claim term was material

to patentability, the **'whereby' clause was not**…[and] [a]s such, the disputed

language is not itself a separate limitation."  A26437; A00013[18-20].

Cochlear parries based on several flawed premises.  For example, contrary to

Cochlear's supposition, claim 10's "displaying" limitation does not require display

of measured voltage and the whereby clause adds no such requirement:

> **[T]he whereby clause** – making known "the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator" – **merely provides a more illustrative expression of the "displaying the processed status-indicating signals" limitation [and] provides no additional restrictions** to the claim's already-existing requirement that the signals obtained by the testing of the implanted stimulator must be displayed for view by the physician.

A26436.

Cochlear mistakenly relies on inapposite precedent because, unlike here, the

patent applicants in Cochlear's cited cases relied on "whereby" or "wherein"

clauses to give meaning to claims or to distinguish prior art.  AOB–39-40;

*Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed.Cir. 2002) ("assaying" meaningless

without "wherein" clause); *Desenberg v. Google*, 392 Fed. Appx. 868, 871

(Fed.Cir. 2010) ("wherein" clause condition of patentability).

In contrast, the district court relied on analogous cases where, as here, the

"whereby" limitation merely expressed an intended result and was not relevant to

patentability.  A26436 (citing *Minton v. Nat'l Ass'n of Securities Dealers, Inc*., 336

F.3d 1373, 1381 (Fed.Cir. 2003) ("traded efficiently" did not provide mechanics of

how trades are executed but expressed intended result); *Texas Instruments Inc. v.

U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (Fed.Cir. 1993) ("whereby"

expressed intended result)).

Moreover, even if the whereby clause limited claim 10, it does not require

display of voltage.  Cochlear misreads the prosecution history, arguing that "AMF

amended this claim to specify that the particular measurements include voltage and

that the voltage is available for display, i.e., 'may be made known.'"  AOB–38.

Not so.  The amendment adding the displaying limitation did not require displaying

electrode voltage in voltage form.  Rather, the applicant distinguished pacemaker

prior art—that gathered data over time for future use—from the claimed

invention's ability to display "real-time data."  A15843-15844.  As the district

court explained:

AMF did not emphasize or even refer to the whereby clause in making clear to the Patent Office that it was amending the claim to distinguish its invention from a pacemaker. Instead, it noted the *displaying capability* of its invention. AMF stated that its invention was novel because rather than downloading histogram data that has accumulated in the invention over a period of time (the technology employed in an implantable pacemaker), its invention deals with a physician's tester that measures signals in real time, which are "sent back to the physician's tester as part of a feedback signal" where they are "displayed or otherwise processed." (PPH, Dkt. No. 60-20, at B-279). Likewise, the Patent Examiner did not emphasize the measuring and displaying of the electrode voltage *in voltage form.* Rather, the Patent Examiner focused on the fact that this invention, as opposed to a pacemaker, allowed for a *display* of the data measurements that are taken in real time.

A26437.

Contrary to Cochlear's argument, the Special Master did not determine that the "'whereby' clause requires the display of voltage measurements." AOB–39; A00598-00599. Instead, the Special Master determined that the specific language "the results of the measurements made within the implanted stimulator" "*refers* to the voltage measurement across the pair of tissue-stimulating electrodes." A00599. In other words, the "whereby" clause further illustrates the requirement that the display of the "processed status-indicating signals" conveys information about the voltage measurement. Consistent with the Special Master's findings, the display of a high or low impedance value makes known that the result of the voltage measurement was correspondingly high or low.

Indeed, the whereby clause is clear that it covers the display of impedance because it requires only that the "results of the measurement are made known," not the actual measurements themselves. This is not a "distinction without a difference." AOB–42. The "result" of the voltage measurement is the discovery of high or low impedance between the electrodes, indicating the status of the electrodes in the implant. Displaying impedance makes these "results" known, regardless of whether the exact voltage measurement is displayed. Here again, Cochlear's construction renders the words "results of" superfluous, effectively writing them out of the claim.

## 2. Substantial Evidence Established That Cochlear Infringed Claim 10

The district court found "substantial evidence that the steps of claim 10 were performed" (A00015)[21-22], and "more than sufficient evidence for 'a reasonable mind [to] accept as adequate to support a conclusion' of direct infringement," (A00016)[12-13]. *See* A00017-00018; *see also* A01905[6-11]; A01420, 01430, 01436; A01433[14-25]; A01422[20-25]; A01432-01434; A41153; A41430; A01411[6-9]; *see generally* A14717-01439; A41130-41195; A41267-41345. Cochlear fails to show otherwise.

### a. Cochlear Literally Infringes Claim 10

Cochlear admits that its accused products display impedance based on voltage measured between selected electrodes. AOB–35, 43. That admission

concedes literal infringement of claim 10.

Foundation expert Dr. Young testified that "displaying occurred in the accused products."[5]  A01466[24]-01467[4]; *see* A01467[5]-[24]; *see generally* A01466[18]-01473[1].  Specifically, Cochlear's infringing systems measure voltage and display the results of those measurements as impedance, which is calculated by dividing voltage measurements by currents, pursuant to the well-known Ohm's Law.

### 3.4.1 Calculating Impedance

Finally, the impedance is calculated according to Ohms law starting from the electrode voltage and the stimulation current converted to Ampere.

A04693; *see* A04689-04690; *see generally* A04686-04696.  Young cited several Cochlear documents showing impedance displayed by Cochlear's products, A01467[5]-01468[7]; A04899; A40853-40855; A04698–04699, as well as screenshots of accused software showing impedance measurements displayed graphically—as red-or-green colored electrodes (ECE1 and E1)—and numerically, in a table (kOhm):

---

[5] At trial, Cochlear only disputed infringement of the "displaying" limitation of claim 10.



A01467[5-18]; A04698-04699; A40855.

Dr. Stickney, an audiologist, explained that when one clicks "measure" on accused Cochlear systems, thereby initiating the impedance test, the screen graphically displays impedance measurements for electrodes using color codes. A04698-04699; A01430[1]-01432[12].

Cochlear documents confirm that color codes correspond to measured impedance values: green means impedance is in an acceptable range; red means impedance is too high or too low. *See* A05000, A04689, A04695; *see also*

A41197, A41226, A41131, A41153-41154, A04960-04965, A04998-05002,

A41267-41268, A41289.  System user manuals explain that "electrodes for which

successful impedance measurements were obtained in all stimulation modes

display in green."  A05000; *see* A04998-05002; *see also* A04960-04961, A04998-

05002.

Cochlear argues that it does not literally infringe the "displaying" limitation

because "Ohm's [L]aw cannot 'make known' voltage information to an operator,

as required by claim 10, unless the operator also knows the stimulation current

used to measure and calculate the impedance value."  AOB–44.  Wrong.

Claim 10 only requires the display of processed status-indicating signals that

convey information about the measurement.  Cochlear's system displays

impedance and thereby conveys information about voltage measurements.

A04689; A04693; A04695; A04686-04696; A02372[15]-02373[22]; A04698-

04701; A01466[24]-01467[24]; A04960-04961, A04998-05002.

Even if more specific information about voltage measurements were

required, substantial evidence shows Cochlear systems still infringed.  Cochlear's

accused systems test the status of implants by measuring voltage while applying a

pre-defined current value.  Cochlear admits that this fixed stimulation current and

impedance display can be used to ascertain voltage.  But Cochlear contends that

system users have no information about the stimulation currents applied and that

37

"as its only support for concluding that an operator 'knows' the stimulation current, [the Foundation] pointed [at trial] to an internal, confidential Cochlear design document that describes the implementation of those measurements." AOB–44.  Cochlear elaborates "that an engineer at Cochlear could view a 'Company Confidential' document and determine the stimulation current is irrelevant to the 'displaying' limitation in claim 10, which is focused on what *users* of the accused systems would know about voltage without knowing the stimulation current."[6]  AOB–45.  Wrong again.

Cochlear's allegedly confidential design manual is not the only evidence that the stimulation current is fixed and users were given information on the current level used in testing.  While performing an impedance test using an accused Cochlear system, Dr. Stickney saw a screenshot showing the "Current Level" fixed at 80 (red):

---

[6] Cochlear directly infringes claim 10, in part, because Cochlear's own technicians perform the method of the claim.  A00015[26]-00016[15]; A01411[6-9]; A01432[13]-01433[25]; A01905[6-11]; A01913[1]-0194[20]; A39897-39975; *see generally* A01422-01433; A04998-05003; A39110-39118; A39136-39137; A39087-39152.  At least these Cochlear employees knew the current levels applied and, consequently, knew the exact voltage measurements.



A04700; A01425[9-15]; *see generally* A01431[13]-01432[6]; A04697–04708.

Accordingly, even if knowledge of the current were required to infringe claim 10, the Foundation provided substantial evidence that system users other than Cochlear employees have such information.

Cochlear claims Dr. Young "agreed" that "when displaying only impedance values, without knowing the current used to generate those values, 'you just have to guess what the [voltage] is. A1587[18-22].'" AOB–45. This argument mischaracterizes Young's testimony.[7] He testified that it is unnecessary for the operator to know the exact current value because it is **fixed** in Cochlear's product:

> Q. If, if you know impedance alone, that's all you know, you cannot tell what the voltage is, can you?
>
> A. As I said in my testimony this morning, given a well-defined relationship, knowing two parameters you know the third parameter; but if you just know one parameter, you cannot know the other two. But in the case we're discussing here, if you know the impedance, the current must be normal, why? **You set the current. You defined the current for stimulation so you know two parameters already, therefore the third parameters of the voltage will automatically follow the equation**.

A01587[7-17]. Moreover, Dr. Young's review of Cochlear's documents confirmed that "the current used for the impedance measurement are well defined." A02374[11-12]; *see also* A02373[23]-0274[12]. Substantial evidence supports the infringement verdict.

---

[7] In responding to Cochlear's "general" hypothetical question regarding Ohm's Law—not about accused products—Young explained that if only one parameter of the Ohm's Law equation is known, you would have to guess the other parameter. A1587[18-22]. That is different from the situation here, which involves Cochlear's implants operating within well-known parameters with fixed levels of current used for testing.

**b.    Prosecution History Estoppel Does Not Save Cochlear From Infringement By Equivalents**

The district court found sufficient evidence to support the jury's verdict of infringement not only literally, but under the doctrine of equivalents ("DOE"). A00017[24]-00018[3].  Cochlear does not dispute that its systems' display of impedance is insubstantially different from claim 10's "display" limitation.  Thus, Cochlear has not challenged on appeal the determination that its accused system infringes claim 10 based on an application of the tripartite function/way/result test. To skirt culpability, Cochlear misreads the prosecution history and contends that estoppel, based on claim amendments, renders DOE inapplicable.  The district court properly rejected this argument:  the reasons for amendments adding the display limitation were tangential to the equivalent at issue here.  A00043-00047 [¶¶ 59-66].

When a claim is amended during prosecution for reasons related to patentability, a presumption arises that the excluded subject matter falls outside the scope of equivalents.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740 (2002) ("*Festo II*").  This "*Festo* presumption" can be "overcome" when "the 'rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question.'"  *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed.Cir. 2006).  The inquiry focuses on "the patentee's objectively apparent reason for the narrowing amendment," which

41

"should be discernible from the prosecution history record." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1369 (Fed.Cir. 2003) ("*Festo III*"). "The scope of the estoppel must fit the nature of the narrowing amendment." *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed.Cir. 2010).

Claim amendments here were unrelated to whether displaying impedance is equivalent to displaying voltage. Applicants amended to require "measuring voltage" in order to overcome the Examiner's objection that the "alternative phrase 'voltages/current'" was indefinite in the "selectively monitoring" limitation. It is not disputed that Cochlear literally infringes this voltage measurement requirement in the "selectively monitoring" limitation. Applicants added the separate "displaying" limitation to overcome the Examiner's objection about the "absence of a step utilizing the processed status indicating signal." A15745 (indefiniteness objection to application claim 12); A15834-15835 (amendment to application claim 12); A15841 ("By way of the present amendment, Applicants have made a diligent effort to address each and every one of the definiteness concerns raised by the Examiner.").

The objectively apparent reasons for these distinct amendments were to address the Examiner's definiteness concerns and not, as Cochlear contends, "to narrow the scope to displaying voltage measurements." AOB–51. Claim 10 says nothing about displaying voltage. If the reason for the amendment was to require

42

display of voltage, the claim would have been amended to recite this requirement.

As the district court recognized, applicants relied on the display limitation to distinguish prior art, not based on voltage or impedance, but based on the invention providing "a 'snapshot,' in real time, of the selected parameter at the electrodes." A15844 ("Advantageously, such real-time data is what the physician needs in order to properly test the ICS, giving him or her … a real time look at the 'output.'"); A00033. The district court noted that this "'display[ ]' of parameters 'in real time,' distinguish[es] the cited pacemaker" prior art that downloaded data "accumulated…over a period of time." A00033. "Hence, because neither van Arragon et al. nor Hafelfinger et al. provide an ability to perform real-time testing of a non-pacemaker implant in the manner set forth in the amended claims, it is submitted that this rejection has been overcome." A15844.

Having never distinguished the invention from prior art based on *what* is displayed, the objectively apparent reason for the amendment is merely tangential to whether displaying impedance is equivalent to displaying voltage. *Regents of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1376 (Fed.Cir. 2008); *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1369 (Fed.Cir. 2010); A00044-47 [¶¶ 63-64, 66].

Finding no support for its estoppel theory in the Examiner's rejections or applicants' remarks, Cochlear resorts to a "camouflaged" invalidity attack, arguing

that "prior art at issue during prosecution does not support the district court's holding." AOB–52. But Cochlear has not appealed the judgment upholding claim 10 as valid. Cochlear never even argued invalidity at trial based on the prior art alleged to give rise to the estoppel. This Court has warned:

> Where validity in view of the prior art has not been challenged, the court is less free to limit the application of the doctrine of equivalents than where invalidity is specifically urged by the alleged infringer.

*Thomas & Betts Corp. v. Litton Systems*, 720 F.2d 1572, 1580 (Fed.Cir. 1983).

To determine the scope of surrendered equivalents, "[a] district court must look to the specifics of the amendment and the rejection that provoked the amendment." *Intervet*, 617 F.3d at 1291. Discerning an "objectively apparent reason" for a narrowing amendment does not call upon this Court to *reinterpret* prior art cited during prosecution or decide whether the Court agrees with the Examiner's stated reasons for rejection or the applicants' arguments in response. AOB–52-53. There is no basis to impose an estoppel on the Foundation here.

### 3.    Claim 10 Is Not Limited To "Intra-cochlear" Electrodes

Cochlear also disputes infringement of claim 10 on the basis that "the district court erred in construing the term 'one pair of the multiplicity of tissue stimulating electrodes' as including an indifferent or extracochlear electrode." AOB–54. Cochlear is again wrong.

Cochlear originally argued that the term "tissue-stimulating electrodes" in independent claims 1, 10, and 12 of the '616 patent means "electrodes implanted within cochlea (intra-cochlear electrodes) for stimulating tissue." A21047. The Special Master refused to read "intra-cochlear" into the claims, adopting the Foundation's definition: "electrodes used in stimulating tissue." A00516. Cochlear objected to this construction for system claims 1 and 12, but not for method claim 10 at issue here. A26142. Consequently, the district court addressed only the interpretation of "tissue-stimulating electrodes" in claims 1 and 12. A26452-26453.[8]

Thereafter, Cochlear never hinted before this appeal that the term "pair" was defined in the '616 patent to mean "intra-cochlear pair." Nor did it rely on the lone passage in the specification that is now the centerpiece of its "intra-cochlear" construction. Consequently, Cochlear's "intra-cochlear" interpretation of claim 10 was forfeited for appeal because Cochlear presented no such argument to the district court. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed.Cir. 2013).

Cochlear's "intra-cochlear" construction also fails for reasons given by the Special Master as to claim 10, and by the district court when it addressed claims 1

---

[8] Although "tissue stimulating electrode" appears in a longer disputed phrase the district court addressed, that dispute is unrelated to the location of the "tissue stimulating electrode." A26143-26144.

45

and 12.  The phrase "tissue-stimulating electrodes" in claim 12 refers to "electrodes used in stimulating tissue" without requiring any electrode *location*. A00416-00417.  Additionally, as *Cochlear conceded* at the *Markman* hearing, "one of the disclosed embodiments includes a non-intracochlear electrode to which stimulation signals are applied."  A00416-00417; A03051[2-7].  Figure 2 depicts both intra-cochlear electrodes 48 and extra-cochlear "indifferent electrode 49." A00804[Fig. 2].  The specification describes passing current between the indifferent electrode and one of the intra-cochlear electrodes 48 to stimulate the cochlear tissue.  616.6:4-6.  Thus, the district court properly found that "adopting Cochlear's proposed construction would exclude a disclosed embodiment…." A26453 (citing *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) (noting strong presumption against doing so).

Furthermore, the disputed phrase is "tissue stimulating," not cochlea-stimulating electrodes.  Per the Special Master, "the specification does not require that all electrodes be implanted in the cochlea, and suggests that other types of tissue may be stimulated by other implanted devices."  A00516; 616.33:62-66.

Cochlear's focus on its new, electrode-location theory effectively concedes the weakness of its trial court arguments, but does not address the trial court's findings or analysis.  AOB–54-55.  Specifically, Cochlear incorrectly interprets a single sentence in the '616 patent specification as re-defining the term "pair": "The

switches allow the current source FET 62 and storage capacitors 60 to be

connected to pairs of electrodes (bipolar mode) or, alternatively, to individual

electrodes and the indifferent electrode 49 via the indifferent electrode switches

92." 616.9:63-67; AOB–54.  Properly read, this passage simply notes that switches

allow "current source FET 62 and capacitors 60" to be connected to more than one

pair of electrodes, *i.e.*, either two intra-cochlear electrodes or one intra-cochlear

electrode and an indifferent electrode.[9]

Nor is "pair" a term of art.  When current is sent between the "indifferent

electrode 49" and one of the intra-cochlear electrodes to stimulate the cochlea, as

in the preferred embodiment, this is obviously applying a stimulation signal to a

"pair" of electrodes.  Cochlear's own documents show that a "pair" of electrodes

may include an indifferent electrode.  A41268, A41286 ("Electrical stimulation

produces current flow between an active (stimulated) and indifferent (reference)

electrode.  A pair of electrodes forms a channel of stimulation.").

Indeed, contrary to Cochlear's contentions, the specification uses the term

"pair" regardless of electrode type or location.  For example, it recites a "need for

---

[9] Contrary to Cochlear's contention, "extrinsic evidence" does not support
Cochlear's narrow construction of the term "pair of electrodes."  AOB–55-56.  The
'590 patent cited by Cochlear teaches that electrode pairs are not limited to intra-
cochlear electrodes.  A40981[Col. 3 Ln. 60-64] ("The number and location of the
electrode pairs are not intended to be limited by the numbers and locations shown
in FIG. 2. In practice, fewer or additional electrode pairs and different electrode
pair locations may be satisfactory.").

an improved multi-channel tissue stimulator system … [having] complete isolation of its electrode *pair channel*" (616.2:62-67).  In the Summary of the Invention, the patent says "*each channel* in the ICS includes … means for selectively driving the *electrodes as unipolar or bipolar electrodes*." 616.3:40-46.  Here, "unipolar" refers to a pair channel including an indifferent electrode and one of the intra-cochlear electrodes.  The specification elaborates: "[i]n the ICS 12 illustrated in FIG. 2, the current sources 62 are floating" (616.8:56-57), explaining that "[t]he importance of such floating current sources in the ICS 12 is to enable the ICS 12 to stimulate *pairs of electrodes* independent of the current flow in other pairs of electrodes and independent from the main power supply."  616.9:2-6; *see also* 616.34:2-8.  Use of the terms "pair channel" and "pairs of electrodes" to refer to both intra-cochlear and extra-cochlear electrodes refutes Cochlear's special definition of "pair."  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning" but "[a]n accused infringer may overcome this 'heavy presumption' and narrow a claim term . . .  if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.")

Cochlear says claim 10 was amended to recite "at least one pair of the multiplicity of" tissue-stimulating electrodes.  But Cochlear does not explain how

48

this supports its construction.  AOB–55.  Nothing in the amendment or prosecution

history shows exclusion of pairs comprising one intra-cochlear and one extra-

cochlear electrode.

Finally, Cochlear infringes under either construction.  All of the accused

products are capable of operating in "bipolar mode" using intra-cochlear pairs.

A01864[3-12]; A39916, 39918-39919; A04998; A39110-39111; A39174-39175.

Thus, even if this Court alters the term's construction, the existing judgment of

claim 10 infringement should remain undisturbed.

### C.    Cross-Appeal:  The Asserted Claims Are Not Indefinite

A patent "shall conclude with one or more claims particularly pointing out

and distinctly claiming the subject matter which the inventor or a joint inventor

regards as the invention."  35 U.S.C. §112(b).  "For computer-implemented means-

plus-function claims where the disclosed structure is a computer programmed to

implement an algorithm, 'the disclosed structure is not the general purpose

computer, but rather the special purpose computer programmed to perform the

disclosed algorithm.'"  *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340

(Fed.Cir. 2008).  A finding of indefiniteness requires clear and convincing

evidence.  *Intel Corp. v. VIA Techs., Inc*., 319 F.3d 1357, 1366 (Fed.Cir. 2003).

The district court declared indefinite claims 6 and 7 of the '691 patent, and

claim 1 of the '616 patent.  But unlike most indefiniteness cases affirmed by this

49

Court, the district court here found the '691 patent claims indefinite despite

acknowledging inherent disclosure of the required algorithm.  In declaring

indefiniteness, the court contradicted prior claim construction rulings, failed to

view the patents from the perspective of one skilled in the art, and erroneously

demanded of the specification extensive detail about well-known and

commonplace algorithms that one skilled in the art would recognize as inherent.

The indefiniteness rulings warrant reversal.

### 1.   The '691 Claims Are Not Indefinite

#### a.   The '691 Patent Discloses A Logarithmic Conversion Algorithm For "Generating Data Indicative Of The Audio Signal"

To determine whether a claim is definite, this Court evaluates whether one

skilled in the art would understand what algorithm is required based on a reading

of the patent.  *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d

1236, 1240 (Fed.Cir. 2007).  "Such an 'algorithm' may be expressed 'in any

understandable terms including as a mathematical formula, in prose, or as a flow

chart, or in any other manner that provides sufficient structure' to a person of

ordinary skill in the art."  *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,

748 F.3d 1134, 1141 (Fed. Cir. 2014); *Atmel Corp. v. Info. Storage Devices, Inc.*,

198 F.3d 1374, 1382 (Fed.Cir. 1999) ("[K]nowledge of one skilled in the particular

art may be used to understand what structure(s) the specification discloses.").

Here, the '691 patent inherently discloses a logarithmic conversion algorithm performed in the wearable processor because of the express disclosure of the inverse exponential conversion performed in the implanted device. Specifically, the '691 patent discloses that the data from the wearable processor is sent to "EXPONENTIAL D/A CONVERTER 64" in the implant. A00838. Based on this disclosure, Dr. Young testified that the microprocessor in the WP of the '691 patent *necessarily* employs the inverse logarithmic conversion algorithm. A33657-33658[¶¶15-17]; A00838; 691.05:62, 691.06:5-48, 691.06:58; A02592[23]-02593[12]; A02615[25]-02616[2-4].

The necessity of pairing logarithmic and exponential conversions is further disclosed by the amplitude levels used in the disclosed embodiment. A33657-33658[¶16]. The amplitude (volume) information for each channel (tone) is limited to just 255 steps, so the logarithmic and exponential conversions work in tandem to provide a "non-linear mapping" where loudness increases in small steps at lower volume and in "much bigger" steps at higher volume. A01399[14]-01400[2]; *see also* 691.6:6-48 (chart showing preferred embodiment of this mapping); A33658[¶17]; A01398[16-23]. This provides patients with "reasonable increase[s] in loudness levels" throughout their restored hearing range using just "255 steps." A01399[24]-01401[1].

A skilled artisan would also recognize the disclosed logarithmic algorithm because it is commonly used to generate audio data in cochlear implant processors. A33659[¶¶19-21]; A16536-16537; A02616[2]-02617[1].  Logarithmic algorithms are used in the external processors of virtually every cochlear implant, including Cochlear's own.  A33660[¶¶22-23]; A01537[2]-01540[7], A14291, A14295, A14316-18 (describing "mapping formula" in Cochlear's wearable processor, and describing a "conversion from the linear to the logarithmic domain").  Moreover, the patent emphasizes that it was developed "using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system."  691.04:15-19.  The explicitly disclosed and depicted "exponential" conversion tells one skilled in the art that the corresponding, well-known, and commonly used logarithmic conversion must necessarily be employed as well.  *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed.Cir. 2001) ("[P]atent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention.")

Even Cochlear's expert conceded that the WP may generate "the log[arithmic] amplitude" of the audio signal received by the microphone. A02592[23]-02593[2].  When asked "[w]hat in the patent tells you that [it may be

the logarithmic amplitude]?" Dr. Stevenson responded, "[t]he fact that at the other end you want this exponential."  A02593[5-8].

Based on this evidence, the district court found that "it may be necessary for the wearable processor (WP) (Block 16 in Figure 1) in the '691 patent to perform a logarithmic conversion, because the implantable cochlear system includes an exponential D/A converter."  A00054[24]-00055[1].  The factual underpinnings of this finding are entitled to deference.  *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341-42 (Fed.Cir. 2015).

> **b.  The District Court Erred In Finding The Disclosed Algorithm Insufficient Due To Purported Uncertainty About Where The Algorithm Is Performed**

Despite acknowledging disclosure of an algorithm, the district court invalidated the '691 patent because "it has not been established that the logarithmic conversion must take place in the microprocessor (Block 30)."  A00054-00055[¶85].  Cochlear's expert conceded that the logarithmic conversion "could be" in the microprocessor 30 (A02593[9-11]), but argued it is technically possible to implement a logarithmic algorithm in an analog-to-digital ("A-to-D" or "A/D") converter.  A02593[7-8].  This argument ignores the '691 patent disclosures that make clear to a skilled artisan that the algorithm is not implemented in the A/D converter 28, but in microprocessor 30.  Indeed, although Dr. Young admitted the technical feasibility of implementing the algorithm in the A/D converter, he

testified that a skilled artisan would understand that the algorithm is actually implemented in microprocessor 30.  A02615[25]-02617[1]; A33659[¶¶20-21].

The '691 patent discloses that the audio signal is subject to "the general processing of microprocessor 30."  691.04:49-58.  One skilled in the art understands that if the "general processing" of the audio signal occurs in microprocessor 30, any processing algorithm would be performed there as well.  A00461-00462; A02616[13]-02617[1].  In an ordinary cochlear implant, other processing factors that need to be programmed on a patient-by-patient basis—such as "the comfort level and the threshold level the audiologist set[s]"—are implemented in connection with the logarithmic conversion function.  A02616[13]-02617[1].  Thus, it only makes sense to implement the logarithmic conversion in the microprocessor.

Additionally, the '691 patent discloses the operation of "A to D Converter 28."  It does not include a logarithmic conversion.  Specifically, the '691 patent states that "[t]he audio signals are…converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30."  691.4:49-52.  Even Cochlear's expert describes A-to-D converter 28 as operating in this simple way.  A02591[22]-02592[1] ("Q:  If you refer to Figure 1, could you describe for the Court what is inputted into the microprocessor from A-to-D converter 28.  A:  A digital signal that's been filtered and converted with an A-to-D converter.").

The '691 patent's omission of any processing in the A-to-D converter 28—beyond converting an analog signal to digital—is telling because in every instance in the patent where an analog-to-digital converter (or its opposite, digital-to-analog converter) applies a logarithmic or exponential transformation, that conversion is explicitly identified. For example, the patent discloses "exponential D to A converter 64" (691.06:58) to describe a converter that not only converts from digital to analog, but also applies an exponential conversion. A01399[14]-01400[9]. Similarly, when a logarithmic algorithm is implemented in a converter, the patent states so. 691.16:36-39 ("[L]ogarithmic D/A converter section 207 consists of conventional analog and digital circuitry, with the exception of the logarithmic D/A converter subsection."). Thus, when a converter includes more than "conventional" digital or analog conversion circuitry, the patent explicitly discloses such additional "exponential" or "logarithmic" capability. Because the '691 patent describes the A-to-D converter 28 without any reference to performing any algorithm—logarithmic or otherwise—a skilled artisan would understand that it simply converts analog to digital without implementing the logarithmic conversion.

The district court's holding that the logarithmic algorithm may be implemented in the A-to-D converter 28 is a startling reversal of its prior interpretation of this claim limitation. During claim construction, the Special

Master expressly rejected the parties' initial, agreed identification of both the A/D converter 28 and microprocessor 30 as the corresponding structure to the "means for generating data indicative of the audio signal." Instead, the Special Master observed that "the only structure in the signal flow between the microphone and the data transmitter that corresponds to the function of 'generating data indicative of the audio signal' is the microprocessor 30." A00461; *see generally* A00460-00462. The "microprocessor takes those [audio] signals and generates data that is then sent" to the implant—the "specification does not disclose the A/D converter as generating data; rather, the A/D converter simply converts the analog signal into a form that the microprocessor can use." A00462. Thus, the Special Master recognized that A-to-D converter 28 merely converts the analog signal to digital and it is the microprocessor that generates the data indicative of the audio signal.

Cochlear did not object to this determination. With the parties' acquiescence, the district court adopted the Special Master's recommendations. A00423. It is too late for Cochlear to now argue that the A/D converter 28 does more than "simply convert the analog signal into a form the microprocessor can use" and, thus, that it may also implement a logarithmic algorithm for generating data indicative of the audio signal.

Finally, any purported lack of clarity or precision in where the algorithm is performed does not warrant invalidation. The allegedly indefinite limitation is not

related to any novel feature of the claimed invention, but simply refers to the standard operation of conventional prior art cochlear implant systems. *Typhoon Touch Tech. Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (detail needed in specification "depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention"). The novel aspects of the invention relate to sending signals to the implant to monitor selected parameters and returning requested diagnostic information by back-telemetry to the wearable processor for display.

In contrast, the claim limitation found "indefinite" simply refers to the conventional operation of a prior art cochlear implant. As Cochlear concedes, the basic idea of a cochlear implant is to "use a microphone to capture sound, ***a processor to convert that sound into appropriate stimulation pulses***, and then electrodes to apply the simulation to the nerves." AOB–7. Even the specific logarithmic algorithm disclosed in the patent is simply a standard part of prior art. A33659[¶¶19-21]; A02618[20]-02619[6].

To find the patent invalid for want of sufficiently articulating where a standard prior art algorithm is performed—something that is apparent to a skilled artisan—would unfairly deprive the Foundation of the benefits of its breakthrough patent. The '691 patent has profoundly improved the lives of so many patients it would be unjust to strip the Foundation of its invention on such flimsy grounds.

### c. The District Court Erred In Declaring The Disclosed Algorithm Insufficient Merely Because It Can Be Implemented More Than One Way

The district court also deemed disclosure insufficient "because the record demonstrates that there are multiple logarithmic algorithms." A00055-00056[¶86]. This conclusion rests on the erroneous proposition that an algorithm is not sufficiently disclosed simply because it leaves implementation choices to those skilled in the art.

The algorithm disclosure requirement helps avoid purely functional claiming. *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed.Cir. 2013). Consistent with this principle, the instant claim element does not capture every device that "generat[es] data indicative of an audio signal." Instead, a person of ordinary skill understands it to be limited to only those systems that incorporate a logarithmic conversion algorithm. *See In re Dossel*, 115 F.3d 942, 946 (Fed.Cir. 1997) (claim definite where device's function is executed "by mathematical operations including a matrix inversion or pseudo inversion, and then output[]… to a display"). Nothing further is required to make the claims definite. *Id.*; *Finisar*, 523 F.3d at 1341 ("This court does not impose a lofty standard in its indefiniteness cases.")

Cochlear contends that the disclosures are insufficient because the logarithmic conversion could be accomplished with a "lookup table," "power

series," "binary," or other mathematical computation method.  A02617[5]-02618[24]; A00055-00056[¶86].  But such implementation choices may "be properly left to the knowledge of those skilled in the art, and need not be specified in the patent."  *Intel*, 319 F.3d at 1357, 1366-67; *Typhoon Touch*, 659 F.3d at 1385-86 (patent definite despite "concession" that "the mathematical algorithm of the programmer is not included in the specification."); *In re Dossel*, 115 F.3d at 946 (patent definite even though "the written description does not disclose exactly what mathematical algorithm will be used to compute the end result").

This Court has routinely found claims definite even though disclosed algorithms could be implemented several ways.  *AllVoice*, 504 F.3d at 1245; *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (an adequate algorithm "need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan").  An algorithm in a flow chart that could be implemented several ways was sufficiently definite in *AllVoice*.  504 F.3d at 1245.  Another patent claim was definite where the "specification discloses an algorithm for matching the remaining orders on a pro rata basis," but did not provide the particular mathematical formula.  *Chicago Bd.*, 784 F.3d at 1141-42; *see also Intel*. 319 F.3d at 1366-67.

"In this case, [Cochlear] needed to prove, by clear and convincing evidence, that the specification lacks adequate disclosure of structure to be understood by

one skilled in the art as able to perform the recited function." *Intel*, 319 F.3d at 1366. The mere identification of multiple potential implementations of the disclosed algorithm is insufficient to meet this burden. Indeed, the district court appears to have misconstrued the law and misplaced the burden by declaring that the Foundation "has not presented credible evidence that there is only a single algorithm available, *i.e.*, 'a simple logarithmic lookup table.'" A00055[23-25]. There is no legal basis for requiring that there be only one mathematical way to implement the disclosed algorithm, nor was it the Foundation's burden to prove definiteness.

Accordingly, the indefiniteness decision should be reversed as to claims 6 and 7 of the '691 patent.

### 2.    Claim 1 Of The '616 Patent Is Not Indefinite

The district court declared claim 1 of the '616 patent indefinite, holding that the patent failed to disclose an algorithm for "processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes." A00049-00052[¶¶72-74, 79]. The court acknowledged disclosure that the microprocessor "processes" the status-indicating voltage signals to compute impedance, but rejected expert testimony that a skilled artisan would understand the patent to disclose use of Ohm's Law for the computation. A00050-00052[¶¶75, 78]. This conclusion

ignores that "Cochlear does not dispute that the '616 patent describes measuring a voltage and using Ohm's law to calculate an impedance." A26270[17-19].

### a.     The '616 Patent Discloses Use Of Ohm's Law To Calculate Impedance

The parties agreed and the court determined that the '616 patent's "external processor means" includes the microprocessor in the Physician's Tester (depicted in Fig. 6 *supra*) as well as the antenna 17 and telemetry receiver 36. A00437-00438.

When set to display impedance, the Physician's Tester's microprocessor 30 uses Ohm's law to compute impedance based on measured voltage and current. The patent explicitly claims an embodiment of the "Physician's Tester" wherein the processor "comput[es] an impedance measurement based on the <u>voltage</u> measured by the [implant] and the peak output <u>current</u>." 616.35:10-15; *see also* 616.35.16-27. This disclosure tells a skilled artisan that the algorithm used in the processor applies Ohm's Law. *See* A33662[23]-33663[3]. Young confirmed that the patent discloses the impedance-calculating algorithm, including the steps of "(1) accepting from the receiver signals representative of measured voltage, [and] (2) applying Ohm's law to convert the measured voltage or voltage and current into impedance." A33661[¶ 30]; *see also Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc*., 336 F.3d 1308, 1319 (Fed.Cir. 2003) (disclosures evaluated "from the viewpoint of one of skill in the art").

Even Cochlear's expert, Dr. Stevenson, conceded that the microprocessor (1) "reads" the current settings from the controls of the Physician's Tester (A02584[4-22]), and (2) the status indicating signals from the implant are sent to the microprocessor, including "the voltage measurement." A02588[16-18]. The district court acknowledged these facts. A00050[¶75]. Stevenson further conceded that Ohm's Law is known to a person of ordinary skill in the art: it is "fundamental… to anyone working in the field" and is "close to 200 years old." A02585[20]-02586[4]; *see also* A01383[13-22].

Notably, Cochlear admits that the '616 patent discloses "using Ohm's law to calculate impedance." A26270[17-19]. During claim construction briefing, Cochlear wrote:

> AMF is essentially asking the Court to rewrite the claim to cover **the additional step of calculating impedance described in the patent's specification (written description)**. **Cochlear does not dispute that the '616 patent describes measuring a voltage and using Ohm's law to calculate an impedance**. However, those steps are not what claim 10 of the '616 patent requires. **Other claims address impedance**. See e.g. '616 patent claim 6 (**"means for computing impedance"**).

*Id.*

The district court nevertheless held claim 1 invalid for want of "**express** disclosure of an algorithm." A00051[¶76]. This was error. *Typhoon Touch*, 659 F.3d at 1386 (*reversing* indefiniteness ruling where district court put "dispositive weight" on "concession" that algorithmic structure was "not explicitly disclosed").

62

Since the patent details the inputs and outputs of the microprocessor's structure for "processing," this is not a case where the court could dismiss the expert testimony. *See Chicago Bd.* 748 F.3d at 1134; c*f. Noah Systems, Inc. v. Intuit Inc*., 675 F.3d 1302, 1312 (Fed.Cir. 2012) (only a "total absence of structure from the specification" justifies disregarding the testimony of one skilled in the art). It was Cochlear's burden to show, by clear and convincing evidence, that "one skilled in the art would [not] understand the bounds of the claim," *AllVoice*, 504 F.3d at 1240, and the district court was required to evaluate disclosures "from the viewpoint of one of skill in the art." *Intellectual Prop. Dev*., 336 F.3d at 1319. Failure to consider the patent from such a vantage point is grounds for reversal. *Atmel*, 198 F.3d at 1383.

Further, the court improperly invalidated claim 1 on the ground that more than one formula based on Ohm's Law could be used to calculate impedance. A claim is definite as long as a person of ordinary skill would be "reasonably certain" of the claim's scope, understanding that it would embrace various particular implementations. *Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2128 (2014) (acknowledging language will inherently create a "modicum of uncertainty"). As Young explained, Ohm's Law is "fundamental" to the

calculation of impedance even if the "negligible complex[10] portion of the

impedance" is included in the calculation.  A33664-33665[¶41].

> **b.    The District Court Failed To Consider The Voltage Display Embodiment Of "Means For… Processing The Status-Indicating Signals"**

In finding indefiniteness, the district court was required to consider all

corresponding structures.  *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed.Cir.

2000) ("proper application of § 112 ¶ 6 generally reads the claim element to

embrace distinct and alternative described structures for performing the claimed

function"); *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed.Cir. 2002)

("[W]here the specification discloses different alternative embodiments, the claim

is valid even if only one embodiment discloses corresponding structure.").  The

court erred in failing to consider the disclosed embodiment of a Physician's Tester

configured to display voltage.

The '616 patent depicts the Physician's Tester alternatively displaying not

only impedance, but also voltage.  616.32:42-44, 616.33:7-54, Figs. 6 & 7.  To

display voltage, the microprocessor simply receives the measured voltage value

and displays it.  A02614[17-19] ("If you just want to display a parameter, [and]

that parameter is the incoming parameter.  That's just a no-brainer.  You don't

need [an] algorithm."); *see generally* A02613[1]-02614[19].  For such routine

---

[10] "Complex" is used in the mathematical sense involving an "imaginary"
component based on the square root of negative one.

computing tasks, such as "receiving" data, the disclosure of a microprocessor provides sufficient structure for definiteness. *In re Katz*, 639 F.3d at 1316.

Remarkably, the district court entirely failed to consider this analysis, despite its presentation during the bench trial (A02613[1]-02614[19]) and in post-trial briefing. A36736 ("**the microprocessor does not require special programming to simply display the measured voltage**") (emphasis original); A36544[¶¶197-198]; A36577-36579[¶¶67, 73-74].

For each of these reasons, the indefiniteness rulings must be reversed.

### D. <u>Cross-Appeal: The Jury's Damages Award Must Be Reinstated</u>

If this Court reverses on indefiniteness, the new trial granted as to damages must be reversed. That new trial was granted only because "the damages awarded by the jury were not broken down as to each claim or patent," and the district court believed it had to grant a new trial once it declared three of the four infringed claims indefinite. A00022-00024.

But even if this Court does not reverse any indefiniteness ruling, the jury's damages award must still be reinstated because all of the damages and the 7.5% royalty rate remediate infringement of claim 10 alone. That is what the evidence shows. That is what the form of verdict provides—a form Cochlear proposed. And that is what is authorized by precedent governing interpretation of verdicts.

Alternatively, even if the damage verdict is not reinstated, the royalty rate should be affirmed for use in any future district court proceedings.

### 1. The Verdict Awards Damages For Infringement Of Claim 10 Of The '616 Patent Alone

The jury awarded 7.5% as the reasonable royalty rate for infringement of claim 10 of the '616 patent, regardless of whether any other claim-in-suit was infringed:



A00069. This verdict was proposed by and used at Cochlear's behest; the Foundation's proposed verdict would have expressed damages on a claim-by-claim basis. A33846; A33793-33794; see generally A33832–33849; A33780–33796.

The evidence justified an undifferentiating verdict form because all damages and the entire royalty rate are attributable to infringement of claim 10 of the '616 patent. The entire, undisputed royalty base was found to infringe that claim. A02295[7]-02296[14] (Parr agreed his royalty base is the same as Elsten's); A01093[9-21] (preliminary jury instructions providing definition of accused products); A01444[5]-01446[12] (Young testimony that all accused products

infringe asserted claims of both patents-in-suit); A01560[10]-01561[11] (same); A02532[7-25] (jury instruction that "[w]hen the parties and I refer to…certain claims of the patents in suit, we mean to include all four of these claims"). The royalty base accused of infringing the '691 patent (whose claims were found invalid) is a subset of the '616 patent royalty base. The '691 and '616 patents expired on September 22, 2009 and March 11, 2014, respectively. A00268; A01085[15-18], 01095[17-20].

Both damage experts used a single royalty rate that remained constant, irrespective of the number of infringed claims or the point-in-time when infringement began. That comports with each expert describing the infringement as relating to claim 10's back-telemetry innovation. Thus, the Foundation's expert (Elsten) testified to a reasonable royalty for a license of back-telemetry technology. She described back-telemetry as a "must-have" feature (A01752[3-20]) that changed industry competitor market shares. A01741[1-4]; *see also* A01753[18-22] (redirect) A01755[15-19] ("The data indicates that back telemetry had a profound [market] impact."). She also explained that "the patents cover the [Cochlear implant] system, not individual components." A01705[4-12].

Similarly, Cochlear's expert (Parr) described infringement of a single technology. His assignment was to determine "an appropriate royalty rate…in the event that Cochlear is found to have committed *patent infringement*."

A02266[23]-02267[3].  Like Elsten, Parr did not differentiate royalties between patents, or among claims.  Parr described the two patents-in-suit together as directed to "back telemetry."  A02288[3]-02289[13]; *see also* A2308[24-25]  ("the incremental royalty rate *for the back telemetry*"); A02291[1-21] (referring to single royalty rate "to associate with *the back telemetry*").  By failing to introduce evidence that the royalty rate should be reduced if infringement was found on less than all asserted claims, Cochlear did not equip the jury with the ability to differentiate royalties or damages among claims.

Given the undifferentiating evidence, and the verdict finding damages based on the infringement of any *one* claim, the district court erred in directing a damages retrial.  *See TiVo, Inc. v. EchoStar Commc'ns Corp*., 516 F.3d 1290, 1312 (Fed.Cir. 2008) ("Because the damages calculation at trial was not predicated on the infringement of particular claims, and because we have upheld the jury's verdict that all of the accused devices infringe the software claims, we affirm the damages award."); *SK Hynix Inc. v. Rambus Inc.*, No. C-00-20905 RMW, 2013 WL 1915865, at *15 (N.D. Cal. May 8, 2013) (denying new trial where "damages were awarded based upon infringement by particular products, not upon infringement of particular patent claims").

Here, "[t]he amount of damages is not affected by the number of claims infringed because the patent is infringed regardless of whether one, some, or all of

its claims are infringed." *See Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F.Supp. 752, 819 (E.D. Pa. 1990). Apportioned, claim-by-claim damages are not required because (1) 35 U.S.C. §284 "requires that the patentee is awarded 'a reasonable royalty for the use made of the *invention* by the infringer,'" (2) current USPTO guidelines contain a "presumption that each issued patent contains only one independent and distinct invention," and (3) "[i]f each patent covers only one invention, then each claim represents merely different shades of the same invention and it is reasonable to require—in the hypothetical negotiation—that the infringer license the entire patent." *Oracle Am. Inc. v. Google, Inc.*, 2012 WL 850705, at *7 (N.D. Cal. Mar. 13, 2012) (citing 35 U.S.C. §284; 35 U.S.C. §121; 37 C.F.R. 1.141; MPEP §802).

**2.    Applying The Proper Standard, An Exercise Of This Court's Discretion Compels Reinstating The Jury's Damage Award And Royalty Rate In Full**

This Court, as a reviewing court, applies regional circuit law to "a district court's decision to set aside a jury's damages award." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1356 (Fed.Cir. 2013). Under Ninth Circuit precedent, the jury's damage and royalty rate awards were expressed as a general verdict—single figures linked to other verdict questions specifying more than one basis for defendants' liability. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003); A00069; *see generally* A00059-00070. The

Ninth Circuit has no rule requiring reversal of a general verdict when a reviewing

court finds error in one of the alternative grounds that could support that verdict.

Instead, as later-to-be-Justice Kennedy explained in *Traver v. Meshriy*, 627 F.2d

934, 938 (9th Cir. 1980):

> Where more than one theory of recovery has been submitted to the
> jury in a civil case, and where on appeal it is claimed that as to one of
> the theories there was a lack of evidential support or an error of law in
> submitting the theory to the jury, the reviewing court has discretion to
> construe a general verdict as attributable to another theory if it was
> supported by substantial evidence and was submitted to the jury free
> from error.

Here, the district court mistakenly believed "it must grant the motion for new trial"

due to its indefiniteness rulings and their effect in rendering three of the jury's four

infringement verdicts based on "error[s] of law."  *Id*; *see also* A00023.

*Traver* specifies four factors that guide exercise of discretion to uphold a

verdict:  (1) "the potential for confusion of the jury which may have resulted from

an erroneous submission of a particular claim," (2) "whether privileges or defenses

of the losing party apply to the count upon which the verdict is being sustained so

that they would have been considered by the jury with reference to the count," (3)

"the strength of the evidence supporting the count being relied upon to sustain the

verdict," and (4) "the extent to which the same disputed issues of fact apply to one

or more of the theories in question."  *Id.* at 938-39.  The reviewing court examines

evidence in the light "most favorable to the prevailing party, accepting as

established all facts which the evidence reasonably tended to prove and giving to the prevailing party the benefit of all inferences which may be reasonably drawn from the evidence." *Bank of Am. N.T.& S.A. v. Hayden*, 231 F.2d 595, 603 (9th Cir. 1956). Ninth Circuit courts liberally exercise discretion to uphold *damages* linked to one basis for liability that is supported by the evidence and was submitted free of error. *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987).

This Court should reinstate the jury's damage and royalty verdicts in full based on infringement of claim 10 alone. There was no evidence of damages attributable to the '691 patent alone that could have created "potential for confusion of the jury." *Traver*, 627 F.2d at 939. There is ample "evidence supporting" the damages verdicts as compensation for infringement of claim 10 alone and the exact "same disputed issues of fact appl[ied]" to the damage evidence related to both patents-in-suit. *Id.*

### 3.    <u>Cochlear Forfeited Any Claim To A New Trial Because It Proposed The Verdict Form Used</u>

Cochlear forfeited its claim to a new damages trial because the damages queries in the verdict—soliciting a single royalty rate and sum of damages—were repeatedly (at least four times) proposed by Cochlear. A30765-30766; A31641-31642; A33210; A33846. The Foundation proposed a special verdict question that would have required the jury to specify damages by individual patent claims and

71

accused products.  A33793-33794.  Cochlear's tactical decision to not allow the jury to render separate damage verdicts as to each claim-in-suit forfeits its ability to attack that verdict on the basis that it does not separately list claim-specific damages.  *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir. 1989) (defendant who did not request special verdict as to each factual theory is prohibited from arguing general verdict erroneously rests on "unsubstantiated factual theories"); *Mitsubishi Elec. Corp. v. Ampex Corp.*, 190 F.3d 1300, 1304 (Fed.Cir. 1999) (forfeited objection by proposing verdict form).

### 4.    Case Law Cited By The District Court Supports Full Reinstatement Of The Damage And Royalty Verdicts

Even applying cases invoked by the district court, the damage and royalty verdicts must be reinstated in full.  The district court cited *Retractable*, where this Court *rejected* a new damages trial even though most of the accused products were found not to infringe.  *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1371 (Fed.Cir. 2014).  This Court noted that "[t]he judgment included the $5 million infringement award, which did not specify amounts separately for each product and could have been based on Retractable's lump-sum reasonable royalty theory, which was not dependent on the type or number of products sold but rather on granting Becton freedom to operate."  *Id*.  Similarly, here, the jury's verdict award was not dependent on the number of patents infringed, but based on

evidence that Cochlear would obtain a license to provide "back telemetry."

A02291[3-21].

The district court also cited a case where the expert testified that each of the three asserted patents supported *separate* and *different* royalty rates. *Accentra, Inc. v. Staples, Inc*., 500 Fed. Appx. 922, 931 (Fed.Cir. 2013). Here, all evidence supports a *single* royalty rate.

The district court and *Retractable* mention a "normal rule" for a new trial when one theory of liability underlying a jury's general verdict is set aside. A00023; 757 F.3d at 1370 (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1310 (Fed.Cir. 2007)). That is not the Ninth Circuit rule. Moreover, this "normal rule" was described in a case where this Court set aside a finding of infringement as to one patent with technology that was entirely unrelated to the technology of the other two patents. *Verizon*, 503 F.3d at 1299, 1310.

*Verizon* cites *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986), where the jury was erroneously allowed to award damages "based on the value or importance of the constitutional rights that were violated." *Id*. at 302. Because "the abstract value of a constitutional right may not form the basis for §1983 damages," the erroneous instruction required a new damages trial. *Id*. at 312-13.

Here, error-free instructions referred to the patents as a single invention. A00137-00138 ("A royalty is a payment made to a patent holder in exchange for the right to make, use or sell *the claimed invention*" and "[e]ven if *the patented feature* is not the reason for customer demand, the value of the whole product could be used if, for example, the *value of the patented feature* could not be separated out from the value of the whole product."). Unlike in *Memphis*, Cochlear did not object to the instructions and it proposed the verdict. A31438-31447 (Cochlear's limited instructional objections).

The damage and royalty verdicts should be fully reinstated. Alternatively, at least the royalty rate should be affirmed for use in any remand proceedings.

### E.    Cross-Appeal:  The Jury's Willfulness Finding As To The '616 Patent Should Be Reinstated

Willful infringement has both objective and subjective prongs. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed.Cir. 2007) (en banc). Under jury instructions Cochlear proposed, the jury addressed both prongs and found willful infringement. A00059-00070; A02553-02555. The district court erroneously set that willfulness verdict aside.

### 1.    Cochlear's Infringement Was Objectively Willful

Infringement is willful when done despite "an objectively high likelihood that [defendant's] actions constituted infringement." *Seagate*, 497 F.3d at 1371. Cochlear's infringement was so clear, and its defenses so inherently flawed, that no

74

"reasonable litigant could realistically expect those defenses to succeed." *Bard*, 682 F.3d at 1009.

The district court granted JMOL as to willfulness by concluding that, "[w]hile the jury's infringement verdict is supported by substantial evidence," Cochlear presented a reasonable argument that it "did not infringe claim 10 of the '616 patent, because its testing system did not display 'voltage' measurements." A00018[22-24]. As demonstrated earlier, there is nothing reasonable about this defense. *See, supra,* Section V.B. Cochlear's systems display impedance—like the preferred embodiment in Figure 6 of the '616 patent. A00816[Fig.6]. Cochlear's defense that it practiced an unclaimed preferred embodiment could only be reasonable if supported by strong evidence of disavowal. Nothing in the patent or the file history even remotely suggests impedance display was excluded. *See, supra,* Section V.B.3. After Cochlear's voltage display construction was soundly rejected by the district court in June 2012, Cochlear no longer had even this very suspect defense upon which to rely. And this was only the first of four losses for this defense: at claim construction (A26452-26459); at summary judgment (A00359-00370); at trial (A00033-00036; A00060-00064; A00002); and in post-trial briefing (A00020). *See generally* A26435-26460; A00347-00381; A00025-00056; A00059-00070; A00001-00003; A00007-00024. Yet after each successive

rejection, Cochlear continued to infringe.  This is not objectively reasonable conduct.

Cochlear's voltage display defense was also unreasonable because Cochlear's 30(b)(6) witness (Nygard) and technical expert (Loeb) rejected the defense's fundamental premise: that impedance display does not convey information about or make known the results of voltage measurements admittedly made by Cochlear's accused systems.  A02050[14-18] (Loeb reading Claim 1's display limitation on impedance); A24015[17]-24016[5] (Nygard admitting measured voltage data results can be seen by viewing the "calculation of electrode impedance"); A01470[23]-01471[20].   A defense cannot be objectively reasonable when it is contradicted by defendant's corporate witness and technical expert. *Fractus, S.A. v. Samsung Electronics Co.*, 876 F. Supp. 2d 802, 829 (E.D. Tex. 2012); *Rawcar Group, LLC, v.  Grace Medical, Inc.*, Case No. 13-cv-1105 H (BLM), Dkt. 250 at *10 (S.D. Cal. Dec. 16, 2014) (unpublished, *see* A40958-40974) ("Defendants' contradiction of their own defense at trial is persuasive evidence that the infringement was objectively willful.").

Cochlear argues its defenses must have been objectively reasonable because they survived summary judgment.  A38353[7-9].  But that "does not automatically immunize [Cochlear] from a finding of willful infringement."  *DuPoy Spine, Inc. v.*

*Medtronic Sofanor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed.Cir. 2009); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1091 (Fed.Cir. 2014).

### 2.    Cochlear's Infringement Was Subjectively Willful

Substantial evidence shows Cochlear acted even though the risk of infringement "was either known or so obvious that it should have been known to" Cochlear. *Seagate*, 497 F.3d at 1371.  Cochlear had actual knowledge of the '616 patent and its subject matter no later than July 2003.  A00265[Stip. Fact 172-73]; A01082[8-11].  Despite this, Cochlear continued to infringe without pause up to the day the '616 patent expired in March 2014—two months after the infringement verdict.  A00265-00266[Stip. Fact 180-84, 193]; A01082[12-14]; A01083[7-9]; A01085[15-18].  Cochlear's conduct clearly fell short of "prudent, and ethical, legal and commercial actions."  *SRI Int'l, Inc. v. Advanced Tech. Labs.*, 127 F.3d 1462, 1465 (Fed.Cir. 1997).

### a.    Cochlear Spurned Offers To License The Foundation Technology And Then Copied The Back-Telemetry System

"[I]n ordinary circumstances, willfulness will depend on an infringer's pre-litigation conduct." *Seagate*, 497 F.3d at 1374.  Cochlear's disdain for the Foundation and its patent rights is evident.

After developing its breakthrough back-telemetry, the Foundation was eager to make it available to patients.  *See* A01179 [9-11] ("And it was so exciting that it

actually brought tears to my eyes, and I was so moved that I said afterwards, even if the market isn't worth it, we've got to do it."). Cochlear was the dominant cochlear implant maker at the time, but its Nucleus implant had no form of back-telemetry that could monitor and report on post-implantation functioning. A01814[16-20]; A01285[1-18]; A39922; *see generally* A01824[22]-01843[6]. If there was a problem with Cochlear's Nucleus implant, a surgeon had to operate on the patient to get even basic diagnostic information. A01336[9-20]; *see generally* A01335[22]-01337[20]; A01341[17]-01344[7]. The Foundation hoped Cochlear would license its technology so Cochlear's patients would not be subjected to the risk of needless surgeries. But Cochlear rebuffed the Foundation's licensing overtures and continued to sell products without back-telemetry capability. A01180-01183 ("I said: You're not willing to pay any money beyond [taking care of six patients]? And they said no.").

Undeterred, the Foundation exclusively licensed its technology to Advanced Bionics, a company created by the Foundation with the express purpose of building an implant with back-telemetry. A01183[9-21]. Advanced Bionics' Clarion became the first implant with back-telemetry capabilities. A01291[19-22]; A01211[1-14]; A04674–04676. This product created a firestorm. Despite being a newcomer, the Clarion quickly took a stunning 30% of Cochlear's market share. A01700[14-17]; A01226[22]-01225[16].

Finding that its "research and market leadership was at stake" due to the better-performing Clarion implant, Cochlear recognized "it was being challenged competitively for the first time."  A14281; A01830[13-16] (Cochlear admitted in May 1991 it was "evaluating the competitive landscape"); *see also* A04461-04462; A01825[12-15]; A01831[17]-01832[2]; A01847[5-7]; A13896.  Shortly thereafter, Cochlear announced plans to develop a competing implant with back-telemetry by 1993, the same year Advanced Bionics' (then MiniMed) product came to market. A04463; *see also* A04515; A01832[3-20].

But Cochlear failed. A01844[6-9].  So, to remain competitive, Cochlear copied the Foundation's back-telemetry invention.  A02385[21]-02386[17]; A13896 (Cochlear admitting its new implant was "influenced by . . . [c]ompetitors' devices offer[ing] telemetry capabilities"); A01825[12-15]; *see also Apple Inc., v. Samsung Electronics Co., Ltd*., No. 14-1802, 2015 WL 5449721, at *1 (Fed.Cir. Sept. 17, 2015) (finding "[i]nternal Samsung documents show[ed] that Samsung 'paid close attention to, and tried to incorporate' some of Apple's patent technology, which was indicative of copying by Samsung"); *K-Tech*, 696 F.3d at 1378.  Since Cochlear and Advanced Bionics were the primary implant market competitors at the time, the jury properly concluded that Cochlear acted to deprive Advanced Bionics of market share.

Cochlear also sought to discredit the Foundation's work using falsehoods.

For instance, Cochlear urged Dr. Graeme Clark to attend the Combined

Otolaryngology Spring Meetings just to "steal their thunder completely." A14281;

A01819[6-11]. Cochlear also "adopt[ed] a 'marketing position' that MiniMed's

flexibility really implies that they don't know what to do." A04505; A01837[20]-

01838[1]. This and other evidence allowed the jury to conclude that Cochlear used

misinformation to neutralize the threat posed to it by the Foundation's technology.

*See i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010),

*aff'd*., 131 S.Ct. 2238 (2011) (willfulness where "internal emails show[ed]

Microsoft intended to render i4i's product 'obsolete' and assure 'there won't be a

need for [i4i's] product'").

### b. The District Court's Ruling That Cochlear Responded Reasonably To Notice Of Infringement Of Claim 10 Bespeaks Clear Legal Error

In 2003, the Foundation wrote and informed Cochlear about the '616 patent.

A14494; *see also* A00265[Stip. Fact 173]; A01082[10-11]. The district court

found that "after AMF provided notice of potential infringement, Cochlear

promptly responded with reasonable non-infringement defenses, including the

single-antenna non-infringement argument." A00019[4-9]; *see also* A14496. Not

so.

Neither the "single antenna non-infringement argument" nor the "external headpiece/transmitter" arguments articulated in Cochlear's 2003 letter has any—even theoretical—application to claim 10.  A14496; *see also* A04784; A04899; A05068; A01480; A02372[14]-02374[21]. "Simply put, the claims of the '616 patent do not require 'separate transmitter and receiver coils' or a 'physician's tester . . . connected directly to an external coil of a headpiece/transmitter.'" A14248-14249.  Even after the Foundation responded and explained to Cochlear why its purported defenses did not apply to claim 10, Cochlear failed to articulate any other defense.  A14246-14247.  Cochlear's objectively unreasonable "voltage display" defense was not asserted until approximately five years later—at claim construction.  Cochlear's failure to even *propose* a defense to claim 10 at the time it learned of the patent epitomizes clearly reckless conduct.

Cochlear had nothing to say because it failed to properly "investigate the patent situation."  *Spectralytics, Inc. v. Cordis Corp*., 649 F.3d 1336, 1348 (Fed.Cir. 2011); *Clonetech Labs v. Invitrogen Corp*., 406 F.3d 1347, 1357 n.6 (Fed.Cir. 2005) (failure to investigate "prior art and other information bearing on the quality of the patents" supports willfulness).  Cochlear did not rely on an opinion of counsel.  A00268[14-18]; A01085[10-14]; *Seagate*, 497 F.3d at 1369 ("failure to proffer any favorable advice…is crucial to the [willfulness] analysis").  In fact, Cochlear did not even bother to obtain the '616 patent file wrapper until

three years after it was notified of infringement.  A14246-14247 (October 2006 admission by Cochlear that it was still "in the process of obtaining the file wrappers").

Cochlear continued to infringe claim 10 for more than a decade after notice. *i4i*, 598 F.3d at 859-60 (defendant knew its copied product practiced the patent but "did not cease its infringing activity or attempt to design around").  Even after suit was filed in 2007, Cochlear never undertook to design around the patents it has now been adjudged to have infringed.  A00265[Stip. Fact 188]; A01082[22]-01083[6]; A02318[7-12].

"The fact that [Cochlear] presented several defenses at trial, including noninfringement and invalidity, does not mean that the jury's willfulness finding lacked a sufficient evidentiary basis." *i4i*, 598 F.3d at 860.  To the contrary, the jury heard Cochlear's defenses and expressly rejected them.  "Based on its own assessment of the evidence and [Cochlear's] defenses, the jury was then free to decide for itself whether [Cochlear] reasonably believed there were any substantial defenses to a claim of infringement." *Id.*; A00059-00070.  Cochlear has not even appealed the jury's rejection of its invalidity defenses for claim 10.

## VI.   **CONCLUSION**

The verdict should be fully reinstated and the district court directed to proceed to issues of damage enhancement and attorneys' fees.

Dated:  October 5, 2015                Respectfully submitted,


                                       By:   /s/ Thomas M. Peterson
                                           Thomas M. Peterson
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           One Market Street, Spear Tower
                                           San Francisco, CA  94105-1126
                                           Telephone:  (415) 442.1000
                                           Facsimile:  (415) 442.1001

                                           Daniel Grunfeld
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           300 South Grand Avenue, 22nd Floor
                                           Los Angeles, CA  90071-3132
                                           Telephone:  (213) 612-2500
                                           Facsimile:  (213) 612-2501

                                           Michael J. Lyons
                                           MORGAN, LEWIS & BOCKIUS LLP
                                           3000 El Camino Real, Suite 700
                                           Palo Alto, CA 94306-2122
                                           Telephone:  (650) 843-4000
                                           Facsimile:  (650) 843-4001

                                           *Attorneys for Plaintiff-Cross-Appellant*
                                           ALFRED E. MANN FOUNDATION
                                           FOR SCIENTIFIC RESEARCH

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e) in that this brief contains 16,494 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), in that this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 and set in 14-point Times New Roman.

Dated:  October 5, 2015                    Respectfully submitted,


By:   /s/ Thomas M. Peterson
        Thomas M. Peterson

        *Attorneys for Plaintiff-Cross-Appellant*
        ALFRED E. MANN FOUNDATION
        FOR SCIENTIFIC RESEARCH

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copy of the foregoing **PLAINTIFF-CROSS-APPELLANT ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH'S PRINCIPAL AND RESPONSE BRIEF** was served upon registered counsel by operation of the Court's CM/ECF system on the 5th day of October, 2015.

By:  /s/ Thomas M. Peterson
Thomas M. Peterson

*Attorneys for Plaintiff-Cross-Appellant*
ALFRED E. MANN FOUNDATION
FOR SCIENTIFIC RESEARCH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALFRED E. MANN FOUNDATION FOR SCIENTIFIC RESEARCH, et al., | ) Case No. CV 07-8108 FMO (SHx) ) |
| Plaintiffs, | ) ) |
| v. | ) **FINDINGS OF FACT AND CONCLUSIONS** ) **OF LAW** |
| COCHLEAR CORPORATION, et al., | ) ) |
| Defendants. | ) ) |

_____

<u>**INTRODUCTION**</u>

Plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF" or "plaintiff") brings this action, alleging that defendants Cochlear Corporation and Cochlear Ltd. (collectively, "Cochlear" or "defendants") infringed two patents directed to cochlear implant technology. (See First Amended Complaint for Patent Infringement ("FAC") at ¶¶ 17 & 21-23; Reply and Counterclaims-in-Reply to Cochlear Americas and Cochlear Limited's Counterclaims ("Pl.'s Supp. Claims") at 13-14) (Document Nos. 164 & 171). AMF alleges that Cochlear infringed U.S. Patent No. 5,938,691, entitled "Multichannel Implantable Cochlear Stimulator" ("the '691 patent"), and U.S. Patent No. 5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator" ("the '616 patent") (collectively, "the patents-in-suit"). (See FAC at ¶¶ 21-23; Pl.'s Supp. Claims at 13-14).

The '691 patent is generally directed to a cochlea stimulation system comprising of: (1) an

audio signal receiving device, i.e., a microphone; (2) a wearable processor ("WP") that receives and processes audio signals; and (3) an implanted cochlea stimulator ("ICS") that receives data representing the audio signals and stimulates electrodes. (See '691 patent at Abstract, col. 3:9-39 & 34:51-35:6). By stimulating the electrodes located within the cochlea, the implant can also stimulate locations of the auditory nerve, so that the hearing impaired person's brain can perceive sound. (See id. at col. 1:24-27; Reporter's Transcript ("RT"), Jan. 14, 2014, vol. 2, at 79:13-15 & 85:18-25). The '616 patent is generally directed to a system and a method for testing such a system. (See '616 patent at Abstract, col. 34:23-61 & 35:43-36:7).

The court, with the consent of the parties, appointed a Special Master for claim construction. (See Order re: Joint Status Report Regarding Appointment of Special Master at 1) (Document No. 179). The Special Master conducted a claim construction hearing, and issued a Report and Recommendation. (See Special Master's Report and Recommendation on Claim Construction ("R&R") at 5) (Document No. 200). After considering the parties' objections to the R&R, the court issued its Claim Construction Order on June 18, 2012.[1] (See Order re: Parties' Objections to the Special Master's Report on Claim Construction ("Claim Construction Order")) (Document No. 212). Advanced Bionics, LLC ("Advanced Bionics"), the exclusive licensee of the asserted patents, (see Pl.'s Supp. Claims at 13), was joined as an involuntary plaintiff on January 13, 2014. (See Final Pretrial Conference Order ("PTO") at 1) (Document No. 399).

The court conducted a jury trial, in which the jury found that Cochlear infringed claims 1 and 10 of the '616 patent, and claims 6 and 7 of the '691 patent. (See Verdict Form at 1-4 & 5-8) (Document No. 460). The jury also found willful infringement of both asserted patents. (See id. at 4 & 8). In addition, the jury found that the asserted claims are not invalid based on Cochlear's obviousness and anticipation defenses. (See id. at 4-5 & 8-9). The jury awarded $131,216,325 damages, based on royalty rate of 7.5 percent. (See id. at 10). Finally, the jury provided an advisory verdict in favor of AMF on inequitable conduct. (See id. at 9-10).

---

[1] The case was transferred to the undersigned judge on January 18, 2013. (See Order of the Chief Judge, dated Jan. 18, 2013) (Document No. 232).

In addition, the court conducted a bench trial regarding the following:  (1) equitable estoppel, (2) laches, (3) inequitable conduct, (4) prosecution history estoppel, and (5) indefiniteness.[2]  (See PTO at 28; RT, Jan. 22, 2014, vol. 2).

The court, having heard live testimony and duly considered the evidence presented during both trials, the credibility of the witnesses, the parties' briefing, and the contentions and arguments of counsel, hereby makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## **FINDINGS OF FACT**

I.     BACKGROUND.

1.  Alfred E. Mann Foundation for Scientific Research is a nonprofit medical research foundation incorporated under California law.  AMF's principal place of business is in Los Angeles County.  (See PTO, App. A, at No. 1).  AMF conducts medical research, and it has developed advanced medical devices for commercialization.  (See RT, Jan. 14, 2014, vol. 2, at 51:15-19 & 52:14-53:18; Declaration of Dr. Joseph Schulman, Ph.D., Re Issues Tried to the Court ("Schulman Decl.") (Document No. 406) at ¶¶ 4-6.  For instance, from about 2001 to 2004, AMF devoted substantial resources to its Battery Bion project, a wireless, implantable microstimulator intended for use in stroke patients.  (See Schulman Decl. at ¶¶ 11-15).  From 2004 to 2008, AMF conducted a human clinical trial with the University of Southampton, in order to reanimate paralyzed arms of post-stroke patients.  (See Declaration of David Lee Hankin Submitted in Support of Plaintiff Re Issues Tried to the Court ("Hankin Decl.") at ¶ 13) (Document No. 403).  In 2006-2009, AMF also worked on a trial involving the reanimation of paralyzed legs of post-spinal cord injury patients.  (See id. at ¶ 21).

---

[2]  The parties also addressed enhanced damages.  (See Plaintiff Alfred E. Mann Foundation's Memorandum of Points and Authorities re Bench Trial ("AMF's Bench Tr. Br.") at 18-25; Defendants Cochlear Ltd. and Cochlear Americas' Memorandum of Points and Authorities re: Bench Trial ("Cochlear's Bench Tr. Br.") at 18-25) (Document Nos. 480 & 482).   In the contemporaneously issued Order re: Post-trial Motions, the court granted Cochlear's motion for judgment as a matter of law as to the willfulness finding.  Accordingly, it is not necessary to address AMF's request for enhanced damages.

2. Defendant Cochlear Ltd. is a for-profit Australian company headquartered in Sydney, Australia. Defendant Cochlear Corporation is a for-profit corporation incorporated under Delaware law with its principal place of business in Colorado. (See PTO, App. A, at Nos. 2 & 3).

3. U.S. Patent No. 5,609,616, entitled, "Physician's Testing System and Method for Testing Implantable Cochlear Stimulator," was issued on March 11, 1997. U.S. Patent Application No. 447,157 was filed on May 25, 1995, and issued as the '616 patent. The U.S. Patent and Trademark Office ("USPTO") issued the '616 patent as a continuation of Ser. No. 23,584, filed on February 26, 1993; which is a continuation of Ser. No. 752,069, filed on August 29, 1991; which is a continuation-in-part of Ser. No. 411,563, filed on September 22, 1989. The '616 patent lists Joseph H. Schulman, John C. Gord, Primoz Strojnik, and David I. Whitmoyer as inventors, and AMF as the original assignee. (See PTO, App. A, at No. 9; '616 patent). The '616 patent expired on March 11, 2014. (See PTO, App. A, at 46).

4. U.S. Patent No. 5,938,691, entitled, "Multichannel Implantable Cochlear Stimulator," issued on August 17, 1999. U.S. Patent Application No. 09/103,264 was filed on June 23, 1998, and issued as the '691 patent. The USPTO issued the '691 patent as a division of Application No. 08/450,041, filed on May 25, 1995; which is a continuation of Application No. 08/322,065, filed on October 12, 1994; which is a continuation-in-part of Application No. 08/23,584, filed on February 26, 1993; which is a continuation of Application Ser. No. 07/752,069, filed on August 29, 1991; which is a continuation-in-part of Application Ser. No. 07/411,563, filed on September 22, 1989. The '691 patent lists Joseph H. Schulman, John C. Gord, Primoz Strojnik, David I. Whitmoyer, and James H. Wolfe as inventors, and AMF as the original assignee. (See PTO, App. A, at No. 11; '691 patent). The '691 patent expired on September 22, 2009. (See PTO, App. A, at 46).

5. AMF remains the assignee and lawful owner of the '616 patent and the '691 patent. (See PTO, App. A, at 46).

II. PATENT PROSECUTION – PRIOR ART.

6. Bryant R. Gold ("Gold") was one of the attorneys who prosecuted the applications that resulted in the issuance of the '616 patent. (See PTO, App. A, at No. 14).

7.  While prosecuting the application that was eventually issued as the '616 patent, Gold filed an Information Disclosure Statement on August 31, 1995 ("the 1995 IDS").  The 1995 IDS disclosed 63 references, including:  (1) United States Patent No. 4,947,844 to McDermott ("the McDermott patent" or "'844 patent"); and (2) United States Patent No. 4,612,934 to Borkan ("the Borkan patent" or "'934 patent").  (See PTO, App. A, at Nos. 14-16).

8.  On May 6, 1996, patent examiner William E. Kamm initialed the column, "Examiner Initial," on the 1995 IDS, indicating that he had considered the McDermott patent and the Borkan patent.  (See PTO, App. A, at No. 18).

9.  The McDermott and Borkan patents appear on the face of the '616 patent.  (See PTO, App. A, at Nos. 19-21).  U.S. Patent No. 4,232,679 to Schulman ("the Schulman patent" or "'679 patent") also appears on the face of the '616 patent.  (See '616 patent).

10.  During the prosecution of the '616 patent, the named inventors and their attorneys of record did not submit to the PTO an article by McDermott entitled, "An Advanced Multiple Channel Cochlear Implant," IEEE Transactions on Biomedical Engineering, pp. 789-97, Vol. 36:7 (July 1989) ("the 1989 McDermott article").  (See PTO, App. A, at 46).

11. The 1989 McDermott article was known to Gold when he submitted it to the PTO during the prosecution of Ser. No. 08/322,066.  (See PTO, App. A, at 46).

12. The '844 patent to McDermott and the 1989 McDermott article were both by the same inventor, Hugh McDermott.  (Trial Exhibits ("Exhs.") 1039 & 1150).

13. The '844 patent issued from an application filed in the United States prior to the priority date claimed in the '616 patent.  (See PTO, App. A, at 45).

III.    PATENT PROSECUTION – AMENDMENTS TO CLAIM 10 OF THE '616 PATENT.

14.  The method claim that issued as claim 10 of the '616 patent first appeared in U.S. Patent Application No. 447,157 (the "'157 Application").  The '157 Application was filed on May 25, 1995.  Joseph H. Schulman, John C. Gord, Primoz Strojnik, and David I. Whitmoyer were listed as the applicants (collectively, "Applicants").  The method claim that later issued as claim 10 of the '616 patent was originally filed as claim 12.  (See Exh. 1303 at COC-1985 & 2053).

15.  In its original form, claim 12 recited as follows:

12.  A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to a plurality of tissue stimulating electrodes;

selectively monitoring at least one of the electrodes to measure voltages/currents associated with the stimulation signals applied thereto;

generating stimulator status indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status indicating signals to the external transmitter; and

receiving and processing the status indicating signals in the external transmitter to produce processed status indicating signals.

(Exh. 1303 at COC-2053).

16.  The claim limitation, "displaying the processed status-indicating signals . . .," in the issued claim 10 did not appear in then-claim 12 as originally proposed.  (See, generally, Exh. 1303 at COC-2053).

17.  In the November 17, 1995 Office Action ("November 1995 Office Action"), Examiner Kamm rejected claim 12 as "indefinite in the use of the alternative phrase 'voltages/current.'" (Exh. 1303 at COC-2113 & 2116).  Examiner Kamm also stated that "[t]he claim is further indefinite and incomplete in the absence of a step utilizing the processing status indicating signal." (Id. at COC-2116).

18.  In the November 1995 Office Action, Examiner Kamm also rejected claim 12 "under 35 U.S.C. § 103 as being unpatentable over Van Arragon et al in view of Hafelfinger et al." (Exh.

1303 at COC-2117-18).  Examiner Kamm explained that "Van Arragon et al discloses the claimed combination of an implantable stimulator with an external programmer-tester communicating in both directions via transmitters and receivers.  While Van Arragon et al does not show the specific parameters of measuring at least one of voltage or current on at least one electrode, such monitoring circuitry further including impedance calculation circuits, are well-known in the implantable stimulator art as shown, for example, by Hafelfinger et al.  It would have been obvious to one of ordinary skill in the art at the time of the invention to choose the parameters to be measured as an indication of the status of the stimulator and it would be a mere matter of choice to employ electrode current/voltage as such a parameter especially in view of the teaching of Hafelfinger et al."  (Exh. 1303 at COC-2117-18).  "Van Arragon et al." refers to U.S. Patent No. 4,513,743; and "Hafelfinger et al." refers to U.S. Patent No. 5,003,975.  (See id. at COC-2120 & 2166-92).

19.  On March 18, 1996, the Applicants filed Amendment A, amending claim 12.  (Exh. 1303 at COC-2202 & 2205-06).

20.  The amended claim 12 states as follows:

12 10. A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of [a plurality of] tissue stimulating electrodes;

selectively monitoring the at least one pair of the multiplicity of electrodes to

measure a voltage associated therewith at the same time [voltages/currents associated with] the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter; [and]

receiving and processing the status-indicating signals [in the external transmitter] to produce processed status-indicating signals which convey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

(Exh. 1303 at COC-2205-06) (underlining and strikeouts in original).

21.  In the Remarks to Amendment A, the Applicants stated that, "[b]y way of the present amendment, Applicants have made a diligent effort to address each and every one of the definiteness concerns raised by the Examiner.  Further, the newly-submitted claims have been carefully drafted in an attempt to ensure that they are definite and fully comply with the requirements of 35 U.S.C. § 112, second paragraph.  Hence, it is believed that this rejection should be overcome."  (Exh. 1303 at COC-2212).

22.  The Applicants also stated that "[b]y way of the present amendment, Claims 1 and 12 (the independent claims) have been amended to distinguish the claimed invention over van Arragon et al. and Hafelfinger et al.  More particularly, both van Arragon et al. and Hafelfigner et al (and, indeed, all of the other prior art cited by the Examiner) relate to implantable pacemakers, not cochlear stimulators.  While there are some similarities between an implantable pacemaker and an implantable cochlear stimulator . . . there are many more dissimilarities."  (Exh. 1303 at COC-2212).

23.  The Applicants further distinguished claim 12 from the prior art by arguing that "the

1  claimed method is restricted to a method of testing an implantable tissue stimulating system that

2  requires, <u>inter alia</u>, <u>monitoring</u> at least one pair of the multiplicity of electrodes <u>at the same time</u>

3  <u>the stimulation signals are applied</u> thereto. Such simultaneous application of the stimulating signal

4  to the electrode at the same time the electrode is monitored is not done in the pacemaker art."

5  (Exh. 1303 at COC-2213-14) (emphasis in original).

6      24.  The Applicants referred to the invention's "display[]" of parameters "in real time," in

7  order to distinguish the cited pacemaker prior art, which "deals with downloading histogram data

8  that has been accumulated in the implant device (the pacemaker) over a period of time."  (Exh.

9  1303 at COC-2214-15) (emphasis in original).  By contrast, the Applicants stated that their

10  invention provides real time feedback, and "[t]he sensed parameter is sent back to the physician's

11  tester as part of a feedback signal were [sic] it is displayed or otherwise processed."  (<u>Id.</u> at

12  COC-2214).

13  IV.   CLAIM CONSTRUCTION.

14      25.  The court construed the "means for generating data indicative of the audio signal"

15  element of claim 6 of the '691 patent to be a means-plus-function element within the scope of 35

16  U.S.C. § 112, sixth paragraph.[3]  The recited function is "generating data indicative of the audio

17  signal," and the corresponding structure is "a microprocessor."  (<u>See</u> R&R at 25-26 & 28; Claim

18  Construction Order at 25; RT, Jan. 22, 2014, vol. 2, at 29:11-14).

19      26.  The court construed the "external processor means coupled to the transmitting means

20  of the external headpiece/transmitter for receiving and processing the status-indicating signals to

21  derive information therefrom regarding the operation of the implanted stimulator and its plurality

22  of tissue stimulating electrodes" element of claim 1 of the '616 patent to be a means-plus-function

23  element.  The recited function is "receiving and processing the status-indicating signals to derive

24  information therefrom regarding the operation of the implanted stimulator and its plurality of

25  tissue-stimulating electrodes," and the corresponding structure is an "antenna, receiver, and

26  microprocessor."  (<u>See</u> R&R at 3-4; Claim Construction Order at 25; RT, Jan. 22, 2014, vol. 2, at

27  _____

28  [3]  Currently 35 U.S.C. § 112(f).

28:3-13).

27.  Each of the above limitations requires the disclosure of an algorithm.  (See Order Re: Cross-Motions for Summary Judgment, filed on January 3, 2014 ("Court's Order of January 3, 2014"), at 28-32 & 34-35) (Document No. 352).

V.   AMF'S KNOWLEDGE AND COMMUNICATIONS RE: COCHLEAR'S POTENTIAL INFRINGEMENT.

28.  Dr. Joseph Schulman, Ph.D. ("Schulman") was the head of AMF's day-to-day operations from AMF's inception in 1985 to 2007.  (See Schulman Decl. at ¶¶ 2-5).  In 1994, Schulman attended a conference regarding cochlear implants in Melbourne, Australia, where Hugh McDermott presented an article regarding the Cochlear Nucleus system.  (See id. at ¶¶ 23-24).  At the conference, Schulman learned that Cochlear's Nucleus implant reported impedance measurements.  (See RT, Jan. 17, 2014, vol. 1, at 123:4-124:9; Exh. 1075).  Schulman did not learn that Cochlear's system necessarily used back telemetry, or the technical details regarding Cochlear's system.  (See Schulman Decl. at ¶ 25; RT, Jan. 17, 2014, vol. 1, at 124:18-22).

29.  In 1998, Schulman learned that the Cochlear Nucleus 24, one of the accused products in this case, had a cochlear implant and a speech processor that included some telemetry features.  (Schulman Decl. at ¶ 26).  However, Schulman did not learn the details of Cochlear's implementation of back telemetry at the time.  (See id.).

30.  Cochlear's implants and processors were not available to the general public for testing. The publicly available material that Schulman reviewed, including marketing materials and conference presentations, did not reveal the detailed technical workings of Cochlear's devices sufficient to allow Schulman to reach a conclusion regarding potential infringement of the patents-in-suit.  (See Schulman Decl. at ¶ 27).

31.  In 2003, Schulman attended a meeting at the House Ear Institute, where he obtained literature on the fitting system for the Nucleus 24.  This literature showed details of the Nucleus 24 product and how its telemetry features were used and programmed.  (See Schulman Decl. at ¶ 28).

32.  Schulman, as President of AMF, sent a letter, dated July 21, 2003, to Jack O'Mahony

("O'Mahony"), who was then the CEO and President of Cochlear Pty Ltd.  In the letter, Schulman states "that we have received information that your Nucleus cochlear implants utilize features that may infringe our U.S. Patent 5,609,616."  (Schulman Decl. at ¶ 29; Exh. 1071).  The letter further states that, "[a]lthough the patent is licensed to the Advanced Bionics Corporation, our licensee has decided, in accordance with the terms of our agreement, to defer enforcement of that patent to the AEMF.  In doing so, Advanced Bionics has asked that we first explore a license agreement with Cochlear Pty Ltd. rather than undertake legal action to prevent you from using such important and patented technology in fitting patients.  We are receptive to any reasonable resolution of the matter."  (Exh. 1071).  The July 21, 2003, letter does not mention the '691 patent.  (See, generally, id.; Schulman Decl. at ¶ 29).

33.  On October 7, 2003, Schulman received a response letter, dated October 1, 2003, from O'Mahony.  (See Exh. 1072; Schulman Decl. at ¶ 30).  The letter states, "With reference to your letter of July 21, 2003 and your U.S. Patent No. 5,609,616, the Nucleus cochlear implants do not infringe the patent."  (Exh. 1072).  The letter further states that "[t]he claims require separate transmitter and receiver coils.  The Nucleus cochlear implant uses common circuitry with a single coil to exchange signals with an external speech processor in a manner very similar to the prior art references cited in the patent, and therefore it does not infringe."  (Id.).  The letter also states that "[a]nother feature of the claimed system is that the physician's tester can be connected directly to the external headpiece/transmitter.  The Nucleus cochlear implant does not have a physician's tester that can be connected directly to an external coil of a headpiece/transmitter."  (Id.).  O'Mahony's response letter does not mention the '691 patent.  (See id.).  Schulman was not contacted further regarding this letter by O'Mahony or other Cochlear representatives.  (See Schulman Decl. at ¶ 30).

34.  In 2006, AMF conducted additional due diligence on Cochlear's implant systems. While AMF had difficulty finding materials regarding the circuitry of Cochlear's systems, it reviewed the materials it was able to locate.  AMF's due diligence included reviewing Cochlear product manuals and speaking with medical doctors familiar with Cochlear's systems.  (See Hankin Decl. at ¶ 24).  AMF then retained the law firm of Irell & Manella LLP regarding this dispute.  (See id.

1    at ¶ 25).

2        35.  On August 28, 2006, AMF's outside counsel, Morgan Chu of Irell & Manella LLP

3    ("Chu"), sent a letter to Dr. Chris Roberts, Cochlear Pty Ltd.'s CEO and President.  (See Hankin

4    Decl. at ¶ 25[4]; Exh. 634).  Following up on the 2003 correspondence, the letter states that "the

5    claims of the '616 patent do not require 'separate transmitter and receiver coils' or a 'physician's

6    tester . . . connected directly to an external coil of a headpiece/transmitter.'" (Exh. 634).  Thus,

7    AMF asserted that Cochlear's arguments "do not bear on Cochlear's infringement of the '616

8    patent." (Id.).  The letter further states that AMF "would like to discuss Cochlear's licensing of the

9    '616 patent in connection with Cochlear's cochlear implant products, such that the matter may be

10   amicably resolved." (Id.; see Hankin Decl. at ¶ 25).  The August 28, 2006, letter does not mention

11   the '691 patent.  (See, generally, Exh. 634).

12       36.  Michael G. Verga ("Verga"), outside counsel for Cochlear Ltd., responded to Chu's

13   letter on October 24, 2006.  (See Hankin Decl. at ¶ 27[5]; Exh. 633).  The October 24, 2006, letter

14   states that "Cochlear was surprised to receive [AMF's] letter of August 28, 2006, since Cochlear

15   and AEMF last communicated about this matter over three years ago.  At that time Cochlear

16   presented to AEMF several reasons that Cochlear's products did not infringe the claims of the '616

17   patent.  Having not received a reply, Cochlear believed that this matter was resolved to [AMF's]

18   satisfaction over three years ago." (Exh. 633).  The October 24, 2006, letter, also does not refer

19   to the '691 patent.  (See, generally, id.).

20       37.  On December 13, 2007, AMF filed this lawsuit against Cochlear.  (See Complaint for

21   Patent Infringement) (Document No. 1).  In the original complaint, AMF asserted infringement only

22   as to the '616 patent.  (See id. at ¶¶ 20-22).

23       38.  Any finding of fact that more correctly constitutes a conclusion of law should be treated

24   as such.

25   ———————————————

26   [4]  The Hankin Declaration refers to an August 18, 2006, letter.  (Hankin Decl. at ¶ 25).  However,
     the referenced letter has an August 28, 2006, date.  (See Exh. 634).

27
     [5]  The Hankin Declaration again refers to the incorrect date of the referenced letter.  (See Hankin
28   Decl. at ¶ 27).

**A00036**

**CONCLUSIONS OF LAW**

I.    EQUITABLE ESTOPPEL.

39.    A patentee may forfeit its right to any relief from an infringer where: "(1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." Radio Sys. Corp. v. Lalor, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (citing A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)).    The alleged infringer must prove each of these elements by a preponderance of the evidence. Aukerman, 960 F.2d at 1045-46. The "applicability of equitable estoppel is 'committed to the sound discretion of the trial judge.'" Radio Sys. Corp., 709 F.3d at 1130 (citing Aukerman, 960 F.2d at 1028).

40.    There is no evidence that AMF communicated with, or made any representation to Cochlear with respect to the '691 patent before filing suit. AMF's discussions with Cochlear in 2003 and 2006 refer only to the alleged infringement of the '616 patent. (See, e.g., Exhs. 1071, 1072, 633 & 634). "[S]ilence alone will not create an estoppel unless there was a clear duty to speak, . . . or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." Aukerman, 960 F.2d at 1043-44. Cochlear has not proven by the preponderance of the evidence that AMF had a "clear duty to speak" concerning the '691 patent, or that it could reasonably infer that AMF would not file suit as to the '691 patent. In other words, there is no "misleading conduct (or silence)" to indicate that AMF did not intend to enforce the '691 patent. See Radio Sys. Corp., 709 F.3d at 1130. Thus, Cochlear's equitable estoppel argument fails as to the '691 patent.

41.    With respect to the '616 patent, AMF's conduct, namely, its 2003 correspondence and silence from late 2003 through mid-2006, was not sufficiently misleading to lead Cochlear to "reasonably infer that the patentee does not intend to enforce its patent[.]" Radio Sys. Corp., 709 F.3d at 1130. "Misleading 'conduct' may include specific statements, action, inaction, or silence when there was an obligation to speak." Aspex Eyewear Inc. v. Clariti Eyewear, Inc., 605 F.3d

1305, 1310 (Fed. Cir. 2010) (citing Aukerman, 960 F.2d at 1028).  Intentionally misleading silence may arise where a patentee "threatened immediate or vigorous enforcement of its patent rights but then did nothing for an unreasonably long time." Id. (internal citations omitted); see, e.g., id. at 1311 (demand letter stating patentholder's "strong intention to fully and vigorously enforce [its] rights"); Radio Sys. Corp., 709 F.3d at 1126 (demand letter alleging infringement and stating that accused infringer "must take a license or cease all manufacturing and destroy all sales inventory.").  Here, while the almost three-year gap between the parties' October 2003 and August 2006 letters raise questions as to AMF's diligence, "equitable relief is not a matter of precise formula." Aspex Eyewear Inc., 605 F.3d at 1311.  AMF's correspondence does not indicate that it would immediately or vigorously enforce its rights.  Rather, the July 21, 2003, letter expressed AMF's interest in "first explor[ing] a license agreement . . . rather than undertak[ing] legal action." (Exh. 1071).  AMF's 2003 letter also stated that AMF was "receptive to any reasonable resolution of the matter."  (Id.).  In the context of AMF's interactions with Cochlear, the court does not interpret AMF's discussions with Cochlear in 2003 as "threats of suit for infringement[.]" Aspex Eyewear Inc., 605 F.3d at 1311.  In short, Cochlear has not proven the elements of equitable estoppel by a preponderance of the evidence.

II.    LACHES.

42.  A patentee's claim for pre-suit damages may be barred under the doctrine of laches where (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) "the delay operated to the prejudice or injury of the defendant." Aukerman, 960 F.2d at 1028 & 1032.  The alleged infringer must prove laches by a preponderance of the evidence. Id. at 1045.  Historically, "[a] rebuttable presumption of laches [has arisen] when a patentee has delayed more than six years after actual or constructive knowledge of the defendant's alleged infringing activity." Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1333 (Fed. Cir. 2009)

1    (citing Aukerman, 960 F.2d at 1032).[6]  Laches is an equitable defense, applied at the trial court's

2    discretion in view of the circumstances.  See Aukerman, 960 F.2d at 1036.

3        43.  The record demonstrates that AMF had actual or constructive knowledge of Cochlear's

4    purported infringement of the '616 patent and the '691 patent in 2003 when Schulman attended

5    a meeting at the House Ear Institute, where he obtained literature regarding the fitting system for

6    Cochlear's Nucleus 24 product.  This literature included details of the Nucleus 24 product and how

7    its telemetry features were used and programmed, (see Schulman Decl. at ¶ 28), and put AMF

8    on inquiry notice regarding Cochlear's purported infringement.  See Wanlass v. Gen. Elec. Co.,

9    148 F.3d 1334, 1338 (Fed. Cir. 1998) ("sales, marketing, publication, or public use of a product

10   similar to or embodying technology similar to the patented invention, or published descriptions of

11   the defendant's potentially infringing activities, give rise to a duty to investigate whether there is

12   infringement.").

13       44.  The court is not persuaded that AMF knew or should have known of Cochlear's

14   infringing activities due to Schulman's attendance at the Melbourne conference in 1994.  (See,

15   e.g., Schulman Decl. at ¶¶ 23-25).  At the Melbourne conference, Schulman learned that

16   Cochlear's Nucleus implant reported impedance measurements; however, he did not receive

17   detailed technical information about the Nucleus implant.  (See id.; Exh. 1075 at AMF8912).  This

18   is insufficient to establish that AMF had inquiry notice regarding Cochlear's purported infringement.

19       45.  Likewise, the court is not persuaded by Cochlear's argument that AMF should have

20   known of its claims by 1996, when AMF purportedly identified the Cochlear 24-N as having "back

21   telemetry."  (See RT, Jan. 22, 2014, vol. 2, at 93:5-13); Cf. Wanlass, 148 F.3d at 1339

22   (constructive knowledge based on defendant's "open and notorious sale of easily testable

23   products," which gave the patentholder "the opportunity to discover the alleged infringement

24   earlier").  The general disclosure of "back telemetry" was not enough to put AMF on inquiry notice

25

26   ───────────────

27   [6]  The Federal Circuit has granted a petition for rehearing en banc to consider Aukerman in light
     of Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S.Ct. 1962 (2014).  See SCA Hygiene Prods.
     Aktiebolag v. First Quality Baby Prods., LLC, 2014 WL 7460970, *1 (Fed. Cir. 2014).  The court
28   has analyzed both Aukerman and Petrella, and considers its ruling consistent with both decisions.

1  of its claims.  For the same reasons, AMF did not have actual or constructive knowledge of

2  Cochlear's infringement in 1998, when Schulman learned that Cochlear's Nucleus 24 implant had

3  telemetry features.  (See Schulman Decl. at ¶ 26).  Under the circumstances, Cochlear has not

4  presented sufficient evidence to establish that AMF had constructive knowledge of its claims in

5  the 1994-1998 time frame.

6      46.  AMF presented credible evidence that Cochlear's implants and processors were not

7  available to AMF for testing, and the readily available materials were not detailed enough for AMF

8  to reach a conclusion as to whether Cochlear's telemetry features were similar to those claimed

9  in the patents-in-suit.  (See Schulman Decl. at ¶ 27).  The record does not indicate that AMF

10  received detailed technical information, such that AMF should have known of its claims against

11  Cochlear.  Nor has Cochlear demonstrated that other public information was detailed enough to

12  put AMF on inquiry notice of its claims.  See Wanlass, 148 F.3d at 1338-39 (constructive

13  knowledge may be warranted due to disclosures in "readily available information").

14      47.  Based on the foregoing, the court finds that AMF knew or should have known of its

15  claims in 2003, when it obtained detailed technical information regarding Cochlear's accused

16  devices.  (See Schulman Decl. at ¶ 28).

17      48.  AMF filed suit in December 2007.  Thus, AMF delayed approximately four years before

18  filing suit, so the traditional presumption of laches does not apply.  See Aukerman, 960 F.2d at

19  1028 & 1035.

20      49.  AMF's four-year delay in bringing suit was not unreasonable under the circumstances.

21  See Aukerman, 960 F.2d at 1032 ("The length of time which may be deemed unreasonable has

22  no fixed boundaries but rather depends on the circumstances.").  In the 2003-2007 time frame,

23  AMF had limited resources, and it devoted substantial portions of its resources to its research and

24  development activities, such as the Battery Bion project.  (See Schulman Decl. at ¶ 15).  During

25  this time period, AMF also conducted a human clinical trial at the University of Southampton, in

26  order to reanimate paralyzed arms of post-stroke patients.  (See Hankin Decl. at ¶ 13).  AMF also

27  initiated a trial involving the reanimation of paralyzed legs of post-spinal cord injury patients.  (See

28  id. at ¶ 21).  Given AMF's limited personnel, AMF's delay in filing suit was not unreasonable.

50. In addition, the court is not persuaded that Cochlear suffered economic prejudice due to AMF's delay. See Aukerman, 960 F.2d at 1033. First, while Cochlear argues that it would not have invested in the "new Nucleus Freedom implant with the exact same telemetry system" as the older accused products, (see Cochlear's Bench Tr. Br. at 4), Cochlear conceded that it did not change the development plans for its implants or processors based on the 2003 letter from AMF. (See PTO, App. A, at No. 188). For the same reason, the court is not persuaded by Cochlear's argument, (see Cochlear's Bench Tr. Br. at 4), that it "could have" designed around the '616 patent with an earlier lawsuit, as there was nothing preventing Cochlear from designing around the '616 patent on the basis of AMF's 2003 letter. In short, Cochlear has not shown economic prejudice due to the delay in filing suit.

51. Likewise, the court is not persuaded by Cochlear's assertions regarding evidentiary prejudice. (See Cochlear's Bench Tr. Br. at 4-5). While some trial witnesses had difficulty remembering some details, the court is not persuaded that such issues rendered Cochlear unable to "present a full and fair defense on the merits[.]" Aukerman, 960 F.2d at 1033. For instance, Cochlear did not present evidence that the "loss of records" or "death of a witness" undermined the trial. (See, generally, Cochlear's Bench Tr. Br. at 4-5). As for fading memories, AMF presented credible evidence that the witness testimony would not have been materially different if it had filed suit earlier. (See, e.g., Schulman Decl. at ¶¶ 33-36).

52. In short, Cochlear has not proven the laches defense by the preponderance of the evidence.

III.   INEQUITABLE CONDUCT.

53. In order to prevail on an inequitable conduct defense, "the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. The accused infringer must prove both elements – intent and materiality – by clear and convincing evidence." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc) (internal citations omitted). "[G]ross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." Id. at 1290. In a case that involves the nondisclosure of a prior art reference, "clear and convincing evidence must show that

the applicant made a deliberate decision to withhold a known material reference."  Id. (internal

quotation marks and emphasis omitted)."  Accordingly, "the accused infringer must prove by clear

and convincing evidence that the applicant knew of the reference, knew that it was material, and

made a deliberate decision to withhold it."  Id.  While the trial court "may infer intent from indirect

and circumstantial evidence[,]" the intent to deceive must be "the single most reasonable inference

able to be drawn from the evidence."  Id. (internal quotation marks omitted).  The evidence "must

be sufficient to require a finding of deceitful intent" under the circumstances.  Id. (internal quotation

marks omitted).  Intent to deceive may not be found where "there are multiple reasonable

inferences that may be drawn[.]"  Id. at 1290-91.

54.  Cochlear asserts that AMF engaged in inequitable conduct as to the '616 patent, due

to the failure of Bryant Gold, one of AMF's patent prosecutors, to disclose the 1989 McDermott

article.  (See Cochlear's Bench Tr. Br. at 14-16).

55.  The jury provided an advisory verdict that Cochlear did not prove inequitable conduct

by clear and convincing evidence.  (See Verdict Form at 9-10).

56.  Based on the record, the court is not persuaded that it should disturb the jury's advisory

verdict.  As for materiality, AMF presented evidence that the 1989 McDermott article was

cumulative of the cited prior art.  See Therasense, 649 F.3d at 1291 (but-for materiality standard

for materiality).  It is undisputed that the Applicants disclosed the McDermott '844 patent during

prosecution.  (See PTO, App. A, at Nos. 14-15, 18-19).  Gold testified that cited prior art, such as

the McDermott '844 patent, the Borkan '934 patent, and the Schulman '679 patent, "disclose[d]

everything and more than is disclosed in the McDermott article."  (RT, Jan. 21, 2014, vol. 1, at

80:15-86:18 & 88:9-12).  Based on the jury's advisory verdict, the jury apparently found Gold's

testimony credible.  The court agrees with the jury's credibility finding.  Based on the current

record, it is reasonable to conclude that the 1989 McDermott article was cumulative.  See

Therasense, Inc., 649 F.3d at 1290-91.  Thus, Cochlear has not proven materiality by clear and

convincing evidence.

57.  As for intent to deceive, AMF presented evidence that Gold did not have the requisite

intent, for instance, because he did not consider the McDermott material.  (See, e.g., RT, Jan. 21,

2014, vol. 1, at 80:12-83:16 & 86:11-18); see Therasense, Inc., 649 F.3d at 1290 ("the accused

infringer must prove by clear and convincing evidence that the applicant . . . knew that [the

reference] was material"). Based on the evidence regarding the cited prior art, it is reasonable to

conclude that Gold considered the 1989 McDermott article cumulative during prosecution. Under

the circumstances, intent to deceive is not the most reasonable inference drawn from the

evidentiary record. See id.

58. Cochlear has not proven inequitable conduct by clear and convincing evidence, so the

'616 patent is not unenforceable due to inequitable conduct.

IV.    PROSECUTION HISTORY ESTOPPEL.[7]

59. "Prosecution history estoppel prevents a patentee from recapturing under the doctrine

of equivalents subject matter surrendered during prosecution to obtain a patent." Cross Med.

Prods. v. Medtronic Sofamor Danek, Inc., 480 F.3d 1335, 1341 (Fed. Cir. 2007); see Festo Corp.

v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 738, 122 S.Ct. 1831, 1841 (2002).

"There are two distinct theories that fall under the penumbra of prosecution history estoppel –

amendment-based estoppel and argument-based estoppel. . . . In general, prosecution history

estoppel, under either theory, requires that patent claims be interpreted in light of the proceedings

before the PTO." Deering Precision Instr., L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314,

1324-25 (Fed. Cir. 2003), cert. denied, 540 U.S. 1184 (2004).

60. For amendment-based estoppel, where the applicant "narrowed the claim in response

to a rejection, courts may presume the amended text was composed with awareness of this rule

and that the territory surrendered is not an equivalent of the territory claimed." Deering Precision

_____

[7]   AMF notes that Cochlear abandoned its prior prosecution history estoppel argument as to the
"means for transmitting" limitation in the '691 patent, which purportedly barred the use of the
doctrine of equivalents to cover a single-antenna implant.  (See AMF's Bench Tr. Br. at 17-18).
Cochlear did not present this argument during the bench trial.  (See, generally, Cochlear's Bench
Tr. Br. at 16-18; RT, Jan. 22, 2014, vol. 2; Defendants' Cochlear Ltd. and Cochlear Americas'
Proposed Findings of Fact and Conclusions of Law; Defendants Cochlear Ltd. and Cochlear
Americas' Opening Statement) (no reference to "means for transmitting" limitation or antenna-
based theory for prosecution history estoppel).  Accordingly, it is unnecessary to address this
limitation.

1  Instr., L.L.C., 347 F.3d at 1325 (internal quotation marks omitted).  In order to rebut the

2  presumption, "the patentee must show that at the time of the amendment one skilled in the art

3  could not reasonably be expected to have drafted a claim that would have literally encompassed

4  the alleged equivalent."  Id. (internal quotation marks omitted).  The patentee may do so by

5  showing that (1) "the equivalent may have been unforeseeable at the time of the amendment;" (2)

6  "the rationale underlying the amendment may bear no more than a tangential relation to the

7  equivalent in question;" or (3) "there may be some other reason suggesting that the patentee could

8  not reasonably be expected to have described the insubstantial substitute in question."  Id.  As for

9  argument-based estoppel, the "prosecution history must evince a clear and unmistakable

10  surrender of subject matter."  Id. at 1326 (internal quotation marks omitted).

11      61.  Cochlear argues that AMF narrowed claim 10 of the '616 patent by:  (1) adding the

12  "displaying" limitation to overcome the prior art; and (2) modifying the "selectively monitoring"

13  limitation.  (See Cochlear's Bench Tr. Br. at 16-18).  Cochlear also notes that in the response to

14  the Amendment, the Examiner withdrew the rejection, stating that claim 10 is "allowable over the

15  prior art of record since the prior art does not show or suggest the measuring of the electrode

16  voltage for external display."  (Id. at 17) (emphasis from brief omitted).

17      62.  AMF argues that it has rebutted the Festo presumption, because the focus of the

18  amendment was on "the displaying capability of the invention, not on any particular type of

19  information that must be displayed."  (AMF's Bench Tr. Br. at 16).  In addition, AMF contends that

20  "the Patent Examiner focused on the fact that this invention, as opposed to the [prior art]

21  pacemaker, allowed for a display of the data measurements that are taken in real time."  (Id. at

22  17 (quoting the Claim Construction Order)) (emphasis omitted).  As for the "selectively monitoring"

23  limitation, AMF asserts that the modification is tangential to the equivalent at issue in the

24  "displaying" limitation.  (See AMF's Bench Tr. Br. at 17).  Finally, AMF argues that the statements

25  of the Examiner alone cannot give rise to prosecution history estoppel.  (Id.).

26      63.  Based on a review of the prosecution history and the parties' briefing, the court is

27  persuaded by AMF's arguments.  As for the "displaying" limitation, the Applicants' addition of the

28  "displaying" limitation to claim 10 was directed towards overcoming the pacemaker prior art that

lacked a display.  "'[T]he inquiry into whether a patentee can rebut the <u>Festo</u> presumption under the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing amendment.'"  <u>Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.</u>, 517 F.3d 1364, 1378 (Fed. Cir. 2008) (quoting <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.</u>, 344 F.3d 1359, 1367 (Fed. Cir. 2003)).  An amendment may be "tangential," where the focus of the amendment was not the equivalent at issue.  <u>See</u>, <u>e.g.</u>, <u>Regents of the Univ. of Cal.</u>, 517 F.3d at 1378 ("The prosecution history therefore reveals that in narrowing the claim to overcome the prior art rejections, the focus of the patentees' arguments centered on the method of blocking – not on the particular type of nucleic acid that could be used for blocking."); <u>Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.</u>, 616 F.3d 1357, 1369-70 (Fed. Cir. 2010) ("It is apparent that the nature of the insulating material was not a factor in the allowance . . . .  This limitation is in the category that the Court called 'merely tangential' to the prosecution, as discussed in <u>Festo</u>.  Thus the district court correctly held that the cancellation of claims 1 and 2 did not surrender access to equivalency with respect to the insulating material. The district court appropriately tried the question of equivalency to the jury.").  Here, the prior art rejection and the amendment to add the "displaying" limitation was focused on the displaying capability of its invention, not on the particular type of information that must be displayed.  Thus,  the "objectively apparent reason" for the amendment was to overcome the pacemaker prior art, which did not include the real-time display of data.  <u>See</u> <u>Regents of the Univ. of Cal.</u>, 517 F.3d at 1378 ("prosecution history estoppel will not bar the doctrine of equivalents when 'the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent'").

64.  As for the "selectively monitoring" amendment, the Examiner rejected claim 10 (then claim 12), on the basis of § 112, explaining, for instance, that it is "indefinite in the use of the alternative phrase voltages/current." (<u>See</u> Exh. 1303 at COC-2116).  The Examiner reiterated that voltage measurements require a reference. (<u>See</u> <u>id.</u>).  In the Amendment, the Applicants replaced "voltages/currents" with "a voltage . . . ."  (<u>See</u> Exh. 1303 at COC-2205).  While it is possible that the amendment to the "selectively monitoring" limitation may foreclose a doctrine of equivalents argument regarding the "voltage" in that step, the court is not persuaded by Cochlear's argument

that AMF should be broadly "estopped from asserting infringement of claim 10 under the doctrine of equivalents." (See Cochlear's Bench Tr. Br. at 17). Here, the equivalent at issue is in the "displaying" step of claim 10. (See id. at 18). However, claim 10 recites several intermediate steps between the "selectively monitoring" and "displaying" steps, which even involve processing the data. (See '616 patent at col. 35:56-36:8). In particular, after the electrodes have been "selectively monitored" to "measure a voltage," the (1) "status-indicating signals representative of the measurements" are generated, (2) these signals are transmitted, and (3) the "status-indicating signals" are processed "to produce processed status-indicating signals," which are then (4) displayed in the "displaying" step. Under the circumstances, the amendment of the "selectively monitoring" limitation is "tangential" to the equivalent in the "displaying" step. See Regents of the Univ. of Cal., 517 F.3d at 1376. The court's review of the prosecution history does not indicate the surrender of the doctrine of equivalents in the "displaying" step. See Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1291 (Fed. Cir. 2010) ("There is no reason why a narrowing amendment should be deemed to relinquish equivalents . . . beyond a fair interpretation of what was surrendered.") (internal quotation marks omitted).

65. Finally, Cochlear asserts that AMF is estopped from asserting infringement of claim 10 under the doctrine of equivalents based on the Examiner's statement that "the prior art does not show or suggest the measuring of the electrode voltage for external display." (Cochlear's Bench Tr. Br. at 17) (citing Exh. 1303 at COC-2221). Cochlear's assertions are unpersuasive. The Examiner's Notice of Allowance cannot, by itself, give rise to disavowal of claim scope. See Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("The parties . . . contest whether the applicant's silence to the examiner's remarks in the Examiner's Statements of Reasons for Allowance amounts to a clear disavowal of claim scope . . . . [S]uch statements do not amount to a clear disavowal of claim scope[.]"). Moreover, the court interprets Examiner Kamm's emphasis to be on the "external display," and does not interpret the Examiner's comment as requiring the display of a voltage value. Indeed, during claim construction, the court rejected a similar argument by Cochlear that claim 10 "must be construed to require that the display be in voltage form." (Claim Construction Order at 2). The court explained that "the Patent Examiner

1   did not emphasize the measuring and displaying of the electrode voltage in voltage form.  Rather,

2   the Patent Examiner focused on the fact that this invention, as opposed to a pacemaker, allowed

3   for a display of the data measurements that are taken in real time."  (See id. at 3) (emphasis in

4   original).

5       66.  In short, the court finds that AMF rebutted the Festo presumption, and that AMF is not

6   foreclosed from arguing that the "displaying" step in claim 10 is met under the doctrine of

7   equivalents.

8   V.    INDEFINITENESS.[8]

9       67.  A patent is presumed to be valid.  35 U.S.C. § 282.  A party challenging the validity of

10  a patent must prove invalidity by clear and convincing evidence.  Intel Corp. v. VIA Techs., 319

11  F.3d 1357, 1366 (Fed. Cir. 2003) ("Any fact critical to a holding on indefiniteness, moreover, must

12  be proven by the challenger by clear and convincing evidence.").

13      68.  Whether a claim is indefinite or definite is a question of law.  See DDR Holdings, LLC

14  v. Hotels.com, L.P., 773 F.3d 1245, 1260 (Fed. Cir. 2014).  The indefiniteness or definiteness

15  analysis requires a determination of whether one skilled in the art would understand the bounds

16  of the claim when read in light of the specification.  See Personalized Media Commc'ns, LLC v.

17  Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Determining whether a claim is definite

18  requires an analysis of whether one skilled in the art would understand the bounds of the claim

19  when read in light of the specification. . . . If the claims read in light of the specification reasonably

---

21  [8]  In the bench trial, Cochlear also argued indefiniteness as to the "means in the WP for receiving
    and processing the ICS-status-indicating signals" limitation in claims 6 and 7 of the '691 patent.
22  (See, e.g., Direct Testimony of Robert J. Stevenson, Ph.D. Re Indefiniteness ("Stevenson Decl.")
    at ¶¶ 15-18) (Document No. 410).  However, Cochlear did not identify the indefiniteness issue for
23  this limitation in its Memorandum of Contentions of Fact and Law.  (See, generally, Def.'s
    Memorandum of Contentions of Fact and Law at 50-54) (Document No. 310).  Nor did Cochlear
24  identify this limitation in its claim construction briefing or its motion for summary judgment.  (See
    Integrated, Joint Brief on Claim Construction at 7) (Document No. 59) (Joint Brief re: Summary
25  Judgment Motions at 27-30 (Document No. 246).  Finally, the parties did not identify the claim
    limitations at issue for indefiniteness in the pretrial order.  (See, generally, PTO).  Under the
26  circumstances, the court finds that Cochlear waived the indefiniteness argument as for the "means
    in the WP for receiving and processing the ICS-status-indicating signals" limitation in claims 6 and
27  7.  AMF's objection to Cochlear's inclusion of this limitation in its indefiniteness case, (see AMF's
    Bench Tr. Br. at 13-14), is sustained.

apprise those skilled in the art of the scope of the invention, § 112 demands no more.") (internal

quotation marks omitted); see also Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2129

(2014) ("[W]e read §112, ¶ 2 to require that a patent's claims, viewed in light of the specification

and prosecution history, inform those skilled in the art about the scope of the invention with

reasonable certainty."); Source Search Tech. LLC v. LendingTree, LLC, 588 F.3d 1063, 1077

(Fed. Cir. 2009) ("[T]his court measures indefiniteness according to an objective measure that

recognizes artisans of ordinary skill are not mindless 'automatons.'").

69.  "While it is undisputed that the question of whether a claim is indefinite is based on how

the claim limitation would be understood by one of skill in the art, the testimony of one of ordinary

skill in the art cannot supplant the total absence of structure from the specification." Noah Sys.,

Inc. v. Intuit Inc., 675 F.3d 1302, 1312 (Fed. Cir. 2012) (internal quotation marks omitted); see also

Intel, 319 F.3d at 1366 (holding that the internal circuitry of an electronic device need not be

disclosed in the specification if one of ordinary skill in the art would understand how to build and

modify the device); Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1341 (Fed. Cir.), cert.

denied, 555 U.S. 1070 (2008) ("This court does not impose a lofty standard in its indefiniteness

cases."); Telcordia Techs., Inc. v. Cisco Sys., 612 F.3d 1365, 1377 (Fed. Cir. 2010) (where

defendant bears the burden of proving that an ordinary artisan would not understand the

disclosure, finding that the trial record did not show that an ordinary artisan would not understand

the link between the controller and the monitoring function).

70.  "In a means-plus-function claim in which the disclosed structure is a computer, or

microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed

algorithm." WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999).

Accordingly, a means-plus-function limitation can be indefinite, due to the failure to adequately

disclose an algorithm corresponding to the microprocessor's function. See Noah Sys., 675 F.3d

at 1312 ("In cases such as this one, involving a special purpose computer-implemented

means-plus-function limitation, this court has consistently required that the structure disclosed in

the specification be more than simply a general purpose computer or microprocessor.  We require

1   that the specification disclose an algorithm for performing the claimed function.") (internal

2   quotation marks, footnote, and citation omitted); see also Net MoneyIN, Inc. v. VeriSign, Inc., 545

3   F.3d 1359, 1367 (Fed. Cir. 2008) ("To avoid purely functional claiming in cases involving

4   computer-implemented inventions, we have consistently required that the structure disclosed in

5   the specification be more than simply a general purpose computer or microprocessor.") (internal

6   quotation marks omitted).

7        71.  "For a claim to be definite, a recited algorithm, or other type of structure for a section

8   112(f) claim limitation, need not be so particularized as to eliminate the need for any

9   implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds

10  of the claim – declared by section 112(f) to cover the particular structure and its equivalents –

11  understandable by the implementer."  Ibormeith IP, LLC v. Mercedes-Benz USA, LLC, 732 F.3d

12  1376, 1379 (Fed. Cir. 2013).  "The usage 'algorithm' in computer systems has broad meaning, for

13  it encompasses in essence a series of instructions for the computer to follow, whether in

14  mathematical formula, or a word description of the procedure to be implemented by a suitably

15  programmed computer."  Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1384 (Fed. Cir.

16  2011) (internal quotation marks and citation omitted); see Finisar, 523 F.3d at 1340 ("This court

17  permits a patentee to express that algorithm in any understandable terms including as a

18  mathematical formula, in prose, . . . or as a flow chart, or in any other manner that provides

19  sufficient structure.") (internal citation omitted).

20       A.   Claim 1 of the '616 Patent.

21       72.  Claim 1 of the '616 patent discloses a "physician's tester," comprising, among other

22  things, an "external processor means coupled to the transmitting means of the external

23  headpiece/transmitter for receiving and processing the status-indicating signals to derive

24  information therefrom regarding the operation of the implanted stimulator and its plurality of tissue

25  stimulating electrodes."   The parties agree that the "external processor means" limitation is a

26  means-plus-function limitation.  (See Joint Brief re: Summary Judgment Motions at 9 & 29).  For

27  purposes of this inquiry, the relevant part of the function is "processing the status-indicating signals

28  to derive information therefrom regarding the operation of the implanted stimulator and its plurality

of tissue stimulating electrodes."  The parties agree that the corresponding structure is an antenna, receiver, and microprocessor.  (See R&R at 3-4).

73.  The court previously found that the disclosed microprocessor is programmed, and therefore, an adequate disclosure of an algorithm is required.  (See Court's Order January 3, 2014, at 35).

74.  Cochlear argues that claim 1 of the '616 patent is indefinite, because it fails to disclose an algorithm for "processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes."  (See Stevenson Decl. at ¶ 19).

75.  The "external processor means . . . for . . . processing the status-indicating signals" claim limitation relates to the "physician's tester," which is described in columns 32-33 of the '616 patent.  Cochlear's expert posits that "[t]here is very little disclosure to inform [his] inquiry regarding processing status-indicating signals" in that section.  (See Stevenson Decl. at ¶ 21). Having reviewed the specification, the court agrees.  The physician's "tester monitors the performance parameters of the ICS 12 by detecting the back telemetry signal of the ICS in an interrogation protocol[9] for the microprocessor."  ('616 patent at col. 32:60-62).  After the tester stores the back telemetry signal in its memory, the tester's control panel, "which contains electronic circuitry," "conver[ts] the back telemetry signal into directly readable information[,] which is read out on the LCD display 304."  (Id. at col. 32:63-33:2).  In addition, the control panel's knobs can be adjusted to change the values that are measured and displayed.  The knobs "control potentiometers, the position of which are read by the microprocessor 30 to control the commands . . . and hence the parameters measured and displayed by the ICS and Physician's Tester combination."  (Id. at col. 33:14-18).  In short, while the "physician's tester" section generally explains that the tester converts the back  telemetry signal into readable information and that the microprocessor helps control the commands, it does not disclose how the microprocessor

---

[9]  "Interrogation protocol" is not defined or discussed in the '616 patent.  (See, generally, '616 patent).

1  "processes" the signal from the implant "to derive information therefrom regarding the operation"

2  of the implant and the electrodes.  (See id. at col. 34:46-52).

3      76.    The tester described in Figure 7 is based on the components in the wearable

4  processor.  (See '616 patent at col. 32:55-59; Figs. 1 & 7).  Thus, the court reviews the

5  corresponding discussion of the microprocessor.  (See id. at col. 5).  The ICS's "processor 46

6  selectively monitors the voltage applied . . . and generates a status indicating signal relative to

7  such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry

8  receiver 36 [in the wearable processor].  As previously stated, such information is utilized in the

9  microprocessor 30 and gate array 32 of the WP 16 to control the power level[.]"  (Id. at col. 5:38-

10  47).  Similarly, "power level indicating signals" are received by the transmitter (Block 36) in the WP

11  "and processed in the microprocessor 30 and gate array 32 to generate signals controlling the

12  power level."  (Id. at col. 5:8-13).  Like columns 32-34, this discussion does not provide significant

13  guidance regarding how the microprocessor "processes" the signal from the implant "to derive

14  information therefrom regarding the operation" of the implant and the electrodes.  (See id. at col.

15  34:46-52).  The court has reviewed the rest of the specification, and it has not located an express

16  disclosure of an algorithm for the "processing the status-indicating signals" function.

17      77.  AMF argues that the '616 patent discloses an algorithm for the "processing the status-

18  indicating signals . . ." limitation.[10]  Specifically, AMF's expert, Dr. Darrin Young, Ph.D. ("Young"),

19  asserts that the '616 patent discloses an algorithm for the microprocessor that "includes the steps

20  of (1) accepting from the receiver signals representative of measured voltage," and "(2) applying

21  Ohm's law to convert the measured voltage or voltage and current into an impedance value."

22  (Declaration of Dr. Darrin J. Young in Opposition to Cochlear Defendants' Indefiniteness Claim

23  ("Young Decl.") at ¶ 30) (Document No. 406).  He further explains that Figure 6 and the tables

24  identify "impedance" as a value that has been derived.  (See id. at ¶ 29; '616 patent at Fig. 6, col.

25  33:23-54).  He then states that a person of ordinary skill in the art would understand from the

26

27  ───────────────

28  [10]    AMF has not identified another algorithm in its briefing or supporting declaration.  (See,
    generally, AMF's Bench Tr. Br. at 10-12; Young Decl.).

1    specification that the tester instructs the microprocessor to calculate impedance, and that one of

2    ordinary skill would know that "[t]he algorithm for calculating impedance is Ohm's law[.]"  (See

3    Young Decl. at ¶¶ 31 & 34).

4         78.  AMF's argument is based on the premise that the patentee necessarily disclosed

5    Ohm's law by identifying impedance and voltage.  The court is not persuaded by AMF's argument.

6    First, the '616 patent does not identify Ohm's law in the disclosure.  (See, generally, '616 patent).

7    Second, AMF's theory that a person of ordinary skill in the art would know how to calculate

8    impedance by using Ohm's law does not mean that the patentee adequately disclosed an

9    algorithm.  See Blackboard, Inc. v. Desire2Learn, Inc., 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("The

10   question before us is whether the specification contains a sufficiently precise description of the

11   'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the

12   art could devise some means to carry out the recited function.").  Third, AMF practically concedes

13   that there are multiple ways to calculate impedance.  (See Young Decl. at ¶ 41) (discounting

14   relevance of alternate equation to calculate impedance); See also Noah Sys. Inc., 675 F.3d at

15   1317 ("We explained that the disclosure must identify the method for performing the function,

16   whether or not a skilled artisan might otherwise be able to glean such a method from other

17   sources or from his own understanding. . . . That various methods might exist to perform a function

18   is 'precisely why' the disclosure of specific programming is required.") (citations and emphasis

19   omitted).

20        79.  Based on the court's review of the specification and the evidence presented during the

21   trials, the court finds that the '616 patent does not disclose an algorithm for "processing the

22   status-indicating signals to derive information therefrom regarding the operation of the implanted

23   stimulator and its plurality of tissue stimulating electrodes."  Defendants have proven by clear and

24   convincing evidence that the '616 patent fails to disclose the algorithm necessary to achieve the

25   claimed function.  See WMS Gaming, Inc., 184 F.3d at 1349; Aristocrat Techs. Austl. Pty Ltd. v.

26   Int'l Game Tech., 521 F.3d 1328, 1333-38 (Fed. Cir.), cert. denied, 555 U.S. 1070 (2008).  Thus,

27   claim 1 of the '616 patent is invalid as indefinite.

28

B.     Claims 6 and 7 of the '691 Patent.

80.   Claims 6 and 7 of the '691 patent require a "means for generating data indicative of the audio signal."[11]  This claim limitation has been determined to be a means-plus-function element.  (See R&R at 28).  The recited function is "generating data indicative of the audio signal," and the corresponding structure is "a microprocessor."  (See R&R at 26 & 28; Claim Construction Order at 25).

81.   The court previously found that the microprocessor structure corresponding to the "means for generating data indicative of the audio signal" requires the disclosure of a corresponding algorithm.  (See Court's Order of January 3, 2014, at 32).

82.   Cochlear argues that the '691 patent fails to disclose any algorithm for the microprocessor to perform the "generating data indicative of the audio signal" limitation in claims 6 and 7.  (Cochlear's Bench Tr. Br. at 10-11).  Cochlear's expert, Dr. Robert J. Stevenson, Ph.D., ("Stevenson") asserts that the specification's description only "provides that a digitized signal is applied to microprocessor 30[,]" and that the "output from the microprocessor is converted into a serial bit stream for transmission to the ICS[.]"  (Stevenson Decl. at ¶ 12).  Indeed, the specification explains that the audio signals are "processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30."  ('691 patent at col. 4:49-52).  The specification further states that "[t]he output of the microprocessor 30 is coupled through the custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34."  (Id. at col. 4:59-62).  Thus, the specification describes the signal flow into the microprocessor (Block 30), as well as the signal flow out of the microprocessor.   However, this section of the specification does not disclose how the microprocessor generates the "data indicative of the audio signal."

83.   The specification also describes an embodiment where the "filter bank may . . . be implemented as a group of digital filters, for example in a digital signal processor integrated

---

[11]   Claim 7 of the '691 patent depends on claim 6 and therefore incorporates the "means for generating data indicative of the audio signal" by reference.

circuit." ('691 patent at col. 4:52-55); (see id. at Fig. 1) (identifying multichannel filter bank as Block 24).  In this embodiment, "the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital filter, then into a digital filter bank 24 and the general processing of microprocessor 30."  (Id. at col. 4:52-58).  While this portion of the specification discloses a variation in the signal flow, it is still silent regarding what happens within the microprocessor.  Rather, the '691 patent discloses "general processing of microprocessor 30." (Id.).  The court has reviewed the rest of the specification, and it has not located an express disclosure of an algorithm for the "means for generating data indicative of the audio signal" requirement.

84.  In response, AMF asserts that claims 6 and 7 of the '691 patent are not indefinite, because the microprocessor "implement[s] a logarithmic conversion algorithm to generate data indicative of [an] audio signal."[12]  (AMF's Bench Tr. Br. at 12).  AMF's expert, Young, posits that "the steps (or algorithm) performed by the microprocessor in the '691 patent to be: (1) receiving digital data from the analog to digital converter and (2) using a logarithmic conversion function to format the received data to be encoded on an amplitude modulated signal."  (Young Decl. at ¶ 15). AMF argues that "because the implant includes an 'exponential D to A converter'" to decompress data, the "microprocessor in the WP must employ a logarithmic conversion algorithm[.]"  (AMF's Bench Tr. Br. at 12).  The specification discloses the implanted cochlea system (i.e., implant), that uses "an exponential D to A converter 64."  (see '691 patent at Fig. 2, col. 5:62 & col. 6:58). Young asserts that the "algorithm is implemented with a simple logarithmic lookup table[,]" and that he "know[s] of no other way to implement such a logarithmic algorithm in a DSP."  (Young Decl. at ¶ 17).

85.  Based on the intrinsic record and the evidence presented in trial, the court is not persuaded by AMF's theory.  First, while it may be necessary for the wearable processor (WP) (Block 16 in Figure 1) in the '691 patent to perform a logarithmic conversion, because the

---

[12]  AMF has not identified another algorithm in its briefing or supporting declaration.  (See, generally, AMF's Bench Tr. Br. at 12-13; Young Decl.).

implantable cochlear system includes an exponential D/A converter, it has not been established that the logarithmic conversion must take place in the microprocessor (Block 30).  AMF's expert admitted that the '691 patent does not state that the logarithmic conversion must take place in the microprocessor.  (See RT, Jan. 22, 2014, vol. 2, at 99:2-4) (Q: "Does the patent say that that function, the logarithmic conversion, is done in the microprocessor?"; A: "The patent doesn't say that.").  Moreover, Young admitted that the logarithmic function could be performed by the A to D converter.  (See id. at 98:13-15) (Q: "So it can't be in the A to D converter?"; A: "You could implement a logarithmic function into the A to D converter").  Young later admitted that based on the disclosure of an exponential delay, the logarithmic function must generally take place in the wearable processor, not specifically in the microprocessor.  (See id. at 100:20-24) (Q: "The patent doesn't say how to implement a logarithmic function in the microprocessor; does it?"; A: "The patent disclose an exponential delay. And when I read that, it suggests to me they got to be a logarithmic function in the external wearable processor.").  Stevenson, Cochlear's expert, confirmed that the logarithmic conversion can take place using a logarithmic A to D converter.  (See, e.g., id. at 78:5-15).  Under the circumstances, the court is not persuaded by AMF's theory, which is based on the flawed assumption that the logarithmic conversion must be performed by the microprocessor.

    86.  AMF's algorithm theory is also unavailing, because the record demonstrates that there are multiple logarithmic algorithms.  See Noah Sys. Inc., 675 F.3d at 1317 ("We explained that the disclosure must identify the method for performing the function, whether or not a skilled artisan might otherwise be able to glean such a method from other sources or from his own understanding. . . . That various methods might exist to perform a function is 'precisely why' the disclosure of specific programming is required.") (citations and emphasis omitted).  AMF has not presented credible evidence that there is only a single algorithm available, i.e., "a simple logarithmic lookup table[.]" (See Young Decl. at ¶ 17).  Young's declaration is equivocal on the topic.  (See id.) ("I know of no other way to implement such a logarithmic algorithm in a DSP.") (emphasis added).  Moreover, during the bench trial, Young admitted that there are additional possible algorithms, such as a power series algorithm and a binary logarithmic algorithm.  (See

1    RT, Jan. 22, 2014, vol. 2, at 99:2-100:21).  Thus, the disclosure in the '691 patent of the purported

2    algorithm for the microprocessor is deficient.

3        87.  Based on the foregoing, claims 6 and 7 of the '691 patent are invalid as indefinite

4    because it has been proven by clear and convincing evidence that the specification of the '691

5    patent fails to disclose the requisite algorithm for the microprocessor to perform the "means for

6    generating data indicative of the audio signal" function.  See 35 U.S.C. § 112(f); WMS Gaming,

7    Inc., 184 F.3d at 1349; Aristocrat Techs. Austl. Pty Ltd. , 521 F.3d at 1333-38.

8        88.  Any conclusion of law that more correctly constitutes a finding of fact should be treated

9    as such.

10                                    **CONCLUSION**

11       Based on the foregoing, IT IS ORDERED that:

12       1.  Defendants have not met their burden to show that plaintiff should be equitably estopped

13   from enforcing its claims.

14       2.  Defendants have not met their burden to show that plaintiff should be barred from pre-

15   suit damages under the doctrine of laches.

16       3.  Defendants have not met their burden to show that plaintiff committed inequitable

17   conduct before the PTO.

18       4.  Plaintiff is not prevented from asserting an infringement theory under the doctrine of

19   equivalents for the "displaying" limitation of claim 10 of the '616 patent.

20       5.  Claim 1 of the '616 patent, and claims 6 and 7 of the '691 patent are invalid on

21   indefiniteness grounds.

22   Dated this 31st day of March, 2015.

23                                    _____
                                                    /s/
                                           Fernando M. Olguin
24                                         United States District Judge

25

26

27

28

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ALFRED E. MANN FOUNDATION FOR      )    Case No. CV 07-8108 FMO (SHx)
    SCIENTIFIC RESEARCH,               )
12                                     )
                    Plaintiff,         )
13                                     )
           v.                          )    **ORDER RE: POST-TRIAL MOTIONS**
14                                     )
    COCHLEAR CORPORATION, et al.,      )
15                                     )
                    Defendants.        )
16  _____)

17        Having reviewed and considered all the briefing filed with respect to the parties' post-trial

18   motions, the court concludes that oral argument is not necessary to resolve the motions and

19   orders as follows.  See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d

20   675, 684 n. 2 (9th Cir. 2001).

21                            **BACKGROUND**

22        Plaintiff Alfred E. Mann Foundation for Scientific Research ("AMF" or "plaintiff") brings this

23   action, alleging that defendants Cochlear Corporation and Cochlear Ltd. (collectively, "Cochlear"

24   or "defendants") infringed two patents directed to cochlear implant technology.  (See First

25   Amended Complaint for Patent Infringement ("FAC") at ¶¶ 17 & 21-23; Reply and Counterclaims-

26   in-Reply to Cochlear Americas and Cochlear Limited's Counterclaims ("Pl.'s Supp. Claims") at 13-

27   14) (Document Nos. 164 & 171).  AMF alleges that Cochlear infringed U.S. Patent No. 5,938,691,

28   entitled "Multichannel Implantable Cochlear Stimulator" ("the '691 patent"), and U.S. Patent No.

1    5,609,616, entitled "Physician's Testing System and Method for Testing Implantable Cochlear

2    Stimulator" ("the '616 patent") (collectively, "the patents-in-suit").  (See FAC at ¶¶ 21-23; Pl.'s

3    Supp. Claims at 13-14).

4         The '691 patent is generally directed to a cochlea stimulation system comprising of:  (1) an

5    audio signal receiving device, i.e., a microphone; (2) a wearable processor ("WP") that receives

6    and processes audio signals; and (3) an implanted cochlea stimulator ("ICS") that receives data

7    representing the audio signals and stimulates electrodes.  (See '691 patent at Abstract, col. 3:9-39

8    & 34:51-35:6).  By stimulating the electrodes located within the cochlea, the implant can also

9    stimulate locations of the auditory nerve, so that the hearing impaired person's brain can perceive

10   sound.  (See id. at col. 1:24-27; Reporter's Transcript ("RT"), Jan. 14, 2014, vol. 2, at 79:13-15 &

11   85:18-25).  The '616 patent is generally directed to a system and a method for testing such a

12   system.  (See '616 patent at Abstract, col. 34:23-61 & 35:43-36:7).

13        The court, with the consent of the parties, appointed a Special Master for claim

14   construction.  (See Order re: Joint Status Report Regarding Appointment of Special Master at 1)

15   (Document No. 179).  The Special Master conducted a claim construction hearing, and issued a

16   Report and Recommendation.  (See Special Master's Report and Recommendation on Claim

17   Construction ("R&R") at 5) (Document No. 200).  After considering the parties' objections to the

18   R&R, the court issued its Claim Construction Order on June 18, 2012.[1]  (See Order re:  Parties'

19   Objections to the Special Master's Report on Claim Construction ("Claim Construction Order"))

20   (Document No. 212).  Advanced Bionics, LLC ("Advanced Bionics"), the exclusive licensee of the

21   asserted patents, (see Pl.'s Supp. Claims at 13), was joined as an involuntary plaintiff on January

22   13, 2014.  (See Final Pretrial Conference Order ("PTO") at 1) (Document No. 399).

23        The court conducted a jury trial, in which the jury found that Cochlear infringed claims 1 and

24   10 of the '616 patent, and claims 6 and 7 of the '691 patent.  (See Verdict Form at 1-4 & 5-8)

25   (Document No. 460).  The jury also found willful infringement of both asserted patents.  (See id.

26

27   _____

28        [1]  The case was transferred to the undersigned judge on January 18, 2013.  (See Order of the
     Chief Judge, dated Jan. 18, 2013) (Document No. 232).

1   at 4 & 8).  In addition, the jury found that the asserted claims are not invalid based on Cochlear's

2   obviousness and anticipation defenses.  (See id. at 4-5 & 8-9).  The jury awarded $131,216,325

3   damages, based on royalty rate of 7.5 percent.  (See id. at 10).  Finally, the jury provided an

4   advisory verdict in favor of AMF on inequitable conduct.  (See id. at 9-10).

5       Pending before the court are the parties' post-trial motions.  Cochlear filed a Motion for

6   Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. [] 50 ("JMOL"), with respect to:  (1) direct

7   and contributory infringement of the asserted claims; and (2) willful infringement of the asserted

8   patents, (see JMOL at 1) (Document No. 507),[2] and a Motion for New Trial pursuant to Fed. R.

9   Civ. P. 59 ("Rule 59 Motion") with respect to (1) infringement, (2) invalidity, and (3) damages

10  issues.  (See Defendants' Notice of Motion and Motion for New Trial at 1) (Document No. 508).[3]

11  Involuntary plaintiff Advanced Bionics moved to revise the proposed judgment, to state that

12  judgment is in favor of both AMF and Advanced Bionics.  (See Motion of Plaintiff Advanced

13  Bionics, LLC to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59 at 2)

14  (Document No. 504).

15  **COCHLEAR'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

16  I.    LEGAL STANDARD.[4]

17      Federal Rule of Civil Procedure 50 permits a district court to grant judgment as a matter of

18  law "when the evidence permits only one reasonable conclusion and the conclusion is contrary

19  to that reached by the jury."  Ostad v. Or. Health Scis. Univ., 327 F.3d 876, 881 (9th Cir. 2003).

20  If there is substantial evidence to support the jury's verdict, the court should deny a motion for

21

22  _____

23      [2]  The parties' Joint Brief Re Defendants' Renewed Motion for Judgment as a Matter of Law
    Pursuant to Fed. R. Civ. P. [] 50 ("JMOL Joint Br.")  was filed in its original form as Document No.
24  507-1, and in re-formatted form as Document No. 511-2.  For convenience, the court refers to the
    pagination in Document No. 511-2, unless otherwise specified.

25      [3]  The parties' Joint Brief Re Defendants' Motion For New Trial ("Rule 59 Joint Br.")  was filed
26  in its original form as Document No. 508-1, and in re-formatted form as Document No. 511-3.  For
    convenience, the court refers to the pagination in Document No. 511-3, unless otherwise specified.

27
        [4]  A motion for judgment as a matter of law "is not a patent-law specific issue, so regional circuit
28  law applies."  Harris Corp. v. Ericsson, Inc., 417 F.3d 1241, 1248 (Fed. Cir. 2005).

1    judgment as a matter of law.  See Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007).

2    "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate

3    to support a conclusion even if it is possible to draw two inconsistent conclusions from the

4    evidence." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994); see Wallace, 479

5    F.3d at 624.  "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff

6    has presented sufficient evidence to support the jury's conclusion." Wallace, 479 F.3d at 624.

7    The court must "view the evidence in the light most favorable to the nonmoving party . . . and draw

8    all reasonable inferences in that party's favor." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d

9    951, 961 (9th Cir. 2009) (internal quotations and citations omitted).  Because a post-verdict Rule

10   50(b) motion is "a renewed motion," it is "limited to the grounds asserted in the pre-deliberation

11   Rule 50(a) motion." Id.

12   II.    INFRINGEMENT.

13          Cochlear contends that AMF failed to present substantial evidence that it infringed the

14   asserted claims.  (See JMOL Joint Br. at 3-35).  A finding of patent infringement involves a

15   two-step analysis.  "First, the claims of the patent must be construed to determine their scope.

16   Second, a determination must be made as to whether the properly construed claims read on the

17   accused device." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir.

18   1999) (internal citation omitted); Carroll Touch, Inc. v. Electro Mechanical Sys., Inc., 15 F.3d 1573,

19   1576 (Fed. Cir. 1993).  The first step of claim construction is a question of law; the second step

20   is a question of fact.  See Pitney Bowes, 182 F.3d at 1304.

21          A.    Applicable Law.

22          "Infringement is assessed by comparing the accused device to the claims; the accused

23   device infringes if it incorporates every limitation of a claim, either literally or under the doctrine

24   of equivalents.  If, however, even one claim limitation is missing or not met, there is no literal

25   infringement." MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005)

26   (quotation marks and brackets omitted); Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317

27   (Fed. Cir. 2009) ("To infringe a method claim, a person must have practiced all steps of the

28

4

**A00010**

1   claimed method."); Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) ("A method

2   claim is directly infringed only by one practicing the patented method.") (emphasis omitted).

3       "A finding of infringement under the doctrine of equivalents requires a showing that the

4   difference between the claimed invention and the accused product was insubstantial.  One way

5   of doing so is by showing on a limitation by limitation basis that the accused product performs

6   substantially the same function in substantially the same way with substantially the same result

7   as each claim limitation of the patented product." Crown Packaging Tech., Inc. v. Rexam Bev.

8   Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citations omitted); see also Festo Corp. v.

9   Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 732, 122 S.Ct. 1831, 1837-38 (2002)

10  (explaining that prosecution history estoppel limits the range of equivalents). "Infringement, either

11  literal or under the doctrine of equivalents, is a question of fact." Brilliant Instruments, Inc. v.

12  GuideTech, LLC, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (citing Crown Packaging Tech., 559 F.3d

13  at 1312). "[P]laintiff has the burden of proving infringement by a preponderance of the evidence."

14  Kegel Co. v. AMF Bowling, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

15      B.  Claim 10 of the '616 Patent.[5]

16          1. **Claim Construction.**

17      Claim 10 of the '616 patent states as follows:

18          10.  A method of testing an implantable tissue stimulating system comprising:

19          transmitting data-containing signals to an implanted stimulator from an

20          external transmitter;

21          selectively controlling the data-containing signals as they are thus

22          transmitted;

23          receiving the data-containing signals within the implanted stimulator, the

24          implanted stimulator having a multiplicity of tissue-stimulating electrodes;

25

26

27     [5] In its bench trial order issued contemporaneously with this Order, the court found that claim

28  1 of the '616 patent and claims 6 and 7 of the '691 patent are invalid for indefiniteness. Accordingly, the discussion in this section will be limited to claim 10 of the '616 patent.

1    processing the data-containing signals within the implanted stimulator to

2    generate stimulation signals;

3    applying the stimulation signals to at least one pair of the multiplicity of tissue

4    stimulating electrodes;

5    selectively monitoring the at least one pair of the multiplicity of electrodes to

6    measure a voltage associated therewith at the same time the stimulation

7    signals are applied thereto;

8    generating stimulator status-indicating signals representative of the

9    measurements made within the implanted stimulator;

10    transmitting the stimulator status-indicating signals to an external receiver

11    coupled to the external transmitter;

12    receiving and processing the status-indicating signals to produce processed

13    status-indicating signals which convey information regarding the status of the

14    implanted stimulator, including the measurements made within the implanted

15    stimulator; and

16    displaying the processed status-indicating signals, whereby the status of the

17    implanted stimulator, including the results of the measurements made within

18    the implanted stimulator, may be made known.

19    ('616 patent, col. 35:43-36:7) (emphasis added).

20        For claim construction, the parties agreed that there was no need to construe the term

21    "implanted cochlear stimulator." (See R&R at 2). Accordingly, there is no need to construe the

22    equivalent term, "implanted stimulator." Per the parties' agreement, the court construed the

23    phrase, "selectively controlling the data-containing signals as they are thus transmitted," as

24    "adjusting the data-containing signals which contain data used to set the stimulation signals." (Id.

25    at 8). With respect to the "receiving the data-containing signals" limitation, the court construed the

26    term "tissue-stimulating electrodes" as "electrodes used in stimulating tissue." (Id. at 82). The

27    court found that the term "multiplicity of tissue-stimulating electrodes" should be given its plain and

28    ordinary meaning. (See id.). As for the "applying the stimulation signals" limitation, the court

6

A00012

1    found that the term "applying the stimulation signals" does not require construction.  (See R&R at

2    96; Claim Construction Order at 23-24).  The court also found that "tissue-stimulating electrodes"

3    should be construed as "electrodes used in stimulating tissue."  (R&R at 82; Claim Construction

4    Order at 18-19).  In addition, the court found that "one pair of the multiplicity of tissue-stimulating

5    electrodes" should be given its plain and ordinary meaning.  (See R&R at 82).

6         With respect to the "selectively monitoring" limitation, the court found, per the parties'

7    agreement, that "at the same time the stimulation signals are applied thereto" should be

8    interpreted as "the measurement of the voltage is made at the same time the stimulation signal

9    is applied."  (R&R at 8).  Likewise, per the parties' agreement, the court found that "voltage

10   associated therewith" should be construed as "voltage across a pair of electrodes."  (Id.).

11        As for the "generating stimulator status-indicating signals" limitation, the court found, per

12   the parties' agreement, that "[t]he measurements made within the implanted stimulator" should be

13   interpreted as "voltage across a pair of electrodes."  (R&R at 8).  As for the "transmitting the

14   stimulator status-indicating signals" limitation, the court found that the term, "transmitting the

15   stimulator status-indicating signals to an external receiver coupled to the external transmitter,"

16   should be given its plain and ordinary meaning.  (See R&R at 118-21; Claim Construction Order

17   at 19-20).  The court further explained that this limitation does not require a separate antenna.

18   (See Claim Construction Order at 19-21).  Finally, for the "displaying the processed status-

19   indicating signals" limitation, the court found that no construction was necessary regarding the

20   "whereby" clause.  (See id. at 2).

21              2.  **Overview of AMF's Infringement Theory.**

22        During trial, AMF's expert, Dr. Darrin Young, Ph.D. ("Young"), testified regarding AMF's

23   infringement theory.  AMF also presented documentary evidence and witness testimony, such as

24   the testimony of Dr. Ginger Stickney, Ph.D. ("Stickney"), an audiologist who worked with

25   Cochlear's accused products, and Dr. David Kelsall ("Kelsall"), an ear surgeon who also worked

26   with Cochlear's implants and related products.  (See RT, Jan. 15, 2014, vol. 2, at 30-62).

27        In general, AMF's infringement theory was directed to the inter-operation of the Cochlear

28   implant, the wearable processor, and the testing software.  For the preamble, "[a] method of

1  testing an implantable tissue stimulating system," AMF presented evidence that the Cochlear

2  system has a method of testing the Cochlear implant and wearable processor through the use of

3  the Custom Sound and WinDPS software.  (See, e.g., RT, Jan. 15, 2014, vol. 2, at 73:8-75:7; Exh.

4  182).  As for the "transmitting data-containing signals" limitation, AMF presented testimony and

5  documentary evidence that the wearable speech processor transmits data to the implant.  (See

6  RT, Jan. 15, 2014, vol. 2, at 75:8-21; Exh. 177 at COC-2089413).  With respect to the "selectively

7  controlling" limitation, AMF presented evidence that the practitioner can adjust the signals by, for

8  instance, using the "sliders" on the Custom Sound software to adjust the current levels for the

9  implant.  (See RT, Jan. 15, 2014, vol. 2, at 75:24-78:21; Exh. 155).

10          For the "receiving the data-containing signals" requirement, AMF presented testimony and

11  documentary evidence that the cochlear implant receives the data, and that there are multiple

12  electrodes in the Cochlear implant.  (See, e.g., RT, Jan. 15, 2014, vol. 2, at 79:13-80:13; Exh. 155

13  (disclosing 22 electrodes); Exh. 177 at COC-2089413).  For the "processing the data-containing

14  signals" limitation, AMF presented evidence that the cochlear implant processes the data to

15  generate signals.  For example, there was evidence that the implant receives the data; its input

16  decoder decodes the command and controls the stimulus output controller to generate stimulation

17  currents.  (See RT, Jan. 15, 2014, vol. 2, at 80:14-82:2; Exh. 5 at COC-2086833).  As for the

18  "applying the stimulation signals" requirement, AMF presented evidence that the implant supplies

19  a current to a pair of electrodes, such as an electrode in the implant and an extracochlear

20  electrode.  (See RT, Jan. 15, 2014, vol. 2, at 82:3-83:2; Exh. 155).

21          With respect to the "selectively monitoring" limitation, AMF presented evidence that once

22  the electrodes are selected, the Cochlear system measures the voltage between the electrodes.

23  (See,. e.g. RT, Jan. 15, 2014, vol. 2, at 83:3-85:11; Exh. 5) (e.g., Exh. 5 at COC-2086800) ("This

24  amplifier measures the DC voltage between a pair of electrodes or an internal voltage of the circuit

25  with respect to VSS.").  As for the "generating stimulator status-indicating signals" limitation, AMF

26  presented evidence that the accused products generate status-indicating signals, such as "the

27  voltage difference between the two electrodes."  (See, e.g., RT, Jan. 15, 2014, vol. 2, at

28  85:12-86:16; Exh. 5).  With respect to the "transmitting the stimulator status-indicating signals"

1   limitation, there was evidence that the Cochlear implant transmits the voltage to the wearable

2   processor.  (See RT, Jan. 15, 2014, vol. 2, at 86:17-87:8; Exh. 5).  As for the "receiving and

3   processing the status-indicating signals" limitation, AMF presented evidence that the accused

4   system creates "processed status-indicating signals" such as impedance values.  (See RT, Jan.

5   15, 2014, vol. 2, at 87:10-89:17, Exh. 169).  Finally, as for the "displaying the processed

6   status-indicating signals" limitation, there was evidence that the computer running the Custom

7   Sound software displays information, such as the impedance values. (See RT, Jan. 15, 2014, vol.

8   2, at 89:18-91:1; Trial Exhibits ("Exhs.") 155 & 101).

9         Thus, AMF's infringement theory generally relies on the inter-operation of the cochlear

10   implant, the wearable processor, and the testing software running on a computer.  While the jury

11   verdict identifies infringement as to each individual product, the court interprets the verdict

12   regarding claim 10 as a finding of infringement as to the implant, processor, and testing software

13   running together.  See Norris v. Sysco Corp., 191 F.3d 1043, 1048 (9th Cir. 1999) (the court must

14   perform and "fair reading" and "the court must search for a reasonable way to read the verdicts

15   as expressing a coherent view of the case.").

16             3. **Direct infringement by Cochlear**.

17         Cochlear asserts that there is no evidence that it directly infringed method claim 10. (See

18   JMOL Joint Br. at 1 & 4).  It asserts that the evidence "falls well short of the requirement that

19   Cochlear itself perform each and every one of the method steps of claim 10." (Id. at 4).

20   Cochlear's assertions are unpersuasive.

21         First, as discussed above, AMF presented substantial evidence that the steps of claim 10

22   were performed.  In particular, AMF presented evidence that the steps would be performed

23   automatically by clicking the "measure" button on Cochlear's diagnostic software.  (See RT, Jan.

24   17, 2014, vol. 1, at 108:6-11; RT, Jan. 15, 2014, vol. 2, at 43, 53 & 59); see also See Vita-Mix

25   Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir. 2009) ("Direct infringement can be

26   proven by circumstantial evidence.").  Second, as to whether Cochlear performed the steps,

27   Stickney testified that Cochlear representatives performed testing with her.  (See RT, Jan. 15,

28   2014, vol. 2, at 56:14-25) ("So, for instance, just like I was mentioning, when I had this little boy

1  and he was just having a lot of problems . . . . [T]hat's when we contact the manufacturer to come

2  out.  And they sat down and they will assist me.  Sometimes this is doing what we call an integrity

3  test where it's like a more sophisticated measure of what we just showed you where you're

4  actually checking the integrity of the electrode."); (see id. at 45) ("the rep then proceeded to do

5  some additional testing, and we confirmed at that time it was a device failure").  She also testified

6  that Cochlear representatives conducted conferences and workshops regarding impedance

7  testing.  (See id. at 55-57).  In addition, AMF presented documentary evidence regarding testing,

8  (see, e.g., Exhs. 4 & 556) (COC 2083658) (Customer Sound, User Manual 59), and evidence that

9  Cochlear personnel trained ear surgeons such as Kelsall to perform impedance checks.  (See RT,

10  Jan. 15, 2014, vol. 2, at 34) (Q: "Where did you learn to do an impedance check

11  intra-operatively?"; A: "My staff would have been trained at training courses provided by the

12  manufacturer.").  In short, there was more than sufficient evidence for "a reasonable mind [to]

13  accept as adequate to support a conclusion" of direct infringement.  Callicrate v. Wadsworth Mfg.,

14  427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.

15  1992)).

16              4.  **Contributory Infringement – Substantial Non-Infringing Use**.

17          Cochlear contends that it does not contribute to the infringement of claim 10, because the

18  accused instrumentalities have "substantial non-infringing uses."  (See JMOL Joint Br. at 5).  Claim

19  10 recites a method that requires, among other things, "displaying the processed status-indicating

20  signals, whereby the status of the implanted stimulator, including the results of the measurements

21  made within the implanted stimulator, may be made known."  ('616 patent at col. 36, ll. 4-7).

22  Cochlear argues that the "accused products are capable of performing impedance testing without

23  displaying impedance value," so performing the "displaying" step is "optional."  (JMOL Joint Br.

24  at 7).  In response, AMF contends that Cochlear waived the substantial non-infringement use

25  theory, because Cochlear failed to raise the argument in its pre-verdict motion.  (See id. at 14-15).

26

27          "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the

28  grounds asserted in the pre-deliberation Rule 50(a) motion.  Thus, a party cannot properly raise

1    arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not

2    raise in its pre-verdict Rule 50(a) motion." E.E.O.C., 581 F.3d at 961 (internal quotations omitted);

3    i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 845 (Fed. Cir. 2010) (to preserve an issue for a

4    post-verdict JMOL, the "party must file a pre-verdict JMOL motion on all theories . . . that it wishes

5    to challenge with a post-verdict JMOL.").

6         Cochlear's pre-verdict JMOL did not address the "substantial non-infringing use" theory that

7    it raises in its post-verdict motion.  (See, generally, Pre-Verdict JMOL at 4-5 & 7) (Document No.

8    426).  For example, with respect to contributory infringement, Cochlear's pre-verdict motion only

9    stated that "if there is no infringement of a patent there can be no contributory infringer."[6]  (Id. at

10   7) (citing Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 341, 81 S.Ct. 599, 602

11   (1961)).  In short, Cochlear waived the substantial non-infringing use theory.  See E.E.O.C., 581

12   F.3d at 961.

13              5.  **Contributory Infringement:  Sufficiency of the Evidence**.

14        Cochlear argues that without evidence that someone directly infringes claim 10, there can

15   be no contributory infringement.  (See JMOL at 9-10).  In particular, Cochlear contends that there

16   is no literal infringement, because claim 10 requires the display of "voltage" measurements, (id.

17   at 9), and AMF presented evidence of the display of impedance values. (Id.).  As a result, AMF

18   has to rely on the doctrine of equivalents, which Cochlear asserts is barred by prosecution history

19   estoppel.  (Id.).

20        As an initial matter, the court rejected Cochlear's prosecution history estoppel argument

21   in its bench trial order.   Additionally, the evidence presented at trial was sufficient to support the

22   jury's verdict as to claim 10.  The jury heard evidence that Cochlear's software displays impedance

23   values and that impedance and voltage measurements are closely related, due to, for instance,

24   Ohm's law.  (See Exh. 155; RT, Jan. 15, 2014, vol. 2, at 60, 90 & 95-96).  While there are

25   differences between impedance and voltage measurements, the jury reasonably could have found

26   _____

27        [6]  Cochlear's reference to a "contributory infringer," (see Pre-Verdict JMOL at 7), was in the
     context of its argument that there was no indirect infringement, because AMF had failed to prove
28   direct infringement.  (See id.).

1   that these differences were insubstantial under the doctrine of equivalents.   Moreover, the

2   "displaying" limitation does not expressly require the display of "voltage."   In other words, the jury

3   could have found that the "displaying" step was performed.

4   III.    WILLFUL INFRINGEMENT.

5          In order to establish willful patent infringement, the court performs a two-step analysis

6   entailing an objective and a subjective inquiry.   First, "a patentee must show by clear and

7   convincing evidence that the infringer acted despite an objectively high likelihood that its actions

8   constituted infringement of a valid patent."   In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed.

9   Cir. 2007) (en banc).   For this requirement, "[t]he state of mind of the accused infringer is not

10  relevant[.]"    Id.   Rather, the court's inquiry asks "whether a reasonable person would have

11  considered there to be a high likelihood of infringement of a valid patent."   Bard Peripheral

12  Vascular, Inc. v. W.L. Gore & Assocs., Inc., 682 F.3d 1003, 1008 (Fed. Cir. 2012).   This issue

13  "should always be decided as a matter of law by the judge."   Id.   "If the accused infringer's position

14  is susceptible to a reasonable conclusion of no infringement," the objective prong "cannot be met."

15  Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1310 (Fed. Cir. 2011).   Second, if the

16  "threshold objective standard is satisfied, the patentee must also demonstrate that this

17  objectively-defined risk (determined by the record developed in the infringement proceeding) was

18  either known or so obvious that it should have been known to the accused infringer."   In re

19  Seagate Tech., LLC, 497 F.3d at 1371.

20         Cochlear asserts that the jury's willful infringement verdict should be set aside, because it

21  presented several reasonable non-infringement defenses.   (See JMOL at 42-43).   The court

22  agrees.   While the jury's infringement verdict is supported by substantial evidence, Cochlear

23  presented reasonable non-infringement arguments, including that Cochlear:   (1) did not infringe

24  claim 10 of the '616 patent, because its testing system did not display "voltage" measurements;

25  and (2) it did not infringe claim 1 of the '616 patent or the asserted claims of the '691 patent

26  because it employs a single-antenna structure.   (See, e.g., RT, Jan. 16, 2014, vol. 1, at 50:17-23,

27  72:21-73:22 & 74:14-17; RT, Jan. 21, 2014, vol. 1, at 92-124).   Cochlear's position is "susceptible

28  to a reasonable conclusion of no infringement," so the objective prong of the Seagate inquiry has

1  not been met.  See Uniloc USA, Inc., 632 F.3d at 1310; DePuy Spine, Inc. v. Medtronic Sofamor

2  Danek, Inc., 567 F.3d 1314, 1336 (Fed. Cir. 2009) (objective prong not met, due to "substantial

3  question of noninfringement").

4         With respect to the subjective prong, AMF did not provide pre-suit notice regarding the '691

5  patent.  (See Exh. 277).  Thus, Cochlear did not have the scienter required for the '691 patent.

6  As for the '616 patent, after AMF provided notice of potential infringement, Cochlear promptly

7  responded with reasonable non-infringement defenses, including the single-antenna non-

8  infringement argument.  (See id.).  Thus, the risk was not "so obvious" that it should have been

9  known to Cochlear.  See Uniloc, 632 F.3d at 1310.

10        Under the circumstances, although there was sufficient evidence to support the jury's

11 verdict of infringement with respect to claim 10 of the '616 patent, the court is persuaded that no

12 reasonable jury could conclude that Cochlear's infringement was willful.  AMF did not meet its

13 burden of putting forth substantial evidence – let alone clear and convincing evidence – to

14 establish willful infringement under the objective prong of the willful infringement test.  Nor did it

15 provide substantial evidence to satisfy the subjective prong of the willful infringement test.  The

16 court therefore grants Cochlear's JMOL as to willful infringement.

17                    **COCHLEAR'S POST-VERDICT RULE 59 MOTION**

18 I.     LEGAL STANDARD.[7]

19        A motion for new trial under Federal Rule of Civil Procedure 59(a) may be granted "only if

20 the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious

21 evidence, or to prevent a miscarriage of justice."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729

22 (9th Cir. 2007).  "[T]he district court's denial of the motion for a new trial is reversible only if the

23 record contains no evidence in support of the verdict."  Openshaw v. FedEx Ground Package

24 System, Inc., 576 F.App'x 685, 689 (9th Cir. 2014) (internal quotation marks omitted).  The court

25 has "the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury,

26

27 ───────────────

28        [7] In patent cases, the law of the regional circuit applies in determining whether to grant a new trial.  See Wordtech Sys. v. Int. Net. Sol., 609 F.3d 1308, 1313 (Fed. Cir. 2010).

13

1   even though supported by substantial evidence, where, in the court's conscientious opinion, the

2   verdict is contrary to the clear weight of the evidence . . . [or] to prevent, in the sound discretion

3   of the trial judge, a miscarriage of justice[.]"  Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d

4   1075, 1087 (9th Cir. 2009) (internal quotation marks omitted).

5   II.    INFRINGEMENT.

6          Cochlear seeks a new trial on infringement, "for all of the same reasons judgment as a

7   matter of law is appropriate."  (Rule 59 Motion at 50).  For the reasons discussed above, the jury

8   verdict is not contrary to the "clear weight" of the evidence with respect to claim 10 of the '616

9   patent.  See DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218 (9th Cir. 2010).  The court denies

10  Cochlear's motion as to infringement.

11  II.    INVALIDITY.[8]

12         "It is well recognized that the persuasiveness of the presentation of complex

13  technology-based issues to lay persons depends heavily on the relative skill of the experts."

14  Mitsubishi Elec. Corp. v. Ampex Corp., 190 F.3d 1300, 1313 (Fed. Cir. 1999).  For its invalidity

15  case, Cochlear relied almost entirely on the testimony of Dr. Gerald Loeb ("Loeb"), who was a

16  former AMF employee and whose BION program had been terminated. (See RT, Jan. 17, 2014,

17  vol. 2, at 49:13-52:20).  AMF presented the rebuttal testimony of Young. (See RT, Jan. 22, 2014,

18  vol. 1, at 17:22-29:18).

19         During the trial, Loeb testified that the '616 patent was anticipated and/or obvious, in view

20  of the prior art.  He testified regarding references such as U.S. Patent No. 4,947,844 to McDermott

21  ("the '844 patent" or "the McDermott '844 patent") (Exh. 1150); U.S. Patent No. 4,612,934 to

22  Borkan ("the '934 patent" or the "Borkan '934 patent") (Exh. 1152); the LAURA Cochlear

23  Prosthesis Development and Description article by Peeters, which was presented at a 1987

24  cochlear implant symposium (Exh. 1200); and an article by McDermott entitled, "An Advanced

25  Multiple Channel Cochlear Implant," IEEE Transactions on Biomedical Engineering, pp. 789-97,

26  _____

27         [8] In its bench trial order issued contemporaneously with this Order, the court found that claim
    1 of the '616 patent and claims 6 and 7 of the '691 patent are invalid for indefiniteness.

28  Accordingly, the discussion in this section will be limited to claim 10 of the '616 patent.

1    Vol. 36:7 (July 1989) ("the 1989 McDermott article") (Exh. 1039).  (See PTO, App. A, at 46); (see

2    RT, Jan. 17, 2014, vol. 2, at 49:13-52:20).

3         AMF appears to have effectively challenged the credibility of Cochlear's expert during his

4    cross-examination.   For example, while AMF previously funded Loeb's BION project, it

5    discontinued the program in 2008, after a license fee dispute arose between Loeb an AMF.  (See

6    RT, Jan. 17, 2014, vol. 2, at 39-41 & 47-51; Exhs. 3030, 3032, 3037 & 3038).  Also, Loeb admitted

7    that the Examiner, William Kamm, (see RT, Jan. 21, 2014, vol. 1, at 35:18), had been the

8    examiner on "many" cochlear implant patents, (id. at 35:20-22), and multiple references had been

9    cited on the face of the patents-in-suit, including the Borkan '934 patent and the McDermott '844

10   patent.  (See id. at 38:11-15 & 40:7-12).  Finally, a reasonable jury could have discounted Loeb's

11   credibility, based on his background – a medical doctor with no formal training in electrical

12   engineering.  (See RT, Jan. 17, 2014, vol. 2, at 37 & 44-45).  Also, Loeb testified that he did not

13   design any circuitry, and that he was not in a position to direct circuitry design.  (See RT, Jan. 21,

14   2014, vol. 1, at 46-47).

15        In addition to its cross-examination of Loeb, AMF presented the testimony of its own expert,

16   Young, who testified that he did not consider Loeb, a medical doctor with some electronics

17   experience, to be well qualified.  (See RT, Jan. 22, 2014, vol. 1, at 18:21-19:4).  Young also

18   addressed prior art issues, including the '844 McDermott patent, the '934 Borkan patent, the 1989

19   McDermott article, the Peeters article, (see id. at 19:5-21:5, 22:5-23:2 & 24:13-28:20), as well as

20   secondary considerations of non-obviousness.  (See id. at 28:21-29:18).

21        To rebut Cochlear's argument that claim 10 of the '616 patent was anticipated or rendered

22   obvious by the 1989 McDermott article, AMF presented evidence distinguishing the prior art.  For

23   instance, AMF presented evidence that the 1989 McDermott article fails to disclose the "selectively

24   monitoring the at least one pair of the multiplicity of electrodes" and "an external receiver coupled

25   to the external transmitter" limitations.  (See RT, Jan. 22, 2014, vol. 1, at 20:3-22).  For the

26   "selectively monitoring" limitation, Young testified that Figure 6 of the 1989 McDermott article

27   depicts a single "V-Mon" line from the electrode array to the Voltage Monitor Telemetry Circuit,

28   demonstrating that the 1989 McDermott article discloses the monitoring of a single electrode, not

a pair of electrodes.  (See id. at 20:22-22:13) (e.g., "in McDermott's article, it's only one line.  He only measures one voltage, not a pair.").  Young also testified that the external transmitter and receiver in the 1989 McDermott article are not "coupled," as required by claim 10.  (See id. at 22-23).

In short, the jury's finding with respect to the validity of claim 10 is not against the clear weight of the evidence.  The jury apparently believed AMF's expert over Cochlear's expert.  See Mitsubishi Elec. Corp., 190 F.3d at 1313 ("what you had in this case was two competing scientific technological witnesses, one of whom claimed that the invention was invalid . . . and the other who claimed it was not. . . .  [T]he jury apparently chose to believe the one witness over the other.").  This is perhaps not surprising given the credibility issues AMF raised with respect to Loeb.  See, e.g., i4i Ltd. Partnership, 670 F.Supp.2d at 587 ("[u]ltimately, there was conflicting testimony regarding this precise [invalidity] issue and the determination fell upon the credibility of the parties' expert analysis"), aff'd as modified, 589 F.3d 1246, 1260-62 (Fed. Cir. 2009); Allergan, Inc. v. Barr Labs., Inc., 808 F.Supp.2d 715, 733 (D. Del. 2011) (denying post-trial invalidity argument based on credibility issues).

III.    DAMAGES.

"[U]nless the amount of damages is grossly excessive, unsupported by the evidence, or based solely on speculation, the reviewing court must uphold the jury's determination of the amount."  Morgan v. Woessner, 997 F.2d 1244, 1268 (9th Cir. 1993).  Where the court concludes that a new trial is appropriate due to excessive damages, it may exercise its discretion to grant a new trial either without qualification, or conditioned on the winner's refusal to accept a reduction in damages, known as remittur.  See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 2222 (1996).

As noted earlier, the jury awarded AMF damages in the $131,216,325.00 for Cochlear's infringement of claims 1 and 10 of the '616 patent, and claims 6 and 7 of the '691 patent.[9]

---

[9]  The verdict form stated: "[i]f you find that the Cochlear Defendants have infringed a valid claim of either the '616 patent or the '691 patent, what are the total damages that the Cochlear Defendants should pay to the Foundation?"  (Verdict Form at 10).

1  However, the court, based on the testimony and evidence presented during both the jury and

2  bench trial, found claim 1 of the '616 patent and claims 6 and 7 of the '691 patent to be invalid on

3  indefiniteness grounds.

4       "[W]here the jury rendered a single verdict on damages, without breaking down the

5  damages attributable to each patent, the normal rule would require a new trial as to damages."

6  Retractable Techs., Inc. v. Becton Dickinson & Co., 757 F.3d 1366, 1370 (Fed. Cir. 2014)

7  (citations omitted); Accentra, Inc. v. Staples, Inc., 500 Fed. Appx. 922, 931 (Fed. Cir. 2013)

8  (vacating and remanding damages award, as expert testimony and jury verdict were based on

9  finding that all asserted patents were valid and infringed). Here, the damages awarded by the jury

10  were not broken down as to each claim or patent. (See Verdict Form at 10). Therefore, in light

11  of the foregoing and the court's contemporaneous finding of indefiniteness with respect to three

12  of the asserted claims, the court believes that it must grant the motion for new trial so as to allow

13  a damages trial with respect to claim 10 of the '616 patent.

14               **ADVANCED BIONIC'S POST-VERDICT RULE 54 MOTION**

15       Advanced Bionics, an involuntary plaintiff and an exclusive licensee to the asserted patents,

16  filed a motion to alter or amend the judgment to reflect that "Advanced Bionics should be included

17  as a party plaintiff." (Motion of Plaintiff Advanced Bionics, LLC to Alter or Amend Judgment

18  Pursuant to Federal Rule of Civil Procedure [] 59 at 2). Under the circumstances, this motion will

19  be denied as moot.

20                              **CONCLUSION**

21       Based on the foregoing, IT IS ORDERED THAT:

22       1. Defendant's Motion for Judgment as a Matter of Law **(Document No. 507)** is **granted**

23  **in part** and **denied in part**. The motion is **granted** and the court sets aside the jury's finding of

24  willful infringement. The motion is **denied** as to infringement in all other respects.

25       2. Defendant's Motion for a New Trial **(Document No. 508)** is **granted in part** and **denied**

26  **in part**. The motion is **granted** as to a new damages trial with respect to claim 10 of the '616

27  patent. The motion is **denied** in all other respects.

28

1        3. Involuntary Plaintiff Advanced Bionics' Motion to Amend the Judgment **(Document No.**

2   **504)** is **denied as moot**.

3   Dated this 31st day of March, 2015.

4

                                             /s/

5                                    Fernando M. Olguin
                             United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US005609616A

# United States Patent [19]

## Schulman et al.

[11] Patent Number: 5,609,616

[45] Date of Patent: Mar. 11, 1997

[54] PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR

[75] Inventors: **Joseph H. Schulman**, Santa Clarita; **John C. Gord**, Venice; **Primoz Strojnik**, Granada Hills; **David I. Whitmoyer**, Los Angeles, all of Calif.

[73] Assignee: **Alfred E. Mann Foundation for Scientific Research**, Sylman, Calif.

[21] Appl. No.: **447,157**

[22] Filed: **May 25, 1995**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 23,584, Feb. 26, 1993, which is a continuation of Ser. No. 752,069, Aug. 29, 1991, abandoned, which is a continuation-in-part of Ser. No. 411,563, Sep. 22, 1989, abandoned.

[51] Int. Cl.[6] .......................................... **A61N 1/36**
[52] U.S. Cl. .......................................... **607/56**
[58] Field of Search ................. 607/27–32, 59–60, 607/56, 57

[56] **References Cited**

U.S. PATENT DOCUMENTS

| Re. 31,031 | 9/1982 | Kissiah, Jr. ...................... | 179/107 R |
| Re. 32,947 | 6/1989 | Dormer et al. ................... | 128/420.6 |
| 3,449,768 | 6/1969 | Doyle ............................... | 3/1 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| 4106178 | 10/1978 | Australia . |
| 2823798 | 9/1979 | Germany . |

OTHER PUBLICATIONS

Gheewala, et al., "A CMOS Implantable Multielectrode Auditory Stimuatlr for the Deaf", *IEEE Journal of Solid State Circuits*, 10:6, pp. 472–479 (Dec. 1975).

Clark, et al., "A Multiple–Electrode Hearing Prosthesis for Cochlear Implantation in Deaf Patients", *Med. Progr. Technol.*, 5:127–140 (1977).

Forster, "Theoretical Design and Implementation of a Transcutaneous, Multichannel Stimulator for Neural Prosthesis Applications", *J. Biomed. Engng.*, 3:107–120 (Apr. 1981).

Hochmair & Hochmair–Desoyer, "An implanted auditory eight channel stimulator for the deaf," *Med. & Biol. Eng. & Comput.* 19:141–148 (1981).

Loeb, G., "The Functional Replacement of the Ear," *Scientific American,* 252(2):104–111 (1985).

(List continued on next page.)

*Primary Examiner*—William E. Kamm
*Attorney, Agent, or Firm*—Fitch, Even, Tabin & Flannery

[57] **ABSTRACT**

A physician's tester provides for physician monitoring and control of an implantable human tissue stimulator system, such as an implantable cochlear stimulator (ICS) system. During normal operation, the tissue stimulator system includes an implantable stimulator and a wearable processor (WP). The physician's tester is designed around a microprocessor, and is basically a modification of the WP. The tester provides control over the selection of voltages and currents to be measured and the presetting of parameters in the implantable stimulator during testing of the implanted stimulator and/or a patient's response to data transmitted by the WP/tester to the implanted stimulator. The physician's testor is portable and utilizes telemetry coupling with the implanted stimulator to provide communication between the tester and stimulator for the monitoring, control and measurement of the stimulator parameters. The tester resides in a portable housing having a control panel and a visual display. The control panel allows the physician to manually set various parameter levels. The visual display provides alpha numeric data for viewing. Various devices, such as additional displays and/or a printer, may be coupled to the tester through a display port and/or an infrared serial output port in order to permit a print out of the displayed data or other information.

**14 Claims, 15 Drawing Sheets**



**5,609,616**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,662,758 | 5/1972 | Glover | 128/419 |
| 3,667,477 | 6/1972 | Susset et al. | 128/419 E |
| 3,727,616 | 4/1973 | Lenzkes | 128/422 |
| 3,751,605 | 8/1973 | Michelson | 179/107 R |
| 3,751,651 | 8/1973 | Pomella et al. | |
| 3,752,939 | 8/1973 | Bartz | 179/107 R |
| 3,818,149 | 6/1974 | Stearns et al. | 179/107 FD |
| 3,989,904 | 11/1976 | Rohrer et al. | 179/107 FD |
| 4,019,518 | 4/1977 | Maurer et al. | 128/419 R |
| 4,025,721 | 5/1977 | Graupe et al. | 179/1 P |
| 4,025,723 | 5/1977 | Blackledge | 179/1 VL |
| 4,026,300 | 5/1977 | De Luca et al. | 128/418 |
| 4,063,048 | 12/1977 | Kissiah, Jr. | 179/107 R |
| 4,207,441 | 6/1980 | Ricard et al. | 179/107 R |
| 4,232,679 | 11/1980 | Schulman | 128/419 |
| 4,267,410 | 5/1981 | Forster et al. | 179/107 BC |
| 4,284,856 | 8/1981 | Hochmair et al. | 179/107 E |
| 4,357,497 | 11/1982 | Hochmair et al. | 179/107 E |
| 4,400,590 | 8/1983 | Michelson | 179/107 FD |
| 4,405,831 | 9/1983 | Michelsen | 179/1 P |
| 4,408,608 | 10/1983 | Daly et al. | 128/421 |
| 4,419,995 | 12/1983 | Hochmair et al. | 128/419 R |
| 4,424,812 | 1/1984 | Lesnick | 128/419 PG |
| 4,428,377 | 1/1984 | Zollner et al. | 128/419 R |
| 4,441,202 | 4/1984 | Tong et al. | 381/68 |
| 4,441,210 | 4/1984 | Hochmair et al. | 455/41 |
| 4,462,406 | 7/1984 | De Cote, Jr. | 128/419 PG |
| 4,513,743 | 4/1985 | van Arragon et al. | 607/27 |
| 4,515,158 | 5/1985 | Patrick et al. | 128/419 R |
| 4,532,930 | 8/1985 | Crosby et al. | 128/419 R |
| 4,550,732 | 11/1985 | Batty, Jr. et al. | 128/419 PG |
| 4,573,481 | 3/1986 | Bullara | 128/784 |
| 4,590,946 | 5/1986 | Loeb | 128/642 |
| 4,592,359 | 6/1986 | Galbraith | 128/419 R |
| 4,592,360 | 6/1986 | Lesnick | 128/419 PG |
| 4,593,696 | 6/1986 | Hochmair et al. | 128/419 R |
| 4,611,598 | 9/1986 | Hortmann et al. | 128/419 R |
| 4,612,934 | 9/1986 | Borkan | 128/421 |
| 4,616,655 | 10/1986 | Weinberg et al. | 128/419 P |
| 4,648,403 | 3/1987 | Van Compernolle | 128/419 R |
| 4,679,560 | 7/1987 | Galbraith | 128/419 R |
| 4,686,765 | 8/1987 | Byers et al. | 29/858 |
| 4,696,287 | 9/1987 | Hortmann et at. | 128/1 R |
| 4,726,378 | 2/1988 | Kaplan | 128/419 R |
| 4,729,366 | 3/1988 | Schaefer | 128/1.6 |
| 4,809,697 | 3/1989 | Causey, III et al. | 607/30 |
| 4,819,647 | 4/1989 | Byers et al. | 128/642 |
| 4,837,049 | 6/1989 | Byers et al. | 427/96 |
| 4,847,617 | 7/1989 | Silvian | 340/870.1 |
| 4,850,962 | 7/1989 | Schaefer | 600/25 |
| 4,918,745 | 4/1990 | Hutchison | 455/41 |
| 4,920,979 | 5/1990 | Bullara | 128/784 |
| 4,931,795 | 6/1990 | Gord | 341/135 |
| 4,932,405 | 6/1990 | Peeters | 128/419 R |
| 4,947,844 | 8/1990 | McDermott | 128/421 |
| 4,961,434 | 10/1990 | Stypulkowski | 128/784 |
| 4,969,468 | 11/1990 | Byers et al. | 128/642 |
| 4,988,333 | 1/1991 | Engebretson et al. | 600/25 |
| 4,990,845 | 2/1991 | Gord | 323/312 |
| 4,991,582 | 2/1991 | Byers et al. | 128/419 P |
| 5,003,975 | 4/1991 | Hafelfinger et al. | 607/27 |
| 5,058,584 | 10/1991 | Bourgeois | 128/421 |
| 5,070,535 | 12/1991 | Hochmair et al. | 455/41 |
| 5,095,904 | 3/1992 | Seligman et al. | 128/420.6 |
| 5,123,419 | 6/1992 | Platt et al. | 607/27 |

## OTHER PUBLICATIONS

Loeb, et al., "Design and fabrication of an experimental cochlear prosthesis," *Med. & Biol. Eng. & Comput.* 21:241–254 (1983).

Mecklenburg & Brimacombe, "An overview of the Nucleus cochlear implant program," *Seminars in Hearing* 6(1):41–51 (1985).

Millar, et al., "Speech processing for cochlear implant prosthesis," *J. Speech & Hearing Research* 27:280–296 (1984).

Herndon, Matthew, "Psychoacoustics and speech processing for a modiolar auditory prosthesis," *Dissertation Stanford Univ. Dept. EE* (Table of Contents only)(Jun. 1981).

Soma, Mani, "Design and fabrication of an implantable multichannel neural stimulator," *Dissertation–Stanford Unviv. Dept. EE* (May 1980).

*FIG. 1*





ELECTRODES 48
1
2
3
16
ELECTRODE SWITCHING MATRIX 66
STORAGE CAPACITOR 1 OF 8
CURRENT SOURCE FET (1 OF 8) 62
60
10.5V
7.0V
3.5V
VOLTAGE DOWN-CONVERTER 58
14.0V
PROCESSOR 46
VOLTAGE REGULATOR ERROR AMPLIFIER 56
14.0V
REGULATOR 44
DC
RECEIVER 40
MAIN COIL 50
VOLTAGE REFERENCE 54
D/A CURRENT REFERENCE 65
OUTPUT CONTROL LOGIC (1 OF 8) 88
ANALOG MUX 80
EXPONENTIAL D/A CONVERTER 64
WORD STROBE GENERATOR 79
AMPLITUDE DATA LATCH 74
SERIAL TO PARALLEL CONVERTER 68
DATA DECODER 52
LOOP FILTER 72
VCO 70
BIT & WORD COUNTERS, ERROR CHECKING 78
OUTPUT MODE REGISTER 86
PULSE WIDTH CONTROL 90
COMMAND DECODER 84
COMMAND LATCH 76
INITIALIZATION 82
INDIFFERENT ELECTRODE SWITCHES 92
49
INDIFFERENT ELECTRODE
MUX 94
TELEMETRY GAIN STAGES 96
A/D CONVERTER 98
TELEMETRY CONTROL LOGIC 102
TELEMETRY MODULATOR SWITCH 104
ICS BACK TELEMETRY SYSTEM
TELEMETRY TRANSMITTER 42
TELEMETRY COIL 106
TELEMETRY A/D CURRENT REFERENCE 100

FIG. 2



FIG. 3

## FIG. 4

| | |
|---|---|
| FIGURE 4-D | FIGURE 4-H |
| FIGURE 4-C | FIGURE 4-G |
| FIGURE 4-B | FIGURE 4-F |
| FIGURE 4-A | FIGURE 4-E |

Case: 15-1580    Document: 50    Page: 156    Filed: 10/05/2015



FIG. 4-A

C203-1 TO 5
C203-6 TO 13
DOWNCLOCK
VOLTAGE DOWNCONVERTER
203B
-14V
-10.5V
-7V
-3.5V
DCLKPH1
DCLKPH2
SYSRESET
VREF
POWERBAD DETECTOR
204A
TO -3.5V LOGIC
RV0(1-8)
RV1(1-8)
OUTENABLE
POWERBAD
INTIALIZATION
204B
CARDET
3
ALLZERO DISCONNECT
CARON
RESETERR
PALARM
PARITY ERROR DETECTOR PARITY
204C
REFRESH VOLTAGE LOGIC
210
RFMAIN
WSTRB1,3
FRMCLK
AMPDATA(1-8)
SERDATA
FUNC7
WORD(1-9)
WORDTRCLK
IREF
LOGARITHMIC D/A CONVERTER
207B
IPOSCON
INEGCON
PLLLOCK
PFRMCLK
CLKPH1
CLKPH2
MANDATA
SERIAL TO PARALLEL CONVERTER
201C
XFERB
XFERC
DATA(1-9)
AMPSYNC
DCENABLE
WORD (1-9)
ALLZERO DISCONNECT

FIG. 4-B

FIG. 4-C

-14V
-10.5V
-7V
-3.5V
DCLKPH1
DCLKPH2
SYSRESET
CF1
REFRESH VOLTAGE CONTROL 212A
PRV1
CRV1
NRV1
TO 212-2 THRU 212-8
RV0(1-8)
RV1(1-8)
RV0(2-8)
RV2(2-8)
NRV(1-8)
NRV(2-8)
IPOS(1-8)
INEG(1-8)
ANALOG MULTIPLEXER 207C
ICP(1-8)
POLARITY
WSTRB1,3
FRMCLK
AMPDATA(1-8)
IPOSCON
INEGCON
XFERB
XFERC
WORDTRCLK
AMPSYNC
WSTRB(1-8)
WORD STROBE GENERATOR 201D
CLKPH1
CLKPH2
WORD9CLK
WSRTB1
AMPDATA (1-8)



FIG. 4-D



FIG. 4-E



CARON
CARON
WSTRB(1-8)
WSTRB9
ADPWR
SH2X1
SH2X3
SH2X10
SH1X10
FUNC4
FUNC5
VRTPWR
DCENABLE
FUNC7
WORD9(1-9)
RFMAIN
ALLZERO
DISCONNECT
WSTRB(1-8)
OUTENABLE
TELEMETRY
FUNCTION
DECODER
211A
COMMAND
LATCH
206A
WORD9CLK
DATA(1-9)
WORD9CLK
WORD9(1-9)
WORD9CLK
COMMAND
DECODER
206B
ALLZERO
DIS
CONNECT
FUNC8
WSRTB1
FUNC2
DCENABLE
FUNC7
FUNC4
FUNC5
RFMAIN
RFMAIN
RFMAIN
PFMAIN
OUTENABLE
IECLOSE
RLOCTRL
RHICTRL
MUXCTRL(1-23)
PFMAIN
IECLOSE
RLCTRL
RHICTRL
IECLOSE
RLCTRL
RHICTRL
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTB(1-8)
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTB(1-8)
INDELEC
ILO
IH1
INDELEC
ILO
IH1

FIG. 4-F

WSTRB(1-8)
WSTRB(1-8)
WSTRB(1-8)
NRV(1-8)
WORDTRCLK
WSTRB1
ICP(1-8)
AMPDATA (1-8)
POLARITY
POLARITY AND AMPLITUDE DATA LATCH
205A
WORD9CLK
WORD9CLK
DATA(1-9)
WORD9(1-9)
WORD9(1-9)
FUNC8
FUNC8
WSRTB1
WSRTB1
FUNC2
FUNC2
PFMAIN
PFMAIN
OUTENABLE
OUTENABLE
IECLOSE
IECLOSE
RLOCTRL
RLOCTRL
RHICTRL
RHICTRL
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTA(1-8)
VOUTB(1-8)
VOUTB(1-8)
INDELEC
INDELEC
IL0
IL0
IH1
IH1

FIG. 4-G



FIG. 4-H

## FIG. 5A

LONG DATA FRAME FOR MULTIPLE CHIP OPERATION

| MASTER | SLAVE 1 | SLAVE 2 | SLAVE 3 | | SLAVE n |



FIG. 5B

FIG. 6

PHYSICIAN'S TESTER

ELECTRODES
48
12
PROCESSOR
46
REG
44
POWER
DATA
DATA
RECEIVER
40
TELEMETRY
TRANSMITTER
42
HEADPIECE
MIKE
14
10.7 MHz
49 MHz
POWER LEVEL CONTROL
MANCHESTER
DATA
TRANSMITTER
34
TELEMETRY
RECEIVER
36
GATE
ARRAY
32
310
308
306
HPC μP
30
DISPLAY
304

FIG. 7

5,609,616

| 1 | 2 |

**PHYSICIAN'S TESTING SYSTEM AND METHOD FOR TESTING IMPLANTABLE COCHLEAR STIMULATOR**

RELATED APPLICATIONS

This application is a continuation of application Ser. No. 08/023,584, filed Feb. 26, 1993, entitled IMPROVED HUMAN TISSUE STIMULATOR; which is a continuation of application Ser. No. 07/752,069, filed Aug. 29, 1991, now abandoned; which is a continuation-in-part of patent application Ser. No. 07/411,563, filed Sep. 22, 1989, also abandoned.

BACKGROUND

The present invention relates to improvements in human tissue stimulators and more particularly to a human tissue stimulating system which in a preferred form comprises an audio responsive system for artificially stimulating the cochlea to improve the hearing of the hearing impaired.

U.S. Pat. No. 4,400,590 issued Aug. 23, 1983 for "Apparatus for Multi-Channel Cochlear Implant Hearing Aid System" describes and illustrates a multi-channel intra-cochlear electrode and system for electrically stimulating predetermined locations of the auditory nerve within the cochlea of the ear. The electrode comprises a plurality of exposed electrode pairs spaced along and embedded in a resilient curved base for implantation in accordance with the method of surgical implantation described in U.S. Pat. No. 3,751,615 issued Aug. 7, 1973 for "Method of Inducing Hearing." The hearing aid system described in the '590 patent receives audio signals at a signal processor located outside the body of a hearing impaired patient. The processor converts the audio signals into analog data signals which are transmitted by a cable connection through the patient's skin to the implanted multi-channel intra-cochlear electrode. The analog signals are applied to selected ones of the plurality of exposed electrode pairs included in the intra-cochlear electrode to electrically stimulate predetermined locations of the auditory nerve within the cochlea of the ear where the intra-cochlear electrode is positioned.

The cochlea stimulating system described in the '590 patent is limited in the number of channels of information, the speed of transfer of stimulating signals to the cochlea and the fidelity of the signals. Also, the cable connection through the skin of the patient to the intra-cochlear electrode is undesired in that it interferes with the freedom of movement of the patient and represents a possible source of infection.

U.S. Pat. No. 4,532,930, issued Aug. 6, 1985 for "Cochlear Implant System For an Auditory Prosthesis" describes and illustrates a multiple electrode system. While multiple electrodes are employed to stimulate hearing the system only operates with a single pulsatile output stimulating a single electrode channel at any given time. Such a sequential system is limited in speed of operation and does not provide for analog operation where continuous stimulating signals controllable in amplitude are simultaneously applied to a number of electrode channels. Further, the system is subject to charge imbalance with misprogramming or circuit fault and inefficient use of electrical power. Moreover, once the stimulator unit is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,592,359, issued Jun. 3, 1986 for "Multi-Channel Implantable Neural Stimulator" describes a cochlear implant system having 4 current sources and 4

current sinks per channel controlled by series switches to provide 16 different circuits for supplying 16 levels of 2 polarities to each output channel. In a pulsatile mode, the system provides for simultaneous update (amplitude control) and output to all channels. However, the system does not permit simultaneous analog update and output on all channels and the electrode pairs for each channel are not electrically isolated from all other electrode pairs whereby undesired current leakage may occur. Further, once the stimulator is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,947,844, issued Aug. 14, 1990 for "Receiver/Stimulator For Hearing Prosthesis" describes and illustrates a multiple channel electrode system. The system includes an implanted receiver/stimulator connected to an implanted electrode array. The receiver/stimulator includes an electrode stimulating current control characterized in that current is delivered to each electrode or to each bipolar pair of electrodes in a series of short electrical pulses, each elemental pulse being separated from the next by an interval of zero current which has a longer duration than an elemental pulse. The waveform of the stimulus current comprises a series of pulses of one polarity followed by an equal number of pulses of an opposite polarity whereby the sum of all the electrical charge transferred through each electrode is approximately zero at the end of a stimulating current waveform. In this way, elemental current pulses applied to each electrode on each pair of electrodes which are stimulating are preferably delivered cyclically such that elemental pulses delivered to one electrode are interleaved in time with those delivered to any other electrodes. This enables the use of a single current source in the receiver/stimulator. The use of a single current source limits the operation of the receiver/stimulator in that the single current source must be switched to serve all output channels in a sequential manner. Simultaneous operation is not possible. Further, the number of channels cannot be greater than 3 or 4 without greatly reducing the duty cycle of the stimulating current waveform in each channel. Not only does the stimulus effectiveness in each channel suffer in such a situation, but the time required to complete the switching cycle for the single current source lengthens in direct proportion to the number of channels. Further, this system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the simultaneous transmission of the telemetry signal and reception of the input carrier signal as described will result in undesired modulation and possible loss of input data.

Accordingly, there is a continuing need for an improved multi-channel tissue stimulator system particularly useful as a cochlear stimulator system and which is characterized (i) by a high operating speed in analog and pulsatile operation, (ii) freedom from charge imbalance, (iii) complete isolation of its electrode pairs for each channel, and (iv) the externally

A00818

5,609,616

| 3 | 4 |

controllable monitoring and selective control a plurality of operating parameters and power supply to and currents and voltages developed within the implanted stimulator unit of the system to optimize system operation and power efficiency. The present invention satisfies such needs.

## SUMMARY OF INVENTION

A preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS). The receiver, which may comprise a headpiece adjacent the ear of a patient, receives audio signals and transmits the audio signals to the WP. The WP receives and processes the audio signal and includes means for generating data indicative of the audio signals for transmission to the ICS.

The ICS includes means for receiving transmissions from the WP as well as a processor for processing such transmissions to sequentially update and simultaneously or sequentially generate and apply stimulation signals to a plurality of cochlea stimulating channels each having capacitor coupled electrodes implanted within the cochlea of the patient. The processor includes means responsive control signals from the WP for selectively monitoring one or more of the electrodes and voltages within the processor and for generating ICS status indicating signals. The ICS status indicating signals are telemetered back to the WP which includes means for receiving and processing the ICS status indicating signals. For example, such means may include means for controlling the power level of transmissions to the ICS.

The processor in the ICS also includes means for selectively controlling the pulse widths of the stimulation signals, the frequency at which stimulating signals are applied to selected electrodes, and means for generating a plurality of voltages for powering different components in the ICS and for selectively receiving and responding to analog and pulsatile input data signals from the WP.

Preferably, each channel in the ICS includes (i) a current source and floating current transfer device with switching capacitors for supplying stimulating signals to the capacitor coupled electrodes which are independent and isolated from the stimulating signals supplied to the output of all other channels, (ii) means for selectively driving the electrodes as unipolar or bipolar electrodes and (iii) means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a block diagram of a basic form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 2 is a more detailed block diagram of the ICS of FIG. 1 and associated circuitry for receiving and transmitting signals from and to the WP.

FIG. 3 is block diagram of second form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 4 illustrates the arrangement of FIGS. 4-A through 4-H.

FIGS. 4-A through 4-H show respective portions of a detailed block/schematic diagram of the ICS.

FIG. 5A depicts a long data frame useful in multiple chip configurations for the stimulating system, the long frame comprising a series of n+1 data frames, the first frame being designated as a master frame and the subsequent frames being designated as slave frames 1 through n. The number of data frames comprising the long data frame corresponds to the number of chips included in the system.

FIG. 5B is a block diagram of multiple chip system for the ICS of FIG. 2 or FIGS. 4A–4H.

FIG. 6 is a diagrammatic representation of a physician's tester useful with the cochlear system of FIG. 1.

FIG. 7 is a block diagram of the cochlear system of FIG. 1 with the WP replaced by the physician's tester.

## DETAILED DESCRIPTION OF INVENTION

The preferred forms of the present invention are implemented using CMOS technology. In development of the invention, however, a prototype was developed using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system, including CMOS integrated circuits and chips. Thus, in duplicating the systems hereinafter described, one may either utilize conventional off-the-shelf electrical components or develop the systems utilizing techniques well known in CMOS technology, whichever is desired.

As illustrated in FIG. 1, the basic system according to a preferred embodiment of the present invention basically comprises an externally wearable system 10 and an implantable cochlear stimulator (ICS) 12. The external system 10 comprises a headpiece 14 and an externally wearable processor (WP) 16. The headpiece may be worn behind the ear of a hearing impaired person and comprises a conventional microphone 18 and an antenna 20 for transmitting and receiving electromagnetic energy preferably in the form of radio frequency signals. Such coupling can be restricted to magnetic field only by an electrostatic shield around the coils comprising the antenna 20. In addition, signals from the ICS to the WP on one carrier frequency and from the WP to the ICS on another frequency can be transferred via a single coaxial cable between the headpiece 14 and the WP 16. This can be accomplished by having tuned inductor-capacitor filters for each frequency at each end of the coaxial cable.

The WP 16, powered by a battery 38, is adapted to receive audio signals received by the microphone 18 and to transmit such signals to a conventional audio front end 22 which features automatic gain control (AGC). The audio signals processed by the audio front end 22 are transmitted to a bank of filters 24 for filtering and for generation of a plurality of parallel audio signals. The audio signals are processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30. The filter bank may also be implemented as a group of digital filters, for example in a digital signal processor integrated circuit. In this case the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank 24 and the general processing of microprocessor 30.

The output of the microprocessor 30 is coupled through a custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34. The gate array 32 also converts data from a telemetry

5,609,616

| 5 | 6 |

receiver 36 and the microprocessor 30 to control the power level of and data generated by the data transmitter 34.

As illustrated in FIG. 1, the ICS 12 includes a receiver 40 for receiving data transmissions from the wearable system 10 and a telemetry transmitter 42 for transmitting ICS status indicating and measured signals from the ICS 12 to the wearable system 10 for processing thereby. For example, power level indicating signals transmitted by the telemetry transmitter 42 are received by the telemetry transmitter 36 and processed in the microprocessor 30 and gate array 32 to generate signals controlling the power level of the transmissions from the transmitter 34 to the ICS 12, thereby providing a closed-loop system for optimizing the power levels of the transmission from the wearable system 10 to the ICS 12 and hence conserving the battery 38 and optimizing the voltages generated within the system 10.

In addition to the receiver 40 and transmitter 42, the ICS 12 includes a regulator 44 for receiving a power signal from the receiver 40 to energize a processor 46. Data signals from the receiver 40 are also transmitted to the processor 46 for processing to generate stimulation signals applied to one or more of a plurality of capacitor coupled electrodes in an intra-cochlear electrode 48.

Generally speaking, in response to control or data signals from the WP16 the processor 46 selectively monitors voltages of the electrodes and associated circuitry in the processor and generates ICS status indicating and measured signals. For example, the processor 46 monitors the voltage applied to the regulator 44, the impedance of the electrodes and other voltages within the processor to generate the status indicating signals which are sent as data to the telemetry transmitter 42 for transmission to the wearable system 10.

More particularly, in the cochlea stimulating system shown in FIG. 1, the signals transmitted to the ICS 12 from the wearable system 10 include electrical power components. Such power components are processed within the receiver 40 through the series regulator 44 to generate a voltage signal which powers the processor 46. The processor 46 selectively monitors the voltage applied to the series regulator and generates a status indicating signal relative to such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry receiver 36. As previously stated, such information is utilized in the microprocessor 30 and gate array 32 of the WP 16 to control the power level of the transmissions from the data transmitter 34 to the ICS 12.

More specifically as to the ICS 12 and the embodiment thereof illustrated in FIG. 2, power and data are sent through a main coil 50 to the receiver 40 comprising a power rectifier 50 which filters out DC power for the regulator 44 and a detector which demodulates the data for transmission to a data decoder 52. The regulator 44 in conjunction with a voltage reference 54 and voltage regulator error amplifier 56 produces a precise 14 volts for powering the balance of the processor 46. More particularly, the 14 volts powers a voltage downconverter 58 which generates three additional voltages, 10.5, 7.0 and 3.5 volts. The three voltages are used to power various other circuits, including the output circuits of the processor 46.

The voltage used to provide charge to the outputs applied to the electrodes 48 is transferred to eight different storage capacitors 60, one of which is illustrated in FIG. 2. There is one storage capacitor for each of eight isolated bipolar channels. The output of each storage capacitor is controlled by a current source FET 62 for that channel. Each FET current is determined by an exponential D to A converter 64

and current reference 65, such as the D to A converter described in U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as the present invention.

The output of the current sources 62 are connected to the electrodes 48 and an indifferent electrode 49 through a switch matrix 66. The output of the electrode switch matrix 66 is capacitor coupled to each of 16 electrodes. The following table lists the output currents available to the electrodes:

| Constant Current Amplitude Steps (μA) | | | | |
|---|---|---|---|---|
| 2500 | 425.7 | 72.49 | 12.34 | 2.102 |
| 2417 | 411.7 | 70.11 | 11.94 | 2.033 |
| 2338 | 398.2 | 67.81 | 11.54 | 1.966 |
| 2261 | 385.1 | 65.58 | 11.16 | 1.901 |
| 2187 | 372.4 | 63.43 | 10.80 | 1.839 |
| 2115 | 360.2 | 61.34 | 10.44 | 1.779 |
| 2046 | 348.4 | 59.33 | 10.10 | 1.720 |
| 1978 | 336.9 | 57.38 | 9.772 | 1.664 |
| 1913 | 325.9 | 55.49 | 9.451 | 1.609 |
| 1850 | 315.2 | 53.67 | 9.140 | 1.556 |
| 1790 | 304.8 | 51.91 | 8.840 | 1.505 |
| 1731 | 294.8 | 50.20 | 8.549 | 1.455 |
| 1674 | 285.1 | 48.55 | 8.269 | 1.408 |
| 1619 | 275.7 | 46.96 | 7.997 | 1.361 |
| 1566 | 266.7 | 45.42 | 7.734 | 1.317 |
| 1514 | 257.9 | 43.92 | 7.480 | 1.273 |
| 1465 | 249.4 | 42.48 | 7.234 | 1.232 |
| 1416 | 241.2 | 41.08 | 6.997 | 1.191 |
| 1370 | 233.3 | 39.73 | 6.767 | 1.152 |
| 1325 | 225.6 | 38.43 | 6.545 | 1.114 |
| 1281 | 218.2 | 37.17 | 6.330 | 1.077 |
| 1239 | 211.1 | 35.95 | 6.122 | 1.042 |
| 1198 | 204.1 | 34.76 | 5.921 | 1.008 |
| 1159 | 197.4 | 33.62 | 5.726 | 0.975 |
| 1121 | 190.9 | 32.52 | 5.538 | 0.000 |
| 1084 | 184.7 | 31.45 | 5.356 | |
| 1049 | 178.6 | 30.42 | 5.180 | |
| 1014 | 172.7 | 29.42 | 5.010 | |
| 981.2 | 167.1 | 28.45 | 4.845 | |
| 949.0 | 161.6 | 27.52 | 4.686 | |
| 917.8 | 156.3 | 26.61 | 4.532 | |
| 887.6 | 151.1 | 25.74 | 4.383 | |
| 858.5 | 146.2 | 24.89 | 4.239 | |
| 830.3 | 141.3 | 24.07 | 4.100 | |
| 803.0 | 136.7 | 23.28 | 3.965 | |
| 776.6 | 132.2 | 22.52 | 3.835 | |
| 751.1 | 127.9 | 21.78 | 3.709 | |
| 726.4 | 123.7 | 21.06 | 3.587 | |
| 702.6 | 119.6 | 20.37 | 3.469 | |
| 679.5 | 115.7 | 19.70 | 3.355 | |
| 657.2 | 111.9 | 19.05 | 3.245 | |
| 635.6 | 108.2 | 18.43 | 3.138 | |
| 614.7 | 104.6 | 17.82 | 3.035 | |
| 594.5 | 101.2 | 17.24 | 2.936 | |
| 575.0 | 97.92 | 16.67 | 2.839 | |
| 556.1 | 94.70 | 16.12 | 2.746 | |
| 537.8 | 91.59 | 15.59 | 2.656 | |
| 520.2 | 88.58 | 15.08 | 2.568 | |
| 503.1 | 85.67 | 14.58 | 2.484 | |
| 486.5 | 82.86 | 14.11 | 2.402 | |
| 470.6 | 80.13 | 13.64 | 2.324 | |
| 455.1 | 77.50 | 13.19 | 2.247 | |
| 440.1 | 74.96 | 12.76 | 2.173 | |

Under control of a voltage controlled oscillator 70 and its loop filter 72, the serial output from the data decoder 52 drives a serial to parallel converter 68. The parallel output of the serial-to-parallel converter 68 provides channel amplitude data to an amplitude data latch 74 and program command data to a command latch 76. More particularly, the serial data from the data decoder 52 is analyzed by bit and word error checking counters 78. The amplitude data from the amplitude data latch 74 determines the output of the exponential D to A converter 64. In that regard, the analog value of the output from the D to A converter 64 is generated

5,609,616

7

in a current mirror which is then transferred via an analog multiplexer 80 to the capacitively-coupled output electrodes 48. The sequence of operation of the multiplexer 80 is controlled by the output of a word strobe generator 79 which is driven by command latch 76. It should be noted that the command latch 76 cannot function unless an initialization circuit 82 and the bit error checking circuit 78 permit data to be transferred to a command decoder 84.

The command decoder 84 controls all the other specific functions such as the electrode switching matrix 66 via an output mode register 86 and output control logic 88, and a pulse width control 90 which also controls the output via the output control logic 88. As with the command latch, the pulse width control 90 and the output control logic 88 cannot function unless the initialization circuit 82 is properly initialized. To be enabled, the initialization circuit 82 must detect the correct initial digital code. When the initialization circuit 82 is not enabled, the electrode switching matrix 66 cannot turn on.

In addition to the other functions of the command decoder 84, it also controls the setting of indifferent electrode switches 92 which are used for monitoring the current flowing through the indifferent electrode and therefore through any or all 16 electrodes in a unipolar configuration. With the appropriate output channel configuration in the unipolar state, the indifferent electrode switches permit multi-polar operation.

As illustrated more clearly in FIG. 2, the ICS back telemetry system described briefly relative to FIG. 1, consists of a signal multiplexer (MUX) 94 programmed by the command decoder 84 to monitor various voltages throughout the processor 46 and ICS 12. The output of the multiplexer 94 is amplified through a series of telemetry gain stages 96 which are connected to an A to D converter 98. Power to the gain stages 96 can be turned on and off by the command decoder 84 to conserve energy when not in use.

The A to D converter 98 may be a single-slope type which functions by comparing the output of the gain stages 96 with a voltage ramp. The slope of the ramp is set by a current reference 100. The output of the A to D converter 98 and a telemetry control logic 102 is a train of bits that controls a telemetry modulator switch 104. The telemetry modulator switch 104 modulates the telemetry transmitter 42 which energizes a telemetry coil 106.

As previously indicated, the back telemetry system included in the cochlear stimulating system of the present invention provides means for minimizing power consumption of the system. As previously noted, the WP 16 is powered by the battery 38. To increase the battery life or to allow a smaller battery to be used, the radio frequency transmitted from the WP 16 via the antenna 20 to the ICS 12 is rectified in the receiver 40 and applied to the regulator 44. It is important that the output voltage of the regulator 44 be held constant, in this case, 14 volts. It is also important that the voltage regulator which has the 14 volt output must have somewhat more than 14 volts available as an input. Any additional voltage is lost as heat and will reduce the life of battery 38. In the present invention, the regulator input voltage (DC) is optimized by controlling the RF power transmitted by the wearable system 10 and received by the ICS 12. As previously indicated, the data transmitter 34 is powered by the battery 38, preferably a 6 volt 0.5 amp-hour battery. The power control is affected through a conventional switching regulator included in the gate array 32 whose output voltage may be varied based upon the duty cycle of a switching transistor or multiple switching transistors in the

8

switching regulator. The output of the power control circuit powers the transmitter 34 and by varying its output voltage can vary the transmitter power. The transmitter may run at 49 MHz and be 100% amplitude modulated by a digital signal. The digital signal comes from the gate array 32. The signals transmitted by the transmitter 34 are received at the ICS 12 and rectified as previously described. The rectified power noted as "DC" in FIG. 2 is applied to the regulator 44 which may be of conventional design including a junction type depletion-mode FET to hold the output voltage of the regulator 44 constant as the input voltage changes. In practice, the input voltage can vary from 14 volts up to 20 volts or more. To maintain best efficiency, it is desired that the DC voltage be only slightly greater than the output voltage of the series regulator 44, perhaps on the order of 14.2 to 15 volts. However, as the antenna 20 is moved or as the circuit loads change, the DC voltage may start to change. One purpose of the back telemetry system is to allow the DC voltage to be automatically maintained at the lowest voltage consistent with normal operation. To accomplish this, under control of the command decoder 84, the multiplexer 94 monitors the DC voltage. The desired output of the multiplexer 94 is applied to the conventional A to D converter 98. As previously described, the output of the A to D converter, telemetry control logic 102 and telemetry modulator switch 104, FM modulates the telemetry transmitter 42 which may comprise a 10.7 MHz oscillator. The output of the oscillator is coupled back through the skin to the headpiece 14 and antenna 20 to the telemetry receiver 36. The output of the receiver 36 is applied to the gate array 32 including a conventional serial to parallel converter. The parallel data output from the serial to parallel converter is processed in the microprocessor 30 to adjust the power level in the power control circuit of the data transmitter 34 to maintain the value of the DC voltage slightly greater than the desired output voltage of the series regulator 44.

As just described, the command decoder 84 controls the monitoring of the value of the DC voltage to provide the desired voltage control. Similarly, the command decoder 84 may select particular channels to be monitored and the impedance of the various electrodes to be determined in the same manner as the DC voltage was monitored and as above described. In such cases, the ICS status indicating signals generated in the processor 46 and telemetered to the WP 16 may be utilized within the microprocessor 30 to provide indications of the operating status of the ICS 12.

In still other instances, to save power the command decoder 84 may function to cause a powering down of various subsystems within the processor 46. With the circuitry of FIG. 2, power may be restored in approximately 20 msec. on appropriate output from the command decoder. Similarly, the microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The hibernation state terminates whenever additional commands are received from the command decoder 84.

In the ICS 12 illustrated in FIG. 2, the current sources 62 are floating. Such "floating" of the current sources may be as described in United States patent application Ser. No. 428,179, filed Dec. 18, 1989, and assigned to the same assignee as the present invention, and may be implemented with an FET that is not directly tied to a power supply. This may be implemented using two identically sized transistors, one being a reference transistor upon which an input current is impressed to generate a voltage difference thereacross which is a predetermined gate voltage for the second or output transistor which is floating with respect to all power supplies. The predetermined gate voltage is that voltage

5,609,616

**9**

which when applied to the output transistor will produce the same current value as the input current. The importance of such floating current sources in the ICS **12** is to enable the ICS **12** to stimulate pairs of electrodes independent of the current flow in other pairs of electrodes and independent from the main power supply. This allows for the exact control of current in each output stage with no direct current path back to the main power supply or to any other output stage. This eliminates any concern of undesired currents flowing between any of the output stages.

The processor **46** included in the ICS **12** includes means (**88** and **90**) for selectively controlling the pulse width of the stimulation signals applied to the electrode **48**. Such means preferably comprises a timing circuit capable of turning the stimulus current of a particular channel on and off with a time resolution of approximately one microsecond. Such means is preferably controlled by a command signal separate from the signals which set the current to each stimulus channel; the command signal controls the duration of current stimulus while the previously described signals control the stimulus current in each channel.

Further, the processor **46** included in the ICS **12** includes means for selectively controlling the frequency at which stimulating signals are applied to select ones of the electrodes. This is preferably accomplished by providing a signal frame (or set of signals to the multiplicity of electrodes) of varying length. The use of short frames allows a subset of channels to be refreshed or updated more often than would be possible if all channels were always updated by a fixed, long frame. Such reduced frame length may be implemented either as a frame length encoded in the frame data or (in the preferred implementation) as a unique end of frame signal.

In the processor **46**, the voltage downconverter **58** generates three voltages of different value for powering different components in the ICS **12**. The voltage downconverter may comprise a set of capacitors and switches so arranged to connect the capacitors alternately in series across the high voltage from the regulator **44** input and then in parallel to provide a lower voltage supply (3.5 volts in the preferred implementation). The storage or supply capacitors **60** may be charged to various multiples of the 3.5 volt supply by connecting their associated transfer capacitors to the appropriate points in the downconverter when the downconverter capacitors are connected in series.

The ICS **12** includes means for selectively receiving and responding to analog and/or pulsatile input data from the WP **16**. Preferably, this is accomplished by using the stimulus current control signals to provide continuous analog control of stimulus and using a separate command signal to selectively control the "on" or "off" status of a given channel. The stimulus parameters of each channel are controlled independently of all other channels by means of separate signals within the data frame and separate configuration commands for each channel encoded in the command signal.

Further, the ICS **12** is capable of selectively stimulating the electrodes in a unipolar and/or bipolar configuration. This is accomplished by providing a set of command signals which affect separate bits for each channel in the output mode register **86**. Via the output control logic **88**, these bits independently configure the switches for each channel in the electrode switching matrix **66**. The switches allow the current source FET **62** and storage capacitors **60** to be connected to pairs of electrodes (bipolar mode) or, alternatively, to individual electrodes and the indifferent electrode **49** via the indifferent electrode switches **92**.

**10**

While FIG. 2 illustrates a basic ICS, FIGS. 3 and 4A–4H illustrate a preferred form of the ICS. FIG. 3 is a more general block diagram illustration of the system which is represented in greater detail in FIGS. 4A–4H. The majority of the active circuitry of the ICS may be imbedded in a custom chip which with other active and passive circuitry comprising the ICS may be supported on a substrate. The ICS illustrated in FIGS. 3 and 4A–4H comprises a receiver **200** for receiving an input signal generated in the WP **16** and transmitted by the headpiece **14**. Preferably, such input is a Manchester-encoded data stream comprising an amplitude-modulated RF signal consisting of a serial sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-of-frame marker. A frame is defined as one such bit sequence and such frames are sent sequentially from the WP to the ICS. The first 8 words of each frame contain the digital amplitude and polarity information for output channels **1** through **8** in that order. The 9th word contains command information for the control of ICS configuration and functionality. The receiver **200** separates the incoming RF signal into a power signal transmitted to a power supply section **202** and data which is transmitted into a data recovery section **201**. In the power supply section, power signals are generated for the ICS and, via a downconverter **203**, are transformed into the voltage levels which provide power for the eight output stages indicated by numbers **212-1** through **212-8**, one of which will be described in greater detail hereinafter.

The data signal extracted by the receiver **200** and transmitted to the data recovery section **201** is further processed within the data recovery section to provide input signals to an initialization and status control section **204**, a polarity and amplitude control section **205**, a command decoder section **206**, and to a multiple chip control **214**. The initialization and status control section **204** receives power from the power supply section **202** and establishes the control conditions of the other sections of the ICS upon system startup and upon detection of a system operating error by the status control section. The polarity and amplitude control section **205** determines the polarity of the output currents generated in the various output stages **212-1** through **212-8** and generates signals which are further processed in a log D-A converter section **207** to control the magnitude of current signals supplied by the outputs of the various output stages. In the command decoder section **206**, the data signals are processed and decoded to form signals which (1) via an output mode register **208** control the status of the output stages as either unipolar or bipolar, (2) via a pulse width control **209** control the width of the output pulses supplied by the output stages when such stages are in a pulsatile mode and (3) via a refresh voltage logic **210** control the power applied to the output stages. In addition, the ICS includes a back telemetry section **211** which in response to signals from the command decoder **206** generates and transmits back to the WP status indicating and power control signals. The status signals indicate the status of the various elements within the ICS and voltages generated therein. The power control signals control the power of the transmitted signals and effect a power conservation by control of the level of the signals from the WP and by control of the refresh voltages from the downconverter **203** to the various output channels.

Still further, the illustrated ICS includes a multiple chip control section **214**. Section **214** enables the chip included in the ICS to act as a "master" having the capacity to drive a plurality of identical "slave" chips mounted on the substrate thereby effecting a multiplication of the number of output stages.

5,609,616

11

FIGS. 4A–4H, organized as set forth in FIG. 4, show details of the various system sections illustrated in FIG. 3, with subsections of the sections bearing the same numbers as set forth in FIG. 3 and with letters to denote the specific subsections, e.g., 201A, 201B, 201C and 201D are subsections of the data recovery section 201. The following detailed description of the sections and subsections comprising the system will begin with the receiver 200 and will continue through a description of the output stages 212-1 through 212-8 and multiple chip control 214 and will be followed by a description of the operation of the system comprising the described sections. Details of the frame structure, data word structure, and/or the transmission rate for the input signal from the WP and data signal extracted therefrom will be included in the description of the operation of the system.

STRUCTURE

Receiver 200

The receiver 200 illustrated in FIG. 4A is a conventional AM detector containing capacitors which implement a parallel resonant tuned circuit in conjunction with a main coil 50 followed by series connected power rectification and data detection diodes and energy storage capacitors to generate signals PDATA, NDATA, RAWDC, ZEROV and TANKV. PDATA and NDATA are differential signals generated across the data detection diodes and convey demodulated data to the data recovery section 201. RAWDC is DC voltage generated across the energy storage capacitors and is delivered to the input of a series regulator 202A in the power supply section 202. ZEROV is the reference voltage against which all other voltages are measured in the ICS. TANKV is derived from RAWDC via a resistive divider network in the receiver 200 and, as will be described in greater detail hereinafter, via a telemetry multiplexor 211B in back telemetry section 211 provides one of the power control signals which is an input to the back telemetry section.

Data Recovery 201

The data recovery section comprises four subsections: a data conditioner 201A, a clock decoder 201B, a serial to parallel converter 201C and a word strobe generator 201D. All analog and digital circuitry in the data recovery section 201 is of conventional design.

Within data conditioner 201A, the signals PDATA and NDATA from the receiver 200 provide the two inputs to an analog comparator. The output from the comparator is the signal MANDATA, which is the recovered version of the Manchester-encoded serial data stream transmitted by the WP. MANDATA is distributed to clock decoder 201B, serial to parallel converter 201C, as well as downconverter clock 203A to be discussed hereinafter.

In addition, within data conditioner 201A, the signal MANDATA is applied to the gate of a MOSFET switch which allows an on-chip capacitor to be charged in a pulsatile manner. A constant-current discharge path in parallel with the on-chip capacitor reduces the voltage to zero in the absence of the signal MANDATA. The voltage across the on-chip capacitor is buffered by three inverters to become the carrier detect signal, CARDET. CARDET is distributed to clock decoder 201B and to an initialization subsection 204B of the initialization and status control section 204.

In the clock decoder subsection 201B, the signal MANDATA is applied to an edge-detector circuit comprised of an XOR gate with an RC delay circuit preceding one of the inputs. Output pulses from the edge detector are the primary input to a phase-locked loop (PLL) circuit of conventional design which, by locking to the MANDATA pulse edges,

12

generates the data clock signals CLKPH1 and CLKPH2. The clock signals comprise a two-phase non-overlapping clock system at a frequency of 1.1 MHz with a CLKPH1 pulse asserted during the first half of each bit time and a CLKPH2 pulse during the second half. Signals CLKPH1 and CLKPH2 are sent to the serial to parallel converter 201C, word strobe generator 201D, pulse width control 209 and an A/D converter 211C in back telemetry section 211.

Further, within clock decoder 201B, the timing of pulse edges in the signal MANDATA is compared to those of the local clock VCO in the PLL. In particular, a unique pulse with non-standard edge timing sent by the WP to mark an end-of-frame is sensed by a circuit of conventional design comprised of a D-type flip-flop and an XOR gate. This unique pulse results in the generation of the frame clock signal, PFRMCLK which is sent to serial to parallel converter 201C.

Additional circuitry of conventional design in the clock decoder 201B, comprising logic gates and binary counters, is used to generate a signal PLLLOCK. PLLLOCK is asserted so long as the PLL is locked to the signal MANDATA, CARDET is asserted, and, as will be described relative to a powerbad detector 204A in initialization and status control section 204, POWERBAD is negated. The signal PLLLOCK is sent to serial to parallel converter 201C and to parity error detector and initialization subsections 204C and 204B of section 204.

Serial to parallel converter 201C comprises logic gates, latches, D type flip-flops, counters and a shift register all of conventional design. Under control of the signal CLKPH1 and a signal DCENABLE from multiple chip control section 214, the serial data bits represented in the signal MANDATA are shifted into a 9-bit serial-in, parallel-out shift register. The first stage output of the shift register generates a serial bit stream signal SERDATA. The 9 outputs of the register are the source of the signal bus DATA (1–9) which is sent solely to a polarity and amplitude data latch 205A in section 205 and to a command latch 206A in command decoder 206.

In addition, within serial to parallel converter 201C, the signal PFRMCLK is gated with the clock signal CLKPH2 to generate a signal FRMCLK sent to pulse width control section 209 and a refresh voltage logic section 210.

Further, within serial to parallel converter 201C, the signal CLKPH1 is connected to the clock input of a 4-bit binary up-counter which is reset by FRMCLK. The counter and succeeding decoders and latches provide the signals XFERB and XFERC solely to an analog multiplexor 207C included in the log D-A converter section 207. Also, the bit 4 output of the counter is gated with CLKPH1 and CLKPH2 to produce the signal WORDTRCLK (word transfer clock) which provides a reset pulse to the counter as well as being sent to word strobe generator 201D, down converter clock 203A and a polarity and amplitude data latch 205A. The counter is also decoded to generate the signal AMPSYNC which is sent solely to pulse width control 209.

Word strobe generator 201D comprises logic gates, D type flip-flops and a 9-stage Johnson counter of conventional design. The signal WORDTRCLK provides the clock input to the Johnson counter. Signals CLKPH1, CLKPH2, FRMCLK and the output from stage 9 of the Johnson counter are combined to provide the reset signal for the counter. Outputs from the first 8 stages of the counter provide the 8-bit signal bus WSTRB (1–8) with each line asserted during the appropriate word time during the data frame. WSTRB (1–8) is sent to analog multiplexor 207C, pulse width control 209 and back telemetry section 211. In addition, the output from stage 9 of the Johnson counter provides the signal

A00823

5,609,616

13

WORD9CLK which is sent to command latch 206A and command decoder 206B.

Power Supply 202

As depicted in FIG. 4A, the power supply section 202 includes the series regulator 202A which includes a series regulating element such as a depletion-mode FET. In conjunction with a conventional voltage reference 202C and a conventional voltage regulator error amplifier 202B, the series regulator produces a precise negative 14 volts (NEG14) with respect to ZEROV for powering the balance of the ICS. The gate of the series regulating element in the regulator 202A is controlled by a signal REGCONT output from an operational amplifier located in a regulator error amplifier 202B, having as its inputs the output VREF of the voltage reference 202C and an attenuated version of NEG14, i.e., TAP14. The voltage reference 202C includes an off chip zener diode which is powered by the NEG14 line. The precision reference voltage VREF is generated across this zener diode.

Downconverter Section 203

As represented in FIGS. 4A and 4B, the downconverter section 203 comprises a downconverter clock 203A and a voltage downconverter 203B.

The downconverter clock 203A has as its inputs NEG14 and ZEROV from regulator 202A, MANDATA from data conditioner 201A, POWERBAD from powerbad detector 204A and WORDTRCLK from serial to parallel converter 201C and comprises two toggle flip-flops and a two-pole FET selector switch of conventional design. The two toggle flip-flops receive and divide by a factor of four, the signal MANDATA. During startup, since MANDATA is pulsing at 550 KHz, the resulting signal from the toggle flip-flop is a 137.5 KHz signal which is applied to one input of the two-pole FET switch. The other input to the two-pole switch is WORDTRCLK and the state of the switch is controlled by POWERBAD. Since, as will be described, POWERBAD is asserted during ICS startup, the 137.5 KHz signal is delivered as DOWNCLOCK during startup to the voltage down converter 203B whereas a level-shifted version of WORDTRCLK is sent out as DOWNCLOCK during normal ICS operation.

The voltage downconverter 203B comprises conventional logic gates and off-chip capacitors. It receives DC power (NEG14 and ZEROV) from series regulator 202A and a squarewave output signal DOWNCLOCK from the downconverter clock 203A. The squarewave is converted into a two-phase non-overlapping pair of clock signals in a conventional cross-connected logic gate and inverter circuit in the downconverter 203B. The two-phase clock signals drive a set of FET switches which establish the pattern of connections between and among a group of four off-chip capacitors 203-1 through -4.

During phase 1 of the clock signals, the four capacitors are connected in series across the −14 volt supply and each charges to a final value of −3.5 volts. At that time, output voltages of −3.5, −7.0, −10.5 and −14 volts are made available on outputs from the voltage downconverter 203B to each of the eight output stages 212-1 through 212-8 in the ICS, and, in particular, to each of the refresh voltage control subsections 212A included in such output stages.

During phase 2 of the clock signals, the four capacitors are connected in parallel and deliver charge to an off-chip storage capacitor 203-5 which is the source of the −3.5 volt logic supply. Also during phase 2, as a natural result of the parallel connection, the voltages on the four capacitors are equalized in preparation for the return to the series arrangement of the next phase 1.

14

Initialization and Status Control Section 204

The initialization and status control section 204 consists of digital circuitry and an analog comparator of conventional design to detect errors and to set the internal conditions of system circuitry on system startup and upon error detection by this section. Section 204 is made up of three subsections: a powerbad detector 204A, an initialization subsection 204B, and a parity error detector 204C.

The powerbad detector 204A comprises an analog comparator having the −3.5 volt output from the voltage downconverter 203B presented to one of its inputs. The other input to the comparator is the reference voltage, VREF, coming from power supply section 202. The comparator operates on the −3.5 volts and VREF to generate an output POWERBAD which is asserted when the −3.5 volt supply is below normal operating potential, such as during startup. Thus, during the initial phase of startup, the POWERBAD signal is asserted. The signal POWERBAD is used to force a known logic condition on circuitry within initialization subsection 204B and is also sent to the downconverter clock 203A and to the data recovery section 201 for the same purpose. For example, while POWERBAD is asserted, the output stages 212-1 through 212-8 are disabled. This is accomplished by POWERBAD resetting a flip-flop within 204B to negate a signal OUTENABLE, the assertion of which is required to enable any of the output stages. Then, upon negation of POWERBAD, assertion of CARDET from data conditioner 201A, PLLLOCK from clock decoder 201B and CONNECT from command decoder 206B, the flip-flop is set and OUTENABLE is asserted to enable the output stages 212.

Similarly, and as will be described again hereinafter, the assertion of a signal PALARM from parity error detector 204C will result in a disabling of the output stages 212 via a negation of Outenable. In this regard, parity error check is made at the end of each frame to assure that the total number of "ones" in the data stream to the ICS is even. The parity error detector 204C comprises a combination of logic gates and flip-flops of conventional design and is based on a D type flip-flop which is clocked by the serial bit data stream SERDATA from signal to parallel converter 201C. The state of the flip-flop at the end of the frame indicates whether the received number of one bits was odd or even. The resulting state of the D type flip-flop is then transferred to a holding flip-flop whose output generates the parity error signal PALARM which is connected to the initialization subsection 204B.

Initialization subsection 204B comprises a combination of logic gates of conventional design and receives input signals CARDET from clock decoder 201B; PALARM from parity error detector 204C; DISCON, CONNECT, and ALLZERO from command decoder 206B, PLLLOCK from clock decoder 201B and POWERBAD from POWERBAD detector 204A. CARDET, PALARM, PLLLOCK and POWERBAD have been described. The manner in which such input signals DISCON, CONNECT and ALLZERO are generated will be described hereinafter relative to section 206. Output signals generated by the initialization subsection 204B are CARON, OUTENABLE, RESETERR, and SYSRESET. In subsection 204B, the signal CONNECT sets a latch flip-flop to assert the output signal OUTENABLE at pulse width control 209. Input signals DISCON and ALLZ-

5,609,616

15

ERO are combined in logic gates within subsection 204B to generate the output RESETERR which goes from 204B to parity error detector 204C to reset the parity error detector flip-flop. Signals PALARM, DISCON, ALLZERO, PLLLOCK and POWERBAD are combined in logic gates within 204B such that when any of these signals indicate a problem, a disconnect command output signal SYSRESET is generated and functions as a general reset signal for all the circuitry in the ICS. In this input, SYSRESET, when asserted will reset the ICS circuitry to its initial state ready for restart in response to system startup data from the WP. Signals CARDET and PLLLOCK asserted and signals POWERBAD and PALARM not asserted combine in gates in 204B to generate the output signal CARON. CARON goes off-chip to turn on the back telemetry carrier signal, at a telemetry transmitter 211E of the back telemetry section 211. As will be described hereinafter, the absence of the back telemetry carrier signal is detected in the WP as an indication of a system defect in the ICS. The WP will initiate a restart of the ICS and will continue in that mode until the back telemetry carrier signal is again detected.

Polarity and Amplitude Data Latch Section 205

The polarity and amplitude data latch section 205 comprises amplitude data latch 205A and a zero current control 205B. The latch 205A consists of a conventional 9-bit latch which receives data bit inputs from a 9-bit bus DATA (1–9) from the serial to parallel converter 201C in addition to WORDTRCLK as generated in 201C. WORDTRCLK causes the input data bits DATA (1–9) to be latched and then held until replaced by a new set of incoming data. Output from the 9-bit latch consists of an 8-bit wide data bus signal AMPDATA (1–8) and a 9th bit defining a single line POLARITY which goes directly to output stages 212-1 through 212-8. AMPDATA (1–8) goes from latch 205A to the zero current control 205B and to the logarithmic D-A converter in section 207, and as described more specifically hereinafter, to the internal subsection 207B.

The zero current control 205B comprises logic gates of conventional design. The signal bus AMPDATA (1–8) from amplitude data latch 205A is decoded in an 8 input gate such that the output of the gate is asserted only when all 8 bits are at logic 0. This corresponds to a requested output current amplitude of zero. The signal POLARITY from the latch 205A is combined with AMPDATA (1–8) to generate two (2) complimentary output signals ZERO and SHORT. SHORT is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 1 and, conversely, ZERO is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 0 (zero).

Command Decoder 206

The command decoder section 206 comprises digital logic circuitry of conventional design and consists of two subsections: command latch 206A and command decoder 206B. The command latch 206A is similar to latch 205A discussed above in that it is a 9-bit latch with input data coming from the 9-bit bus DATA (1–9) from serial to parallel converter 201C. In command latch 206A, DATA (1–9) is caused to be latched by signal WRD9CLK from the word strobe generator 201D to develop a 9-bit bus WORD9 (1–9) output which is maintained until replaced by a new ninth word command. WORD9 (1–9) connects directly to the command decoder 206B which consists of logic gates to decode the various functions from the 9-bit combinations on the output bus. The

16

following table depicts the content of WORD9 and the outputs generated by the various function codes contained in bits 6–8 of WORD9.

TABLE 1

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C B A | | | Channel number | | |

| Function Code | Outputs | Description |
|---|---|---|
| 000 | ALLZERO, DISCON, CONNECT | global control |
| 001 | FUNC2 | output control |
| 011 | FUNC4 | normal back telemetry read |
| 100 | FUNC5 | inverted back telemetry read |
| 110 | FUNC7 | refresh voltage control |
| 111 | FUNC8 | output pulse width control |

In addition, command decoder 206B receives input signals RFMAIN from refresh voltage logic 210, PFMAIN from pulse width control 209 and WORD9CLK and WSTRB1 from the word strobe generator 201D. Output signals from 206B which exit the command decoder 206 consist of logic gate output signals CONNECT, DISCON, ALLZERO, FUNC2, FUNC4, FUNC5, FUNC7 and FUNC8.

As previously described, the signals CONNECT, DISCON and ALLZERO exiting the command decoder 206 provide inputs into the initialization section 204. FUNC2 through FUNC8 are function decodes which provide inputs to the various sections which they control on a command basis. The signal FUNC2 is the primary enabling signal going from the command decoder to the output mode register 208. Signals FUNC4 and FUNC5 are connected directly to the back telemetry section 211 (telemetry function decoder 211A and A/D converter 211C) to control its function. FUNC7 is directly and solely connected to the refresh voltage logic 210 to provide enabling for the refresh voltage control portion. FUNC8 is connected directly and solely to pulse width control 209 to enable that function to take place.

Logarithmic D/A Converter 207

The logarithmic D/A converter section 207 consists of conventional analog and digital circuitry, with the exception of a logarithmic D/A converter subsection 207B which is the subject of U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as this invention. The logarithmic D/A converter 207 consists of three subsections: a current reference generator 207A, the logarithmic D/A converter subsection 207B, and an analog multiplexer 207C. The current reference generator 207A receives a voltage input VREF from the voltage reference 202C and utilizes that reference voltage to generate reference output current signals ADIREF and IREF. ADIREF is a fixed current supply to A/D converter 211C while IREF provides the input current to the logarithmic D/A converter 207B which includes multiplicative stages of current mirrors controlled by the 8-bit data bus AMPDATA (1–8) from the data latch 205A. Output signals from the logarithmic D/A converter subsection 207B are control voltages IPOSCON and INEG-CON connected to the analog multiplexer subsection 207C. The multiplexer is controlled by signals XFERB and XFERC from the serial to parallel converter 201C and an 8-bit bus signal WSTRB (1–8) from the word strobe generator 201D. Outputs from the analog multiplexer are distributed to, and control, each of the current sources 212B in

5,609,616

| 17 | 18 |

the eight output circuits 212-1 through 212-8 as signals IPOS (1–8) and INEG (1–8). Thus, the output current from each of the eight output stages 212-1 through 212-8 are controlled individually, separately and sequentially.

Output Mode Register 208

The output mode register 208 contains 24 transparent latches of conventional design arranged in 3 banks of 8 latches each. The 8 latches in the first bank give rise to an 8-bit bus AMONO (1–8) and likewise the remaining 2 banks generate bus signals BMONO (1–8) and DRC (1–8). AMONO(1), BMONO(1) and DRC(1) connect to output stage 212-1 and the rest of the bus signals are distributed to the other 7 output stages in a like manner.

Only upon assertion of function code signal FUNC2 from the command decoder 206B can the bit pattern in the latches of the register 208 be modified. More particularly, under control of pulse signal WSTRB1 from word strobe generator 201D, the low-order 3 bits of the 9-bit bus signal WORD9 (1–9) from the command latch 206A are decoded in a conventional 3-to-8 decoder. The decoder has each of its 8 output lines connected to and selectively enabling one latch in the same position in each of the three banks comprising the register 208 to effect a selective modification of the bit pattern in the register according to the pattern of the low order 3 bits. The middle 3 bits of WORD9 (1–9) are each connected to a single one of the 3 banks and enable the data inputs to all 8 latches in each of the three banks comprising 208. The high-order 3 bits in WORD9 (1–9) are not used in section 208.

Pulse Width Control Section 209

The pulse width control section 209 comprises logic gates, latches, D type flip-flops, counters and decoders of conventional design. The signals FUNC8 from command decoder 206B in conjunction with FRMCLK, CLKPH1 and CLKPH2 enables the operation of this section and causes the contents of two sequential 9th words to be latched from the bus signal WORD9 (1–9) into one of two buffers under control of a bit 5 in the first WORD9. The contents of the two WORD9 commands are diagrammed below:

TABLE 2

| WORD9 | | | | | |
|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 9 3 | 2 1 0 | |
| | 1 1 1 | E | F F | C C C | |
| Second WORD9 | 8 | 7 | 6 5 4 3 2 1 0 | | |
| | X | D | N N N N N N N | | |

| E | EDGE CONTROL BUFFER NUMBER [0,1] |
|---|---|
| FF | EDGE EXECUTION FRAME NUMBER [00,01,10,11] |
| CCC | CHANNEL NUMBER [000–111 = CH1–CH8] |
| X | DON'T CARE |
| D | DIRECTION OF EDGE [0=ON TO OFF, 1=OFF TO ON] |
| NNNNNNN | COUNT TO OCCURRENCE OF EDGE [0–84] |

As depicted in Table 2, requested stimulus output pulse edges will occur at the bit time specified in second WORD9 bits 0–6 above, during the frame time according to the command specified in the first WORD9 bits 3 and 4. This is accomplished by using such data bits to preset two down-counters which are decremented by the signal CLKPH1 from the clock decoder 201B and FRMCLK from the serial to parallel converter 201C respectively. Channel select bits

0–2 in the first WORD9 are latched and decoded to allow the passing of edge information only to the requested output channel as represented in the 8-bit signal bus PWC (1–8). The signal OUTENABLE from initialization 204B is gated with all bits of PWC (1–8) and must be asserted to enable any PWC (1–8) line to be asserted. Assertion of at least one PWC line is required for any stimulation signal to occur (see Table 6 herein).

Refresh Voltage Logic Section 210

Refresh voltage logic 210 comprises logic gates and latches of conventional design. The signal bus WORD9 (1–9) is gated into 8 pairs of such latches. The outputs from each one of each pair of latches is represented as one line in each of the two output bus signals RV0 (1–8) and RV1 (1–8) which are sent to a refresh voltage control 212A included in each of the output stages in section 212.

Since at least 16 bits are required to establish 4 possible refresh voltage levels across 8 channels, the refresh system is controlled by 2 consecutive 9th word commands of 9 bits each. The format of these 2 command words is shown below:

TABLE 3

| Word9 | | | | | |
|---|---|---|---|---|---|
| First WORD9 | 8 7 6 | 5 | 4 3 | 2 1 | 0 |
| | 1 1 0 | stage 1/2 select | stage 1/2 RV | stage 3 RV | stage 4 RV |
| Second WORD9 | 8 | 7 6 | 5 4 | 3 2 | 1 0 |
| | stage 4 RV | stage 5 RV | stage 6 RV | stage 7 RV | stage 8 RV |

As depicted in Table 3 above, the first WORD9 consists of the function code for refresh voltage control (110 in bits 8–6), a stage 1 or 2 select code (bit 5: 1=stage 1, 0=stage 2) which determines whether stage 1 or stage 2 will be updated at this time, the stage 1 or 2 refresh voltage level code RV (bits 3 and 4), the stage 3 refresh level code (bits 1 and 2) and the high-order bit of the refresh level code for stage 4. The second WORD9 also consists of 9 bits with bit 8 representing the low-order bit of the refresh level code for stage 4 and the remaining 8 bits representing the 2-bit refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two separate double WORD9 refresh voltage commands. The 2-bit RV codes and the refresh voltage levels associated with them are shown below:

| Code | | refresh |
|---|---|---|
| RV1 | RV0 | voltage |
| 0 | 0 | −14 volts |
| 0 | 1 | −7.0 volts |
| 1 | 0 | −3.5 volts |
| 1 | 1 | −10.5 volts |

Backtelemetry Section 211

The backtelemetry section 211 comprises telemetry function decoder 211A, a telemetry multiplexer 211B, an A/D converter 211C, a telemetry modulator 211D and a telemetry transmitter 211E.

5,609,616

| 19 | 20 |

Decoder 211A comprises logic gates, latches and decoders of conventional design receiving as inputs WSTRB (1–8), WORD9 (1–9), FUNC4 and FUNC5. Within decoder 211A signals WSTRB8 and WSTRB1 are combined to create signal WSTRB9 which is asserted from the end of WSTRB8 until the beginning of WSTRB1 and sent to the A/D converter 211C and telemetry modulator 211D. Signals FUNC4 and FUNC5 are the primary activation signals for decoder 211A and cause the 6 low-order bits in the input bus signal WORD9 (1–9) to be latched, decoded and gated to control output signals applied to: indifferent electrode switch 212D (IECLOSE); bus MUXCTRL (1–23); and lines identified as VRTPWR, RLOCTRL and RHICTRL (to telemetry multiplexer 211B), ADPWR, and SH2X1, SH2X3, SH2X10 and SH1X10 (to A/D converter 211C) to control functions in subsections 211B and 211C as shown in the tables below:

TABLE 4A

| Six low order bits WORD9 | | Output Signal | Description of Function |
|---|---|---|---|
| 543 | 210 | | Activated in MUX 211B |
| 001 | 000 | MUXCTRL1 | VOUTA1 vs VOUTB1 |
| 001 | 001 | MUXCTRL2 | VOUTA2 vs VOUTB2 |
| 001 | 010 | MUXCTRL3 | VOUTA3 vs VOUTB3 |
| 001 | 011 | MUXCTRL4 | VOUTA4 vs VOUTB4 |
| 001 | 100 | MUXCTRL5 | VOUTA5 vs VOUTB5 |
| 001 | 101 | MUXCTRL6 | VOUTA6 vs VOUTB6 |
| 001 | 110 | MUXCTRL7 | VOUTA7 vs VOUTB7 |
| 001 | 111 | MUXCTRL8 | VOUTA8 vs VOUTB8 |
| 010 | 000 | MUXCTRL9 | ICP1 vs NRV1 |
| 010 | 001 | MUXCTRL10 | ICP2 vs NRV2 |
| 010 | 010 | MUXCTRL11 | ICP3 vs NRV3 |
| 010 | 011 | MUXCTRL12 | ICP4 vs NRV4 |
| 010 | 100 | MUXCTRL13 | ICP5 vs NRV5 |
| 010 | 101 | MUXCTRL14 | ICP6 vs NRV6 |
| 010 | 110 | MUXCTRL15 | ICP7 vs NRV7 |
| 010 | 111 | MUXCTRL16 | ICP8 vs NRV8 |
| 011 | XXX | RLOCTRL | Output current monitor, high range |
| 100 | XXX | RHICTRL | Output current monitor, low range |
| 101 | 000 | MUXCTRL17 | ZEROV vs ZEROV |
| 101 | 001 | MUXCTRL18 | ZEROV vs 3.5 |
| 101 | 010 | MUXCTRL19 | ZEROV vs VREF |
| 101 | 111 | MUXCTRL20 | EXTP vs EXTN |
| 101 | 100 | MUXCTRL21 | ZEROV vs TAP14 |
| 101 | 101 | MUXCTRL22 | NEG14 vs TANKV |
| 101 | 110 | MUXCTRL23 | ZEROV vs VRTV (int. voltage) |
| 101 | 111 | | no operation |

TABLE 4B

| Six low order bits WORD9 | | Output Signal | Description of Function Activated in A/D Converter 211C |
|---|---|---|---|
| 543 | 210 | from 211A | |
| 111 | 000 | SH2X1 | set gain to x1 (default) |
| 111 | 001 | SH2X1, 3 | set gain to x3 |
| 111 | 010 | SH2X1, 10 | set gain to x10 |
| 111 | 011 | | no operation |
| 111 | 100 | SH1X10, SH2X1 | set gain to x10 (redundant) |
| 111 | 101 | SH1X10, SH2X3 | set gain to x30 |
| 111 | 110 | SH1X10, SH2X10 | set gain to x100 |
| 111 | 111 | | no operation |

TABLE 4C

| Six Low Order Bits | | | Description of Function Activated in 211B, C, D | | |
|---|---|---|---|---|---|
| 543 | 210 | | IECLOSE | VRTPWR | ADPWR |
| 110 | 000 | | open | off | off |
| 110 | 001 | | open | off | on |
| 110 | 010 | invalid state | | | |
| 110 | 011 | | open | on | on |
| 110 | 100 | | closed | off | off |
| 110 | 101 | | closed | off | on |
| 110 | 110 | invalid state | | | |
| 110 | 111 | | closed | on | on |

The telemetry multiplexer subsection (telemetry MUX 211B) comprises 25 level shifters connected to 25 pairs of transmission-gates of conventional design which allow one and only one pair of MUX input signals to be connected to the pair of output lines, MUXOUT+ and MUXOUT−. This pair of output lines convey the differential signal to be measured and are connected to the A/D converter 211C.

A/D converter 211C comprises logic gates, level shifters, transmission-gates, switched capacitor amplifiers and comparators of conventional design arranged in 2 stages. The first stage has a default gain of 1 and can be changed to a gain of 10 by signal SH1X10. The second stage has selectable gains of 1, 3 or 10 as set by signals SH2X1, SH2X3 and SH2X10, respectively. Signal ADPWR from decoder 211A is used to turn on operating power to the amplifiers and the comparator in subsection 211C only when back telemetry has been requested by the WP WORD9 commands. This manner of operation is power-conservative.

In addition, in the converter 211C signals FUNC4 and FUNC5 are connected to the set and reset inputs of a flip-flop which has as its Q output a signal NORMPOL. Assertion of FUNC4 results in NORMPOL true and assertion of FUNC5 causes negation of NORMPOL. Within the converter 211C, NORMPOL is used to direct the converter to take a normal or inverted sample of the signal presented to it via the telemetry MUX 211B In addition, NORMPOL is sent to the telemetry modulator 211D.

Further, in converter 211C, the signals WSTRB (1–8) from the word strobe generator 201D and WSTRB9 from telemetry function decoder 211A are combined in logic gates and level shifters to generate a multiphase clock for controlling switch timing in a switched capacitor amplifier circuit which samples, holds and conditions the voltage to be measured. A reference level for the samples is established by signal VREF.

More particularly, the voltage sample is delivered to a single-slope A/D converter of conventional design which comprises a comparator along with a ramp generator. The ramp generator uses the fixed current ADIREF to charge an on-chip capacitor. The comparator senses equality of the ramp voltage and the sample voltage, terminating the conversion cycle and causing the contents of a 6-bit counter driven by the signal CLKPH1 to be latched. The 6-bit latch output is the bus signal ADCOUNT (1–6) which is sent to telemetry modulator 211D.

Subsection 211D comprises 7 tri-state buffers of conventional design. The 7 buffers are connected to the output line DATAOUT and represent the 6 bits resulting from the A/D conversion plus a 7th bit which indicates polarity. The 7 bits are placed on the common output line DATAOUT in a sequence controlled by WSTRB (2–8) following a logic 1 sent during the WSTRB1 on-time and preceding a logic 0

5,609,616

21

sent during the WSTRB9 on-time. Thus, 9 bits are conveyed to a conventional off-chip telemetry transmitter 211E and thence to the WP in synchrony with one full data frame sent to the ICS by the WP. As previously described, the transmitter 211E is enabled for such transmission by the signal CARON from initialization 204B.

Output Stages 212 - 1 through 8

Output stages 1–8, section 212 (1–8), comprise 8 identical circuits. The table below summarizes the electrical connections to the output stages 1–8 comprising single lines connected to all 8 stages in parallel as well as 8-line buses with an individual line connected to each of output stages 1–8.

TABLE 5

SUMMARY OF CONNECTIONS
TO OUTPUT STAGES 1 THROUGH 8

| Single lines connected to all eight stages in parallel: | 8 Line buses with 1 line connected to each output stage 1 through 8: |
| --- | --- |
| ZeroV | RV0 (1–8) |
| –14 V | RV1 (1–8) |
| –10.5 V | IPOS (1–8) |
| –7 V | INEG (1–8) |
| DCLKPH1 | PWC (1–8) |
| DCLKPH2 | AMONO (1–8) |
| ZERO | BMONO (1–8) |
| SHORT | DRC (1–8) |
| POLARITY | OUTA (1–8) |
| INDCOM | OUTB (1–8) |
| | VOUTA (1–8) |
| | VOUTB (1–8) |
| | ICP (1–8) |
| | NRV (1–8) |

Output stage 1 will be discussed below as representative of all 8 stages. Output stage 1, section 212-1, comprises a refresh voltage control 212A, a current source 212B, an electrode switching matrix 212C and an indifferent electrode switch 212D. The refresh voltage control 212A comprises a conventional switching matrix, like the matrix 212C, in addition to level shifters connected to input circuitry to distribute two different logic levels defined by –3.5 and –14 volts within the refresh voltage control 212A and to the circuits that communicate with the refresh voltage control. As indicated, inputs to the refresh voltage control 212A include the 4 power supply voltage levels (–14 V, –10.5 V, –7.0 V, –3.5 V) along with signals DCLKPH1 and DCLKPH2 from the downconverter 203B. Signals RV1 and RV0 from the refresh control logic 210 provide a 2-bit code to logic gates connected to an intermediate charge storage device for the output stage 1, comprising "flying" capacitor CF1. Signals RV0 and RV1 operate on the logic gates to select one of the four power supply voltages to charge CF1 during assertion of signal DCLKPH1. During assertion of signal DCLKPH2, capacitor CF1 is disconnected from the selected power supply voltage and is connected in parallel with and transfers charge to a capacitor CRV1 via lines PRV1 and NRV1. Such switched capacitor circuitry impresses the voltage of CF1 on storage capacitor CRV1. CRV1 then functions as a floating power source for output stage 1. In this regard, it is the use of the intermediate charge storage device, CF1, alternately connected to the power supply voltages and to CRV1 of output stage 1, that provides electrical isolation for the output stage 1.

As previously described with respect to Refresh Voltage Logic Section 210, more than 9 bits are required to specify which one of the four refresh voltages is to be selected for each of the 8 isolated output stages. Therefore, two ninth-word commands are issued by the WP in two frames in sequence, processed in the ICS, and produce two WORD9

22

commands from command latch 206A. To control the refresh voltage for Stage 1, the first WORD9 command consists of the refresh voltage function control 110 in bits 8–6, a stage 1 select code 1 in bit 5, a stage 1 refresh voltage level code in bits 3 and 4, a stage 3 refresh level code in bits 1 and 2 and a high-order bit of the refresh level code for stage 4. The second WORD9 command includes the refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two 2-word refresh voltage commands. The 2-bit refresh voltage level codes for stage 1 in bits 3 and 4 of the first WORD9 (RV1 and RV0) and the refresh levels associated therewith are shown below:

| Code | | refresh |
| --- | --- | --- |
| RV1 | RV0 | voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

The refresh voltage control 212A has a pair of input latches to hold the 2-bit level codes. The latches are always reset to the 00 (–14 volt) state at startup by the startup reset signal SYSRESET from the initialization section 204B and remain in that condition unless overwritten by a refresh voltage command. Thus, the highest available source voltage is automatically selected for all channels. However, the source voltage can be reduced on a channel-by-channel basis as indicated by back-telemetry data related to the power required for each channel. Such reduction of the source voltage will minimize power dissipation in the current source 212B in the affected output stage and thereby reduce power dissipation in the ICS 12.

Within current source 212B, power signal NRV1 from refresh voltage control 212A is connected to the source of a conventional MOSFET device comprising the current source. Connected to the drain of the MOSFET device is the output line –IN1 which connects to the electrode switching matrix 212C and is one line of the signal bus ICP (1–8) connected to the telemetry MUX 211B Similarly, signal NRV1 is one line of the signal bus NRV (1–8) also connected to subsection 211B.

The gate-to-source voltage of the MOSFET device is controlled by signals IPOS1 and INEG1 respectively from analog multiplexer 207C, with such signals being applied to the device through transmission gates in the analog multiplexer controlled by signals XFERB and XFERC from converter 201C. The gate-to-source voltage so applied in a periodic manner is stored in a capacitor associated with the gate of the MOSFET device and remains operative between the refresh episodes. The refresh episodes are sequentially distributed across all 8 output stages in a non-overlapping manner so that only one current source 212B is connected via multiplexer 207C to the ICS circuitry at any time. The seven non-selected current sources are isolated from each other and the rest of the ICS circuitry by the off-resistance of the transmission gates in multiplexer 207C.

Electrode switching matrix 212C is the final subsection leading to the output coupling capacitors CA1 and CB1 which are connected to the stimulating electrodes. The circuitry in this subsection comprises logic gates, transmission gates, latches and level shifters of conventional design. Electrical isolation of the output stage is maintained in the switching matrix 212C since the various control signals for

**A00828**

5,609,616

| 23 | 24 |

the matrix are applied only to the gates of MOSFET devices which comprise the transmission gates and which directly control the functions described hereinafter.

In particular, two transmission gates are connected between the signal lines +IN1 and –IN1 upon their entry into the matrix 212C. One of the transmission gates is of low on-resistance and is latched by the signal SHORT from the zero current control 205B. The other transmission gate is a high on-resistance device which is turned on by the signal DRC1 from the output mode register 208.

Signals +IN1 and –IN1 are connected to outputs OUTA1, OUTB1, VOUTA1, VOUTB1 and INDCOM via 10 transmission gates in the matrix 212C. The transmission gates are controlled by logic gates driven by input signals AMONO1 and BMONO1 from the output mode register 208, PWC1 from pulse width control 209 and POLARITY from amplitude data latch 205A. The connection patterns are shown in the table below.

Multiple Chip Control 214

In the preferred embodiments thus far described, the ICS comprises a single chip. However, multiple chips of the same or similar circuitry may be usefully employed in a human tissue stimulator. In such an embodiment, a circuit 214 at the input of each chip permits the interconnection of several chips into one functional unit by making one of the chips a master device which receives data and clock signals and then distributes such signals to all the slave chips. In this manner a large number of chips may be connected together forming a system with a large number of output channels, e.g., 16 monopolar channels times the number of chips. Such an embodiment, for example, with two chips, one master and one slave, provides twice the number of channels and requires twice the number of words per frame. In such an embodiment, a total of 18 words per frame instead of the basic 9 words per frame is required since the two chips are in series.

TABLE 6

| INPUT SIGNALS | | | | CONNECTION | | | PATTERN | | DESCRIPTION |
| | | | | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | CON-NECT TO | OF |
| AMONO1 | BMONO1 | PWC1 | POLARITY | OUTA1 | OUTB1 | INDCOM | VOUTA1 | VOUTB1 | CONNECTION PATTERN |
| 0 | 0 | 1 | 1 | +IN1 | –IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR NORMAL |
| 0 | 0 | 1 | 0 | –IN1 | +IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR INVERT |
| 1 | 0 | 1 | 1 | +IN | NONE | –IN | OUTA1 | INDCOM | MONOA NORMAL |
| 1 | 0 | 1 | 0 | –IN | NONE | +IN | OUTA1 | INDCOM | MONOA INVERT |
| 0 | 1 | 1 | 1 | NONE | +IN1 | –IN | OUTB1 | INDCOM | MONOB NORMAL |
| 0 | 1 | 1 | 0 | NONE | –IN1 | +IN | OUTB1 | INDCOM | MONOB INVERT |
| 1 | 1 | X | X | NONE | NONE | NONE | OUTA1 | OUTB1 | DISCONNECT |
| X | X | 0 | X | NONE | NONE | NONE | X | X | DISCONNECT |

Please note that selection of any monopolar mode will eliminate the electrical isolation of that particular output stage via the common connection to INDCOM.

Bus signals VOUTA (1–8) and VOUTB (1–8) from the matrix 212C, ICP (1–8) from current source 212B and NRV (1–8) from refresh voltage control 212A are all connected to the telemetry multiplexer 211B as previously described. Output line INDCOM from the matrix 212C is connected to the indifferent electrode switch 212D.

Within the switch 212D, the signals OUTENABLE from initialization 204B and IECLOSE, RLOCTRL and RHICTRL from telemetry function decoder 211A control the connection between INDCOM and the indifferent electrode via line INDELEC. Assertion of OUTENABLE and IECLOSE activates a transmission gate within the switch 212D which then connects INDCOM directly to INDELEC. Further, assertion of RLOCTRL or RHICTRL from telemetry function decoder 211A places off-chip resistor RLO or RHI, respectively, in a series connection between INDCOM and INDELEC. Stimulus current flowing through the selected resistor generates the voltage output signal ILO or IHI with respect to INDELEC. Such signal is proportional to stimulus current in the monopolar mode and is sent to telemetry MUX 211B

FIG. 5A depicts a long data frame for multiple chip operation including n+1 standard frames per long frame, where n is the number of slave chips and 1 represents the frame associated with the master chip. Note that each standard frame included in the long frame comprises an end of frame pulse (depicted in black) and that the long frame is terminated in a unique marker that signals the end of the long frame. Thus in multiple chip operation, the format of the data transmission is extended by one level. A set of data consists of bits, words, and standard frames embedded in a long frame. As in the regular operation of an ICS previously described, one word consists of 9 bits and one frame consists of 9 words. However, one long frame consists of as many frames as there are chips participating in the multiple chip operation. The beginning (or end) of a long frame is defined by a long frame pulse that has a duration of two regular frame pulses.

An example of multiple chip system is set forth in FIG. 5B having a master chip and n slave chips. Each chip includes a multiple chip control circuit (214, 214-S1 to 214-Sn). As shown in FIG. 4E, chip control 214 has inputs PFRMCLK from the clock decoder 201B, RFMAIN from refresh voltage logic 210, PFMAIN from the pulse width control 209, a preset master/slave input M/S ("1" for the master chip and "0" for all slave chips) and open input leads DIN and ECLK. The control 214 outputs going off-chip include PFRMCLK (for connection to each of the inputs ECLK of the slave chips) and DCENABLE (for a control signal applied to the serial to parallel converter 201C). The chip control 214 in

5,609,616

25

each slave chip includes the same input and output lines. However, each line ECLK is connected to receive the signal PFRMCLK from the master chip, each line PFRMCLK is open and each line DIN is connected to DCENABLE of the preceding chip.

Basically each chip control includes a conventional gate flip-flop. In the chip control **214**, the gated flip-flop is preset by M/S=1 and changes state to develop the control signal DCENABLE upon receipt of PFRMCLK (indicative of the long frame marker when in multiple mode operation and indicative of standard end of frame pulse during regular single chip operation). As previously discussed, DCEN-ABLE enables operation of **201C** to develop DATA (1–9) from MANDATA and hence the processing of input data from the WP by the ICS. In multiple chip operation, as depicted in FIG. 5B, DCENABLE from chip control **214** is applied to input DIN of chip control **214-S1**. This effects a preset of the flip-flop in **214-S1**, which will change state to develop a control signal DCENABLE for output to the chip control **214-S2** at its DIN input upon receipt of the next PFRMCLK at the ECLK input of **214-S1**. DCENABLE developed within **214-S1** is applied to the serial to parallel converter **201C** in the ICS of the Slave **1** chip to enable processing of data from the WP by that ICS. This process is repeated in sequence for each slave chip. From slave n chip, DCENABLE is fed back to the DIN input of the master chip to complete the ring.

Thus, in the multiple chip operation, the flip-flops in each chip control are ganged together such that the output DCEN-ABLE of the master chip feeds into the DIN input of the next slave flip-flop and the DCENABLE output of the next slave chip feeds into the DIN input of the following slave flip-flop and so on until the DCENABLE of the last chip feeds into DIN input of the master chip flip-flop. In this way, the flip-flops form a ring-type shift register.

The multiple chip operation also allows for short frames and short-long frames. With an early application of a long frame pulse and execution, the long frame can be shortened. Further, when WORD9 commands requiring more than one frame for loading and execution are in process, the frame pulse may be inhibited as a clock pulse for the flip-flops until the WORD9 command is fully executed.

Having described each section and subsection of the ICS of FIGS. 4A–4-I, the following is a description of the general operation of the ICS.

SYSTEM OPERATION

(a) Power Supply

The ICS has no internal power source and, therefore, is completely dependent for power from an outside source, that is, power radiated by the antenna connected to the wearable processor WP. The magnetic portion of that radiated field is received by the ICS and converted into two types of signals. One is the power supply for the balance of the implantable system and the second is the data stream which contains the commands which control the behavior of the ICS. The data stream coming from WP is a 50% duty cycle amplitude-modulated signal. The modulated carrier is converted to RAWDC power in receiver **200**. The DC power, RAWDC, is passed to series regulator **202A** and its associated circuitry to generate a regulated negative 14 volts, NEG14, which is the primary power supply for the ICS. The primary power is further operated on to create various voltage levels for the balance of the circuitry. The principal derived power supply is the output from the downconverter **203B**, which is the −3.5 volt line, used to power much of the logic circuitry

26

within the ICS. Also derived are −7 volts, −10.5 volts, and the original −14 volts, which are supplied to the output circuits, of which there are 8. Each output circuit utilizes one of 4 different levels of refresh voltages, which can be selected according to requirements for stimulation output of a given channel in the ICS. In addition, the −14 volt supply is used to power much of the ICS analog circuitry to provide rail to rail operation, where the rails are defined by the −14 V line and the ZEROV line. ZEROV is common to all the circuitry, except for the isolated output stages, and is the logic true or logic one level for all the logic circuitry. The zero or false logic level is −3.5 V or −14 V, depending on the power supply for a particular logic section.

The signals TANKV from receiver **200** and TAP14 from regulator **202A** are resistively-divided representations of RAWDC and NEG14, respectively. As indicated at telemetry MUX **211B**, TANKV and TAP14 are applied to the back telemetry system so that closed loop control of the incoming DC power to the ICS can be maintained. In particular, during startup, the microprocessor in the WP sets the transmit power to a level sufficient to insure proper operation of the ICS (see FIG. 1 and related text). Then, during operation of the ICS, TANKV and TAP14 are telemetered back to the WP for processing. Depending upon the magnitude of the difference between TANKV and TAP14, that is the voltage drop across the series regulator **202A**, the transmit power of WP can be reduced by operation of the microprocessor. Preferably, the power transmitted to the ICS is just sufficient for normal operation, thereby conserving power drawn from the WP and its batteries.

(b) Initialization

As previously described, the WP startup procedure comprises transmission of a data stream of alternating ones and zeros. Simultaneously, the series regulator **202A** output NEG14 ramps from 0 to −14 volts with respect to ZEROV and the receiver develops outputs RAWDC, PDATA and NDATA at half the standard bit transmission rate (550 KHz) to data conditioner **201A**. Within **201A**, PDATA and NDATA result in the signal MANDATA which is transmitted to downconverter clock **203A**, clock decoder **201B** and serial to parallel converter **201C**. Within downconverter clock **203A**, MAN-DATA is divided by four in passing through two toggle flip-flops. The resulting 137.5 KHz signal is applied to one input to a two-pole FET selector switch, the other input comprising WORDTRCLK from serial to parallel converter **201C**. The state of the switch is controlled by POWERBAD, which is asserted during system startup to cause the switch to transmit the 137.5 KHz signal. Thus the 137.5 KHz signal is selected as the clock signal for the voltage downconverter **203B** during startup operation of the ICS whereas a level-shifted version (−3.5 to −14 V) of WORDTRCLK (122 KHz) from converter **201C** is selected during normal operation of the ICS (DOWNCLOCK).

Also during initial startup, the powerbad detector **204A** asserts POWERBAD from just after the start of transmission until the −3.5 volt power supply reaches about −3.3 volts. As previously described, POWERBAD drives the reset of logic circuitry in many parts of the ICS and also forces the output stages **212** to be off so that no stimulus can be presented until proper functioning of the ICS is determined. This is accomplished by POWERBAD resetting a flip-flop within **204B** to OUTENABLE, the assertion of which is required to enable the output stages **212**. The assertion of POWER-BAD, assertion of CARDET from clock decoder **201B** and assertion of CONNECT and PLLLOCK from command decoder **206B**, the flip-flop is set and OUTENABLE is asserted to enable the output stages **212**. Similarly, the

5,609,616

27

assertion of PALARM from parity error detector 204C results in a disabling of the output stages 212 via a negation of OUTENABLE.

In addition, during power-up of the ICS, the carrier of the back telemetry transmitter section 211 is turned on and the turning on of that carrier is sensed by the WP and indicates normal operation of the ICS. Such turning on of the carrier is accomplished by assertion of CARON from 204B. As previously described, CARON is generated only when signals CARDET and PLLLOCK asserted and signal POWERBAD and PALARM not asserted are combined in gates in 204B. CARON goes off chip to turn on the back telemetry carrier signal at a telemetry transmitter 211E of the back telemetry section 211, the back telemetry section being off-chip. If at any time any of the signals CARDET, PLLLOCK, POWERBAD or PALARM changes to a different state indicative of a problem condition, CARON will be negated and the back telemetry carrier will be turned off. Thus, if at any time the WP no longer detects the back telemetry carrier from the ICS, we assume that improper operation is in progress. The microprocessor in the WP halts data transmission and begins the above described startup procedure which should then result in detection of the back telemetry carrier from the ICS.

Following this initial handshake between the WP and the ICS, a series of patient-specific parameters which have been embedded in the WP via a clinician's programmer will be sent into the ICS. Once all such parameters are set up, the electrode outputs will be connected and stimulation will commence. This is accomplished via a WORD9 command to assert the command line CONNECT from the command decoder 206B followed by assertion of the OUTENABLE line from the initialization section, 204B. Assertion of OUTENABLE will enable an output from Pulse Width Control 209 [PWC (1–8)] which in matrix 212C will connect the electrode outputs (see table 6 herein). Conversely, the WP can force a global disconnect of all of the outputs at any time by sending in the WORD9 command which asserts the command line DISCON from the command decoder 206B. Of course, in the event of catastrophic failure of the stimulation circuitry, the user can disable the ICS simply by moving the headpiece away from the ICS.

If a parity error is detected by the parity error detector 204C the detector asserts line PALARM to the initialization section 204. Section 204 then issues the system reset signal SYSRESET to force the ICS system into its restart condition 45 and turn off the back telemetry carrier, signaling the WP that a serious error has occurred. A new startup sequence will then ensue under control of the startup procedure of the WP.

(c) Data Recovery

The pair of data signals, PDATA and NDATA, coming from receiver 200 are squared up in the data conditioner 201A to generate the signal MANDATA. The signal MANDATA represents the recovered data signal from the Manchester-encoded stream transmitted by the WP to the ICS and, therefore, represents the primary data signal input into the ICS to control its function. In addition, the presence of modulated carrier is used to create the carrier detect signal CARDET. CARDET is connected to the clock decoder 201B to indicate the presence of carrier and therefore is one of the requisites for normal operation of the ICS. Since MANDATA is a Manchester-encoded signal, it comprises a clock and data. The clock information is extracted from MANDATA in the clock decoder 201B The clock information is then expressed as 2 signals: CLKPH1 and CLKPH2, used to control the clocking of the serial data into a register in serial to parallel converter 201C. In the converter 201C the nature of the signal is converted from serial to parallel.

28

As previously discussed, data sent to the ICS by the WP is in the form of a serial bit stream organized within a frame, which consists of 9, 9 bit words, that is 81 bits, plus a parity bit and a frame-ending marker. The 9 bit data words, which make up the data portion of the frame, comprise 8 amplitude and polarity data words for the eight output channels in sequence 1 through 8, and a 9th word containing special commands which control housekeeping and certain other functions of the ICS.

In clock decoder 201B, the signal PFRMCLK is derived from the frame ending pulse. PFRMCLK signals the end of one data frame and, therefore, the beginning of the next.

In the converter 201C, WORDTRCLK is generated at the end of each 9 bit word transmitted and causes those specific 9 bits, DATA (1–9), to be latched into the amplitude data latch 205A for amplitude and polarity control. The signal WORD9CLK is used to cause latching of the 9th word coming in so that those 9 bits are directed to the command latch 206A and will remain in that latch until the next 9th word time. Thus, the amplitude data latch 205A is updated 8 times during the normal frame, with data for any particular channel being available only for the transmit time of the next word, when it is then replaced by the new data.

On the other hand, command latch 206A retains the 9th word command information for at least one complete frame time, that is, until the next 9th word occurs. Of course, the succeeding 9th word command could be the same command sent again, in which case the functionality requested by that command would simply be maintained for another frame or, potentially for additional frames for an unlimited period of time.

Note that at times when use of the 9th word command is not required, the frame can be shortened by sending the frame-ending marker after any word of the amplitude data information. The sequence of the data is amplitude and polarity data for channel 1, followed by 2 through 8, and this sequence can be terminated at the end of any word by a frame ending marker. This manner of operation is known as short cycling, and allows the frame to be shortened for more rapid update of low number channels but, of course, without 9th word commands. Such short cycle operation will allow higher frequency waveforms to be represented on such low-order channels at the expense of less-frequent updates on the higher order channels and the absence of 9th word command information. Under short cycling conditions, the amplitude and polarity information for channels not addressed, as well as 9th word commands not overwritten, will simply maintain their previous setting until written again at some future time.

(d) Amplitude and Polarity Control

In the normal full frame sequence, amplitude and polarity data, that is 9 binary bits each for 8 different channels, is received in sequence for channels 1 through 8. The first amplitude and polarity data word received is latched as noted above, and then presented to the logarithmic D to A converter 207B during the second word transmit time. Thus, the update of amplitude and polarity information for a given channel lags that channel's transmit time by one word time. In addition, since the data queue is only one word deep, the amplitude and polarity information sent, for example for channel 1, has to be operated on and completed during the channel 2 transmit time. During that time, the logarithmic D to A converter 207B uses the 8 bits of amplitude information to operate on the reference current IREF from the current reference generator 207A to generate the two current control voltages IPOSCON and INEGCON, which are passed to the analog multiplexer 207C as signals IPOS and INEG. IPOS

5,609,616

29

and INEG are the gate-to-source voltage which will be impressed on the current source 212B in the appropriate output signal channel under the control of the signal WSTRB appropriate for that particular channel. The signals WSTRB (1–8) arise from the word strobe generator 201D, and are a sequence of pulses which are active in the appropriate word time for each channel in sequence 1 through 8. The current source 212B in each of the 8 individual isolated output channels, stores its appropriate gate-to-source voltage on capacitance associated with the MOSFET, maintaining control at the commanded level until updated in the next frame. Each of the 8 current sources is a unidirectional current-controlling device which controls output current drawn from the refresh voltage capacitor, e.g., labeled CRV1 in FIG. 4-C.

Each current source 212B is only connected to the logic circuitry during its signal transfer time. The refresh voltage capacitor CRV1 is only connected during its transfer time. Thus, for the balance of the time of operation, each output channel is electrically isolated from all other channels and also from the logic circuitry.

Since the MOSFET comprising current source 212B is unidirectional, the switching network 212C is placed after the current source in order to control the direction of stimulus current. This aspect is controlled by the signal POLARITY from latch 205A, which for bipolar operation directs the electrode switching matrix 212C to connect output A1 and output B1 for the first channel, for example, directly to the lines +IN1 and –IN1 for normal polarity, or to –IN1 and +IN1 for reverse polarity. In this way the direction of current flow between the electrodes can be controlled to be in either direction, even though the actual current source is a unidirectional device. For monopolar operation, as opposed to bipolar operation as described above, the electrode switching matrix 212C, along with the indifferent electrode switch 212D, is configured to allow the output to be generated between output A1 and the indifferent electrode or output B1 and the indifferent electrode with either direction of current flow being possible. The selection of bipolar or monopolar style of output in the matrix 212C is under control of the buses AMONO (1–8) and BMONO (1–8) from output mode register 208. In this regard, AMONO (1–8) and BMONO (1–8) each have one representative line going to each of the eight output channels (see Table 6).

In addition, there is a capability for placing a discharge resistor across each pair of outputs. Such function is under control of the discharge resistor control bus lines DRC1–8. Assertion of a DRC line to a particular output by the output mode register 208 will place a 150K resistance across the output terminals to discharge the output coupling capacitors. Alternatively, or in addition, a low resistance connection in 212C can be placed across the output terminals to more rapidly discharge the output coupling capacitors in response to the signal SHORT from the zero current control 205B. Further, the output current can be forced to zero by assertion of the signal ZERO from zero current control 205B. In this regard, the signal ZERO causes all output switches in the switching matrix 212C to be in an off or high impedance state.

An additional output mode (MULTIPOLAR MODE) involves using a pair of output channels to generate a bipolar output using any pair of electrodes in the electrode array. To accomplish this, two channels are programmed by the output mode register 208 to assume a monopolar mode. This causes one side of each of the selected channels to be connected together and to the indifferent electrode. Then, unlike the

30

normal monopolar mode, a WORD9 command from WP is sent to the ICS to disconnect the indifferent electrode via IECLOSE. Thus, by programming one of the channels as a source and the other as a sink, current can be driven through any selected pair of electrodes with complete control over amplitude and polarity.

(e) Pulse Width Control

The amplitude and polarity control described above is typical of the analog operation of the ICS. An additional mode of operation is provided by the ICS in which the described amplitude and polarity control is still in operation, but the outputs to one or more channels, controlled individually, can be turned on and off in order to create pulses of controlled amplitude and controlled duration. This is the pulsatile mode of operation. Pulsatile operation is under the control of pulse width control 209. Pulse width control is via a sequence of 9th word commands (WORD9), the first of which results in the assertion of the line FUNC8, which enables the pulse width control 209. The first such command also contains information about the placement of pulse edges within the next succeeding frame, and the rest of the command is issued in a series of 9th words which must not be interrupted by any other 9th word command. Therefore, a feedback signal to prevent other 9th word commands from interfering is sent back from the pulse width control 209 to the command decoder 206, that signal being PFMAIN.

In the control 209, bits of the first of the pulse width commands and succeeding ones are loaded into the pulse width control registers. The bits are used to preset downcounters, driven by the internal system clock, to control the appearance of the on and off times for the channel which is being controlled. Therefore, on a channel by channel basis, the amplitude of the pulse can be controlled in the usual way by the amplitude and polarity information sent in for that channel, and the turning on and off of the output is controlled by the pulse width control 209 in conjunction with the electrode switching matrix.

In addition to the channel by channel control of outputs being either on or off via the pulse width control 209, there is also a global control which can enable or disable all outputs from all channels simultaneously, that is via the signal OUTENABLE from the initialization section 204B. The global signal OUTENABLE can be controlled by the outputs, CONNECT and DISCON, from the command decoder 206B. That is, the line can be driven by a 9th word command to connect or disconnect all the outputs. In addition, the global output control, OUTENABLE, can be negated by the initialization section 204B when circuitry in that section detects conditions of improper operation. Furthermore, during startup of the ICS, all outputs are disconnected until normal operation is in progress, at which time OUTENABLE is asserted and stimulation will begin.

(f) Refresh Voltage Control

The isolated power supply voltages for the stimulus currents from each of the 8 output channels is provided by charge stored on the refresh capacitors, CRV1 through 8. Selection of the appropriate voltage level for each of the 8 output stages is a decision made by the WP based on information telemetered back to it from the ICS about the voltage requirements for proper output drive of that individual channel. This is an important power conservation feature of the ICS which seeks to minimize the potential difference and, therefore, the power dissipation in the current source 212B.

Any one of four different power supply voltage levels are selectable for each of the output channels, independently, and those voltages are –3.5, –7.0, –10.5, 10.5, and –14. Refresh voltage control on a channel by channel basis is effected by two sequential 9th word commands which are decoded in the command decoder 206B and result in asser-

5,609,616

31                                                    32

tion of the signal FUNC7 line going to refresh voltage logic **210**. This requires 2 full frames to implement, that is two 9th words must be transmitted in sequence to achieve such control. The command decoder **206B** must be prevented from operating on a different 9th word during the sequence, hence the line RFMAIN from refresh voltage logic **210** is applied to the command decoder to lock it into the refresh voltage sequence for two frames. Refresh voltage logic **210** provides 2 bits RV0 and RV1 which define the four possible power supply voltage levels for each of the 8 output channels via the lines RV0 (1 to **8**) and RV1 (1 to **8**) connected to refresh voltage control **212A**. The control bits, two for each channel, are latched into their respective refresh voltage control so that (1) one of the four possible power supply voltage levels is selected for each associated channel, e.g., $-3.5$ for channel **1**, $-10.5$ for channel **2**, $-14$ for channel **3**, $-7$ for channel **4**, and so on, and (2) the selected power supply levels are maintained until changed by a new refresh voltage command. During startup, all 8 output channels are automatically commanded to use the $-14$ volt refresh, which provides for the maximum output power. As the system continues to run and, as described hereinafter at (g) "Back Telemetry", as information is fed back via telemetry to the WP, logic within the microprocessor of the WP can then cause a reduction in the power supply voltage for each channel to a level most appropriate for the stimulation requirements for that channel, thereby enhancing the power conservation within the ICS.

(g) Back Telemetry

Function codes FUNC4 and FUNC5 from the command decoder **206B** enable the function of the back telemetry section **211** which is to report back to the WP the state of various voltages within the ICS. As previously indicated, some of the functions of the telemetry section are of a housekeeping nature. For example, the measurement and transmission back of the voltage TANKV provides an index or status indication of the RAWDC voltage generated in the ICS in response to data from the WP. In addition, the power supply voltages ZEROV, $-3.5$ volts and TAP14 are available for transmission back to the WP as indicators of proper power supply function and for feedback control of the WP and the power transmitted therefrom to the ICS.

Also, the back telemetry can be commanded to measure and send back the value of the voltage reference, VREF, to indicate proper operation and, since this voltage is highly stabilized, to provide a system calibration point. In addition, stimulus output voltages can be measured via the lines OUTA (1 through **8**) and OUTB (1 though **8**), when the ICS is in the bipolar mode.

In the monopolar mode, the output value can be measured between either output A and the indifferent electrode, or output B and the indifferent electrode, whichever is appropriate. Additionally, in the monopolar mode, the current sampling resistors RLO or RHI can be placed in series with the stimulus circuit, and the resulting voltage drop across the resistors measured and transmitted back to the WP as an index of stimulus current. Thus, in the monopolar mode, both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP. The WP is able to use this information in its microprocessor to choose the appropriate refresh voltage for each channel in the manner heretofore described at (f) Refresh Voltage Control.

As indicated in FIG. 4-E, following the telemetry multiplexer **211B** which selects the signal to be measured and transmitted back to the WP, the analog to digital converter section **211C**. The analog to digital converter is of a unipolar type. But, at least some of the signals which are to be measured have unknown polarity at the time of measurement. Therefore, the capability is provided to make measurements in a normal mode or an inverted mode, depending on the state of the function lines, FUNC4 and FUNC5. If FUNC4 is asserted at the converter **211C** and the resulting ADCOUNT is zero, this indicates either that the measured signal is zero or of a polarity opposite to the setting of the converter. To determine which is the case, FUNC5 is asserted to switch the converter to the inverted mode. If ADCOUNT now registers other than zero, this indicates that the measured signal was of an opposite polarity to the normal setting of the converter. If ADCOUNT remains zero, this indicates that the measured signal was in fact zero.

In addition, the amplitude of some of the voltages to be measured is unknown at the time of measurement. Therefore provision is made for a stepwise gain selection prior to analog to digital conversion under control of SH2X1, SH2X3, SH2X10 and SH1X10. For example, if SH2X1 is asserted and ADCOUNT is a series of 1's, the input is out of range of the converter and the gain should be reduced until ADCOUNT reads less than 111111.

Thus, if the measurement is taken and is judged by the WP to be of the wrong polarity or wrong gain setting, correction can be sent back from the WP to make another measurement using the correct parameters as deduced from the first reading. The 6 bit parallel output bus from the A to D converter is connected to the telemetry modulator multiplexer which converts this parallel set of bits into a serial bit stream which is then applied to the back telemetry transmitter.

PHYSICIAN'S TESTER

As described herein most clearly under the heading "SYSTEM OPERATION", the system of the present invention provides for feedback and microprocessor control of various power levels and measurement of different voltages and currents within the ICS in response to commands and data changes transmitted by the WP in response to data telemetered back to the WP in the form of status indicating and measurement signals. The present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS.

Basically such physician control is embodied in a portable tester utilizing telemetry coupling to the implanted ICS, thereby providing communication between the tester and ICS for the monitoring, control and measurement of the ICS parameters. In this regard, the tester as shown in FIG. 6 comprises a modification of the previously described WP embodied in a portable housing **300** having a control panel **302** and a visual display **304** providing alpha numeric data for viewing and appropriate action by the physician. A block diagram of the circuitry embodied in the tester is depicted in FIG. **7** in combination with the ICS **12** of FIG. 1—all previously described components bearing the same numerals as in FIG. 1.

The tester monitors the performance parameters of the ICS **12** by detecting the back telemetry signal of the ICS in an interrogation protocol for the microprocessor. The tester places the received signal into a self contained memory storage section.

Physician interaction with the ICS is exercised by the use of the control panel **302** which contains electronic circuitry for conversion of the back telemetry signal into directly

A00833

5,609,616

**33**

readable information which is read out on the LCD display **304**. Commands are provided to the implanted stimulator through a control of the microprocessor **30** and the commands generated thereby. The physician's tester additionally can provide a print out of both the displayed data and information and the executed commands.

As illustrated, the physician's tester is basically a modification of the WP **16**. The Physician's Tester microprocessor **30** has both a display port and an infrared serial output port. The display port drives display **304** while the infrared port can drive a separate infrared display, a printer for recording the displayed information or a separate IR transducer for generating infrared light signals for transmission to an IR receiver for separate processing of the information from the ICS. Panel knob **306**, **308**, and **310** control potentiometers, the position of which are read by the microprocessor **30** to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination. In particular, such manual control results in changes in the commands transmitted by the WP to the ICS to control the measurement of the ICS parameters in the same manner as previously described for the system of FIGS. 4-A through 4-I.

Table 7 describes typical parameter settings for the control knobs **306**, **308**, and **310**.

TABLE 7

Control Knob 306

| Position 1 = | Ground (0 Volts) |
| Position 2 = | 14.0 Volts |
| Position 3 = | 3.5 Volts |
| Position 4 = | Reference Voltage |
| Position 5 = | Coil Voltage |

Control Knob 308

| Position 1 = | Impedance of Monopolar A configured channel |
| Position 2 = | Impedance of Monopolar B configured channel |
| Position 3 = | Impedance of Bipolar configured channel |
| Position 4 = | Voltage of Monopolar A configured channel |
| Position 5 = | Voltage of Monopolar B configured channel |
| Position 6 = | Voltage of Bipolar configured channel |
| Position 7 = | Voltage of Pass FET |
| Position 8 = | 1 KHz output current Monopolar A configured channel |
| Position 9 = | 1 KHz output current Monopolar B configured channel |
| Position 10 = | 1 KHz output current Bipolar configured channel |

Control Knob 310
Volume Control (Peak Output Current)

| Position 1 = | 0 µA |
| Position 2 = | 0.5 µA |
| Position 3 = | 1.0 µA |
| Position 4 = | 10 µA |
| Position 5 = | 100 µA |
| Position 6 = | 1000 µA |
| Position 7 = | 2500 µA |

Extended System Operation and Applications

While preferred forms of the human tissue stimulator of the present invention embodied in cochlear stimulating systems have been described in detail hereinabove, it should be appreciated that various changes and modifications may be made in the described systems without departing from the spirit of the present invention.

For example, while the outputs of the preferred embodiments have been described as stimulating tissue, the DC and squarewave outputs of the ICS under control of the pulse width control **209** may be utilized to power other implanted devices. For some such AC applications, a larger capacitor CA1 and/or CB1 may be required for each or some of the

**34**

ICS output channels. Conversely, for strictly DC applications, no output capacitors are necessary.

Further, while the ICS status signal-generating features for the preferred embodiment include the measurement and telemetry functions described in subsection (g) hereinabove, similar measurements and telemetry back to the WP may be provided by the ICS for other implanted devices connected to an electrode pair of the ICS. This permits a wide range of applications since the back telemetry feature can sample and measure any external voltage within its amplitude and frequency range and provide 6 bit resolution. Any external device which can generate an appropriate voltage related to its function can utilize this feature.

Moreover, with the ICS as previously described with respect to FIGS. 4-A through 4-I, the output electrode pairs for the separate channels of the ICS are simultaneously available to power another implanted device or stimulate tissue and to sense variable voltage conditions therebetween.

In view of the foregoing and other additions and changes which may be made in the illustrated embodiments, the present invention is to be limited in scope only by the terms of the following claims.

We claim:

1. A physician's testing system for testing a multichannel cochlear stimulating system, comprising a physician's tester, an external headpiece/transmitter, and an implanted cochlear stimulator (ICS),

the external headpiece/transmitter having transmitting means for transmitting data-containing signals to the ICS;

the ICS comprising: (a) receiving means for receiving the data-containing signals, (b) processor means for processing the data-containing signals to generate stimulation signals, (c) a plurality of tissue-stimulating electrodes for receiving the stimulation signals, (d) monitor means in the processor means and responsive to the data-containing signals for (1) selectively monitoring at least one pair of the tissue-stimulating electrodes as one of the stimulation signals is applied thereto to measure a voltage associated with said pair of electrodes, and (2) generating stimulator status-indicating signals, and (e) telemetry means for transmitting the stimulator status-indicating signals to the external headpiece/transmitter means; and

the physician's tester comprising:

external processor means coupled to the transmitting means of the external headpiece/transmitter for receiving and processing the status-indicating signals to derive information therefrom regarding the operation of the implanted stimulator and its plurality of tissue stimulating electrodes;

user-controllable means connected to the external processor means for selectively generating and controlling the data-containing signals transmitted by the transmitting means of the external headpiece/transmitter means, said user-controllable means including manual means for specifying a peak output current for the stimulation signals to be applied to the at least one pair of tissue-stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

2. The physician's testing system of claim **1** wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a parallel output port coupled thereto through which information derived from the status-indicating signals may be coupled to a remote site.

A00834

5,609,616

35

3. The physician's testing system of claim 1 wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having a printer port coupled thereto through which information derived from the status-indicating signals may be sent.

4. The physician's testing system of claim 1 wherein the manual means of the user-controllable means of the physician's tester further includes means for specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

5. The physician's testing system of claim 4 wherein the external-processor means includes means for computing an impedance measurement based on the voltage measured by the monitor means of the ICS and the peak output current specified by the manual means of the user-controllable means.

6. The physician's testing system of claim 4 wherein the ICS includes a current-sensing resistor within the ICS through which a current associated with a stimulating signal applied to a select pair of the tissue-stimulating electrodes must pass, and wherein said monitor means within said ICS includes means for measuring a voltage across said current-sensing resistor, which voltage provides a measure of a stimulating current flowing through the select pair of electrodes, and wherein the external-processor means of the physician's tester includes means for computing an impedance measurement based on the voltage and current measured by the monitor means of the ICS.

7. The physician's testing system of claim 1 wherein the external processor means of the physician's tester includes a microprocessor, said microprocessor having an RS232 output port coupled thereto through which information derived from the status-indicating signals may be sent to a remote site.

8. The physician's testing system of claim 1 wherein the manual means for specifying the peak output current, included as part of the user-controllable means of the physician's tester, comprises a manual switch having means for selecting one of at least seven separate peak output current settings.

9. The physician's testing system of claim 8 wherein the at least seven separate peak output current settings of the manual switch include 0, 0.5, 1.0, 10, 100, 1000 and 2500 µa.

10. A method of testing an implantable tissue stimulating system comprising:

transmitting data-containing signals to an implanted stimulator from an external transmitter;

selectively controlling the data-containing signals as they are thus transmitted;

receiving the data-containing signals within the implanted stimulator, the implanted stimulator having a multiplicity of tissue-stimulating electrodes;

processing the data-containing signals within the implanted stimulator to generate stimulation signals;

applying the stimulation signals to at least one pair of the multiplicity of tissue stimulating electrodes;

selectively monitoring the at least one pair of the multiplicity of electrodes to measure a voltage associated therewith at the same time the stimulation signals are applied thereto;

generating stimulator status-indicating signals representative of the measurements made within the implanted stimulator;

transmitting the stimulator status-indicating signals to an external receiver coupled to the external transmitter;

receiving and processing the status-indicating signals to produce processed status-indicating signals which con-

36

vey information regarding the status of the implanted stimulator, including the measurements made within the implanted stimulator; and

displaying the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be made known.

11. The method of claim 10 further including printing the processed status-indicating signals, whereby the status of the implanted stimulator, including the results of the measurements made within the implanted stimulator, may be preserved on a printed record.

12. A system for testing an implantable cochlear stimulator (ICS) comprising a portable physician's tester and the ICS,

the ICS comprising (a) receiver means for receiving data-containing signals, (b) processor means for processing the received data-containing signals to generate stimulation signals, the stimulation signals having a peak output current associated therewith prescribed by the data-containing signals, (c) a multiplicity of tissue-stimulating electrodes; (d) means for applying the stimulation signals to selected pairs of the multiplicity of tissue stimulating electrodes, (e) monitor means in the processor and responsive to the data-containing signals received by the receiver means for (1) monitoring a selected pair of the multiplicity of electrodes as one of the stimulation signals is applied thereto to measure a voltage associated therewith, and (2) generating stimulator status-indicating signals, said stimulator status-indicating signals including the voltage measured at the selected pair of electrodes by the monitor means as one of the stimulation signals is applied thereto, and (f) telemetry means for transmitting the stimulator-status indicating signals to an external receiver;

the portable physician's tester comprising:

user-controllable means for selectively generating the data-containing signals, said user-controllable means including manual means for manually specifying a peak output current to be included in the data-containing signals;

external transmitter means for transmitting the data-containing signals to the receiver means of the ICS;

external receiver means for receiving the status-indicating signals transmitted by the telemetry means of the ICS;

external processor means for processing the received status-indicating signals to derive information therefrom regarding the operation of the ICS and its plurality of tissue stimulating electrodes; and

display means for displaying the information derived from the status-indicating signals.

13. The system for testing of claim 12 wherein the portable physician's tester further includes a signal port coupled to the external processor means through which the information derived from the status-indicating signals may be sent for further processing at a location removed from the external processor means.

14. The system for testing of claim 12 wherein the manual means of the user-controllable means of the portable physician's tester further includes means for manually specifying a particular pair of the plurality of tissue-stimulating electrodes at which the monitor means of the ICS is to measure a voltage.

* * * * *



US005938691A

# United States Patent [19]

## Schulman et al.

| [11] | Patent Number: | **5,938,691** |
|---|---|---|
| [45] | Date of Patent: | **Aug. 17, 1999** |

[54] **MULTICHANNEL IMPLANTABLE COCHLEAR STIMULATOR**

[75] Inventors: **Joseph H. Schulman**, Santa Clarita; **John C. Gord**, Venice; **Primoz Strojnik**, Granada Hills; **David I. Whitmoyer**, Los Angeles; **James H. Wolfe**, Canyon Country, all of Calif.

[73] Assignee: **Alfred E. Mann Foundation**, Sylmar, Calif.

[21] Appl. No.: **09/103,264**

[22] Filed: **Jun. 23, 1998**

### Related U.S. Application Data

[62] Division of application No. 08/450,041, May 25, 1995, Pat. No. 5,776,172, which is a continuation of application No. 08/322,065, Oct. 12, 1994, Pat. No. 5,531,774, which is a continuation-in-part of application No. 08/023,584, Feb. 26, 1993, Pat. No. 5,603,726, which is a continuation of application No. 07/752,069, Aug. 29, 1991, abandoned, which is a continuation-in-part of application No. 07/411,563, Sep. 22, 1989, abandoned.

[51] Int. Cl.⁶ ................................ **A61N 1/36; A61F 2/18; H04R 25/00**

[52] U.S. Cl. ................................................ **607/57; 607/55**

[58] Field of Search ............................................ 607/55–57

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,532,930 | 8/1985 | Crosby et al. | 607/57 |
| 4,592,359 | 6/1986 | Galbraith | 607/57 |
| 4,947,844 | 8/1990 | McDermott | 607/57 |

*Primary Examiner*—William E. Kamm
*Assistant Examiner*—Carl H. Layno
*Attorney, Agent, or Firm*—Alfred E. Mann Foundation

[57] **ABSTRACT**

A cochlea stimulation system includes a patient wearable system comprising an externally wearable signal processor (WP) and a headpiece in electronic communication with an implanted cochlear stimulator (ICS). The ICS comprises eight output stages each having two electrically isolated capacitor-coupled electrodes, designated "A" and "B", circuits for monitoring the voltages on these electrodes, and circuits for both transmitting status information to and receiving control information from the WP. Based upon information received from the WP, a processor within the ICS can control both the frequency and the widths of the output stimulation pulses applied to the electrodes and may select which electrodes to monitor. The ICS receives power and data signals telemetrically through the skin from the WP. To save power, the ICS may be "powered down" by the WP based upon the absence of audio information or "powered up" if audio is present. The WP communicates with the headpiece over a co-axial cable using one frequency for transmitting signals and a second different frequency for receiving signals.

**15 Claims, 15 Drawing Sheets**





Fig. 1



MAIN COIL 50
RECEIVER 40
DC
REGULATOR 44
PROCESSOR 46
14.0V
VOLTAGE REGULATOR ERROR AMPLIFIER 56
VOLTAGE REFERENCE 54
D/A CURRENT REFERENCE 65
VOLTAGE DOWN CONVERTER 58
10.5V
7.0V
3.5V
STORAGE CAPACITOR 1 OF 8
60
CURRENT SOURCE FET (1 OF 8) 62
ELECTRODE SWITCHING MATRIX 66
1
2
3
16
EXPONENTIAL D/A CONVERTER 64
ANALOG MUX 80
OUTPUT CONTROL LOGIC (1 OF 8) 88
DATA DECODER 52
LOOP FILTER 72
VCO 70
SERIAL TO PARALLEL CONVERTER 68
AMPLITUDE DATA LATCH 74
WORD STROBE GENERATOR 79
OUTPUT MODE REGISTER 86
BIT & WORD COUNTERS, ERROR CHECKING 78
COMMAND LATCH 76
COMMAND DECODER 84
PULSE WIDTH CONTROL 90
INITIALIZATION 82
TELEMETRY A/D CURRENT REFERENCE 100
INDIFFERENT ELECTRODE SWITCHES 92
49
INDIFFERENT ELECTRODE
MUX 94
TELEMETRY GAIN STAGES 96
A/D CONVERTER 98
TELEMETRY CONTROL LOGIC 102
TELEMETRY MODULATOR SWITCH 104
ICS BACK TELEMETRY SYSTEM
TELEMETRY TRANSMITTER 42
TELEMETRY COIL 106

Fig. 2



Fig. 3

Fig. 4





Fig. 4—A



C203-1 TO 5
C203-6 TO 13
DOWNCLOCK
VOLTAGE DOWNCONVERTER
203B
-14V
-10.5V
-7V
-3.5V
DCLKPH1
DCLKPH2
SYSRESET
VREF
POWERBAD DETECTOR 204A
-3.5V
TO -3.5V LOGIC
RV0(1-8)
RV1(1-8)
POWERBAD
CARDET
INTIALIZATION 204B
OUTENABLE
3
ALLZERO
DISCONNECT
SYSRESET
RV0(1-8)
RV1(1-8)
PARITY ERROR DETECTOR PARITY 204C
Fig. 4-B
RFMAIN
REFRESH VOLTAGE LOGIC 210
SERDATA
WSTRB1,3
FRMCLK
AMPDATA(1-8)
WORDTRCLK
IREF
LOGARITHMIC D/A CONVERTER 207B
IPOSCON
INEGCON
XFERB
XFERC
PLLOCK
PFRMCLK
CLKPH1
CLKPH2
MANDATA
SERIAL TO PARALLEL CONVERTER 201C
DATA(1-9)
WORDTRCLK
AMPSYNC
CLKPH1
CLKPH2
CARON
DCENABLE
FUNC7
WORD (1-9)
RFMAIN
ALLZERO
DICONNECT
DATA(1-9)
OUTENABLE



Fig. 4-C



Fig. 4–D



TANKV
ADIREF
VREF
PFRMCLK
CLKPH1
TEL
TRANS
211E
CARON
CARON
WSTRB(1-8)
WSTRB(1-8)
WSTRB9
WSTRB9
DATAOUT
TELEMETRY
MODULATOR
211D
ADCOUNT(1-6)
NORMPOL
A/D
CONVERTER
211C
ADPWR
SH2X1
SH2X3
SH2X10
SH1X10
FUNC4
FUNC5
VRTPWR
DCENABLE
MULTIPLE
CHIP
CONTROL
214
DCENABLE
DCENABLE
M/S
ECLK
PFRMCLK
RFMAIN
PFMAIN
RFMAIN
PFMAIN
FRMCLK
DIN
IECLOSE
RLOCTRL
RHICTRL
MUXCTRL(1-23)
MUXOUT-
MUXOUT+
TANKV
TELEMETRY
MUX
211B
ZEROVN
-3.5
VREF
TAP14
NEG14
NRV(1-8)
ICP(1-8)
VOUTA(1-8)
VOUTB(1-8)
INDELEC
ILO
IH1
EXTP
EXTN

Fig. 4-E



Fig. 4—F



Fig. 4—G



Fig. 4—H

Fig. 5A

LONG DATA FRAME FOR MULTIPLE CHIP OPERATION
MASTER
SLAVE 1
SLAVE 2
SLAVE 3
SLAVE n

RECEIVER 200
POWER SUPPLY 202
PDATA
NDATA
NEG 14
ZEROV
MASTER CHIP
1
M/S
DCENABLE
DIN
ECLK
PFRMCLK
214
SLAVE 1 CHIP
0
M/S
DCENABLE
DIN
ECLK
PFRMCLK
214
SLAVE n CHIP
0
M/S
DCENABLE
DIN
ECLK
PFRMCLK
214

Fig. 5B



Fig. 6

PHYSICIAN'S TESTER

A00850



Fig. 7

5,938,691

1

# MULTICHANNEL IMPLANTABLE COCHLEAR STIMULATOR

## RELATED APPLICATIONS

This application is a divisional application of application Ser. No. 08/450,041, filed May 25, 1995, now U.S. Pat. No. 5,776,172; which is a continuation of application Ser. No. 08/322,065, filed Oct. 12, 1994, now U.S. Pat. No. 5,531, 774; which is a continuation-in-part of application Ser. No. 08/023,584, filed Feb. 26, 1993, now U.S. Pat. No. 5,603, 726; which is a continuation of application Ser. No. 07/752, 069, filed Aug. 29, 1991, now abandoned; which is a continuation-in-part of patent application Ser. No. 07/411, 563, filed Sep. 22, 1989, also abandoned.

## BACKGROUND

The present invention relates to improvements in human tissue stimulators and more particularly to a human tissue stimulating system which in a preferred form comprises an audio responsive system for artificially stimulating the cochlea to improve the hearing of the hearing impaired.

U.S. Pat. No. 4,400,590 issued Aug. 23, 1983 for "Apparatus for Multi-Channel Cochlear Implant Hearing Aid System" describes and illustrates a multi-channel intra-cochlear electrode and system for electrically stimulating predetermined locations of the auditory nerve within the cochlea of the ear. The electrode comprises a plurality of exposed electrode pairs spaced along and embedded in a resilient curved base for implantation in accordance with the method of surgical implantation described in U.S. Pat. No. 3,751, 615 issued Aug. 7, 1973 for "Method of Inducing Hearing." The hearing aid system described in the '590 patent receives audio signals at a signal processor located outside the body of a hearing impaired patient. The processor converts the audio signals into analog data signals which are transmitted by a cable connection through the patient's skin to the implanted multi-channel intra-cochlear electrode. The analog signals are applied to selected ones of the plurality of exposed electrode pairs included in the intra-cochlear electrode to electrically stimulate predetermined locations of the auditory nerve within the cochlea of the ear where the intra-cochlear electrode is positioned.

The cochlea stimulating system described in the '590 patent is limited in the number of channels of information, the speed of transfer of stimulating signals to the cochlea and the fidelity of the signals. Also, the cable connection through the skin of the patient to the intra-cochlear electrode is undesired in that it interferes with the freedom of movement of the patient and represents a possible source of infection.

U.S. Pat. No. 4,532,930, issued Aug. 6, 1985 for "Cochlear Implant System For an Auditory Prosthesis" describes and illustrates a multiple electrode system. While multiple electrodes are employed to stimulate hearing the system only operates with a single pulsatile output stimulating a single electrode channel at any given time. Such a sequential system is limited in speed of operation and does not provide for analog operation where continuous stimulating signals controllable in amplitude are simultaneously applied to a number of electrode channels. Further, the system is subject to charge imbalance with misprogramming or circuit fault and inefficient use of electrical power. Moreover, once the stimulator unit is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,592,359, issued Jun. 3, 1986 for "Multi-Channel Implantable Neural Stimulator" describes a

2

cochlear implant system having 4 current sources and 4 current sinks per channel controlled by series switches to provide 16 different circuits for supplying 16 levels of 2 polarities to each output channel. In a pulsatile mode, the system provides for simultaneous update (amplitude control) and output to all channels. However, the system does not permit simultaneous analog update and output on all channels and the electrode pairs for each channel are not electrically isolated from all other electrode pairs whereby undesired current leakage may occur. Further, once the stimulator is implanted there are no means for monitoring its ongoing circuit operation or power requirements so as to optimize its continued operation.

U.S. Pat. No. 4,947,844, issued Aug. 14, 1990 for "Receiver/Stimulator For Hearing Prosthesis" describes and illustrates a multiple channel electrode system. The system includes an implanted receiver/stimulator connected to an implanted electrode array. The receiver/stimulator includes an electrode stimulating current control characterized in that current is delivered to each electrode or to each bipolar pair of electrodes in a series of short electrical pulses, each elemental pulse being separated from the next by an interval of zero current which has a longer duration than an elemental pulse. The waveform of the stimulus current comprises a series of pulses of one polarity followed by an equal number of pulses of an opposite polarity whereby the sum of all the electrical charge transferred through each electrode is approximately zero at the end of a stimulating current waveform. In this way, elemental current pulses applied to each electrode on each pair of electrodes which are stimulating are preferably delivered cyclically such that elemental pulses delivered to one electrode are interleaved in time with those delivered to any other electrodes. This enables the use of a single current source in the receiver/stimulator. The use of a single current source limits the operation of the receiver/ stimulator in that the single current source must be switched to serve all output channels in a sequential manner. Simultaneous operation is not possible. Further, the number of channels cannot be greater than 3 or 4 without greatly reducing the duty cycle of the stimulating current waveform in each channel. Not only does the stimulus effectiveness in each channel suffer in such a situation, but the time required to complete the switching cycle for the single current source lengthens in direct proportion to the number of channels. Further, this system lacks output coupling capacitors in series with each electrode. This omission may lead to net DC current flow through the electrodes in the event of misprogramming or under circuit fault conditions.

The system described in the 844 patent also includes in the implanted receiver/stimulator a transmitter for telemetering one electrode voltage, measured during stimulation, to an external receiver for monitoring and analysis as an indicator of proper operation of the implanted stimulator. The transmitter comprises an oscillator operating at a frequency of about 1 MHz. The output of the oscillator is coupled to the implant's receiving coil and demodulated to recover the selected voltage waveforms. Unfortunately, such a telemetry system is not only limited to the monitoring of one voltage, but the simultaneous transmission of the telemetry signal and reception of the input carrier signal as described will result in undesired modulation and possible loss of input data.

Accordingly, there is a continuing need for an improved multi-channel tissue stimulator system particularly useful as a cochlear stimulator system and which is characterized (i) by a high operating speed in analog and pulsatile operation, (ii) freedom from charge imbalance, (iii) complete isolation

5,938,691

3

of its electrode pairs for each channel, and (iv) the externally controllable monitoring and selective control a plurality of operating parameters and power supply to and currents and voltages developed within the implanted stimulator unit of the system to optimize system operation and power efficiency. The present invention satisfies such needs.

## SUMMARY OF INVENTION

A preferred embodiment of the present invention comprises a cochlea stimulating system including an externally wearable signal receiver and processor (WP) and an implanted cochlea stimulator (ICS). The receiver, which may comprise a headpiece adjacent the ear of a patient, receives audio signals and transmits the audio signals to the WP. The WP receives and processes the audio signal and includes means for generating data indicative of the audio signals for transmission to the ICS.

The ICS includes means for receiving transmissions from the WP as well as a processor for processing such transmissions to sequentially update and simultaneously or sequentially generate and apply stimulation signals to a plurality of cochlea stimulating channels each having capacitor coupled electrodes implanted within the cochlea of the patient. The processor includes means responsive control signals from the WP for selectively monitoring one or more of the electrodes and voltages within the processor and for generating ICS status indicating signals. The ICS status indicating signals are telemetered back to the WP which includes means for receiving and processing the ICS status indicating signals. For example, such means may include means for controlling the power level of transmissions to the ICS.

The processor in the ICS also includes means for selectively controlling the pulse widths of the stimulation signals, the frequency at which stimulating signals are applied to selected electrodes, and means for generating a plurality of voltages for powering different components in the ICS and for selectively receiving and responding to analog and pulsatile input data signals from the WP.

Preferably, each channel in the ICS includes (i) a current source and floating current transfer device with switching capacitors for supplying stimulating signals to the capacitor coupled electrodes which are independent and isolated from the stimulating signals supplied to the output of all other channels, (ii) means for selectively driving the electrodes as unipolar or bipolar electrodes and (iii) means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a block diagram of a basic form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 2 is a more detailed block diagram of the ICS of FIG. 1 and associated circuitry for receiving and transmitting signals from and to the WP.

FIG. 3 is block diagram of second form of a cochlea stimulating system comprising a preferred embodiment of the present invention.

FIG. 4 is a block diagram of the layout of the system components and circuitry comprising the detailed showing of the ICS in FIGS. 4A–4H.

FIG. 5A depicts a long data frame useful in multiple chip configurations for the stimulating system, the long frame comprising a series of n+1 data frames, the first frame being

4

designated as a master frame and the subsequent frames being designated as slave frames 1 through n. The number of data frames comprising the long data frame corresponds to the number of chips included in the system.

FIG. 5B is a block diagram of multiple chip system for the ICS of FIG. 2 or FIGS. 4A–4H.

FIG. 6 is a diagrammatic representation of a physician's tester useful with the cochlear system of FIG. 1.

FIG. 7 is a block diagram of the cochlear system of FIG. 1 with the WP replaced by the physician's tester.

## DETAILED DESCRIPTION OF INVENTION

The preferred forms of the present invention are implemented using CMOS technology. In development of the invention, however, a prototype was developed using standard, off-the-shelf electrical components which when connected functioned in accord with the general principles and features set forth in the preferred forms of the system, including CMOS integrated circuits and chips. Thus, in duplicating the systems hereinafter described, one may either utilize conventional off-the-shelf electrical components or develop the systems utilizing techniques well known in CMOS technology, whichever is desired.

As illustrated in FIG. 1, the basic system according to a preferred embodiment of the present invention basically comprises an externally wearable system 10 and an implantable cochlear stimulator (ICS) 12. The external system 10 comprises a headpiece 14 and an externally wearable processor (WP) 16. The headpiece may be worn behind the ear of a hearing impaired person and comprises a conventional microphone 18 and an antenna 20 for transmitting and receiving electromagnetic energy preferably in the form of radio frequency signals. Such coupling can be restricted to magnetic field only by an electrostatic shield around the coils comprising the antenna 20. In addition, signals from the ICS to the WP on one carrier frequency and from the WP to the ICS on another frequency can be transferred via a single coaxial cable between the headpiece 14 and the WP 16. This can be accomplished by having tuned inductor-capacitor filters for each frequency at each end of the coaxial cable.

The WP 16, powered by a battery 38, is adapted to receive audio signals received by the microphone 18 and to transmit such signals to a conventional audio front end 22 which features automatic gain control (AGC). The audio signals processed by the audio front end 22 are transmitted to a bank of filters 24 for filtering and for generation of a plurality of parallel audio signals. The audio signals are processed by a multiplexer 26 and converted to a series of digital signals by an A to D converter 28 for application to a microprocessor 30. The filter bank may also be implemented as a group of digital filters, for example in a digital signal processor integrated circuit. In this case the signal flow would be from the audio front end and AGC 22, through an anti-aliasing filter, to an analog to digital converter, then into a digital filter bank 24 and the general processing of microprocessor 30.

The output of the microprocessor 30 is coupled through a custom gate array 32 that converts data from the microprocessor into a serial bit stream going to a data transmitter 34. The gate array 32 also converts data from a telemetry receiver 36 and the microprocessor 30 to control the power level of data and data generated by the data transmitter 34.

As illustrated in FIG. 1, the ICS 12 includes a receiver 40 for receiving data transmissions from the wearable system 10 and a telemetry transmitter 42 for transmitting ICS status

A00853

5,938,691

5

indicating and measured signals from the ICS 12 to the wearable system 10 for processing thereby. For example, power level indicating signals transmitted by the telemetry transmitter 42 are received by the telemetry transmitter 36 and processed in the microprocessor 30 and gate array 32 to generate signals controlling the power level of the transmissions from the transmitter 34 to the ICS 12, thereby providing a closed-loop system for optimizing the power levels of the transmission from the wearable system 10 to the ICS 12 and hence conserving the battery 38 and optimizing the voltages generated within the system 10.

In addition to the receiver 40 and transmitter 42, the ICS 12 includes a regulator 44 for receiving a power signal from the receiver 40 to energize a processor 46. Data signals from the receiver 40 are also transmitted to the processor 46 for processing to generate stimulation signals applied to one or more of a plurality of capacitor coupled electrodes in an intra-cochlear electrode 48.

Generally speaking, in response to control or data signals from the WP16 the processor 46 selectively monitors voltages of the electrodes and associated circuitry in the processor and generates ICS status indicating and measured signals. For example, the processor 46 monitors the voltage applied to the regulator 44, the impedance of the electrodes and other voltages within the processor to generate the status indicating signals which are sent as data to the telemetry transmitter 42 for transmission to the wearable system 10.

More particularly, in the cochlea stimulating system shown in FIG. 1, the signals transmitted to the ICS 12 from the wearable system 10 include electrical power components. Such power components are processed within the receiver 40 through the series regulator 44 to generate a voltage signal which powers the processor 46. The processor 46 selectively monitors the voltage applied to the series regulator and generates a status indicating signal relative to such voltage which is transmitted by the telemetry transmitter 42 and received by the telemetry receiver 36. As previously stated, such information is utilized in the microprocessor 30 and gate array 32 of the WP 16 to control the power level of the transmissions from the data transmitter 34 to the ICS 12.

More specifically as to the ICS 12 and the embodiment thereof illustrated in FIG. 2, power and data are sent through a main coil 50 to the receiver 40 comprising a power rectifier which filters out DC power for the regulator 44 and a detector which demodulates the data for transmission to a data decoder 52. The regulator 44 in conjunction with a voltage reference 54 and voltage regulator error amplifier 56 produces a precise 14 volts for powering the balance of the processor 46. More particularly, the 14 volts powers a voltage downconverter 58 which generates three additional voltages, 10.5, 7.0 and 3.5 volts. The three voltages are used to power various other circuits, including the output circuits of the processor 46.

The voltage used to provide charge to the outputs applied to the electrodes 48 is transferred to eight different storage capacitors 60, one of which is illustrated in FIG. 2. There is one storage capacitor for each of eight isolated bipolar channels. The output of each storage capacitor is controlled by a current source FET 62 for that channel. Each FET current is determined by an exponential D to A converter 64 and current reference 65, such as the D to A converter described in U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as the present invention.

The output of the current sources 62 are connected to the electrodes 48 and an indifferent electrode 49 through a

6

switch matrix 66. The output of the electrode switch matrix 66 is capacitor coupled to each of 16 electrodes. The following table lists the output currents available to the electrodes:

| Constant Current Amplitude Steps (µA) | | | | |
|---|---|---|---|---|
| 2500 | 470.6 | 88.58 | 16.67 | 3.138 |
| 2417 | 455.1 | 85.67 | 16.12 | 3.035 |
| 2338 | 440.1 | 82.86 | 15.59 | 2.936 |
| 2261 | 425.7 | 80.13 | 15.08 | 2.839 |
| 2187 | 411.7 | 77.50 | 14.58 | 2.746 |
| 2115 | 398.2 | 74.96 | 14.11 | 2.656 |
| 2046 | 385.1 | 72.49 | 13.64 | 2.568 |
| 1978 | 372.4 | 70.11 | 13.19 | 2.484 |
| 1913 | 360.2 | 67.81 | 12.76 | 2.402 |
| 1850 | 348.4 | 65.58 | 12.34 | 2.324 |
| 1790 | 336.9 | 63.43 | 11.94 | 2.247 |
| 1731 | 325.9 | 61.34 | 11.54 | 2.173 |
| 1674 | 315.2 | 59.33 | 11.16 | 2.102 |
| 1619 | 304.8 | 57.38 | 10.80 | 2.033 |
| 1566 | 294.8 | 55.49 | 10.44 | 1.966 |
| 1514 | 285.1 | 53.67 | 10.10 | 1.901 |
| 1465 | 275.7 | 51.91 | 9.772 | 1.839 |
| 1416 | 266.7 | 50.20 | 9.451 | 1.779 |
| 1370 | 257.9 | 48.55 | 9.140 | 1.720 |
| 1325 | 249.4 | 46.96 | 8.840 | 1.664 |
| 1281 | 241.2 | 45.42 | 8.549 | 1.609 |
| 1239 | 233.3 | 43.92 | 8.269 | 1.556 |
| 1198 | 225.6 | 42.48 | 7.997 | 1.505 |
| 1159 | 218.2 | 41.08 | 7.734 | 1.455 |
| 1121 | 211.1 | 39.73 | 7.480 | 1.408 |
| 1084 | 204.1 | 38.43 | 7.234 | 1.361 |
| 1049 | 197.4 | 37.17 | 6.997 | 1.317 |
| 1014 | 190.9 | 35.95 | 6.767 | 1.273 |
| 981.2 | 184.7 | 34.76 | 6.545 | 1.232 |
| 949.0 | 178.6 | 33.62 | 6.330 | 1.191 |
| 917.8 | 172.7 | 32.52 | 6.122 | 1.152 |
| 887.6 | 167.1 | 31.45 | 5.921 | 1.114 |
| 858.5 | 161.6 | 30.42 | 5.726 | 1.077 |
| 830.3 | 156.3 | 29.42 | 5.538 | 1.042 |
| 803.0 | 151.1 | 28.45 | 5.356 | 1.008 |
| 776.6 | 146.2 | 27.52 | 5.180 | 0.975 |
| 751.1 | 141.3 | 26.61 | 5.010 | 0.000 |
| 726.4 | 136.7 | 25.74 | 4.845 | |
| 702.6 | 132.2 | 24.89 | 4.686 | |
| 679.5 | 127.9 | 24.07 | 4.532 | |
| 657.2 | 123.7 | 23.28 | 4.383 | |
| 635.6 | 119.6 | 22.52 | 4.239 | |
| 614.7 | 115.7 | 21.78 | 4.100 | |
| 594.5 | 111.9 | 21.06 | 3.965 | |
| 575.0 | 108.2 | 20.37 | 3.835 | |
| 556.1 | 104.6 | 19.70 | 3.709 | |
| 537.8 | 101.2 | 19.05 | 3.587 | |
| 520.2 | 97.92 | 18.43 | 3.469 | |
| 503.1 | 94.70 | 17.82 | 3.355 | |
| 486.5 | 91.59 | 17.24 | 3.245 | |

Under control of a voltage controlled oscillator 70 and its loop filter 72, the serial output from the data decoder 52 drives a serial to parallel converter 68. The parallel output of the serial-to-parallel converter 68 provides channel amplitude data to an amplitude data latch 74 and program command data to a command latch 76. More particularly, the serial data from the data decoder 52 is analyzed by bit and word error checking counters 78. The amplitude data from the amplitude data latch 74 determines the output of the exponential D to A converter 64. In that regard, the analog value of the output from the D to A converter 64 is generated in a current mirror which is then transferred via an analog multiplexer 80 to the capacitively-coupled output electrodes 48. The sequence of operation of the multiplexer 80 is controlled by the output of a word strobe generator 79 which is driven by command latch 76. It should be noted that the command latch 76 cannot function unless an initialization circuit 82 and the bit error checking circuit 78 permit data to be transferred to a command decoder 84.

5,938,691

7

The command decoder 84 controls all the other specific functions such as the electrode switching matrix 66 via an output mode register 86 and output control logic 88, and a pulse width control 90 which also controls the output via the output control logic 88. As with the command latch, the pulse width control 90 and the output control logic 88 cannot function unless the initialization circuit 82 is properly initialized. To be enabled, the initialization circuit 82 must detect the correct initial digital code. When the initialization circuit 82 is not enabled, the electrode switching matrix 66 cannot turn on.

In addition to the other functions of the command decoder 84, it also controls the setting of indifferent electrode switches 92 which are used for monitoring the current flowing through the indifferent electrode and therefore through any or all 16 electrodes in a unipolar configuration. With the appropriate output channel configuration in the unipolar state, the indifferent electrode switches permit multi-polar operation.

As illustrated more clearly in FIG. 2, the ICS back telemetry system described briefly relative to FIG. 1, consists of a signal multiplexer (MUX) 94 programmed by the command decoder 84 to monitor various voltages throughout the processor 46 and ICS 12. The output of the multiplexer 94 is amplified through a series of telemetry gain stages 96 which are connected to an A to D converter 98. Power to the gain stages 96 can be turned on and off by the command decoder 84 to conserve energy when not in use.

The A to D converter 98 may be a single-slope type which functions by comparing the output of the gain stages 96 with a voltage ramp. The slope of the ramp is set by a current reference 100. The output of the A to D converter 98 and a telemetry control logic 102 is a train of bits that controls a telemetry modulator switch 104. The telemetry modulator switch 104 modulates the telemetry transmitter 42 which energizes a telemetry coil 106.

As previously indicated, the back telemetry system included in the cochlear stimulating system of the present invention provides means for minimizing power consumption of the system. As previously noted, the WP 16 is powered by the battery 38. To increase the battery life or to allow a smaller battery to be used, the radio frequency transmitted from the WP 16 via the antenna 20 to the ICS 12 is rectified in the receiver 40 and applied to the regulator 44. It is important that the output voltage of the regulator 44 be held constant, in this case, 14 volts. It is also important that the voltage regulator which has the 14 volt output must have somewhat more than 14 volts available as an input. Any additional voltage is lost as heat and will reduce the life of battery 38. In the present invention, the regulator input voltage (DC) is optimized by controlling the RF power transmitted by the wearable system 10 and received by the ICS 12. As previously indicated, the data transmitter 34 is powered by the battery 38, preferably a 6 volt 0.5 amp-hour battery. The power control is affected through a conventional switching regulator included in the gate array 32 whose output voltage may be varied based upon the duty cycle of a switching transistor or multiple switching transistors in the switching regulator. The output of the power control circuit powers the transmitter 34 and by varying its output voltage can vary the transmitter power. The transmitter may run at 49 MHz and be 100% amplitude modulated by a digital signal. The digital signal comes from the gate array 32. The signals transmitted by the transmitter 34 are received at the ICS 12 and rectified as previously described. The rectified power noted as "DC" in FIG. 2 is applied to the regulator 44 which may be of conventional design including a junction

8

type depletion-mode FET to hold the output voltage of the regulator 44 constant as the input voltage changes. In practice, the input voltage can vary from 14 volts up to 20 volts or more. To maintain best efficiency, it is desired that the DC voltage be only slightly greater than the output voltage of the series regulator 44, perhaps on the order of 14.2 to 15 volts. However, as the antenna 20 is moved or as the circuit loads change, the DC voltage may start to change. One purpose of the back telemetry system is to allow the DC voltage to be automatically maintained at the lowest voltage consistent with normal operation. To accomplish this, under control of the command decoder 84, the multiplexer 94 monitors the DC voltage. The desired output of the multiplexer 94 is applied to the conventional A to D converter 98. As previously described, the output of the A to D converter, telemetry control logic 102 and telemetry modulator switch 104, FM modulates the telemetry transmitter 42 which may comprise a 10.7 MHz oscillator. The output of the oscillator is coupled back through the skin to the headpiece 14 and antenna 20 to the telemetry receiver 36. The output of the receiver 36 is applied to the gate array 32 including a conventional serial to parallel converter. The parallel data output from the serial to parallel converter is processed in the microprocessor 30 to adjust the power level in the power control circuit of the data transmitter 34 to maintain the value of the DC voltage slightly greater than the desired output voltage of the series regulator 44.

As just described, the command decoder 84 controls the monitoring of the value of the DC voltage to provide the desired voltage control. Similarly, the command decoder 84 may select particular channels to be monitored and the impedance of the various electrodes to be determined in the same manner as the DC voltage was monitored and as above described. In such cases, the ICS status indicating signals generated in the processor 46 and telemetered to the WP 16 may be utilized within the microprocessor 30 to provide indications of the operating status of the ICS 12.

In still other instances, to save power the command decoder 84 may function to cause a powering down of various subsystems within the processor 46. With the circuitry of FIG. 2, power may be restored in approximately 20 msec. on appropriate output from the command decoder. Similarly, the microprocessor can go into a hibernation state which consumes less than 10 milliwatts. The hibernation state terminates whenever additional commands are received from the command decoder 84.

In the ICS 12 illustrated in FIG. 2, the current sources 62 are floating. Such "floating" of the current sources may be as described in U.S. patent application Ser. No. 428,179, filed Dec. 18, 1989, and assigned to the same assignee as the present invention, and may be implemented with an FET that is not directly tied to a power supply. This may be implemented using two identically sized transistors, one being a reference transistor upon which an input current is impressed to generate a voltage difference thereacross which is a predetermined gate voltage for the second or output transistor which is floating with respect to all power supplies. The predetermined gate voltage is that voltage which when applied to the output transistor will produce the same current value as the input current. The importance of such floating current sources in the ICS 12 is to enable the ICS 12 to stimulate pairs of electrodes independent of the current flow in other pairs of electrodes and independent from the main power supply. This allows for the exact control of current in each output stage with no direct current path back to the main power supply or to any other output stage. This eliminates any concern of undesired currents flowing between any of the output stages.

5,938,691

9

The processor 46 included in the ICS 12 includes means (88 and 90) for selectively controlling the pulse width of the stimulation signals applied to the electrode 48. Such means preferably comprises a timing circuit capable of turning the stimulus current of a particular channel on and off with a time resolution of approximately one microsecond. Such means is preferably controlled by a command signal separate from the signals which set the current to each stimulus channel; the command signal controls the duration of current stimulus while the previously described signals control the stimulus current in each channel.

Further, the processor 46 included in the ICS 12 includes means for selectively controlling the frequency at which stimulating signals are applied to select ones of the electrodes. This is preferably accomplished by providing a signal frame (or set of signals to the multiplicity of electrodes) of varying length. The use of short frames allows a subset of channels to be refreshed or updated more often than would be possible if all channels were always updated by a fixed, long frame. Such reduced frame length may be implemented either as a frame length encoded in the frame data or (in the preferred implementation) as a unique end of frame signal.

In the processor 46, the voltage downconverter 58 generates three voltages of different value for powering different components in the ICS 12. The voltage downconverter may comprise a set of capacitors and switches so arranged to connect the capacitors alternately in series across the high voltage from the regulator 44 input and then in parallel to provide a lower voltage supply (3.5 volts in the preferred implementation). The storage or supply capacitors 60 may be charged to various multiples of the 3.5 volt supply by connecting their associated transfer capacitors to the appropriate points in the downconverter when the downconverter capacitors are connected in series.

The ICS 12 includes means for selectively responding and responding to analog and/or pulsatile input data from the WP 16. Preferably, this is accomplished by using the stimulus current control signals to provide continuous analog control of stimulus and using a separate command signal to selectively control the "on" or "off" status of a given channel. The stimulus parameters of each channel are controlled independently of all other channels by means of separate signals within the data frame and separate configuration commands for each channel encoded in the command signal.

Further, the ICS 12 is capable of selectively stimulating the electrodes in a unipolar and/or bipolar configuration. This is accomplished by providing a set of command signals which affect separate bits for each channel in the output mode register 86. Via the output control logic 88, these bits independently configure the switches for each channel in the electrode switching matrix 66. The switches allow the current source FET 62 and storage capacitors 60 to be connected to pairs of electrodes (bipolar mode) or, alternatively, to individual electrodes and the indifferent electrode 49 via the indifferent electrode switches 92.

While FIG. 2 illustrates a basic ICS, FIGS. 3 and 4A–4H illustrate a preferred form of the ICS. FIG. 3 is a more general block diagram illustration of the system which is represented in greater detail in FIGS. 4A–4H. The majority of the active circuitry of the ICS may be imbedded in a custom chip which with other active and passive circuitry comprising the ICS may be supported on a substrate. The ICS illustrated in FIGS. 3 and 4A–4H comprises a receiver 200 for receiving an input signal generated in the WP 16 and transmitted by the headpiece 14. Preferably, such input is a

10

Manchester-encoded data stream comprising an amplitude-modulated RF signal consisting of a serial sequence of 83 bits representing 9 words of 9 bits each plus a parity bit and an end-of-frame marker. A frame is defined as one such bit sequence and such frames are sent sequentially from the WP to the ICS. The first 8 words of each frame contain the digital amplitude and polarity information for output channels 1 through 8 in that order. The 9th word contains command information for the control of ICS configuration and functionality. The receiver 200 separates the incoming RF signal into a power signal transmitted to a power supply section 202 and data which is transmitted into a data recovery section 201. In the power supply section, power signals are generated for the ICS and, via a downconverter 203, are transformed into the voltage levels which provide power for the eight output stages indicated by numbers 212-1 through 212-8, one of which will be described in greater detail hereinafter.

The data signal extracted by the receiver 200 and transmitted to the data recovery section 201 is further processed within the data recovery section to provide input signals to an initialization and status control section 204, a polarity and amplitude control section 205, a command decoder section 206, and to a multiple chip control 214. The initialization and status control section 204 receives power from the power supply section 202 and establishes the control conditions of the other sections of the ICS upon system startup and upon detection of a system operating error by the status control section. The polarity and amplitude control section 205 determines the polarity of the output currents generated in the various output stages 212-1 through 212-8 and generates signals which are further processed in a log D-A converter section 207 to control the magnitude of current signals supplied by the outputs of the various output stages. In the command decoder section 206, the data signals are processed and decoded to form signals which (1) via an output mode register 208 control the status of the output stages as either unipolar or bipolar, (2) via a pulse width control 209 control the width of the output pulses supplied by the output stages when such stages are in a pulsatile mode and (3) via a refresh voltage logic 210 control the power applied to the output stages. In addition, the ICS includes a back telemetry section 211 which in response to signals from the command decoder 206 generates and transmits back to the WP status indicating and power control signals. The status signals indicate the status of the various elements within the ICS and voltages generated therein. The power control signals control the power of the transmitted signals and effect a power conservation by control of the level of the signals from the WP and by control of the refresh voltages from the downconverter 203 to the various output channels.

Still further, the illustrated ICS includes a multiple chip control section 214. Section 214 enables the chip included in the ICS to act as a "master" having the capacity to drive a plurality of identical "slave" chips mounted on the substrate thereby effecting a multiplication of the number of output stages.

FIGS. 4A–4H, organized as set forth in FIG. 4, show details of the various system sections illustrated in FIG. 3, with subsections of the sections bearing the same numbers as set forth in FIG. 3 and with letters to denote the specific subsections, e.g., 201A, 201B, 201C and 201D are subsections of the data recovery section 201. The following detailed description of the sections and subsections comprising the system will begin with the receiver 200 and will continue through a description of the output stages 212-1 through 212-8 and multiple chip control 214 and will be

5,938,691

<table>
<tr><td>11</td><td>12</td></tr>
</table>

followed by a description of the operation of the system comprising the described sections. Details of the frame structure, data word structure, and/or the transmission rate for the input signal from the WP and data signal extracted therefrom will be included in the description of the operation of the system.

Structure

Receiver 200

The receiver 200 illustrated in FIG. 4A is a conventional AM detector containing capacitors which implement a parallel resonant tuned circuit in conjunction with a main coil 50 followed by series connected power rectification and data detection diodes and energy storage capacitors to generate signals PDATA, NDATA, RAWDC, ZEROV and TANKV. PDATA and NDATA are differential signals generated across the data detection diodes and convey demodulated data to the data recovery section 201. RAWDC is DC voltage generated across the energy storage capacitors and is delivered to the input of a series regulator 202A in the power supply section 202. ZEROV is the reference voltage against which all other voltages are measured in the ICS. TANKV is derived from RAWDC via a resistive divider network in the receiver 200 and, as will be described in greater detail hereinafter, via a telemetry multiplexor 211B in back telemetry section 211 provides one of the power control signals which is an input to the back telemetry section.

Data Recovery 201

The data recovery section comprises four subsections: a data conditioner 201A, a clock decoder 201B, a serial to parallel converter 201C and a word strobe generator 201D. All analog and digital circuitry in the data recovery section 201 is of conventional design.

Within data conditioner 201A, the signals PDATA and NDATA from the receiver 200 provide the two inputs to an analog comparator. The output from the comparator is the signal MANDATA, which is the recovered version of the Manchester-encoded serial data stream transmitted by the WP. MANDATA is distributed to clock decoder 201B, serial to parallel converter 201C, as well as downconverter clock 203A to be discussed hereinafter.

In addition, within data conditioner 201A, the signal MANDATA is applied to the gate of a MOSFET switch which allows an on-chip capacitor to be charged in a pulsatile manner. A constant-current discharge path in parallel with the on-chip capacitor reduces the voltage to zero in the absence of the signal MANDATA. The voltage across the on-chip capacitor is buffered by three inverters to become the carrier detect signal, CARDET. CARDET is distributed to clock decoder 201B and to an initialization subsection 204B of the initialization and status control section 204.

In the clock decoder subsection 201B, the signal MANDATA is applied to an edge-detector circuit comprised of an XOR gate with an RC delay circuit preceding one of the inputs. Output pulses from the edge detector are the primary input to a phase-lock loop (PLL) of conventional design which, by locking to the MANDATA pulse edges, generates the data clock signals CLKPH1 and CLKPH2. The clock signals comprise a two-phase non-overlapping clock system at a frequency of 1.1 MHz with a CLKPH1 pulse asserted during the first half of each bit time and a CLKPH2 pulse during the second half. Signals CLKPH1 and CLKPH2 are sent to the serial to parallel converter 201C, word strobe generator 201D, pulse width control 209 and an A/D converter 211C in back telemetry section 211.

Further, within clock decoder 201B, the timing of pulse edges in the signal MANDATA is compared to those of the

local clock VCO in the PLL. In particular, a unique pulse with non-standard edge timing sent by the WP to mark an end-of-frame is sensed by a circuit of conventional design comprised of a D-type flip-flop and an XOR gate. This unique pulse results in the generation of the frame clock signal, PFRMCLK which is sent to serial to parallel converter 201C.

Additional circuitry of conventional design in the clock decoder 201B, comprising logic gates and binary counters, is used to generate a signal PLLLOCK. PLLLOCK is asserted so long as the PLL is locked to the signal MANDATA, CARDET is asserted, and, as will be described relative to a powerbad detector 204A in initialization and status control section 204, POWERBAD is negated. The signal PLLLOCK is sent to serial to parallel converter 201C and to parity error detector and initialization subsections 204C and 204B of section 204.

Serial to parallel converter 201C comprises logic gates, latches, D type flip-flops, counters and a shift register all of conventional design. Under control of the signal CLKPH1 and a signal DCENABLE from multiple chip control section 214, the serial data bits represented in the signal MANDATA are shifted into a 9-bit serial-in, parallel-out shift register. The first stage output of the shift register generates a serial bit stream signal SERDATA. The 9 outputs of the register are the source of the signal bus DATA (1–9) which is sent solely to a polarity and amplitude data latch 205A in section 205 and to a command latch 206A in command decoder 206.

In addition, within serial to parallel converter 201C, the signal PFRMCLK is gated with the clock signal CLKPH2 to generate a signal FRMCLK sent to pulse width control section 209 and a refresh voltage logic section 210.

Further, within serial to parallel converter 201C, the signal CLKPH1 is connected to the clock input of a 4-bit binary up-counter which is reset by FRMCLK. The counter and succeeding decoders and latches provide the signals XFERB and XFERC solely to an analog multiplexer 207C included in the log D-A converter section 207. Also, the bit 4 output of the counter is gated with CLKPH1 and CLKPH2 to produce the signal WORDTRCLK (word transfer clock) which provides a reset pulse to the counter as well as being sent to word strobe generator 201D, down converter clock 203A and a polarity and amplitude data latch 205A. The counter is also decoded to generate the signal AMPSYNC which is sent solely to pulse width control 209.

Word strobe generator 201D comprises logic gates, D type flip-flops and a 9-stage Johnson counter of conventional design. The signal WORDTRCLK provides the clock input to the Johnson counter. Signals CLKPH1, CLKPH2, FRMCLK and the output from stage 9 of the Johnson counter are combined to provide the reset signal for the counter. Outputs from the first 8 stages of the counter provide the 8-bit signal bus WSTRB. (1–8) with each line asserted during the appropriate word time during the data frame. WSTRB (1–8) is sent to analog multiplexer 207C, pulse width control 209 and back telemetry section 211. In addition, the output from stage 9 of the Johnson counter provides the signal WORD9CLK which is sent to command latch 206A and command decoder 206B.

Power Supply 202

As depicted in FIG. 4A, the power supply section 202 includes the series regulator 202A which includes a series regulating element such as a depletion-mode FET. In conjunction with a conventional voltage reference 202C and a conventional voltage regulator error amplifier 202B, the series regulator produces a precise negative 14 volts (NEG14) with respect to ZEROV for powering the balance

5,938,691

13

of the ICS. The gate of the series regulating element in the regulator 202A is controlled by a signal REGCONT output from an operational amplifier located in a regulator error amplifier 202B, having as its inputs the output VREF of the voltage reference 202C and an attenuated version of NEG14, i.e., TAP14. The voltage reference 202C includes an off chip zener diode which is powered by the NEG14 line. The precision reference voltage VREF is generated across this zener diode.

Downconverter Section 203

As represented in FIGS. 4A and 4B, the downconverter section 203 comprises a downconverter clock 203A and a voltage downconverter 203B.

The downconverter clock 203A has as its inputs NEG14 and ZEROV from regulator 202A, MANDATA from data conditioner 201A, POWERBAD from powerbad detector 204A and WORDTRCLK from serial to parallel converter 201C and comprises two toggle flip-flops and a two-pole FET selector switch of conventional design. The two toggle flip-flops receive and divide by a factor of four, the signal MANDATA. During startup, since MANDATA is pulsing at 550 KHz, the resulting signal from the toggle flip-flop is a 137.5 KHz signal which is applied to one input of the two-pole FET switch. The other input to the two-pole switch is WORDTRCLK and the state of the switch is controlled by POWERBAD. Since, as will be described, POWERBAD is asserted during ICS startup, the 137.5 KHz signal is delivered as DOWNCLOCK during startup to the voltage down converter 203B whereas a level-shifted version of WORDTRCLK is sent out as DOWNCLOCK during normal ICS operation.

The voltage downconverter 203B comprises conventional logic gates and off-chip capacitors. It receives DC power (NEG14 and ZEROV) from series regulator 202A and a squarewave output signal DOWNCLOCK from the downconverter clock 203A. The squarewave is converted into a two-phase non-overlapping pair of clock signals in a conventional cross-connected logic gate and inverter circuit in the downconverter 203B. The two-phase clock signals drive a set of FET switches which establish the pattern of connections between and among a group of four off-chip capacitors 203-1 through -4.

During phase 1 of the clock signals, the four capacitors are connected in series across the −14 volt supply and each charges to a final value of −3.5 volts. At that time, output voltages of −3.5, −7.0, −10.5 and −14 volts are made available on outputs from the voltage downconverter 203B to each of the eight output stages 212-1 through 212-8 in the ICS, and, in particular, to each of the refresh voltage control subsections 212A included in such output stages.

During phase 2 of the clock signals, the four capacitors are connected in parallel and deliver charge to an off-chip storage capacitor 203-5 which is the source of the −3.5 volt logic supply. Also during phase 2, as a natural result of the parallel connection, the voltages on the four capacitors are equalized in preparation for the return to the series arrangement of the next phase 1.

Initialization and Status Control Section 204

The initialization and status control section 204 consists of digital circuitry and an analog comparator of conventional design to detect errors and to set the internal conditions of system circuitry on system startup and upon error detection by this section. Section 204 is made up of three subsections: a powerbad detector 204A, an initialization subsection 204B, and a parity error detector 204C.

The powerbad detector 204A comprises an analog comparator having the −3.5 volt output from the voltage down-

14

converter 203B presented to one of its inputs. The other input to the comparator is the reference voltage, VREF, coming from power supply section 202. The comparator operates on the −3.5 volts and VREF to generate an output POWERBAD which is asserted when the −3.5 volt supply is below normal operating potential, such as during startup. Thus, during the initial phase of startup, the POWERBAD signal is asserted. The signal POWERBAD is used to force a known logic condition on circuitry within initialization subsection 204B and is also sent to the downconverter clock 203A and to the data recovery section 201 for the same purpose. For example, while POWERBAD is asserted, the output stages 212-1 through 212-8 are disabled. This is accomplished by POWERBAD resetting a flip-flop within 204B to negate a signal OUTENABLE, the assertion of which is required to enable any of the output stages. Then, upon negation of POWERBAD, assertion of CARDET from data conditioner 201A, PLLLOCK from clock decoder 201B and CONNECT from command decoder 206B, the flip-flop is set and OUTENABLE is asserted to enable the output stages 212.

Similarly, and as will be described again hereinafter, the assertion of a signal PALARM from parity error detector 204C will result in a disabling of the output stages 212 via a negation of Outenable. In this regard, parity error check is made at the end of each frame to assure that the total number of "ones" in the data stream to the ICS is even. The parity error detector 204C comprises a combination of logic gates and flip-flops of conventional design and is based on a D type flip-flop which is clocked by the serial bit data stream SERDATA from signal to parallel converter 201C. The state of the flip-flop at the end of the frame indicates whether the received number of one bits was odd or even. The resulting state of the D type flip-flop is then transferred to a holding flip-flop whose output generates the parity error signal PALARM which is connected to the initialization subsection 204B.

Initialization subsection 204B comprises a combination of logic gates of conventional design and receives input signals CARDET from clock decoder 201B; PALARM from parity error detector 204C; DISCON, CONNECT, and ALLZERO from command decoder 206B, PLLLOCK from clock decoder 201B and POWERBAD from POWERBAD detector 204A. CARDET, PALARM, PLLLOCK and POW-ERBAD have been described. The manner in which such input signals DISCON, CONNECT and ALLZERO are generated will be described hereinafter relative to section 206. Output signals generated by the initialization subsection 204B are CARON, OUTENABLE, RESETERR, and SYSRESET. In subsection 204B, the signal CONNECT sets a latch flip-flop to assert the output signal OUTENABLE at pulse width control 209. Input signals DISCON and ALLZ-ERO are combined in logic gates within subsection 204B to generate the output RESETERR which goes from 204B to parity error detector 204C to reset the parity error detector flip-flop. Signals PALARM, DISCON, ALLZERO, PLLLOCK and POWERBAD are combined in logic gates within 204B such that when any of these signals indicate a problem, a disconnect command output signal SYSRESET is generated and functions as a general reset signal for all the circuitry in the ICS. In this regard, SYSRESET, when asserted will reset the ICS circuitry to its initial state ready for restart in response to system startup data from the WP. Signals CARDET and PLLLOCK asserted and signals POWERBAD and PALARM not asserted combine in gates in 204B to generate the output signal CARON. CARON goes off-chip to turn on the back telemetry carrier signal, at

5,938,691

| 15 | 16 |

a telemetry transmitter 211E of the back telemetry section 211. As will be described hereinafter, the absence of the back telemetry carrier signal is detected in the WP as an indication of a system defect in the ICS. The WP will initiate a restart of the ICS and will continue in that mode until the back telemetry carrier signal is again detected.

Polarity and Amplitude Data Latch Section 205

The polarity and amplitude data latch section 205 comprises amplitude data latch 205A and a zero current control 205B. The latch 205A consists of a conventional 9-bit latch which receives data bit inputs from a 9-bit bus DATA (1–9) from the serial to parallel converter 201C in addition to WORDTRCLK also generated in 201C. WORDTRCLK causes the input data bits DATA (1–9) to be latched and then held until replaced by a new set of incoming data. Output from the 9-bit latch consists of an 8-bit wide data bus signal AMPDATA (1–8) and a 9th bit defining a single line POLARITY which goes directly to output stages 212-1 through 212-8. AMPDATA (1–8) goes from latch 205A to the zero current control 205B and to the logarithmic D-A converter in section 207, and as described more specifically hereinafter, to the internal subsection 207B.

The zero current control 205B comprises logic gates of conventional design. The signal bus AMPDATA (1–8) from amplitude data latch 205A is decoded in an 8 input gate such that the output of the gate is asserted only when all 8 bits are at logic 0. This corresponds to a requested output current amplitude of zero. The signal POLARITY from the latch 205A is combined with AMPDATA (1–8) to generate two (2) complimentary output signals ZERO and SHORT. SHORT is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 1 and, conversely, ZERO is asserted when AMPDATA (1–8) is all zeroes and POLARITY is 0 (zero).

Command Decoder 206

The command decoder section 206 comprises digital logic circuitry of conventional design and consists of two subsections: command latch 206A and command decoder 206B. The command latch 206A is similar to latch 205A discussed above in that it is a 9-bit latch with input data coming from the 9-bit bus DATA (1–9) from serial to parallel converter 201C. In command latch 206A, DATA (1–9) is caused to be latched by signal WRD9CLK from the word strobe generator 201D to develop a 9-bit bus WORD9 (1–9) output which is maintained until replaced by a new ninth word command. WORD9 (1–9) connects directly to the command decoder 206B which consists of logic gates to decode the various functions from the 9-bit combinations on the output bus. The following table depicts the content of WORD9 and the outputs generated by the various function codes contained in bits 6–8 of WORD9.

TABLE 1

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C B A | | | Channel Number | | |

| Func. Code Outputs | Description |
|---|---|
| 000  ALLZERO, DISCON, CONNECT | global control |
| 001  FUNC2 | output control |
| 011  FUNC4 | normal back telemetry read |
| 100  FUNC5 | inverted back telemetry read |

TABLE 1-continued

| 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|
| Function code | | | Value C B A | | | Channel Number | | |

| Func. Code Outputs | Description |
|---|---|
| 110  FUNC7 | refresh voltage control |
| 111  FUNC8 | output pulse width control |

In addition, command decoder 206B receives input signals RFMAIN from refresh voltage logic 210, PFMAIN from pulse width control 209 and WORD9CLK and WSTRB1 from the word strobe generator 201D. Output signals from 206B which exit the command decoder 206 consist of logic gate output signals CONNECT, DISCON, ALLZERO, FUNC2, FUNC4, FUNC5, FUNC7 and FUNC8.

As previously described, the signals CONNECT, DISCON and ALLZERO exiting the command decoder 206 provide inputs into the initialization section 204. FUNC2 through FUNC8 are function decodes which provide inputs to the various sections which they control on a command basis. The signal FUNC2 is the primary enabling signal going from the command decoder to the output mode register 208. Signals FUNC4 and FUNC5 are connected directly to the back telemetry section 211 (telemetry function decoder 211A and A/D converter 211C) to control its function. FUNC7 is directly and solely connected to the refresh voltage logic 210 to provide enabling for the refresh voltage control portion. FUNC8 is connected directly and solely to pulse width control 209 to enable that function to take place.

Logarithmic D/A Converter 207

The logarithmic D/A converter section 207 consists of conventional analog and digital circuitry, with the exception of a logarithmic D/A converter subsection 207B which is the subject of U.S. Pat. No. 4,931,795 issued Jun. 5, 1990 and assigned to the same assignee as this invention. The logarithmic D/A converter 207 consists of three subsections: a current reference generator 207A, the logarithmic D/A converter subsection 207B, and an analog multiplexer 207C. The current reference generator 207A receives a voltage input VREF from the voltage reference 202C and utilizes that reference voltage to generate reference output current signals ADIREF and IREF. ADIREF is a fixed current supply to A/D converter 211C while IREF provides the input current to the logarithmic D/A converter 207B which includes multiplicative stages of current mirrors controlled by the 8-bit data bus AMPDATA (1–8) from the data latch 205A. Output signals from the logarithmic D/A converter subsection 207B are control voltages IPOSCON and INEGCON connected to the analog multiplexer subsection 207C. The multiplexer is controlled by signals XFERB and XFERC from the serial to parallel converter 201C and an 8-bit bus signal WSTRB (1–8) from the word strobe generator 201D. Outputs from the analog multiplexer are distributed to, and control, each of the current sources 212B in the eight output circuits 212-1 through 212-8 as signals IPOS (1–8) and INEG (1–8). Thus, the output current from each of the eight output stages 212-1 through 212-8 are controlled individually, separately and sequentially.

Output Mode Register 208

The output mode register 208 contains 24 transparent latches of conventional design arranged in 3 banks of 8

5,938,691

17

latches each. The 8 latches in the first bank give rise to an 8-bit bus AMONO (1–8) and likewise the remaining 2 banks generate bus signals BMONO (1–8) and DRC (1–8). AMONO(1), BMONO(1) and DRC(1) connect to output stage 212-1 and the rest of the bus signals are distributed to the other 7 output stages in a like manner.

Only upon assertion of function code signal FUNC2 from the command decoder 206B can the bit pattern in the latches of the register 208 be modified. More particularly, under control of pulse signal WSTRB1 from word strobe generator 201D, the low-order 3 bits of the 9-bit bus signal WORD9 (1–9) from the command latch 206A are decoded in a conventional 3-to-8 decoder. The decoder has each of its 8 output lines connected to and selectively enabling one latch in the same position in each of the three banks comprising the register 208 to effect a selective modification of the bit pattern in the register according to the pattern of the low order 3 bits. The middle 3 bits of WORD9 (1–9) are each connected to a single one of the 3 banks and enable the data inputs to all 8 latches in each of the three banks comprising 208. The high-order 3 bits in WORD9 (1–9) are not used in section 208.

Pulse Width Control Section 209

The pulse width control section 209 comprises logic gates, latches, D type flip-flops, counters and decoders of conventional design. The signals FUNC8 from command decoder 206B in conjunction with FRMCLK, CLKPH1 and CLKPH2 enables the operation of this section and causes the contents of two sequential 9th words to be latched from the bus signal WORD9 (1–9) into one of two buffers under control of a bit 5 in the first WORD9. The contents of the two WORD9 commands are diagrammed below:

TABLE 2

| | | WORD9 | | |
|---|---|---|---|---|
| First WORD9 | 876 | 5 | 43 | 210 |
| | 111 | E | FF | CCC |
| Second WORD9 | 8 | 7 | 6543210 | |
| | X | D | NNNNNNN | |

E—EDGE CONTROL BUFFER NUMBER [0,1]
FF—EDGE EXECUTION FRAME NUMBER [00,01,10,11]
CCC—CHANNEL NUMBER [000–111 = CH1–CH8]
X—DON'T CARE
D—DIRECTION OF EDGE [0 = ON TO OFF, 1 = OFF TO ON]
NNNNNNN—COUNT TO OCCURRENCE OF EDGE [0–84]

As depicted in Table 2, requested stimulus output pulse edges will occur at the bit time specified in second WORD9 bits 0–6 above, during the frame time according to the command specified in the first WORD9 bits 3 and 4. This is accomplished by using such data bits to preset two down-counters which are decremented by the signal CLKPH1 from the clock decoder 201B and FRMCLK from the serial to parallel converter 201C respectively. Channel select bits 0–2 in the first WORD9 are latched and decoded to allow the passing of edge information only to the requested output channel as represented in the 8-bit signal bus PWC (1–8). The signal OUTENABLE from initialization 204B is gated with all bits of PWC (1–8) and must be asserted to enable any PWC (1–8) line to be asserted. Assertion of at least one PWC line is required for any stimulation signal to occur (see Table 6 herein).

Refresh Voltage Logic Section 210

Refresh voltage logic 210 comprises logic gates and latches of conventional design. The signal bus WORD9

18

(1–9) is gated into 8 pairs of such latches. The outputs from each one of each pair of latches is represented as one line in each of the two output bus signals RVO (1–8) and RV1 (1–8) which are sent to a refresh voltage control 212A included in each of the output stages in section 212.

Since at least 16 bits are required to establish 4 possible refresh voltage levels across 8 channels, the refresh system is controlled by 2 consecutive 9th word commands of 9 bits each. The format of these 2 command words is shown below:

TABLE 3

| | | Word9 | | |
|---|---|---|---|---|
| First WORD9 | 876 | 5 | 43 | 21 | 0 |
| | 110 | stage 1/2 select | stage 1/2 RV | stage 3 RV | stage 4 RV |
| Second WORD9 | 8 | 76 | 54 | 32 | 10 |
| | stage 4 RV | stage 5 RV | stage 6 RV | stage 7 RV | stage 8 RV |

As depicted in Table 3 above, the first WORD9 consists of the function code for refresh voltage control (110 in bits 8–6), a stage 1 or 2 select code (bit 5: 1=stage 1, 0=stage 2) which determines whether stage 1 or stage 2 will be updated at this time, the stage 1 or 2 refresh voltage level code RV (bits 2 and 1), the stage 3 refresh level code (bits 1 and 2) and the high-order bit of the refresh level code for stage 4. The second WORD9 also consists of 9 bits with bit 8 representing the low-order bit of the refresh level code for stage 4 and the remaining 8 bits representing the 2-bit refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two separate double WORD9 refresh voltage commands. The 2-bit RV codes and the refresh voltage levels associated with them are shown below:

| | Code | |
|---|---|---|
| RV1 | RV0 | refresh voltage |
| 0 | 0 | −14 volts |
| 0 | 1 | −7.0 volts |
| 1 | 0 | −3.5 volts |
| 1 | 1 | −10.5 volts |

Backtelemetry Section 211

The backtelemetry section 211 comprises telemetry function decoder 211A, a telemetry multiplexer 211B, an A/D converter 211C, a telemetry modulator 211D and a telemetry transmitter 211E.

Decoder 211A comprises logic gates, latches and decoders of conventional design receiving as inputs WSTRB (1–8), WORD9 (1–9), FUNC4 and FUNC5. Within decoder 211A signals WSTRB8 and WSTRB1 are combined to create signal WSTRB9 which is asserted from the end of WSTRB8 until the beginning of WSTRB1 and sent to the A/D converter 211C and telemetry modulator 211D. Signals FUNC4 and FUNC5 are the primary activation signals for decoder 211A and cause the 6 low-order bits in the input bus signal WORD9 (1–9) to be latched, decoded and gated to control output signals applied to: indifferent electrode switch 212D (IECLOSE); bus MUXCTRL (1-23); and lines iden-

5,938,691

**19**

tified as VRTPWR, RLOCTRL and RHICTRL (to telemetry multiplexer 211B), ADPWR, and SH2X1, SH2X3, SH2X10 and SH1X10 (to A/D converter 211C) to control functions in subsections 211B and 211C as shown in the tables below:

TABLE 4A

| Six low order bits WORD9 543 210 | Output Signal from 211A | Description of Function Activated in MUX 211B |
|---|---|---|
| 001 000 | MUXCTRL1 | VOUTA1 vs VOUTB1 |
| 001 001 | MUXCTRL2 | VOUTA2 vs VOUTB2 |
| 001 010 | MUXCTRL3 | VOUTA3 vs VOUTB3 |
| 001 011 | MUXCTRL4 | VOUTA4 vs VOUTB4 |
| 001 100 | MUXCTRL5 | VOUTA5 vs VOUTB5 |
| 001 101 | MUXCTRL6 | VOUTA6 vs VOUTB6 |
| 001 110 | MUXCTRL7 | VOUTA7 vs VOUTB7 |
| 001 111 | MUXCTRL8 | VOUTA8 vs VOUTB8 |
| 010 000 | MUXCTRL9 | ICP1 vs NRV__1 |
| 010 001 | MUXCTRL10 | ICP2 vs NRV2 |
| 010 010 | MUXCTRL11 | ICP3 vs NRV3 |
| 010 011 | MUXCTRL12 | ICP4 vs NRV4 |
| 010 100 | MUXCTRL13 | ICP5 vs NRV5 |
| 010 101 | MUXCTRL14 | ICP6 vs NRV6 |
| 010 110 | MUXCTRL15 | ICP7 vs NRV7 |
| 010 111 | MUXCTRL16 | ICP8 vs NRV8 |
| 011 XXX | RLOCTRL | Output current monitor, high range |
| 100 XXX | RHICTRL | Output current monitor, low range |
| 101 000 | MUXCTRL17 | ZEROV vs ZEROV |
| 101 001 | MUXCTRL18 | ZEROV vs 3.5 |
| 101 010 | MUXCTRL19 | ZEROV vs VREF |
| 101 011 | MUXCTRL20 | EXTP vs EXTN |
| 101 100 | MUXCTRL21 | ZEROV vs TAP14 |
| 101 101 | MUXCTRL22 | NEG14 vs TANKV |
| 101 110 | MUXCTRL23 | ZEROV vs VRTV (int. voltage) |
| 101 111 | | no operation |

TABLE 4B

| Six low order bits WORD9 543 210 | Output Signal from 211A | Description of Function Activated in A/D Converter 211C |
|---|---|---|
| 111 000 | SH2 × 1 | set gain to × 1 (default) |
| 111 001 | SH2 × 1,3 | set gain to × 3 |
| 111 010 | SH2 × 1,10 | set gain to × 10 |
| 111 011 | | no operation |
| 111 100 | SH1 × 10,SH2 × 1 | set gain to × 10 (redundant) |
| 111 101 | SH1 × 10,SH2 × 3 | set gain to × 30 |
| 111 110 | SH1 × 10,SH2 × 10 | set gain to × 100 |
| 111 111 | | no operation |

TABLE 4C

| Six Low Order Bits 543 210 | Description of Function Activated in 211B,C,D | | |
|---|---|---|---|
| | IECLOSE | VRTPWR | ADPWR |
| 110 000 | open | off | off |
| 110 001 | open | off | on |
| 110 010 invalid state | | | |
| 110 011 | open | on | on |
| 110 100 | closed | off | off |
| 110 101 | closed | off | on |
| 110 110 invalid state | | | |
| 110 111 | closed | on | on |

The telemetry multiplexer subsection (telemetry MUX 211B) comprises 25 level shifters connected to 25 pairs of transmission-gates of conventional design which allow one and only one pair of MUX input signals to be connected to the pair of output lines, MUXOUT+ and MUXOUT−. This

**20**

pair of output lines convey the differential signal to be measured and are connected to the A/D converter 211C.

A/D converter 211C comprises logic gates, level shifters, transmission-gates, switched capacitor amplifiers and comparators of conventional design arranged in 2 stages. The first stage has a default gain of 1 and can be changed to a gain of 10 by signal SH1X10. The second stage has selectable gains of 1, 3 or 10 as set by signals SH2X1, SH2X3 and SH2X10, respectively. Signal ADPWR from decoder 211A is used to turn on operating power to the amplifiers and the comparator in subsection 211C only when back telemetry has been requested by the WP WORD9 commands. This manner of operation is power-conservative.

In addition, in the converter 211C signals FUNC4 and FUNC5 are connected to the set and reset inputs of a flip-flop which has as its Q output a signal NORMPOL. Assertion of FUNC4 results in NORMPOL true and assertion of FUNC5 causes negation of NORMPOL. Within the converter 211C, NORMPOL is used to direct the converter to take a normal or inverted sample of the signal presented to it via the telemetry MUX 211B. In addition, NORMPOL is sent to the telemetry modulator 211D.

Further, in converter 211C, the signals WSTRB (1–8) from the word strobe generator 201C and WSTRB9 from telemetry function decoder 211A are combined in logic gates and level shifters to generate a multiphase clock for controlling switch timing in a switched capacitor amplifier circuit which samples, holds and conditions the voltage to be measured. A reference level for the samples is established by signal VREF.

More particularly, the voltage sample is delivered to a single-slope A/D converter of conventional design which comprises a comparator along with a ramp generator. The ramp generator uses the fixed current ADIREF to charge an on-chip capacitor. The comparator senses equality of the ramp voltage and the sample voltage, terminating the conversion cycle and causing the contents of a 6-bit counter driven by the signal CLKPH1 to be latched. The 6-bit latch output is the bus signal ADCOUNT (1–6) which is sent to telemetry modulator 211D.

Subsection 211D comprises 7 tri-state buffers of conventional design. The 7 buffers are connected to the output line DATAOUT and represent the 6 bits resulting from the A/D conversion plus a 7th bit which indicates polarity. The 7 bits are placed on the common output line DATAOUT in a sequence controlled by WSTRB (2–8) following a logic 1 sent during the WSTRB1 on-time and preceding a logic 0 sent during the WSTRB9 on-time. Thus, 9 bits are conveyed to a conventional off-chip telemetry transmitter 211E and thence to the WP in synchrony with one full data frame sent to the ICS by the WP. As previously described, the transmitter 211E is enabled for such transmission by the signal CARON from initialization 204B.

Output Stages 212—1 through 8

Output Stages 1–8, section 212 (1–8), comprise 8 identical circuits. The table below summarizes the electrical connections to the output stages 1–8 comprising single lines connected to all 8 stages in parallel as well as 8-line buses with an individual line connected to each of output stages 1–8.

5,938,691

| 21 | 22 |

## TABLE 5

SUMMARY OF CONNECTIONS
TO OUTPUT STAGES 1 THROUGH 8

| Single lines connected to all eight stages in parallel: | 8 line buses with 1 line connected to each output stage 1 through 8: |
|---|---|
| Zero V | RV0 (1–8) |
| –14 V | RV1 (1–8) |
| –10.5 V | IPos (1–8) |
| –7 V | INEG (1–8) |
| DCLKPH1 | PWC (1–8) |
| DCLKPH2 | AMONO (1–8) |
| ZERO | BMONO (1–8) |
| SHORT | DRC (1–8) |
| POLARITY | OUTA (1–8) |
| INDCOM | OUTB (1–8) |
| | VOUTA (1–8) |
| | VOUTB (1–8) |
| | ICP (1–8) |
| | NRV (1–8) |

Output stage 1 will be discussed below as representative of all 8 stages. Output stage 1, section 212-1, comprises a refresh voltage control 212A, a current source 212B, an electrode switching matrix 212C and an indifferent electrode switch 212D. The refresh voltage control 212A comprises a conventional switching matrix, like the matrix 212C, in addition to level shifters connected to input circuitry to distribute two different logic levels defined by –3.5 and –14 volts within the refresh voltage control 212A and to the circuits that communicate with the refresh voltage control. As indicated, inputs to the refresh voltage control 212A include the 4 power supply voltage levels (–14V, –10.5V, –7.0V, –3.5V) along with signals DCLKPH1 and DCLKPH2 from the downconverter 203B. Signals RV1 and RV0 from the refresh control logic 210 provide a 2-bit code to logic gates connected to an intermediate charge storage device for the output stage 1, comprising "flying" capacitor CF1. Signals RV0 and RV1 operate on the logic gates to select one of the four power supply voltages to charge CF1 during assertion of signal DCLKPH1. During assertion of signal DCLKPH2, capacitor CF1 is disconnected from the selected power supply voltage and is connected in parallel with and transfers charge to a capacitor CRV1 via lines PRV1 and NRV1. Such switched capacitor circuitry impresses the voltage of CF1 on storage capacitor CRV1. CRV1 then functions as a floating power source for output stage 1. In this regard, it is the use of the intermediate charge storage device, CF1, alternately connected to the power supply voltages and to CRV1 of output stage 1, that provides electrical isolation for the output stage 1.

As previously described with respect to Refresh Voltage Logic Section 210, more than 9 bits are required to specify which one of the four refresh voltages is to be selected for each of the 8 isolated output stages. Therefore, two ninth-word commands are issued by the WP in two frames in sequence, processed in the ICS, and produce two WORD9 commands from command latch 206A. To control the refresh voltage for Stage 1, the first WORD9 command consists of the refresh voltage function control 110 in bits 8–6, a stage 1 select code 1 in bit 5, a stage 1 refresh voltage level code in bits 3 and 4, a stage 3 refresh level code in bits 1 and 2 and a high-order bit of the refresh level code for stage 4. The second WORD9 command includes the refresh level codes for stages 5 through 8. Note that stages 3 through 8 are always updated but only stage 1 or stage 2 may be manipulated by a given command. Updating both stages 1 and 2 requires two 2-word refresh voltage commands. The

2-bit refresh voltage level codes for stage 1 in bits 3 and 4 of the first WORD9 (RV1 and RV0) and the refresh levels associated therewith are shown below:

| Code | | |
|---|---|---|
| RV1 | RV0 | refresh voltage |
| 0 | 0 | –14 volts |
| 0 | 1 | –7.0 volts |
| 1 | 0 | –3.5 volts |
| 1 | 1 | –10.5 volts |

The refresh voltage control 212A has a pair of input latches to hold the 2-bit level codes. The latches are always reset to the 00 (–14 volt) state at startup by the startup reset signal SYSRESET from the initialization section 204B and remain in that condition unless overwritten by a refresh voltage command. Thus, the highest available source voltage is automatically selected for all channels. However, the source voltage can be reduced on a channel-by-channel basis as indicated by back-telemetry data related to the power required for each channel. Such reduction of the source voltage will minimize power dissipation in the affected output stage 212B and thereby reduce power dissipation in the ICS 12.

Within current source 212B, power signal NRV1 from refresh voltage control 212A is connected to the source of a conventional MOSFET device comprising the current source. Connected to the drain of the MOSFET device is the output line –IN1 which connects to the electrode switching matrix 212C and is one line of the signal bus ICP (1–8) connected to the telemetry MUX 211B. Similarly, signal NRV1 is one line of the signal bus NRV (1–8) also connected to subsection 211B.

The gate-to-source voltage of the MOSFET device is controlled by signals IPOS1 and INEG1 respectively from analog multiplexer 207C, with such signals being applied to the device through transmission gates in the analog multiplexer controlled by signals XFERB and XFERC from converter 2D1C. The gate-to-source voltage so applied in a periodic manner is stored in a capacitor associated with the gate of the MOSFET device and remains operative between the refresh episodes. The refresh episodes are sequentially distributed across all 8 output stages in a non-overlapping manner so that only one current source 212B is connected via multiplexer 207C to the ICS circuitry at any time. The seven non-selected current sources are isolated from each other and the rest of the ICS circuitry by the off-resistance of the transmission gates in multiplexer 207C.

Electrode switching matrix 212C is the final subsection leading to the output coupling capacitors CA1 and CB1 which are connected to the stimulating electrodes. The circuitry in this subsection comprises logic gates, transmission gates, latches and level shifters of conventional design. Electrical isolation of the output stage is maintained in the switching matrix 212C since the various control signals for the matrix are applied only to the gates of MOSFET devices which comprise the transmission gates and which directly control the functions described hereinafter.

In particular, two transmission gates are connected between the signal lines +IN1 and –IN1 upon their entry into the matrix 212C. One of the transmission gates is of low on-resistance and is latched by the signal SHORT from the zero current control 205B. The other transmission gate is a high on-resistance device which is turned on by the signal DRC1 from the output mode register 208.

Signals +IN1 and –IN1 are connected to outputs OUTA1, OUTB1, VOUTA1, VOUTB1 and INDCOM via 10 trans-

5,938,691

23

mission gates in the matrix 212C. The transmission gates are controlled by logic gates driven by input signals AMONO1 and BMONO1 from the output mode register 208, PWC1 from pulse width control 209 and POLARITY from amplitude data latch 205A. The connection patterns are shown in the table below.

24

where n is the number of slave chips and 1 represents the frame associated with the master chip. Note that each standard frame included in the long frame comprises an end of frame pulse (depicted in black) and that the long frame is terminated in a unique marker that signals the end of the long frame. Thus in multiple chip operation, the format of

TABLE 6

| | | | | CONNECTION | | | PATTERN | | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| INPUT SIGNALS | | | | CONNECT TO | CONNECT TO | CONNECT TO | CONNECT TO | CONNECT TO | OF CONNECTION |
| AMONO1 | BMONO1 | PWC1 | POLARITY | OUTA1 | OUTB1 | INDCOM | VOUTA1 | VOUTB1 | PATTERN |
| 0 | 0 | 1 | 1 | +IN1 | −IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR NORMAL |
| 0 | 0 | 1 | 0 | −IN1 | +IN1 | NONE | OUTA1 | OUTB1 | BIPOLAR INVERT |
| 1 | 0 | 1 | 1 | +IN | NONE | −IN | OUTA1 | INDCOM | MONOA NORMAL |
| 1 | 0 | 1 | 0 | −IN | NONE | +IN | OUTA1 | INDCOM | MONOA INVERT |
| 0 | 1 | 1 | 1 | NONE | +IN1 | −IN | OUTB1 | INDCOM | MONOB NORMAL |
| 0 | 1 | 1 | 0 | NONE | −IN1 | +IN | OUTB1 | INDCOM | MONOB INVERT |
| 1 | 1 | X | X | NONE | NONE | NONE | OUTA1 | OUTB1 | DISCONNECT |
| X | X | 0 | X | NONE | NONE | NONE | X | X | DISCONNECT |

Please note that selection of any monopolar mode will eliminate the electrical isolation of that particular output stage via the common connection to INDCOM.

Bus signals VOUTA (1–8) and VOUTB (1–8) from the matrix 212C, ICP (1–8) from current source 212B and NRV (1–8) from refresh voltage control 212A are all connected to the telemetry multiplexer 211B as previously described. Output line INDCOM from the matrix 212C is connected to the indifferent electrode switch 212D.

Within the switch 212D, the signals OUTENABLE from initialization 204B and IECLOSE, RLOCTRL and RHIC-TRL from telemetry function decoder 211A control the connection between INDCOM and the indifferent electrode via line INDELEC. Assertion of OUTENABLE and IECLOSE activates a transmission gate within the switch 212D which then connects INDCOM directly to INDELEC. Further, assertion of RLOCTRL or RHICTRL from telemetry function decoder 211A places off-chip resistor RLO or RHI, respectively, in a series connection between INDCOM and INDELEC. Stimulus current flowing through the selected resistor generates the voltage output signal ILO or IHI with respect to INDELEC. Such signal is proportional to stimulus current in the monopolar mode and is sent to telemetry MUX 211B.

Multiple Chip Control 214

In the preferred embodiments thus far described, the ICS comprises a single chip. However, multiple chips of the same or similar circuitry may be usefully employed in a human tissue stimulator. In such an embodiment, a circuit 214 at the input of each chip permits the interconnection of several chips into one functional unit by making one of the chips a master device which receives data and clock signals and then distributes such signals to all the slave chips. In this manner a large number of chips may be connected together forming a system with a large number of output channels, e.g., 16 monopolar channels times the number of chips. Such an embodiment, for example, with two chips, one master and one slave, provides twice the number of channels and requires twice the number of words per frame. In such an embodiment, a total of 18 words per frame instead of the basic 9 words per frame is required since the two chips are in series.

FIG. 5A depicts a long data frame for multiple chip operation including n+1 standard frames per long frame,

the data transmission is extended by one level. A set of data consists of bits, words, and standard frames embedded in a long frame. As in the regular operation of an ICS previously described, one word consists of 9 bits and one frame consists of 9 words. However, one long frame consists of as many frames as there are chips participating in the multiple chip operation. The beginning (or end) of a long frame is defined by a long frame pulse that has a duration of two regular frame pulses.

An example of multiple chip system is set forth in FIG. 5B having a master chip and n slave chips. Each chip includes a multiple chip control circuit (214, 214-S1 to 214-Sn). As shown in FIG. 4E, chip control 214 has inputs PFRMCLK from the clock decoder 201B, RFMAIN from refresh voltage logic 210, PFMAIN from the pulse width control 209, a preset master/slave input M/S ("1" for the master chip and "0" for all slave chips) and open input leads DIN and ECLK. The control 214 outputs going off-chip include PFRMCLK (for connection to each of the inputs ECLK of the slave chips) and DCENABLE (for a control signal applied to the serial to parallel converter 201C). The chip control 214 in each slave chip includes the same input and output lines. However, each line ECLK is connected to receive the signal PFRMCLK from the master chip, each line PFRMCLK is open and each line DIN is connected to DCENABLE of the preceding chip.

Basically each chip control includes a conventional gate flip-flop. In the chip control 214, the gated flip-flop is preset by M/S=1 and changes state to develop the control signal DCENABLE upon receipt of PFRMCLK (indicative of the long frame marker when in multiple mode operation and indicative of standard end of frame pulse during regular single chip operation). As previously discussed, DCEN-ABLE enables operation of 201C to develop DATA (1–9) from MANDATA and hence the processing of input data from the WP by the ICS. In multiple chip operation, as depicted in FIG. 5B, DCENABLE from chip control 214 is applied to input DIN of chip control 214-S1. This effects a preset of the flip-flop in 214-S1, which will change state to develop a control signal DCENABLE for output to the chip control 214-S2 at its DIN input upon receipt of the next PFRMCLK at the ECLK input of 214-S1. DCENABLE developed within 214-S1 is applied to the serial to parallel converter 201C in the ICS of the Slave 1 chip to enable

5,938,691

25

processing of data from the WP by that ICS. This process is repeated in sequence for each slave chip. From slave n chip, DCENABLE is fed back to the DIN input of the master chip to complete the ring.

Thus, in the multiple chip operation, the flip-flops in each chip control are ganged together such that the output DCEN-ABLE of the master chip feeds into the DIN input of the next slave flip-flop and the DCENABLE output of the next slave chip feeds into the DIN input of the following slave flip-flop and so on until the DCENABLE of the last chip feeds into DIN input of the master chip flip-flop. In this way, the flip-flops form a ring-type shift register.

The multiple chip operation also allows for short frames and short-long frames. With an early application of a long frame pulse or marker, the long frame can be shortened. Further, when WORD9 commands requiring more than one frame for loading and execution are in process, the frame pulse may be inhibited as a clock pulse for the flip-flops until the WORD9 command is fully executed.

Having described each section and subsection of the ICS of FIG. 4, the following is a description of the general operation of the ICS.

System Operation

(a) Power Supply

The ICS has no internal power source and, therefore, is completely dependent for power from an outside source, that is, power radiated by the antenna connected to the wearable processor WP. The magnetic portion of that radiated field is received by the ICS and converted into two types of signals. One is the power supply for the balance of the implantable system and the second is the data stream which contains the commands which control the behavior of the ICS. The data stream coming from WP is a 50% duty cycle amplitude-modulated signal. The modulated carrier is converted to RAWDC power in receiver **200**. The DC power, RAWDC, is passed to series regulator **202**A and its associated circuitry to generate a regulated negative 14 volts, NEG14, which is the primary power supply for the ICS. The primary power is further operated on to create various voltage levels for the balance of the circuitry. The principal derived power supply is the output from the downconverter **203**B, which is the −3.5 volt line, used to power much of the logic circuitry within the ICS. Also derived are −7 volts, −10.5 volts, and the original −14 volts, which are supplied to the output circuits, of which there are 8. Each output circuit utilizes one of 4 different levels of refresh voltages, which can be selected according to requirements for stimulation output of a given channel in the ICS. In addition, the −14 volt supply is used to power much of the ICS analog circuitry to provide rail to rail operation, where the rails are defined by the −14V line and the ZEROV line. ZEROV is common to all the circuitry, except for the isolated output stages, and is the logic true or logic one level for all the logic circuitry. The zero or false logic level is −3.5V or −14V, depending on the power supply for a particular logic section.

The signals TANKV from receiver **200** and TAP14 from regulator **202**A are resistively-divided representations of RAWDC and NEG14, respectively. As indicated at telemetry MUX **211**B, TANKV and TAP14 are applied to the back telemetry system so that closed loop control of the incoming DC power to the ICS can be maintained. In addition, during startup, the microprocessor in the WP sets the transmit power to a level sufficient to insure proper operation of the ICS (see FIG. 1 and related text). Then, during operation of the ICS, TANKV and TAP14 are telemetered back to the WP for processing. Depending upon the magnitude of the difference between TANKV and TAP14, that is the voltage

26

drop across the series regulator **202**A, the transmit power of WP can be reduced by operation of the microprocessor. Preferably, the power transmitted to the ICS is just sufficient for normal operation, thereby conserving power drawn from the WP and its batteries.

(b) Initialization

As previously described, the WP startup procedure comprises transmission of a data stream of alternating ones and zeros. Simultaneously, the series regulator **202**A output NEG14 ramps from 0 to −14 volts with respect to ZEROV and the receiver develops outputs PDATA and NDATA at half the standard bit transmission rate (550 KHz) to data conditioner **201**A. Within **201**A, PDATA and NDATA result in the signal MANDATA which is transmitted to downconverter clock **203**A, clock decoder **201**B and serial to parallel converter **201**C. Within downconverter clock **203**A, MANDATA is divided by four in passing through two toggle flip-flops. The resulting 137.5 KHz signal is applied to one input to a two-pole FET selector switch, the other input comprising WORDTRCLK from serial to parallel converter **201**C. The state of the switch is controlled by POWERBAD, which is asserted during system startup to cause the switch to transmit the 137.5 KHz signal. Thus the 137.5 KHz signal is selected as the clock signal for the voltage downconverter **203**B during startup operation of the ICS whereas a level-shifted version (−3.5 to −14V) of WORDTRCLK (122 KHz) from converter **201**C is selected during normal operation of the ICS (DOWNCLOCK).

Also during initial startup, the powerbad detector **204**A asserts POWERBAD from just after the start of transmission until the −3.5 volt power supply reaches about −3.3 volts. As previously described, POWERBAD drives the reset of logic circuitry in many parts of the ICS and also forces the output stages **212** to be off so that no stimulus can be presented until proper functioning of the ICS is determined. This is accomplished by POWERBAD resetting a flip-flop within **204**B to OUTENABLE, the assertion of which is required to enable the output stages **212**. Then, upon a negation of POWERBAD, assertion of CARDET from clock decoder **201**B and assertion of CONNECT and PLLLOCK from command decoder **206**B, the flip-flop is set and OUTEN-ABLE is asserted to enable the output stages **212**. Similarly, the assertion of PALARM from parity error detector **204**C results in a disabling of the output stages **212** via a negation of OUTENABLE.

In addition, during power-up of the ICS, the carrier of the back telemetry transmitter section **211** is turned on and the turning on of that carrier is sensed by the WP and indicates normal operation of the ICS. Such turning on of the carrier is accomplished by assertion of CARON from **204**B. As previously described, CARON is generated only when signals CARDET and PLLLOCK asserted and signal POW-ERBAD and PALARM not asserted are combined in gates in **204**B to indicate proper operation of the ICS. From **204**B, CARON goes off chip to turn on the back telemetry carrier signal at a telemetry transmitter **211**E of the back telemetry section **211**, the back telemetry section being off-chip. If at any time any of the signals CARDET, PLLLOCK, POW-ERBAD or PALARM changes to a different state indicative of a problem condition, CARON will be negated and the back telemetry carrier will be turned off. Thus, if at any time the WP no longer detects the back telemetry carrier from the ICS, we assume that improper operation is in progress. The microprocessor in the WP halts data transmission and begins the above described startup procedure which should then result in detection of the back telemetry carrier from the ICS.

Following this initial handshake between the WP and the ICS, a series of patient-specific parameters which have been

5,938,691

27

embedded in the WP via a clinician's programmer will be sent into the ICS. Once all such parameters are set up, the electrode outputs will be connected and stimulation will commence. This is accomplished via a WORD9 command to assert the command line CONNECT from the command decoder 206B followed by assertion of the OUTENABLE line from the initialization section, 204B. Assertion of OUTENABLE will enable an output from Pulse Width Control 209 [PWC (1–8)] which in matrix 212C will connect the electrode outputs (see table 6 herein). Conversely, the WP can force a global disconnect of all of the outputs at any time by sending in the WORD9 command which asserts the command line DISCON from the command decoder 206B. Of course, in the event of catastrophic failure of the stimulation circuitry, the user can disable the ICS simply by moving the headpiece away from the ICS.

If a parity error is detected by the parity error detector 204C the detector asserts line PALARM to the initialization section 204. Section 204 then issues the system reset signal SYSRESET to force the ICS system into its restart condition and turn off the back telemetry carrier, signaling the WP that a serious error has occurred. A new startup sequence will then ensue under control of the startup procedure of the WP.

(c) Data Recovery

The pair of data signals, PDATA and NDATA, coming from receiver 200 are squared up in the data conditioner 201A to generate the signal MANDATA. The signal MAN-DATA represents the recovered data signal from the Manchester-encoded stream transmitted by the WP to the ICS and, therefore, represents the primary data signal input into the ICS to control its function. In addition, the presence of modulated carrier is used to create the carrier detect signal CARDET. CARDET is connected to the clock decoder 201B to indicate the presence of carrier and therefore is one of the requisites for normal operation of the ICS. Since MAN-DATA is a Manchester-encoded signal, it comprises a clock and data. The clock information is extracted from MAN-DATA in the clock decoder 201B. The clock information is then expressed as 2 signals: CLKPH1 and CLKPH2, used to control the clocking of the serial data into a register in serial to parallel converter 201C. In the converter 201C the nature of the signal is converted from serial to parallel.

As previously discussed, data sent to the ICS by the WP is in the form of a serial bit stream organized within a frame, which consists of 9, 9 bit words, that is 81 bits, plus a parity bit and a frame-ending marker. The 9 bit data words, which make up the data portion of the frame, comprise 8 amplitude and polarity data words for the eight output channels in sequence 1 through 8, and a 9th word containing special commands which control housekeeping and certain other functions of the ICS.

In clock decoder 201B, the signal PFRMCLK is derived from the frame ending pulse. PFRMCLK signals the end of one data frame and, therefore, the beginning of the next.

In the converter 201C, WORDTRCLK is generated at the end of each 9 bit word transmitted and causes those specific 9 bits, DATA (1–9), to be latched into the amplitude data latch 205A for amplitude and polarity control. The signal WORD9CLK is used to cause latching of the 9th word coming in so that those 9 bits are directed to the command latch 206A and will remain in that latch until the next 9th word time. Thus, the amplitude data latch 205A is updated 8 times during the normal frame, with data for any particular channel being available only for the transmit time of the next word, when it is then replaced by the new data.

On the other hand, command latch 206A retains the 9th word command information for at least one complete frame

28

time, that is, until the next 9th word occurs. Of course, the succeeding 9th word command could be the same command sent again, in which case the functionality requested by that command would simply be maintained for another frame or, potentially for additional frames for an unlimited period of time.

Note that at times when use of the 9th word command is not required, the frame can be shortened by sending the frame-ending marker after any word of the amplitude data information. The sequence of the data is amplitude and polarity data for channel 1, followed by 2 through 8, and this sequence can be terminated at the end of any word by a frame ending marker. This manner of operation is known as short cycling, and allows the frame to be shortened for more rapid update of low number channels but, of course, without 9th word commands. Such short cycle operation will allow higher frequency waveforms to be represented on such low-order channels at the expense of less-frequent updates on the higher order channels and the absence of 9th word command information. Under short cycling conditions, the amplitude and polarity information for channels not addressed, as well as 9th word commands not overwritten, will simply-maintain their previous setting until written again at some future time.

(d) Amplitude and Polarity Control

In the normal full frame sequence, amplitude and polarity data, that is 9 binary bits each for 8 different channels, is received in sequence for channels 1 through 8. The first amplitude and polarity data word received is latched as noted above, and then presented to the logarithmic D to A converter 207B during the second word transmit time. Thus, the update of amplitude and polarity information for a given channel lags that channel's transmit time by one word time. In addition, since the data queue is only one word deep, the amplitude and polarity information sent, for example for channel 1, has to be operated on and completed during the channel 2 transmit time. During that time, the logarithmic D to A converter 207B uses the 8 bits of amplitude information to operate on the reference current IREF from the current reference generator 207A to generate the two current control voltages IPOSCON and INEGCON, which are passed to the analog multiplexer 207C as signals IPOS and INEG. IPOS and INEG are the gate-to-source voltage which will be impressed on the current source 212B in the appropriate output signal channel under the control of the signal WSTRB appropriate for that particular channel. The signals WSTRB (1–8) arise from the word strobe generator 201D, and are a sequence of pulses which are active in the appropriate word time for each channel in sequence 1 through 8. The current source 212B in each of the 8 individual isolated output channels, stores its appropriate gate-to-source voltage on capacitance associated with the MOSFET, maintaining control at the commanded level until updated in the next frame. Each of the 8 current sources is a unidirectional current-controlling device which controls output current drawn from the refresh voltage capacitorla-beled CRV in FIG. 4.

Each current source 212B is only connected to the logic circuitry during its signal transfer time. The refresh voltage capacitor CRV1 is only connected during its transfer time. Thus, for the balance of the time of operation, each output channel is electrically isolated from all other channels and also from the logic circuitry.

Since the MOSFET comprising current source 212B is unidirectional, the switching network 212C is placed after the current source in order to control the direction of stimulus current. This aspect is controlled by the signal

5,938,691

29

POLARITY from latch 205A, which for bipolar operation directs the electrode switching matrix 212C to connect output A1 and output B1 for the first channel, for example, directly to the lines +IN1 and –IN1 for normal polarity, or to –IN1 and +IN1 for reverse polarity. In this way the direction of current flow between the electrodes can be controlled to be in either direction, even though the actual current source is a unidirectional device. For monopolar operation, as opposed to bipolar operation as described above, the electrode switching matrix 212C, along with the indifferent electrode switch 212D, is configured to allow the output to be generated between output A1 and the indifferent electrode or output B1 and the indifferent electrode with either direction of current flow being possible. The selection of bipolar or monopolar style of output in the matrix 212C is under control of the buses AMONO (1–8) and BMONO (1–8) from output mode register 208. In this regard, AMONO (1–8) and BMONO (1–8) each have one representative line going to each of the eight output channels (see Table 6).

In addition, there is a capability for placing a discharge resistor across each pair of outputs. Such function is under control of the discharge resistor control bus lines DRC1–8. Assertion of a DRC line to a particular output by the output mode register 208 will place a 150K resistance across the output terminals to discharge the output coupling capacitors. Alternatively, or in addition, a low resistance connection in 212C can be placed across the output terminals to more rapidly discharge the output coupling capacitors in response to the signal SHORT from the zero current control 205B. Further, the output current can be forced to zero by assertion of the signal ZERO from zero current control 205B. In this regard, the signal ZERO causes all output switches in the switching matrix 212C to be in an off or high impedance state.

An additional output mode (MULTIPOLAR MODE) involves using a pair of output channels to generate a bipolar output using any pair of electrodes in the electrode array. To accomplish this, two channels are programmed by the output mode register 208 to assume a monopolar mode. This causes one side of each of the selected channels to be connected together and to the indifferent electrode. Then, unlike the normal monopolar mode, a WORD9 command from WP is sent to the ICS to disconnect the indifferent electrode via IECLOSE. Thus, by programming one of the channels as a source and the other as a sink, current can be driven through any selected pair of electrodes with complete control over amplitude and polarity.

(e) Pulse Width Control

The amplitude and polarity control described above is typical of the analog operation of the ICS. An additional mode of operation is provided by the ICS in which the described amplitude and polarity control is still in operation, but the outputs to one or more channels, controlled individually, can be turned on and off in order to create pulses of controlled amplitude and controlled duration. This is the pulsatile mode of operation. Pulsatile operation is under the control of pulse width control 209. Pulse width control is via a sequence of 9th word commands (WORD9), the first of which results in the assertion of the line FUNC8, which enables the pulse width control 209. The first such command also contains information about the placement of pulse edges within the next succeeding frame, and the rest of the command is issued in a series of 9th words which must not be interrupted by any other 9th word command. Therefore, a feedback signal to prevent other 9th word commands from interfering is sent back from the pulse

30

width control 209 to the command decoder 206, that signal being PFMAIN.

In the control 209, bits of the first of the pulse width commands and succeeding ones are loaded into the pulse width control registers. The bits are used to preset downcounters, driven by the internal system clock, to control the appearance of the on and off times for the channel which is being controlled. Therefore, on a channel by channel basis, the amplitude of the pulse can be controlled in the usual way by the amplitude and polarity information sent in for that channel, and the turning on and off of the output is controlled by the pulse width control 209 in conjunction with the electrode switching matrix.

In addition to the channel by channel control of outputs being either on or off via the pulse width control 209, there is also a global control which can enable or disable all outputs from all channels simultaneously, that is via the signal OUTENABLE from the initialization section 204B. The global signal OUTENABLE can be controlled by the outputs, CONNECT and DISCON, from the command decoder 206B. That is, the line can be driven by a 9th word command to connect or disconnect all the outputs. In addition, the global output control, OUTENABLE, can be negated by the initialization section 204B when circuitry in that section detects conditions of improper operation. Furthermore, during startup of the ICS, all outputs are disconnected until normal operation is in progress, at which time OUTENABLE is asserted and stimulation will begin.

(f) Refresh Voltage Control

The isolated power supply voltages for the stimulus currents from each of the 8 output channels is provided by charge stored on the refresh capacitors, CRV1 through 8. Selection of the appropriate voltage level for each of the 8 output stages is a decision made by the WP based on information telemetered back to it from the ICS about the voltage requirements for proper output drive of that individual channel. This is an important power conservation feature of the ICS which seeks to minimize the potential difference and, therefore, the power dissipation in the current source 212B.

Any one of four different power supply voltage levels are selectable for each of the output channels, independently, and those voltages are –3.5, –7.0, –10.5, and –14. Refresh voltage control on a channel by channel basis is effected by two sequential 9th word commands which are decoded in the command decoder 206B and result in assertion of the signal FUNC7 line going to refresh voltage logic 210. This requires 2 full frames to implement, that is two 9th words must be transmitted in sequence to achieve such control. The command decoder 206B must be prevented from operating on a different 9th word during the sequence, hence the line RFMAIN from refresh voltage logic 210 is applied to the command decoder to lock it into the refresh voltage sequence for two frames. Refresh voltage logic 210 provides 2 bits RV0 and RV1 which define the four possible power supply voltage levels for each of the 8 output channels via the lines RV0 (1 to 8) and RV1 (1 to 8) connected to refresh voltage control 212A. The control bits, two for each channel, are latched into their respective refresh voltage control so that (1) one of the four possible power supply voltage levels is selected for each associated channel, e.g., –3.5 for channel 1, –10.5 for channel 2, –14 for channel 3, –7 for channel 4, and so on, and (2) the selected power supply levels are maintained until changed by a new refresh voltage command. During startup, all 8 output channels are automatically commanded to use the –14 volt refresh, which provides for the maximum output power. As the system continues to

5,938,691

31                                                                    32

run and, as described hereinafter at (g) "Back Telemetry", as information is fed back via telemetry to the WP, logic which in the microprocessor of the WP can then cause a reduction in the power supply voltage for each channel to a level most appropriate for the stimulation requirements for that channel, thereby enhancing the power conservation within the ICS.

(a) Back Telemetry

Function codes FUNC4 and FUNC5 from the command decoder 206B enable the function of the back telemetry section 211 which is to report back to the WP the state of various voltages within the ICS. As previously indicated, some of the functions of the telemetry section are of a housekeeping nature. For example, the measurement and transmission back of the voltage TANKV provides an index or status indication of the RAWDC voltage generated in the ICS in response to data from the WP. In addition, the power supply voltages ZEROV, −3.5 volts and TAP14 are available for transmission back to the WP as indicators of proper power supply function and for feedback control of the WP and the power transmitted therefrom to the ICS.

Also, the back telemetry can be commanded to measure and send back the value of the voltage reference, VREF, to indicate proper operation and, since this voltage is highly stabilized, to provide a system calibration point. In addition, stimulus output voltages can be measured via the lines OUTA (1 through 8), and OUTB (1 though 8), when the ICS is in the bipolar mode.

In the monopolar mode, the output voltage can be measured between either output A and the indifferent electrode, or output B and the indifferent electrode, whichever is appropriate. Additionally, in the monopolar mode, the current sampling resistors RLO or RHI can be placed in series with the stimulus circuit, and the resulting voltage drop across the resistors measured and transmitted back to the WP as an index of stimulus current. Thus, in the monopolar mode, both the stimulus voltage and current can be measured and, thereby, the impedance of the electrode and the tissue-electrode interface can be measured and transmitted back to the WP. The WP is able to use this information in its microprocessor to choose the appropriate refresh voltage for each channel in the manner heretofore described at (f) Refresh Voltage Control.

As indicated in FIG. 4, following the telemetry multiplexer 211B which selects the signal to be measured and transmitted back to the WP, inputs are generated for the analog to digital converter section 211C. The analog to digital converter is of a unipolar type. But, at least some of the signals which are to be measured have unknown polarity at the time of measurement. Therefore, the capability is provided to make measurements in a normal mode or an inverted mode, depending on the state of the function lines, FUNC4 and FUNC5. If FUNC4 is asserted at the converter 211C and the resulting ADCOUNT is zero, this indicates either that the measured signal is zero or of a polarity opposite to the setting of the converter. To determine which is the case, FUNC5 is asserted to switch the converter to the inverted mode. If ADCOUNT now registers other than zero, this indicates that the measured signal was of an opposite polarity to the normal setting of the converter. If ADCOUNT remains zero, this indicates that the measured signal was in fact zero.

In addition, the amplitude of some of the voltages to be measured is unknown at the time of measurement. Therefore provision is made for a stepwise gain selection prior to analog to digital conversion under control of SH2X1, SH2X3, SH2X10 and SH1X10. For example, if SH2X1 is asserted and ADCOUNT is a series of 1's, the input is out of range of the converter and the gain should be reduced until ADCOUNT reads less than 111111.

Thus, if the measurement is taken and is judged by the WP to be of the wrong polarity or wrong gain setting, correction can be sent back from the WP to make another measurement using the correct parameters as deduced from the first reading. The 6 bit parallel output bus from the A to D converter is connected to the telemetry modulator multiplexer which converts this parallel set of bits into a serial bit stream which is then applied to the back telemetry transmitter.

Physician's Tester

As described herein most clearly under the heading "SYSTEM OPERATION", the system of the present invention provides for feedback and microprocessor control of various power levels and measurement of different voltages and currents within the ICS in response to commands and data changes transmitted by the WP in response to data telemetered back to the WP in the form of status indicating and measurement signals. The present invention also contemplates physician control over the selection of voltages and currents to be measured and the presetting of parameters in the ICS during testing of the ICS and/or a patient's response to data transmitted by the WP to the ICS.

Basically such physician control is embodied in a portable tester utilizing telemetry coupling to the implanted ICS, thereby providing communication between the tester and ICS for the monitoring, control and measurement of the ICS parameters. In this regard, the tester as shown in FIG. 6 comprises a modification of the previously described WP embodied in a portable housing 300 having a control panel 302 and a visual display 304 providing alpha numeric data for viewing and appropriate action by the physician. A block diagram of the circuitry embodied in the tester is depicted in FIG. 7 in combination with the ICS 12 of FIG. 1—all previously described components bearing the same numerals as in FIG. 1.

The tester monitors the performance parameters of the ICS 12 by detecting the back telemetry signal of the ICS in an interrogation protocol for the microprocessor. The tester places the received signal into a self contained memory storage section.

Physician interaction with the ICS is exercised by the use of the control panel 302 which contains electronic circuitry for conversion of the back telemetry signal into directly readable information which is read out on the LCD display 304. Commands are provided to the implanted stimulator through a control of the microprocessor 30 and the commands generated thereby. The physician's tester additionally can provide a print out of both the displayed data and information and the executed commands.

As illustrated, the physician's tester is basically a modification of the WP 16. The Physician's Tester microprocessor 30 has both a display port and an infrared serial output port. The display port drives display 304 while the infrared port can drive a separate infrared display, a printer for recording the displayed information or a separate IR transducer for generating infrared light signals for transmission to an IR receiver for separate processing of the information from the ICS. Panel knob 306, 308, and 310 control potentiometers, the position of which are read by the microprocessor 30 to control the commands generated thereby and hence the parameters measured and displayed by the ICS and Physician's Tester combination. In particular, such

A00867

5,938,691

33

manual control results in changes in the commands transmitted by the WP to the ICS to control the measurement of the ICS parameters in the same manner as previously described for the system of FIG. 4.

Table 7 describes typical parameter settings for the control knobs **306**, **308**, and **310**.

TABLE 7

| Control Knob 306 | | |
|---|---|---|
| Position 1 | = | Ground (0 Volts) |
| Position 2 | = | 14.0 Volts |
| Position 3 | = | 3.5 Volts |
| Position 4 | = | Reference Voltage |
| Position 5 | = | Coil Voltage |
| Control Knob 308 | | |
| Position 1 | = | Impedance of Monopolar A configured channel |
| Position 2 | = | Impedance of Monopolar B configured channel |
| Position 3 | = | Impedance of Bipolar configured channel |
| Position 4 | = | Voltage of Monopolar A configured channel |
| Position 5 | = | Voltage of Monopolar B configured channel |
| Position 6 | = | Voltage of Bipolar configured channel |
| Position 7 | = | Voltage of Pass FET |
| Position 8 | = | 1 KHz output current Monopolar A configured channel |
| Position 9 | = | 1 KHz output current Monopolar B configured channel |
| Position 10 | = | 1 KHz output current Bipolar configured channel |
| Control Knob 310 | | |
| Volume Control (Peak Output Current) | | |
| Position 1 | = | 0 μA |
| Position 2 | = | 0.5 μA |
| Position 3 | = | 1.0 μA |
| Position 4 | = | 10 μA |
| Position 5 | = | 100 μA |
| Position 6 | = | 1000 μA |
| Position 7 | = | 2500 μA |

Extended System Operation and Applications

While preferred forms of the human tissue stimulator of the present invention embodied in cochlear stimulating systems have been described in detail hereinabove, it should be appreciated that various changes and modifications may be made in the described systems without departing from the spirit of the present invention.

For example, while the outputs of the preferred embodiments have been described as stimulating tissue, the DC and squarewave outputs of the ICS under control of the pulse width control **209** may be utilized to power other implanted devices. For some such AC applications, a larger capacitor CA1 and/or CB1 may be required for each or some of the ICS output channels. Conversely, for strictly DC applications, no output capacitors are necessary.

Further, while the ICS status signal-generating features for the preferred embodiment include the measurement and telemetry functions described in subsection (g) hereinabove, similar measurements and telemetry back to the WP may be provided by the ICS for other implanted devices connected to an electrode pair of the ICS. This permits a wide range of applications since the back telemetry feature can sample and measure any external voltage within its amplitude and frequency range and provide 6 bit resolution. Any external device which can generate an appropriate voltage related to its function can utilize this feature.

Moreover, with the ICS as previously described with respect to FIG. **4**, the output electrode pairs for the separate

34

channels of the ICS are simultaneously available to power another implanted device or stimulate tissue and to sense variable voltage conditions therebetween.

In view of the foregoing and other additions and changes which may be made in the illustrated embodiments, the present invention is to be limited in scope only by the terms of the following claims.

We claim:

1. A cochlea stimulation system, comprising:

audio signal receiving means, including a headpiece coupled to a signal and energy coupling means, the headpiece having transmitting and receiving means and means for transferring data through the signal and energy coupling means at one frequency for data that originates from an implanted cochlea stimulator (ICS) and is sent to an externally wearable signal processor (WP); and at another frequency data and energy originate from the WP and are sent to the ICS;

said WP receives and processes audio signals received by the audio signal receiving means and includes means for generating data indicative of the audio signal;

means for transmitting the data to the ICS, the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the processor and for generating ICS status indicating signals,

means in the ICS for transmitting such ICS status indicating signals to the WP; and

means in the WP for receiving and processing the ICS status indicating signals.

2. The system of claim **1** wherein the means in the headpiece comprises tuned inductive capacitive filters.

3. The system of claim **1** including means for electrostatically shielding the coils in the headpiece and ICS so that only magnetic coupling occurs.

4. The system of claim **1** wherein stimulation signals are pulses and further including means in the processor for selectively controlling the pulse width of the stimulation signals.

5. The system of claim **1** further including means in the processor for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes.

6. A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation pulses and for controlling the pulse width of the stimulation pulses,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation pulses,

means in the ICS responsive to data from the WP for selectively monitoring at least one of the electrodes

5,938,691

35

or voltages in the ICS and for generating ICS-status-indicating signals, and

means in the ICS for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

**7.** The system of claim **6** further including

means for transmitting power signals from the WP to the ICS,

means in the ICS for processing the power signals and for generating power for the ICS, and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

**8.** The system of claim **7** further including means in the ICS and responsive to the power signals for generating a plurality of voltages for powering different components in the ICS.

**9.** A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

a processor for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means for selectively controlling the frequency at which stimulating signals are applied to selected ones of the electrodes,

means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals,

means for transmitting such ICS-status-indicating signals to the WP; and

means in the WP for receiving and processing the ICS-status-indicating signals.

**10.** The system of claim **9** further including means for isolating electrical signals on any pair of electrodes independent of electrical signals on any other pair of electrodes.

**11.** The system of claim **9** further including in the ICS means for selectively generating analog and pulsatile stimulating signals.

**12.** The system of claim **9** further including in the ICS means for selectively stimulating the electrodes as either unipolar or bipolar electrodes.

**13.** The system of claim **9** further including means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

36

**14.** A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signal received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including:

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the ICS and for generating ICS-status-indicating signals therefrom, and

means for transmitting such ICS status indicating signals to the WP;

means in the WP for receiving and processing the ICS status indicating signals;

means for transmitting power signals from the WP to the ICS;

means in the ICS for processing the power signals and generating power for the processor; and

means in the WP responsive to at least a portion of the status indicating signals for controlling the power level of transmissions to the ICS.

**15.** A cochlea stimulation system, comprising:

audio signal receiving means;

an externally wearable signal processor (WP) for receiving and processing the audio signals received by the audio signal receiving means and including means for generating data indicative of the audio signal;

means for transmitting the data to an implanted cochlea stimulator (ICS), the ICS including

means for receiving transmissions from the WP,

processor means for processing such transmissions to generate stimulation signals,

a plurality of electrically isolated capacitor-coupled cochlea stimulating electrodes for receiving the stimulation signals,

means responsive to data from the WP for selectively monitoring at least one of the electrodes or voltages in the processor and for generating ICS-status-indicating signals, and

means for transmitting such ICS status indicating signals to the WP;

means in the WP for receiving and processing the ICS-status-indicating signals; and

means for powering down the ICS when audio signals are not received by the WP and for rapidly powering up the ICS in response to the reception of audio signals at the WP.

\*   \*   \*   \*   \*

US005938691C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (10472nd)

# United States Patent
### Schulman et al.

(10) **Number:**  **US 5,938,691 C1**

(45) **Certificate Issued:**  **Jan. 13, 2015**

(54) **MULTICHANNEL IMPLANTABLE COCHLEAR STIMULATOR**

(75) Inventors: **Joseph H. Schulman**, Santa Clarita, CA (US); **John C. Gord**, Venice, CA (US); **Primoz Strojnik**, Granada Hills, CA (US); **David I. Whitmoyer**, Los Angeles, CA (US); **James H. Wolfe**, Canyon County, CA (US)

(73) Assignee: **Alfred E. Mann Foundation for Scientific Research**, Sylmar, CA (US)

**Reexamination Request:**
No. 90/013,294, Jul. 9, 2014

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | 5,938,691 |
| Issued: | Aug. 17, 1999 |
| Appl. No.: | 09/103,264 |
| Filed: | Jun. 23, 1998 |

**Related U.S. Application Data**

(60) Division of application No. 08/450,041, filed on May 25, 1995, now Pat. No. 5,776,172, which is a continuation of application No. 08/322,065, filed on Oct. 12, 1994, now Pat. No. 5,531,774, which is a continuation-in-part of application No. 08/023,584, filed on Feb. 26, 1993, now Pat. No. 5,603,726, which is a continuation of application No. 07/752,069, filed on Aug. 29, 1991, now abandoned, which is a continuation-in-part of application No. 07/411,563, filed on Sep. 22, 1989, now abandoned.

(51) **Int. Cl.**
| | |
|---|---|
| *A61N 1/36* | (2006.01) |
| *A61F 2/18* | (2006.01) |
| *H04R 25/00* | (2006.01) |

(52) **U.S. Cl.**
USPC ............................................. **607/57**; 607/55

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,294, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Karin Reichle

(57) **ABSTRACT**

A cochlea stimulation system includes a patient wearable system comprising an externally wearable signal processor (WP) and a headpiece in electronic communication with an implanted cochlear stimulator (ICS). The ICS comprises eight output stages each having two electrically isolated capacitor-coupled electrodes, designated "A" and "B", circuits for monitoring the voltages on these electrodes, and circuits for both transmitting status information to and receiving control information from the WP. Based upon information received from the WP, a processor within the ICS can control both the frequency and the widths of the output stimulation pulses applied to the electrodes and may select which electrodes to monitor. The ICS receives power and data signals telemetrically through the skin from the WP. To save power, the ICS may be "powered down" by the WP based upon the absence of audio information or "powered up" if audio is present. The WP communicates with the headpiece over a co-axial cable using one frequency for transmitting signals and a second different frequency for receiving signals.



US 5,938,691 C1

**1**

**2**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **6-7** is confirmed.

Claims **1-5** and **8-15** were not reexamined.

* * * * *